UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation,

       Plaintiff,

              Case No. 14-CV-748

   v.

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation; and TATA
AMERICA INTERNATIONAL
CORPORATION (dba TCS AMERICA), a
New York Corporation,

       Defendants.

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR EXPEDITED DISCOVERY**

---

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ...................................................................................................1

    A.    The Relevant Parties ................................................................................1

        1.    Epic Systems Corporation.............................................................1

        2.    Kaiser Foundation Hospitals.........................................................2

        3.    TCS ...............................................................................................2

    B.    Access to Epic's UserWeb Portal ...........................................................3

        1.    UserWeb Access For Epic Customers, Such as Kaiser ...............3

        2.    UserWeb Access for Customer Consultants, Including TCS ......4

    C.    TCS Abused Its Kaiser Consulting Relationship to Download More Than 6,000 Epic Files .............................................................................5

        1.    TCS Employee Ramesh Gajaram Lied to Gain Customer-level Epic UserWeb Access ....................................................6

        2.    Mr. Gajaram Shared His Login Credentials, Resulting in Thousands of Downloads of Epic Files Worldwide ...................6

        3.    TCS Manager Phillipe Guionnet Learns of the Wrongdoing, Reports it to TCS Executives, and is Told to Ignore It ...............7

        4.    TCS Used Stolen Epic Data to Develop and Enhance its Competing Med Mantra Software ...............................................8

        5.    Mr. Gajaram Admitted His Wrongdoing ......................................8

    D.    The Stolen Data Contain Sensitive Business and Technical Information Epic Developed Over Decades ...............................................9

    E.    Epic Files This Civil Action ..................................................................10

III.    ARGUMENT.....................................................................................................10

    A.    The "Good Cause" Standard Should Apply to Epic's Request .............10

i

B.     Good Cause Exists to Permit Expedited Discovery..................................................11

     1.     Epic Requires Expedited Discovery to Determine Whether it Will File for Preliminary Injunctive Relief.........................................................11

     2.     The Discovery Epic Seeks is Narrowly Tailored to a Specific Issue ........12

     3.     The Purpose of Epic's Discovery Favors Granting The Request ..............14

     4.     Any Burden on Defendants is Not Excessive and is Self-Inflicted ..........14

     5.     The Expedited Discovery Will Be Served Only a Short Time Before What is Allowed Under the Typical Case Schedule ......................15

C.     The Stringent *Notaro* Standard Does Not Apply Here ..........................................15

IV.     CONCLUSION...................................................................................................................18

## I.      INTRODUCTION

Epic's computer network was wrongfully accessed, with more than six thousand files related to its premier software products misappropriated and sent to a competing software firm based in India.  Although Epic has worked hard to uncover what was stolen, the identity of the thieves, and where its sensitive documents and information were sent—and has determined that the two Defendants in this case are at the heart of the misconduct outlined in the Complaint— Epic needs help from this Court to learn more about the injuries it has suffered at the hands of the Defendants and perhaps others.  Limited expedited discovery will help Epic and the Court obtain a more fulsome understanding of the Defendants' misconduct, whether other parties were involved, how the thousands of stolen files are being used, and what precise steps Epic and this Court should take to fairly and fully stop the wrongdoers from further irreparably harming Epic.

## II.     BACKGROUND

### A.      The Relevant Parties.

#### 1.      Epic Systems Corporation.

Epic Systems Corporation ("Epic") develops and markets industry-leading medical software used by hospitals, medical groups, and other healthcare organizations.  Martin Decl., ¶ 2.  Epic's software products are regarded as high quality and specialized for individual customer needs.  *Id.*  Epic's suite of software products includes options such as EpicCare, which organizes patient information and guides coordinated care across healthcare settings, as well as Epic's Cadence Enterprises Scheduling and Resolute Professional Billing systems.  Ex. A.[1]

Epic communicates frequently with customers who use its products so the company can continually improve and individualize its healthcare record management systems.  Martin Decl.,

---

[1]  Citations to Exhibits refer to Exhibits A-L attached to the Declaration of Nick G. Saros filed concurrently herewith.

¶ 2. One way Epic supports its customers' many individualized software applications is by providing them access to a confidential, secure area of Epic's computer network called the UserWeb. *Id.*, ¶ 3. The UserWeb contains certain product specifications, updates, training manuals, and other materials that were created to support Epic customers with their implementation and maintenance of Epic software. *Id.*

### 2. Kaiser Foundation Hospitals.

Kaiser Foundation Hospitals ("Kaiser") is a large health care provider involved in all aspects of patient care and health plan administration. Kaiser operates dozens of hospitals and hundreds of medical offices in nine states. Ex. B. Kaiser is the largest managed care provider in the United States. *Id.* Kaiser is a substantial Epic customer and utilizes a number of Epic software products in its various medical facilities. Martin Decl., ¶ 3.

Kaiser is not a party to this litigation. As explained in more detail below, Kaiser is nevertheless at the center of the case because it contracted with one or more TCS organizations to provide software management and consultancy services for Kaiser's sophisticated web of computer networks and programs. Epic does not yet know the specifics of Kaiser's relationship with TCS. It is through the TCS-Kaiser relationship, and the Kaiser computer system, that TCS personnel wrongfully accessed Epic's UserWeb and misappropriated thousands of Epic files.

### 3. TCS.

Tata Consultancy Services Limited ("TCS India") is an information technology services and consulting company headquartered in Mumbai, India. Ex. C. TCS India is part of the Tata group, India's largest industrial conglomerate, and claims to have more than 285,000 consultants worldwide. *Id.* Tata America International Corporation (dba "TCS America") is a subsidiary of TCS India. Ex. D (TCS website listing Tata America International Corporation as a subsidiary).

TCS India and TCS America appear to act as one entity, sharing a website, leadership, office locations, email address protocol, and likely network servers, and are thus collectively referred to herein as TCS.  Ex. E (showing common address for TCS India and TCS America); Exs. C & F (showing @tcs.com email address for both entities); Exs. F & G (showing www.tcs.com used for both entities).  TCS is one of the largest providers of technology support and consultancy services in the world.  Ex. C.  Besides its information technology consulting business, TCS has also developed its own medical software programs.  Ex. G.  One of TCS's leading software products is called Med Mantra.  *Id.*  Med Mantra is a hospital management software solution with both electronic medical record and business analytics functionalities.  *Id.*  Med Mantra's capabilities position the product as a direct competitor to Epic's software.

> **B.**      **Access to Epic's UserWeb Portal.**

Epic provides its customers with controlled access to the UserWeb in order to support their implementation and maintenance of Epic's software products.  Martin Decl., ¶ 3.  Because Epic's customers often hire third-party software analysts and test engineers to assist in the configuration and operation of their network, Epic has created a tiered access protocol.  Epic provides broad UserWeb access to its customers' employees while permitting more limited access, subject to confidentiality promises and other restrictions, to consultants who are supporting Epic's customers.  *Id.*, ¶¶ 3, 6.

> **1.**      **UserWeb Access For Epic Customers, Such as Kaiser.**

Kaiser employees receive customer-level access to Epic's UserWeb.  When registering for access to UserWeb, each Kaiser employee must complete a registration form and in that process affirmatively identify himself or herself as a Kaiser employee.  Martin Decl., ¶ 7.  After the registration process is complete, the Kaiser employee is granted network access through a username and password, and has the ability to use the many resources on the UserWeb to

customize and manage licensed Epic products. *Id.*, ¶¶ 3, 6. For example, the employee may download product brochures, software updates, product specifications, technical repair information, patches, and other electronic files containing detailed information about Epic's products. *Id.*, ¶ 3.

The conduct of the Kaiser personnel who access Epic's UserWeb is governed by a written agreement between Epic and Kaiser. Martin Decl., ¶ 4 That contract contains, among other things, provisions requiring Kaiser to protect Epic's confidential information. For instance, Kaiser must hold Epic's confidential information in strict confidence and limit dissemination to those who have a "need to know" such information to fulfill the agreement, such as managing the licensed software. *Id.* The UserWeb has functioned for many years as a confidential but valuable source for Epic's many software customers.

### 2.      UserWeb Access for Customer Consultants, Including TCS.

Epic maintains a tighter leash on UserWeb access for consultants who are working for Epic customers. First, consultants are required to disclose their consultant status on the UserWeb registration form. Martin Decl., ¶ 7. Once identified as a consultant, rather than the employee of an Epic customer, each consultant must complete a UserWeb Access Agreement before an account will be considered for approval, and authorization to Epic's UserWeb is granted to the consultant. *Id.*

Under the terms of the UserWeb Access Agreement, in addition to each consultant's individual promises, consultants are not eligible to obtain access to the UserWeb until their consulting firm has also entered a Consultant Access Agreement with Epic. Martin Decl., ¶ 5. The specifics of the Consultant Access Agreement are designed to limit the Consultant's use of information, and protect Epic from any improper use or disclosure. *Id.*

4

On August 10, 2005, Epic and TCS America entered a Standard Consultant Agreement (the "TCS Agreement") whereby Epic agreed to allow TCS America personnel access to Epic's training programs and information for purposes of providing consulting services to Epic's customers related to the implementation of Epic software.  Ex. H.  The agreement was called for and signed in the context of TCS supplying certain consultancy services to Kaiser.  *Id.*  The TCS Agreement includes a host of restrictions limiting TCS's use of Epic's information and restricting access to TCS employees working on competing software.  Specifically, the TCS Agreement requires that TCS do the following, among other things:

Use Epic confidential information "only for the purpose of implementing the Program Property on an Epic customer's behalf," where "Program Property" is the computer code and documentation for Epic's computer programs [Ex. H, §§ 3(c)(ii), 1(d)];

Limit TCS's access to Epic's information "to those of Your employees who must have access to the Program Property in order to implement the Program Property on Epic's or its customer's behalf" [*Id.* § 3(c)(iii)];

Not permit any employee while in Your employment who has had access to the Program Property or any Confidential information relating to the Program Property to participate in any development, enhancement or design of, or to consult, directly or indirectly, with any person concerning any development, enhancement or design of, any software that competes with or is being developed to compete with the Epic program Property …" [*Id.* § 3(c)(vii)];

Not "grant access to or allow any third party (including the Consulting Firm and any other employees of the Consulting Firm) to use the password issued to You to gain access to the UserWeb" [*Id.* § 3(a)]; and

"Not use the Confidential Information for any purpose other than performance of the [consulting] Project" [*Id.* § 3(b)].

**C.      TCS Abused Its Kaiser Consulting Relationship to Download More Than 6,000 Epic Files.**

A few months ago, Epic learned from a whistleblower that certain TCS employees were fraudulently accessing Epic's UserWeb to download Epic data, and then using the stolen information in the development of TCS's Med Mantra software.  Martin Decl., ¶ 9; Saros Decl.

5

¶¶ 18, 21-23; MacLeod Decl., ¶ 4.  The whistleblower, corroborated by careful review of Epic's

computer network and interviews of TCS personnel at the Kaiser facility, revealed the story of

economic espionage detailed below.

1.     **TCS Employee Ramesh Gajaram Lied to Gain Customer-level Epic UserWeb Access.**

Ramesh Gajaram is a TCS employee who was assigned to work as a consultant for

Kaiser, testing and implementing software at Kaiser facilities in Portland, Oregon.  MacLeod

Decl., ¶¶ 3-5.  Several years ago, Mr. Gajaram enrolled for UserWeb access.  When registering

through the Epic UserWeb interface, Mr. Gajaram should have truthfully identified himself as a

"Consultant" and thus would have been required to take extra steps to complete his registration.

Martin Decl., ¶¶ 7, 10.  As a consultant, Mr. Gajaram would only have been granted certain

restricted access to Epic's UserWeb.  *Id.*, ¶ 6.

Mr. Gajaram did not, however, tell the truth.  He registered as a Kaiser employee instead

of as a consultant even though he knew this representation was not true.  MacLeod Decl., ¶ 8.

By misrepresenting himself as a Kaiser employee, Mr. Gajaram gained access to a broader

universe of documents on UserWeb than he otherwise would have been granted.  Martin Decl., ¶

6.

2.     **Mr. Gajaram Shared His Login Credentials, Resulting in Thousands of Downloads of Epic Files Worldwide.**

After falsely registering with Epic as a Kaiser employee, Mr. Gajaram shared his login

credentials with at least two other TCS employees:  Aswin Kumar Anandhan and Sankari

Gunasekaram.  MacLeod Decl., ¶ 7.  Neither Mr. Anandhan nor Mr. Gunasekaram had registered

with Epic or had authorization of any kind to access Epic's UserWeb.  Martin Decl., ¶ 10.

Neither Mr. Anandhan nor Mr. Gunasekaram had received any permission to take Epic

6

information from UserWeb or any other Epic Network.  *Id.*  Neither Mr. Anandhan nor Mr. Gunasekaram needed the Epic materials to perform their job duties.  MacLeod Decl., ¶ 7.

Epic investigated the login access credentials of all persons associated with Kaiser, and the documents downloaded by those users.  Martin Decl., ¶ 9.  Epic discovered an extraordinary number of downloads from a particular account, which Epic determined to be Mr. Gajaram's account.  Epic determined that Mr. Gajaram's login credentials were used to download over ***6,000*** files form Epic's computer network.  *Id.*  Epic investigated the location of where the downloads occurred using Mr. Gajaram's login credentials by analyzing the IP addresses associated with those downloads.  *Id.*  Numerous IP addresses used to download Epic documents are located in India and registered to TCS.  Ex. I (IP address look-up report showing 125.22.43.12 (used to download documents under Mr. Gajaram's account) registered to TCS at a location in India).

### 3.   TCS Manager Phillipe Guionnet Learns of the Wrongdoing, Reports it to TCS Executives, and is Told to Ignore It.

Phillipe Guionnet is a computer engineer and manager of technology projects.  Ex. J.  He was hired by TCS in 2012 to manage TCS's approximately $40 million software support contract with Kaiser.  *Id.*

In late 2013, Mr. Guionnet came across information that led him to believe that TCS was fraudulently accessing and downloading Epic documents when another TCS employee uncovered the scheme and reported it to Mr. Guionnet.  Saros Decl., ¶ 16.  Mr. Guionnet was also accidentally copied on an email chain evidencing wrongdoing.  *Id.*, ¶ 17.  Mr. Guionnet confirmed through various other methods that the illicit activity was occurring at TCS.  *Id.*

According to Mr. Guionnet, TCS senior executives had complicit knowledge of TCS's scheme to gain unauthorized access to Epic's network and information, and full knowledge of

the unauthorized downloading of Epic data by TCS employees.  Saros Decl., ¶ 19.  In 2013 and

2014, Mr. Guionnet reported TCS's wrongdoing to two leaders at TCS.  *Id.*, ¶ 20.  In response,

one of those leaders told Mr. Guionnet to "let it go" and "drop it."  *Id.*  Mr. Guionnet received a

similarly dismissive response after revealing his suspicions to his immediate supervisor.  *Id.*  Mr.

Guionnet has communicated to Epic that he has documents, including electronic evidence,

supporting his view that Epic information has been stolen and that TCS management were fully

aware of TCS's misconduct with respect to Epic.  *Id.*, ¶ 21.

### 4.    TCS Used Stolen Epic Data to Develop and Enhance its Competing Med Mantra Software.

Based on information from Mr. Guionnet, TCS has been using the stolen Epic data to

develop and enhance TCS's competing Med Mantra software.  Saros Decl., ¶¶ 22-23.  Mr.

Guionnet recently explained that, during a trip to TCS in India in February 2014, he confronted

members of the TCS Med Mantra team regarding enhancements to the product.  *Id.*, ¶ 23.  The

Med Mantra team's response confirmed his suspicions that TCS was incorporating the

improperly-acquired Epic confidential documents into Med Mantra.  *Id.*  Mr. Guionnet also

stated that he has documents in his possession that evidence TCS's misconduct, and the use of

the Epic information to benefit the Med Mantra product.  *Id.*, ¶ 21.  Mr. Guionnet has thus far

refused Epic's request for information on the documents in his possession.  *Id.*

### 5.    Mr. Gajaram Admitted His Wrongdoing.

After determining Mr. Gajaram to be the primary source of TCS's misappropriation and

fraudulent access to the Epic network, a Kaiser investigator interviewed Mr. Gajaram in Oregon.

MacLeod Decl., ¶ 5.  Mr. Gajaram initially denied downloading or saving any Epic documents

from UserWeb, or sharing his login credentials with any other person.  *Id.*, ¶ 6.  Once confronted

with the login and download history for his UserWeb credentials, however, Mr. Gajaram

changed his story.  *Id.*, ¶ 7.  He admitted to downloading Epic documents and to providing his

access credentials to two other TCS employees, Aswin Kumar Anandhan and Sankari

Gunasekaram, even though neither of them required access to UserWeb to perform their jobs.

*Id.*  Mr. Gajaram also acknowledged that he had concealed his consultant status when he first

registered for UserWeb access and that he knew that doing so was wrong.  *Id.*, ¶ 8.

      **D.     The Stolen Data Contain Sensitive Business and Technical Information Epic**
             **Developed Over Decades.**

      The files downloaded from Epic utilizing Mr. Gajaram's account contain confidential and

trade secret material, which Epic does not want in the hands of a competitor because they can be

used to construct or enhance a competing product to compete with Epic.  Martin Decl., ¶¶ 11-12.

The documents cover subject matters such as the operation of Epic software and database

systems, programming rules and processes to optimize the software functionality, and documents

that decode the operation of Epic's source code that would otherwise be unusable to those

outside of Epic.  *Id.*, ¶ 11.  Other documents include rules related to information collection,

methods for limiting access to patient records, and procedures for processes for converting

customer data utilized in Epic's software.  *Id.*  The documents detail decades of work by Epic

software engineers, and are highly sensitive.  *Id.*, ¶¶ 11-12.  The great majority of these

documents were not required for TCS employees to perform their job functions in support of

Kaiser.  *Id.*, ¶ 11.

      Though Epic has been able to determine which files were accessed and taken by TCS

personnel, and in some cases where those personnel were located, Epic is not able to determine

with certainty what TCS has done with the stolen data.  Epic has no access to TCS's Med Mantra

product, including prior versions, recent improvements, or documents (such as TCS email or data

logs) regarding the dissemination and use of Epic information.  Epic also does not know which

other TCS or Tata companies may have received Epic's confidential and trade secret information, and whether evidence related to TCS's wrongdoing is at risk of destruction in light of the filing of this civil litigation matter.

**E.      Epic Files This Civil Action.**

On October 31, 2014, Epic filed this action against Defendants for Injunctive Relief and Damages.  Epic alleges violations of the Computer Fraud and Abuse Act, Trade Secret Misappropriation, Breach of Contract, and various other state law claims related to TCS's theft of documents and information from Epic.  Epic is contemplating a motion for a preliminary injunction to prevent TCS (and any other entity that has wrongfully misappropriated Epic's information) from misusing Epic's information to obtain a competitive advantage over Epic, but first seeks immediate discovery to determine the extent of TCS's wrongdoing and the proper scope of interim relief.

**III.    ARGUMENT**

**A.      The "Good Cause" Standard Should Apply to Epic's Request.**

Courts have "wide discretion [to] manag[e] the discovery process," including by authorizing expedited discovery under Federal Rule of Civil Procedure 26(d)(1).  *Dallas Buyers Club LLC v. Does 1-26*, No. 14-360, 2014 WL 1612251 (E.D. Wis. Apr. 22, 2014) (citation omitted) (granting request to serve discovery before Rule 26(f) conference; Fed. R. Civ. P. 26(d)(1) (discovery may commence when authorized "by court order").

The majority of courts in this Circuit and elsewhere evaluate expedited discovery requests based on "the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances."  *Dallas Buyers Club LLC*, 2014 WL 1612251, at *1 (quoting *Merrill Lynch v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill. 2000)); *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill. 2011) ("District courts within the Seventh Circuit

10

have applied [this] approach, as have many other district courts.").  "This amounts to a requirement that the movant show good cause for the request."  *Id.*; *see also St. Louis Group, Inc. v. Metals and Additives Corp., Inc*., 275 F.R.D. 236, 239 (S.D. Tex. 2011) ("An increasing majority of district courts have . . . adopted a 'good cause' standard to determine whether to authorize expedited discovery").

  **B.**  **Good Cause Exists to Permit Expedited Discovery.**

  Factors relevant to the good cause inquiry include "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."  *Suzhou Parson Power Machine Co., Ltd. v. W. Import Mfg. Distribution Grp. Ltd.*, No. 10-398, 2010 WL 2925894, at *1 (E.D. Wis. July 20, 2010).

  Each of the five "good cause" factors favors expedited discovery in this case.  First, although a preliminary injunction is not currently pending, Epic seeks immediate discovery to determine if preliminary injunctive relief is required in this case and, if so, the appropriate scope of that relief.  Second, Epic's proposed discovery is narrowly tailored to determine what TCS has done with Epic's stolen documents.  Third, the discovery is crucial in that it will allow Epic to learn the extent of TCS's use of the stolen documents and to prevent further harm.  Fourth, discovery will commence only a number of weeks before Epic would otherwise serve far broader discovery.  Fifth, any burden on TCS is minimal.  Each factor is discussed in detail below.

  **1.**  **Epic Requires Expedited Discovery to Determine Whether it Will File for Preliminary Injunctive Relief.**

  TCS has stolen a large amount of data regarding Epic's products.  The forensic evidence, such as download and access records, plus the admissions from TCS employee Ramesh Gajaram

(and the whistleblower Mr. Guionnet), prove this fact.  What is not entirely known is the extent to which TCS has used or disclosed Epic's data to enhance its own product or engage in other misconduct.  While Epic has been told that the stolen information has been incorporated into TCS's Med Mantra product, Epic seeks to develop the factual record necessary for preliminary relief by gathering documents and information from TCS, Mr. Gajaram, Mr. Guionnet, and Kaiser.

Courts regularly find good cause to expedite discovery "to allow a plaintiff to determine whether to seek an early injunction."  *NobelBiz, Inc. v. Wesson*, No. 14-0832, 2014 WL 1588715, at *1-2 (S.D. Cal. April 18, 2014); *see also Interserve, Inc. v. Fusion Garage PTE, LTD.*, No. 09-05812, 2010 WL 143665, at *2 (N.D. Cal. Jan. 7, 2010) (finding good cause for expedited discovery that "will allow plaintiff to determine whether to seek an early injunction"); *Tracfone Wireless, Inc. v. King Trading, Inc.*, No. 08-0398, 2008 WL 918243, *1 (N.D. Tex March 13, 2008) (granting a request for expedited discovery "necessary to enable plaintiff to determine the nature and extent of defendants' alleged counterfeiting activities so it can decide whether to seek preliminary injunctive relief"); *Light Salt Invs., LP v. Fisher*, 2013 WL 3205918, at *2 (S.D. Cal. June 24, 2013) (finding good cause exists when discovery "crucial" to plaintiff's anticipated preliminary injunction motion).  The same rationale applies here.

## 2. The Discovery Epic Seeks is Narrowly Tailored to a Specific Issue.

Narrowly tailored requests weigh in favor of allowing expedited discovery.  *See Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 457 (D.S.D. 2014) (granting request for expedited discovery where "[t]he court finds plaintiffs' request is narrowly tailored and not overly broad"); *Ellsworth Associates, Inc. v. U.S.*, 917 F. Supp. 841, 844 (D.D.C. 1996) (same).  Here, Epic has carefully winnowed down the discovery that it would like to take to just four depositions and a small number of document requests.

<u>Depositions.</u>  Epic requests permission to depose Ramesh Gajaram, Aswin Kumar Anandhan, and Sankari Gunasekaram.  Each of these three TCS employees was directly involved in the theft of information from Epic.  Martin Decl., ¶¶ 9-10; MacLeod Decl., ¶ 7.  Mr. Gajaram provided his login credentials to Mssrs. Anandhan and Gunasekaram, and those credentials were used to download over 6,000 files.  Martin Decl., ¶ 9.  They are likely the best source of information about the misconduct.  They may also have information regarding how Epic's confidential information has been used or disclosed since it was taken from Epic and delivered to TCS personnel in India and other places around the world.

Epic also seeks to depose Phillipe Guionnet, the whistleblower who alerted Epic to TCS's misconduct.  Mr. Guionnet has stated that he has detailed information regarding TCS's misconduct, including the original theft as well as the subsequent use of Epic information.  Epic would also request that Mr. Guionnet bring to the deposition certain written and electronic evidence in his possession that he told Epic evidences his statements regarding TCS's misconduct, management knowledge of the misconduct, and the use of Epic information to enhance the Med Mantra product.  Saros Decl., ¶¶ 22-23.  A copy of the proposed subpoena is attached hereto as Exhibit L.  Mr. Guionnet is a key witness in this matter and his testimony is likely very important to determine the extent of the ongoing harm and the likelihood of potential future harm.

<u>Document Requests.</u>  Epic also respectfully requests permission to serve a limited number of document requests on the TCS entities.  A copy of the proposed requests is attached hereto as Exhibit K.  The nine document requests to TCS are limited to TCS's downloading, storage, dissemination, and use of the documents it stole from Epic.  This would include identification of those persons that accessed or reviewed the stolen information, and documents

showing how that information was used to design or improve Med Mantra, such as comparisons of Med Mantra to certain features of Epic products revealed in the stolen documents.  This information is solely in TCS's control and is not available from any other source.  Epic also seeks permissions to serve a subpoena on Kaiser seeking documents related to the TCS consultants accessing Epic's UserWeb as well as Kaiser's investigation of TCS's misconduct.

That is the only discovery Epic requests at this time.  Epic is not asking to do all discovery in an expedited manner—just to start a few narrow depositions and serve document requests regarding conduct relevant to a potential motion for a preliminary injunction.

### 3.     The Purpose of Epic's Discovery Favors Granting The Request.

The limited discovery requested by Epic will allow Epic to determine the extent to which TCS has misused the documents and information it stole from Epic, and confirm that the harm caused by the theft is continuing and irreparable.  To prevent or limit the harm caused by TCS, Epic cannot wait for the standard discovery period to begin—such a delay will only further allow TCS to misuse Epic's trade secrets and confidential information, and perhaps destroy evidence of its misconduct.  Thus, the purpose of this request justifies granting the Motion.

### 4.     Any Burden on Defendants is Not Excessive and is Self-Inflicted.

Epic's document requests are specifically targeted to the information required for Epic to immediately determine (and ultimately prevent) the harm caused by TCS's actions.  While any document collection imposes some burden, the burden here does not warrant denying Epic's request.  *See Oglala Sioux Tribe*, 298 F.R.D. at 458 (granting request for expedited discovery and noting that "while the request may be time consuming, it is not overly burdensome"); *State of New York v. Mountain Tobacco Co.*, 953 F. Supp. 2d 385, 392-93 (E.D.N.Y. 2013) (permitting expedited requests that were "broad in scope" but "narrowly tailored to the [relevant time] period" and the relevant issue).

14

Indeed, TCS will have to collect the requested documents whether or not expedited discovery is granted.  The burden is largely the same, only on a shorter time schedule.  *See Kone Corporation v. Thyssenkrupp USA, Inc.*, No. 11-465, 2011 WL 4478477, at *7 (D. Del. Sept. 26, 2011) (granting motion for expedited discovery where discovery "will not be wasteful, because much of the information at issue will likely have been turned over anyway by Defendants soon after a Rule 16 conference").  In any event, the cause of any alleged burden here falls on TCS through its bad acts.

### 5.    The Expedited Discovery Will Be Served Only a Short Time Before What is Allowed Under the Typical Case Schedule.

If the Court grants this Motion, Epic's discovery will be served only a matter of weeks or a few months (depending on the service date and the scheduling of the Rule 26(f) conference) before it would otherwise be served under the Court's typical schedule.  While those few weeks are not significant to TCS, they are very significant to Epic.  During those weeks, Epic will continue to be harmed by TCS's misuse of the information it stole from Epic.  Courts have routinely held that a short time frame between the expedited discovery request and when discovery may otherwise be served favors granting Epic's request.  *See, e.g., First Option Mortg., LLC v. Tabbert*, No. 12-00600, 2012 WL 1669430, at *4 (D. Nev. May 11, 2012) (fifth factor weighs in favor of expedited discovery where "the court is permitting discovery to commence only a short period in advance of the time typical discovery would begin").

### C.    The Stringent *Notaro* Standard Does Not Apply Here.

 While the "good cause" standard is the norm, some courts in this circuit and elsewhere have evaluated expedited discovery requests under the more stringent standard set forth in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982); *St. Louis Group*, 275 F.R.D. at 239 (calling *Notaro* the "minority approach").  *Notaro* "mirrors" the preliminary injunction standard, which

requires a showing of irreparable injury. *Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 259 F.R.D. 358, 386 (E.D. Wis. 2009).

The *Notaro* standard is particularly inapt in this case. It frustrates the purpose of Epic's request, which is to seek evidence regarding the irreparable harm caused by TCS, by requiring that Epic prove irreparable harm at the outset without any discovery on that very subject. *Notaro* puts the proverbial cart before the horse, and for this reason has been rejected by a growing number of courts as discussed below.

*First*, numerous courts have explicitly rejected *Notaro* where expedited discovery is sought in relation to a preliminary injunction motion, as is the case here. Courts reason that "it does not make sense to use preliminary injunction analysis factors to determine the propriety of an expedited discovery request" when the discovery itself is sought to justify injunctive relief. *Merrill Lynch*, 194 F.R.D. at 624; *see also Mountain Tobacco Co.*, 953 F. Supp. 2d at 392 (same); *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326-27 (S.D.N.Y. 2005) (same). As stated succinctly in *Kone Corporation v. Thyssenkrupp USA, Inc.*, "[u]nder a *Notaro*-style analysis, a movant would have to paradoxically demonstrate a 'probability of success' on the merits of infringement to justify discovery—discovery that is presumably needed in order to help make a showing of the same type of 'likelihood of success' at a later preliminary injunction hearing." 2011 WL 4478477, *6. Though other non-binding precedent inexplicably ignores this sound rationale by applying the *Notaro* standard to motions for expedited discovery based solely on the "lack of a pending motion for a preliminary injunction," *see, e.g., Centrifugal Acquisition Corp., Inc. v. Moon*, No. 09-327, 2009 WL 1249294 (E.D. Wis. May 6, 2009), no logical justification exists for limiting the "good cause" standard to such cases, and this Court should reject that unsound precedent.

*Second*, other courts have held that *Notaro* should be limited to its unique facts, which involved an opposition political party's proposed expedited deposition of candidate-for-Governor Edward Koch.  *Notaro*, 95 F.R.D. at 404.  As articulated by the court in *Kone*, "[t]he *Notaro* Court's decision was [] affected by the atypical purpose behind the deposition, which it found would be tantamount to an 'inquisition of counsel for an opposition political party without sufficient advance notice, [where] the possibility of an incidental embarrassment is great.'"  No. 11-465, 2011 WL 4478477, at *5 (D. Del. Sept. 26, 2011); *Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 624 (N.D. Ill. 2000) (distinguishing *Notaro* because the plaintiffs there "sought expedited discovery *in lieu of* a preliminary injunction hearing").

*Third*, some courts have rejected *Notaro* as "inconsistent not only with Rule 26(d)"—which requires courts to consider "the interests of justice" in resolving discovery motions—but also with "the wide discretion normally accorded the trial court in managing discovery." *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002); *cf. Sheridan v. Oak Street Mortgage, LLC*, 244 F.R.D. 520, (E.D. Wis. 2007) (rejecting *Notaro* and holding that the "'good cause' standard . . . is a workable and practical standard" that accords with the court's discretion).

These sound rationales counsel against using the *Notaro* standard here.  Most significantly, Epic seeks discovery to determine whether a preliminary injunction is warranted. Applying *Notaro* would require Epic to "paradoxically demonstrate" its entitlement to injunctive relief in order to obtain the necessary discovery needed to prove its entitlement to such relief. *Kone Corporation*, 2011 WL 4478477, *6.  Further, the *Notaro* standard is inapposite to the Court's discretion to manage the discovery process, and this case does not involve the unique factual scenario of political volatility that guided the *Notaro* court's development of the stringent

17

standard in the first place.  Notably, other courts have held that the good cause standard should apply in similar situations, *see, e.g., NobelBiz*, 2014 WL 1588715, at *1-2, and this case is no different.

## IV.    CONCLUSION

For the reasons set forth above, Epic respectfully requests that the Court grant its motion for expedited discovery and permit Epic to serve certain limited expedited discovery so that Epic and the Court can fairly and accurately evaluate the scope of any preliminary injunctive relief to prevent further irreparable harm to flow from TCS' misconduct.

Dated:  November 6, 2014

*/s/ Nick G. Saros*

Brent Caslin
bcaslin@jenner.com
Nick G. Saros
nsaros@jenner.com
Kate T. Spelman
kspelman@jenner.com
JENNER & BLOCK LLP
633 West 5th Street Suite 2600
Los Angeles, CA 90066
Tel:  213-239-5100
Fax:  213-230-5199

Anthony A. Tomaselli
aat@quarles.com
Kristin G. Noel
kristin.noel@quarles.com
Stacy A. Alexejun
stacy.alexejun@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: 608.251.5000
Fax: 608.251.9166

*Attorneys for Plaintiff Epic Systems Corporation*