# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation;

                       Plaintiff,

        v.

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation;
and TATA AMERICA INTERNATIONAL
CORPORATION (dba TATA AMERICA), a
New York Corporation;

                       Defendants.

Case No. 14-CV-748

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' PARTIAL MOTION TO DISMISS

Philip D. Robben
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178

David W. Long
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street NW
Washington, D.C. 20007

Barbara A. Neider
Meg Vergeront
STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784

*Attorneys for Defendants Tata Consultancy
Services Limited and Tata America
International Corporation*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF FACTS ...................................................................................................... 3

STANDARD OF REVIEW .................................................................................................. 11

ARGUMENT ...................................................................................................................... 12

I.    EPIC FAILS TO PLEAD A CLAIM UNDER
      THE COMPUTER FRAUD AND ABUSE ACT ........................................................ 12

      A.    The CFAA Does Not Apply To The Conduct Alleged In The Complaint .......... 12

      B.    Epic Does Not Plead Damage or Loss ................................................................ 14

      C.    Epic's Claim That TCS Was Not Authorized
            To Access The Documents At Issue Is Implausible ......................................... 17

      D.    Epic Does Not Plead Fraud With Particularity As Required By Rule 9(b) ........ 20

II.   EPIC FAILS TO PLEAD A CLAIM UNDER THE COMPUTER CRIMES ACT ....... 21

III.  EPIC FAILS TO PLEAD A CLAIM FOR
      MISAPPROPRIATION OF TRADE SECRETS ...................................................... 22

      A.    Epic Does Not Sufficiently Allege Misappropriation ........................................ 22

      B.    Epic Does Not Sufficiently Allege That TCS Accessed Any Trade Secrets ....... 25

IV.   EPIC FAILS TO PLEAD A BREACH OF THE
      COVENANT OF GOOD FAITH AND FAIR DEALING ........................................... 28

V.    SEVERAL OF EPIC'S CLAIMS ARE PREEMPTED BY
      THE UTSA ............................................................................................................... 29

VI.   EPIC DOES NOT PLEAD CLAIMS FOR FRAUD
      OR MISREPRESENTATION WITH PARTICULARITY ......................................... 31

      A.    Epic's Sixth Cause of Action Fails To State A Claim ....................................... 32

      B.    Epic's Seventh Cause of Action Fails To State A Claim .................................. 33

VII.  EPIC FAILS TO STATE A CLAIM FOR CONVERSION ....................................... 33

CONCLUSION ................................................................................................................... 35

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander Interactive, Inc. v. Leisure Pro Ltd.,*
No. 14-CV-2796 PKC, 2014 WL 4651942 (S.D.N.Y. Sept. 16, 2014)...................................27

*Alliance Laundry Sys. LLC v. Eaton Corp.,*
No. 13-CV-687-JPS, 2013 WL 5719011 (E.D. Wis. Oct. 21, 2013).......................................29

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ..............................................................................3, 11

*Associated Banc-Corp v. John H. Harland Co.,*
No. 06-C-1097, 2007 WL 128337 (E.D. Wis. Jan. 11, 2007) .................................................29

*Baden Sports, Inc. v. Wilson Sporting Goods Co.,*
No. C11-0603-MJP, 2011 WL 3158607 (W.D. Wash. July 26, 2011)....................................27

*Batt v. Sweeney,* 2002 WI App 119, 254 Wis.2d 721, 647 N.W.2d 868 (Ct. App.).....................31

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................................... *passim*

*Brownmark Films, LLC v. Comedy Partners,*
800 F. Supp. 2d 991 (E.D. Wis. 2011)......................................................................................6

*Bruner v. Heritage Companies,*
225 Wis. 2d 728, 593 N.W.2d 814 (Ct. App. 1999) ..............................................................34

*Burbank Grease Servs., LLC v. Sokolowski,*
294 Wis. 2d 274, 717 N.W.2d 781 (Wis. 2006) ...............................................................21, 30

*CardioNet, Inc. v. LifeWatch Corp.,*
No. CIV.A. 07C6625, 2008 WL 567223 (N.D. Ill. Feb. 27, 2008) .......................................30

*Cassetica Software, Inc. v. Computer Sciences Corp.,*
No. 09 C 0003, 2009 WL 1703015 (N.D. Ill. June 18, 2009) ...........................................16, 17

*Data Key Partners v. Permira Advisers LLC,*
356 Wis. 2d 665, 849 N.W.2d 693 (Wis. 2014) ....................................................................25

*ECT Int'l, Inc. v. Zwerlein,*
228 Wis. 2d 343, 597 N.W.2d 479 (Ct. App. 1999) ........................................................25, 27

*Fail-Safe LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 831 (E.D. Wis. 2010) ................................27

*First Fin. Bank, N.A. v. Bauknecht,*
No. 12-CV-1509, 2014 WL 5421241 (C.D. Ill. Oct. 24, 2014).......................................16, 30

*Garelli Wong & Associates, Inc. v. Nichols*,
  551 F. Supp. 2d 704 (N.D. Ill. 2008) ............................................................................13, 15

*Gilson v. Rainin Instrument, LLC*,
  No. 04-C-852-S, 2005 WL 955251 (W.D. Wis. Apr. 25, 2005).........................................28

*Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392 (7th Cir. 2011)........................................32

*Ice Bowl, L.L.C. v. Weigel Broad. Co.*,
  14 F. Supp. 2d 1080, 1082 (E.D. Wis. 1998).............................................................32, 33

*Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006)........................................12

*Kluber Skahan & Associates, Inc. v. Cordogen, Clark & Assoc., Inc.*,
  No. 08-CV-1529, 2009 WL 466812 (N.D. Ill. Feb. 25, 2009) ........................................12

*Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990 (E.D. Wis. 2010) .........................13

*Lands' End, Inc. v. Genesys Software Sys., Inc.*,
  No. 13-CV-38-BBC, 2014 WL 266630 (W.D. Wis. Jan. 24, 2014)................................27, 34

*Liturgical Publications, Inc. v. Karides*,
  2006 WI App 101, 293 Wis. 2d 361, 715 N.W.2d 240 (Ct. App.) ........................................21

*Maryland Staffing Servs., Inc. v. Manpower, Inc.*,
  936 F. Supp. 1494 (E.D. Wis. 1996).............................................................................34

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) ........................................3, 11

*Meyer v. The Laser Vision Inst.*,
  2006 WI App 70, 290 Wis. 2d 764, 714 N.W.2d 223 (Ct. App.) ........................................30

*Mintel Int'l Grp., Ltd. v. Neergheen*,
  No. 08-CV-3939, 2010 WL 145786 (N.D. Ill. Jan. 12, 2010)....................................15, 16, 17

*Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760 (N.D. Ill. 2009) ............................13, 14, 20

*Muwonge v. Eisenberg*,
  No. 07-C-0733, 2008 WL 753898 (E.D. Wis. Mar. 19, 2008)........................................31

*New S. Equip. Mats, LLC v. Keener*,
  989 F. Supp. 2d 522 (S.D. Miss. 2013).....................................................................13, 30

*nexTUNE, Inc. v. McKinney*,
  No. C12-1974 TSZ, 2013 WL 2403243 (W.D. Wash. May 31, 2013)....................................24

*RxUSA, Inc. v. Capital Returns, Inc.*,
  No. 06-C-00790, 2007 WL 2712958 (E.D. Wis. Sept. 14, 2007).........................................32

*Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*,
    No. CIV.A. 10-1363, 2011 WL 2650028 (W.D. Pa. July 6, 2011) ........................................27

*Share Corp. v. Momar Inc.*,
    No. 10-CV-109, 2011 WL 284273 (E.D. Wis. Jan. 26, 2011) ........................................24, 27

*Third Educ. Grp., Inc. v. Phelps*,
    No. 07-C-1094, 2009 WL 2150686 (E.D. Wis. May 15, 2009) ........................................34

*Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968 (N.D. Ill. 2000) ..........................30

*Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994 (7th Cir. 2014) ...............................11

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) .............................................................6

*Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 677 N.W.2d 233 (Wis.
    2004) ........................................................................................................33

*Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863 (N.D. Ill. 2010) .............................................17

*Worldspan, L.P. v. Orbitz, LLC*,
    No. 05 C 5386, 2006 WL 1069128 (N.D. Ill. Apr. 19, 2006)..................................................19

*Zimmerman v. Logemann*,
    No. 09-CV-210, 2011 WL 1674956 (W.D. Wis. Mar. 17, 2011)...........................................31

## Statutes

18 U.S.C. § 1030 ................................................................................................ *passim*

Wis. Stat. Ann. § 134.01 ........................................................................................29

Wis. Stat. Ann. § 134.90 ..................................................................................... *passim*

Wis. Stat. Ann. § 895.446 .......................................................................................29

Wis. Stat. Ann. § 943.70 .........................................................................................21

## Other Authorities

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..........................................................................................3, 11

## PRELIMINARY STATEMENT

Defendant Tata America International Corporation ("Tata America") was hired as a consultant by Kaiser Foundation Hospitals ("Kaiser"), in order to help Kaiser implement software created by Plaintiff Epic Systems Corporation ("Epic").  Defendant Tata Consultancy Services Limited ("TCS Limited", together with Tata America, "TCS") provided services in support of Tata America's consultant work for Kaiser.  In connection with this work, Epic alleges that Epic and Tata America entered into a standard consulting agreement that, on its face, provides broad access to Epic's information, including Epic's confidential information, and has restrictions regarding TCS's use of Epic's information.  This included access to a web portal maintained by Epic called UserWeb, which contains training, support, and other information regarding Epic's software, including details on the features and configuration of the software.

Epic sues under the agreement in this action.  However, instead of asserting a simple breach of contract claim for TCS's alleged access and improper use of Epic's information, Epic concocted a 28-page Complaint, which includes 11 additional statutory and tort causes of action in addition to Epic's breach of contract claim. These include claims pursuant to the Computer Fraud and Abuse Act, the Wisconsin Computer Crimes Act, the Uniform Trade Secrets Act, breach of the covenant of good faith and fair dealing, fraud, misrepresentation, conversion, unfair competition, injury to business, property damage caused by a crime, and unjust enrichment.

All of Epic's surplus claims are based on the same allegedly wrongful conduct: that TCS has used the information allegedly downloaded from UserWeb in the development of a competing software called Med Mantra. However, Epic does not allege any facts to demonstrate that Med Mantra is in fact a competing product.  Nor does Epic allege any facts regarding how

even a single piece of the information allegedly accessed by TCS — much of which Epic contends is "decades" old — has been, or could be, used in connection with TCS's own product. Such allegations of fact are all the more important since Epic, by its own admission, routinely allows its competitors to access its allegedly confidential, proprietary, and trade secret information in order to provide services to  customers that are implementing and using Epic's products.

Epic neglects to plead anything more than conclusory statements and legal elements for these claims, even where the requisite information is exclusively in Epic's possession.  For many of its claims Epic does not even attempt to assert any factual allegations to support the required legal elements. Epic's claims, despite involving different legal theories, are based on the same speculative, unsupported allegations regarding TCS's access to and use of Epic information.  For example, Epic asserts a claim under the Computer Fraud and Abuse Act, but does not specify which section of the statute it relies on and neglects to plead facts showing either "loss" or "damage" as required under the statute.  Nor do Epic's allegations that TCS accessed documents "without authorization" appear plausible when viewed in light of the consulting agreement Epic sues under that allows TCS to access Epic's systems.  For its claim under the Uniform Trade Secrets Act, Epic does not specify its theory of misappropriation.  For its conversion claim, Epic wholly neglects to plead the required interference with its use or possession of Epic data.

Tellingly, Epic does not identify the documents allegedly downloaded by TCS with any detail. While Epic alleges that trade secrets are at issue, the Complaint does not allege whether the documents allegedly downloaded by TCS constitute trade secrets, information required to be kept confidential under the parties' contract, or simply information not protected

2

under any legal theory.  Rather, Epic focuses entirely on whether certain TCS employees, who Epic contends improperly accessed UserWeb, obtained and used proper credentials for accessing the system.  Epic does not allege that any TCS employee downloaded a single document that TCS would not otherwise have been permitted to access.  Indeed, while Epic broadly contends that it provides different levels of access for customers and consultants as a general practice, it does not claim that TCS accessed documents that were only available to customers and would not have been available to TCS, as a consultant working for Epic's customer, with the proper access credentials.  Epic's contention that some of the documents TCS accessed were not required for its work with Kaiser is, likewise, not supported by any factual detail, underscoring the implausibility of Epic's contention that TCS used Epic's information for TCS's own software.

Epic's allegations do not state a claim under the Supreme Court's decisions in *Twombly* and *Iqbal* and their progeny in this Circuit. In order to survive a motion to dismiss under Rule 12(b)(6), Epic needed to "give enough details about the subject-matter of the case to present a story that holds together." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).  Epic's Complaint, which is full of oft-repeated, conclusory allegations that unfairly accuse TCS of wrongful conduct, does not state a claim for damages or injunctive relief in connection with Epic's First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action.  TCS, therefore, brings this motion pursuant to Rule 12(b)(6) and Rule 9(b) seeking dismissal of these claims.

## SUMMARY OF FACTS

For purposes of a Rule 12(b)(6) motion such as this, the Court is, of course, required to accept "well-pleaded" facts in the Complaint as true.  Thus, this Summary of Facts is drawn from Plaintiff's allegations.  Defendants not, however, concede the truth of any particular

allegations in the Complaint.  Indeed, as demonstrated below, key facts alleged in the Complaint

are not well-pleaded and call for the dismissal of all but Plaintiff's breach of contract claim.

**The Parties**

Plaintiff Epic makes software for medical groups, hospitals, and integrated

healthcare organizations.  (Compl., ¶ 2).[1]  Its software provides for the collection and storage,

into a common database, of patient and other data, including admissions records, pharmacy,

specialty care, billing, insurance benefits, and referral information.  (*Id.*)

Defendant TCS Limited is a corporation organized and existing under the laws of

India.  TCS Limited provides information technology services, consulting and business solutions

on a global scale, and offers wide portfolio of infrastructure, engineering and assurance services.

Defendant Tata America is a New York corporation that is registered to do business in

Wisconsin.  (*Id.*, ¶ 10).  Tata America is a wholly-owned subsidiary of TCS Limited that

provides IT services, consulting and computer systems integration services in the United States.

(*See id.*).  One of the many software products that TCS Limited develops and markets is a

hospital management and information system called Med Mantra.  (Compl., ¶ 9).

**Epic's Agreement With Kaiser**

While it did not attach a copy to the Complaint, or allege any details, Epic alleges

it is party to an agreement with Kaiser dated February 4, 2003 (the "Kaiser Agreement").

(Compl., ¶ 16).  Pursuant to the Kaiser Agreement, Epic licensed computer software to Kaiser to

support patient care delivery activities.  (*Id.*)  Epic provided Kaiser with access to UserWeb, an

electronic workspace that Epic uses to provide training and other materials to its customers.  (*Id.*,

---

[1]     A copy of Epic's Complaint is annexed to the accompanying Declaration of Philip D. Robben (the "Robben
Decl.") as Exhibit A.

¶ 17). The Kaiser Agreement allegedly contains limitations on the dissemination and use of Epic's confidential information. (*Id.*)

## Access To Epic's UserWeb

Epic alleges that it limits access to UserWeb to those who require access in order to facilitate installation, maintenance, or support of Epic software in use by an Epic customer. (*Id.*, ¶ 19). Epic's customers regularly hire consultants to assist in the configuration, operation, and support of Epic's software systems. (*Id.*, ¶ 18). The UserWeb Access Agreement allegedly provides that a user will only have access to UserWeb for the purpose of performing specific services on behalf of the Epic customer, that confidential Epic information will not be used for any purpose other than the specific project the consultant is supporting, and prohibits a user from sharing his or her login information. (*Id.*, ¶ 22).

In order to access UserWeb, an individual must register as either an employee of an Epic customer or a consultant to an Epic customer. (*Id.*, ¶ 20). Epic further alleges that, prior to accessing UserWeb, consultants are required to enter into a Consultant Access Agreement and each employee of a consultant is required to complete a UserWeb Access Agreement. (*Id.*, ¶ 21). The Consultant Access Agreement is intended to limit the use of Epic's confidential information and protect Epic from any improper use or disclosure of information on UserWeb. (*Id.*, ¶ 21).

## The Agreement Between Epic and TCS America

Although it provides no specifics, Epic alleges that it is a competitor of TCS because it offers competing software systems and services. (*Id.*, ¶ 24). To the extent that Epic and TCS compete at all, it could only be in the very narrow field Epic occupies, as this is the only point of commonality Epic alleges.

In August 2005, Tata America was working with Kaiser in connection with Kaiser's complex computer networks and software systems. (*Id.*, ¶ 25). Defendant TCS Limited

5

provided services in support of Tata America's work with Kaiser. In connection with this work, several individuals with TCS email addresses purportedly registered with Epic to receive training classes. Epic does not specifically allege whether these were TCS Limited or Tata America employees. Epic alleges that these employees claimed to be Kaiser employees. (*Id.*) Epic removed the TCS employees from the training course until an agreement could be put in place between Epic and TCS. (*Id.*)

Epic alleges that on August 10, 2005, Epic and Tata America entered into a Standard Consultant Agreement (the "TCS-Epic Agreement"). The TCS-Epic Agreement provided that TCS employees would have access to Epic training programs for the purpose of providing consulting services to Epic's customers in connection with the implementation of Epic "Program Property," defined as the "computer program object and source code and the Documentation for all of Epic's computer programs." (*Id.*, ¶ 27). Although Epic relies on the TCS-Epic Agreement, makes allegations regarding the terms of the agreement, and asserts a claim for breach of the agreement, Epic did not attach a copy to the Complaint. A copy is therefore attached to the accompanying Robben Declaration as Exhibit B.[2]

In addition to "Program Property", the TCS-Epic Agreement defines broad categories of Epic information as "Confidential Information", "Documentation", and "Code" and governs TCS' access to that information.[3] "Confidential Information is "any information [Tata

---

[2]   The Court may consider the TCS-Epic Agreement in connection with this motion because Epic specifically references and relies on the TCS-Epic Agreement in its Complaint and asserts a claim for breach of the TCS-Epic Agreement. *See, e.g. Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (noting that on a motion to dismiss, the court can consider a contract not attached to the pleading but central to plaintiff's claim); *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 998 (E.D. Wis. 2011) *aff'd*, 682 F.3d 687 (7th Cir. 2012) (courts may rely on material outside of the pleadings "where the material in question is expressly referenced in the complaint and is central to the plaintiff's claim").

[3]   While Epic uses the term "Epic Program Property" in the Complaint, it appears to be relying on the definition of "Program Property" in the TCS-Epic Agreement. Ex. B, ¶ 1.

America] or [Tata America] employees obtain from Epic or any Epic licensee as to the Program Property, Epic or Epic's plans or customers . . .". "Documentation" means "any instructions, manuals or other materials created by Epic, in any format, relating to the implementation, operation, or Code of the Program Property." "Code" means "both the object and source code of the Program Property." (Ex. B, ¶ 1). The Agreement further notes that Epic Program Property includes protected trade secrets. (Compl., ¶ 27).

The TCS-Epic Agreement contains restrictions on the use of Epic's Confidential Information and Epic Program Property. With respect to Epic Program Property, TCS agreed to the following in the TCS-Epic Agreement, among other things: it would "[l]imit access to the Program Property to those . . . employees who must have access to the Program Property in order to implement the Program Property on Epic's or its customer's behalf" (Ex. B, ¶ 3(c)(iii)); it would "[n]otify Epic promptly and fully in writing of any person, corporation, or entity that [TCS] know[s] has copied or obtained possession or access to any of the Program Property without authorization from Epic" (Ex. B, ¶ 3(c)(vi)); and it would "[n]ot permit any employee . . . who has had access to the Program Property or any Confidential Information Relating to the Program Property to participate in any development, enhancement or design of . . . any software that competes with or is being developed to compete with the Epic Program Property for a period of at least two (2) years after the date such employee last has access to such Program Property or Confidential Information" (Ex. B, ¶ 3(c)(vii)). (*See also* Compl., ¶ 28). TCS further agreed to use Confidential Information "only for the purpose of implementing the Program Property on an Epic customer's behalf." (Ex. B, ¶ 3(c)(ii); Compl., ¶ 28).

With respect to Confidential Information, TCS agreed to either: (i) require any of its employees "who are given access to the Confidential Information to execute a written

agreement . . . requiring non-disclosure of the Confidential Information and limiting the use of the Confidential Information to uses within the scope of the employee's duties conducted pursuant to the agreement"; or (ii) "inform all such employees that [TCS is] obligated to keep the Confidential Information confidential and that it is [TCS's] policy to keep all such information confidential." (Ex. B, ¶ 3(v); Compl., ¶ 28). Epic alleges that TCS continues to provide consulting services to Kaiser related to Epic software systems and that such work is covered by the TCS-Epic Agreement. (*Id.*, ¶¶ 29, 30). TCS is performing a Testing Center of Excellence contract with Kaiser, pursuant to which TCS employees develop and implement processes, tools, and best practices related to certain Epic Program Property licensed to Kaiser through the Kaiser Agreement. (*Id.*, ¶ 31).

**TCS' Alleged Unauthorized Access to Epic Information**

Epic alleges that it learned from an informant that TCS (without specifying which particular Defendant) has been accessing UserWeb without authorization, and in so doing has obtained information it then used to benefit TCS' Med Mantra software. (Compl., ¶ 32). The informant purportedly claims that unnamed "TCS leaders" in the U.S. and India "appear to be" aware of and complicit in a "scheme" by TCS (without specification as to which Defendant these individuals are affiliated with) to gain unauthorized access to UserWeb and that such access began in 2012. (*Id.*, ¶ 33). The informant also allegedly informed Epic that someone used an access credential for UserWeb from India to download information from UserWeb, and that the purpose was to use information relating to Epic's software to benefit the creation of and improvements to Med Mantra. (*Id.*, ¶ 34). Epic does not identify the informant, name his or her employer or place of residence, or provide any facts to suggest that the informant is in a position

to know facts supporting the allegations regarding this scheme or the involvement of "TCS leaders".[4]

Epic alleges that it discovered that an account associated with a TCS employee located in Oregon had downloaded copies of 1,687 unique files from UserWeb. (*Id.*, ¶ 35). This TCS employee had authorized access to UserWeb because he or she worked on projects relating to Epic's provision of software and services to Kaiser. (*Id.*) Epic does not say when this downloading occurred, though it claims that the credentials were used in India during the time the employee resided in Oregon, as well as from other IP addresses outside of Oregon but within the United States. (*Id.*, ¶ 36).[5] Epic makes no allegation that its access to or use of the downloaded documents was interfered with by either Defendant.

According to the Complaint, the documents downloaded included documents regarding Epic's proprietary software and database systems, and information regarding Epic's system capabilities and functions. (*Id.*, ¶ 37). Epic subsequently suspended the employee's login credentials. (*Id.*, ¶ 39). Epic alleges that the "majority" of the documents "were not required" for TCS employees to perform job functions in support of Kaiser, but it does not specify any facts forming the basis for this conclusion. (*Id.*; *see also* Compl., ¶¶ 37, 41). Epic does not allege that the documents downloaded included Epic Program Property or Confidential Information within the meaning of the TCS-Epic Agreement. Indeed, Epic does not allege any details concerning the documents; it merely provides conclusory assertions concerning them.

---

[4]     In support of Epic's Motion for Expedited Discovery (Dkt. 4), Epic filed the Declaration of Nick G. Saros dated November 6, 2014 (Dkt. 4-2), in which it identified the informant as Phillipe Guionnet, a Tata America employee that Epic's counsel spoke to, and tried to obtain internal TCS documents from, without notice to TCS.

[5]     On December 29, 2014, Epic's counsel produced a document that purportedly constitutes a log of this access. The document appears to indicate that the access took place between June 2012 and June 2014.

9

Epic further alleges that to obtain the login credentials for UserWeb, the TCS employee represented that he was an employee of Epic's customer, and used a "kp.org" email address, in order to mislead Epic into thinking that he was an employee of Kaiser rather than TCS. (*Id.*, ¶ 38). However, Epic does not allege that registrants are prohibited from using an email address provided by an Epic customer during the UserWeb registration process.

After the credentials were suspended, the employee emailed Epic seeking to have his access reactivated. Epic does not make any allegations concerning the contents of the email other than to allege that it was sent on June 24, 2014 and listed the employee's title as "QA Lead, Kaiser Permanente." Epic alleges that a second email, sent on June 30, 2014, included the employee's Kaiser title as well as "Onshore Test Lead" for TCS. (*Id.*, ¶ 40). As with the first alleged email, Epic does not make any allegations as to its substance. Notwithstanding the fact that Epic alleges that the employee's second email plainly referred to his employment by TCS, Epic alleges, solely on information and belief, that the employee was trying to hide the fact that he was a TCS employee purportedly in order to obtain access to UserWeb that exceeded what Epic would provide to a consultant. (*Id.*)

Kaiser confronted the TCS employee regarding the downloading of Epic documents. (*Id.*, ¶ 42). Epic alleges that the employee initially denied downloading the information. Once the employee was shown unspecified download logs, he allegedly stated that he provided his access credentials to two other unnamed TCS personnel and that those individuals did not need access to UserWeb to perform work for Kaiser. (*Id.*) Epic also alleges that on July 29, 2014, it suspended credentials for another unnamed TCS employee working with Kaiser. Epic claims this employee downloaded documents with "no apparent" relationship to his

work for Kaiser. (*Id.*, ¶ 43). Epic does not describe the documents downloaded or specify from where the downloading incurred.

## STANDARD OF REVIEW

To survive this Rule 12(b)(6) motion to dismiss, Epic's Complaint must plead enough "factual matter" to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014). While the court must accept well-pleaded facts as true for the purposes of this motion, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *McCauley*, 671 F.3d at 618 (legal elements "are not factual allegations and as such contribute nothing to the plausibility analysis under Twombly/Iqbal").

Accordingly, courts in the Seventh Circuit perform a two-step analysis. First, the court "excis[es] the allegations not entitled to the presumption [of truth]." *McCauley*, 671 F.3d at 616. Second, the court determines whether the remaining factual allegations plausibly suggest an entitlement to relief. *Id.* Epic must provide enough factual detail to "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "The degree of specificity required is not easily quantified, but 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.'" *McCauley*, 671 F.3d at 616-17 (citation omitted). "Whether a complaint states a claim upon which relief may be granted depends upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Thulin*, 771 F.3d at 997 (quoting *Iqbal*, 556 U.S. at 679). Applying these standards, most of Epic's claims fail to hold together and should be dismissed.

<u>**ARGUMENT**</u>

I.   **EPIC FAILS TO PLEAD A CLAIM UNDER**
     <u>**THE COMPUTER FRAUD AND ABUSE ACT**</u>

Epic's First Cause of Action is based on the Computer Fraud and Abuse Act, 18

U.S.C. § 1030 ("CFAA").  This claim fails for several, independent reasons, including that: (i)

the CFAA was not intended to cover the type of conduct Epic alleges; (ii) Epic fails to plead any

specific "damage" or "loss" actionable under the CFAA; (iii) Epic does not plausibly allege that

TCS accessed UserWeb in a manner that was without authorization or exceeded authorization;

and (iv) Epic fails to plead fraud with particularity as required by Rule 9(b) of the Federal Rules

of Civil Procedure.

   A.   <u>**The CFAA Does Not Apply To The Conduct Alleged In The Complaint**</u>

At the outset, the CFAA is not intended to cover the type of conduct alleged in the

Complaint.  The statute was intended to address computer hackers and disgruntled employees.

As the Seventh Circuit explained:

> Congress was concerned with both types of attack: attacks by virus
> and worm writers, on the one hand, which come mainly from the
> outside, and attacks by disgruntled programmers who decide to
> trash the employer's data system on the way out (or threaten to do
> so in order to extort payments), on the other.

*Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006); *see also Kluber Skahan*

*& Associates, Inc. v. Cordogen, Clark & Assoc., Inc.*, No. 08-CV-1529, 2009 WL 466812, at *8

(N.D. Ill. Feb. 25, 2009) ("the statutory purpose is to punish trespassers and hackers").  Put

differently,

> There is virtually no support for the proposition that merely
> accessing and disseminating information from a protected
> computer suffices to create a cause of action under the CFAA.  The
> CFAA claim borders on the frivolous, and the court can only
> surmise that the CFAA claim was alleged in an attempt to
> artificially create federal jurisdiction for this case.

*Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 994 (E.D. Wis. 2010).  Moreover, several courts have noted that the CFAA does not prohibit misappropriation of trade secrets.  *See e.g., Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) (definition of damage in the CFAA does not include "disclosure to a competitor of its trade secrets and other confidential information"); *Garelli Wong & Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704, 710 (N.D. Ill. 2008); *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 530 (S.D. Miss. 2013) (no CFAA claim where plaintiff alleged that defendant copied plaintiff's trade secrets and confidential information and gave the information to plaintiff's competitor).

Epic does not specify in the Complaint which section of the CFAA it is pursuing claims under, and none are applicable here.  Instead, Epic, merely tracking the general tenor of the statute, alleges:

> Epic's computer system is a protected computer as that term is defined by the Computer Fraud & Abuse Act.  Defendants accessed Epic's UserWeb, without authorization and by exceeding their authorization, to obtain confidential business information and/or trade secrets belonging to Epic, and to engage in and advance a fraud and theft, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The conduct of TCS described above was knowing and intentional.

(Compl., ¶ 49).  Epic further alleges that Defendants' actions were "without Epic's knowledge, permission, or authorization" and that Epic "has suffered damage and loss far in excess of $5,000."  (Compl., ¶¶ 50-52).

Based on this language, TCS — and the Court — can only guess that Epic's First Cause of Action asserts claims under Sections 1030(a)(2)(C) and 1030(a)(4) of the CFAA.  Section 1030(a)(2)(C) applies to whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  Section 1030(a)(4) applies to whoever:

> knowingly and with intent to defraud, accesses a protected
> computer without authorization, or exceeds authorized access, and
> by means of such conduct furthers the intended fraud and obtains
> anything of value, unless the object of the fraud and the thing
> obtained consists only of the use of the computer and the value of
> such use is not more than $5,000 in any 1-year period . . . .

18 U.S.C. § 1030(a)(4).  The CFAA is a criminal statute, but provides that any person " who

suffers damage or loss" by reason of a violation may bring a civil action "to obtain compensatory

damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).[6]  For the reasons

set forth below, Epic does not plausibly allege a claim for civil relief under the CFAA.

### B.   Epic Does Not Plead Damage or Loss

Courts in this Circuit are split as to whether a plaintiff must plead both "damage"

*and* "loss" within the meaning of the CFAA in order to sustain a claim under the statute, or

whether a plaintiff need only plead damage *or* loss.  *See, e.g., Motorola*, 609 F. Supp. 2d at 766.

While Epic makes passing references to both in the Complaint, it has not sufficiently plead

either.

The CFAA defines "damage" as "any impairment to the integrity or availability of

data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  The statute defines "loss"

as:

> any reasonable cost to any victim, including the cost of responding
> to an offense, conducting a damage assessment, and restoring the
> data, program, system, or information to its condition prior to the
> offense, and any revenue lost, cost incurred, or other consequential
> damages incurred because of interruption of service.

---

[6]   A civil action may only be brought, however, if the conduct involves one of the factors set forth in
subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Id.  The only clause in Section
1030(c)(4)(A)(i) that possibly applies to Epic's claims is subsection (I), which refers, in pertinent part, to
"loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. §
1030(c)(4)(A)(i)(I).  Damages for a violation involving only conduct described in that subsection. 18
U.S.C. § 1030(g).  Epic is therefore limited to economic damages.

18 U.S.C. § 1030(e)(11).  Thus, both "damage" and "loss" relate to harm to the actual computer system or data, or interruption of service, not simply copying information from a website as Epic has alleged here.

For example, in *Garelli Wong & Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704, 710 (N.D. Ill. 2008), the plaintiff alleged that its former employee copied confidential and proprietary information and emailed it to his personal email account.  Ruling on defendant's motion to dismiss, the court found that the plaintiff failed to allege either loss or damage within the meaning of the CFAA:

> [A] civil violation of the CFAA requires "impairment to the integrity or availability of data, a program, a system, or information" and "interruption in service." 18 U.S.C. § 1030. *Allegations of trade secret theft and misappropriation do not suggest such a violation.* . . . Though Garelli Wong would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

*Id.* at 710 (emphasis added).

In a later decision, the Northern District of Illinois similarly held that mere copying of data did not give rise to a CFAA claim:

> [T]he plain language of the statute appears to refer to situations in which data is lost or impaired because it was erased or otherwise destroyed, or in which computer networks or databases are disabled.  Thus, this Court, like other courts in this district, finds that copying, e-mailing or printing electronic files from a computer database is not enough to satisfy the damage requirement of the CFAA.  Rather, there must be destruction or impairment to the integrity of the underlying data

*Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-CV-3939, 2010 WL 145786, at *9 (N.D. Ill. Jan. 12, 2010).  Because the defendant "did not erase any files from Mintel's database, nor did he install

15

any destructive software that would compromise the integrity of the data or disable Mintel's

computers or its networks", the court found that Mintel had not demonstrated "damage" under

the CFAA. *Id.*; *see also First Fin. Bank, N.A. v. Bauknecht*, No. 12-CV-1509, 2014 WL

5421241, at *23 (C.D. Ill. Oct. 24, 2014) (finding no damage under the CFAA where all

defendant did was "access documents to which he had no right" and did not "delete or corrupt

those files").

   With respect to "loss" under the CFAA, the "alleged loss must relate to the

investigation or repair of a computer or computer system following a violation that caused

impairment or unavailability of data or interruption of service." *Mintel*, 2010 WL 145786 at *10.

"[E]conomic costs unrelated to computer systems do not fall within the statutory definition of the

term." *Cassetica Software, Inc. v. Computer Sciences Corp.*, No. 09 C 0003, 2009 WL 1703015,

at *4 (N.D. Ill. June 18, 2009).

   As the *Cassetica* court explained, "loss" under the CFAA must also be related to

the impairment or unavailability of data:

> Because of the CFAA's definition of "loss," to state a claim based
> upon a loss, the alleged loss must relate to the investigation or
> repair of a computer system following a violation that caused
> impairment or unavailability of data. . . .  Therefore, courts have
> found that costs that are not related to the impairment or damage to
> a computer or computer system are not cognizable "losses" under
> the CFAA. . . .

*Id.* at *4 (internal citations and quotations omitted).  Cassetica alleged that it suffered "loss"

within the meaning of the CFAA when the defendant, CSC, downloaded copies of Cassetica's

software program after the agreement between the parties allowing access had expired.  The

court rejected the argument that simply downloading copies was "loss" under the CFAA:

> Similarly, Cassetica claims that it incurred costs in "assessing and
> responding to the improper actions of [CSC]." (Compl.¶ 54.)
> Again, Cassetica has not properly alleged that it incurred an

interruption of service or an impairment of data. The CFAA only permits the recovery of costs incurred for damage assessment or recovery when the costs are related to an interruption of service. Although it makes the conclusory allegation that CSC's access "impaired [Cassetica's] data, programs and information," Cassetica does not allege any facts that would plausibly suggest that CSC's downloads caused any interruption of service or impairment of data. Therefore, Cassetica has failed to allege that it suffered a "loss" within the meaning of the CFAA.

*Id.* (internal citations omitted); *see also Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 875 (N.D. Ill. 2010); *Mintel*, 2010 WL 145786 at *10 (holding that fees incurred in hiring an expert to assess plaintiff's copying and emailing of files from defendant's system, and in preparation for the lawsuit, do not constitute "loss" under the CFAA).

Here, Epic has only alleged that TCS employees downloaded copies of documents. (Compl., ¶ 35). Epic does not allege that TCS modified, deleted, or damaged any of Epic's data or Epic's computer systems. Nor does Epic allege any interruption in service or access to UserWeb. Epic has therefore failed to allege "damage" or "loss" within the meaning of the CFAA, and Epic's First Cause of Action should be dismissed.

### C.   Epic's Claim That TCS Was Not Authorized To Access The Documents At Issue Is Implausible

As set forth above, both of the CFAA sections that Epic appears to rely on here — 18 U.S.C. § 1030(a)(2)(C) and (a)(4) — require Epic to sufficiently allege that TCS accessed information either "without authorization" or in a manner that "exceed[ed] authorized access." Epic's Complaint lacks well-pled factual allegations regarding authorization. Moreover, the plain language of the TCS-Epic Agreement, which this Court can consider in connection with this motion (*see* n. 2, *supra*) renders Epic's allegations concerning TCS's authorization implausible on their face.

17

In the Complaint, Epic repeatedly alleges that Epic authorized TCS to access Epic's information, including Epic's UserWeb.  For example, Epic alleges that:

- "Epic shares its confidential information and trade secrets on a need-to-know basis with . . . certain customers subject to confidentiality obligations designed to protect Epic's computer network, software, documents, confidential information, and trade secrets." (Compl., ¶ 4).

- "[C]onsultants are not eligible to obtain access to the UserWeb until their consulting firm has entered a Consultant Access Agreement with Epic for the applicable customer." (*Id.*, ¶ 21).

- "[O]n August 10, 2005, Epic and Tata America entered a Standard Consultant Agreement (the 'TCS-Epic Agreement') . . . ." (*Id.*, ¶ 26).

The TCS-Epic Agreement, which forms the basis for Epic's breach of contract claim, is selectively quoted in Paragraph 26 of the Complaint.  In fact, the Agreement provides for far-reaching access to Epic's information.  It is not even limited to work for Kaiser as it just refers generally to "Epic's customers".  The TCS-Epic Agreement provides for the following:

- "Epic may provide [TCS] with access to some of the Documentation, the Program Property, and certain third party data or software."  (Ex. B, ¶ A).

- "Epic may disclose certain other confidential information to [TCS]."  (*Id.*, ¶ B).

- " [TCS] may make copies of Documentation for the purposes of disseminating such Documentation only to [TCS] employees who are or will be involved in the implementation of the Program Property for an Epic customer."  (*Id.*, ¶ 3(a)(i)).

- TCS may use the Program Property for "in-house training of [TCS] employees to assist Epic customers in the implementation of the Program Property licensed by that Epic customer."  (*Id.*, ¶ 3(a)(iii)).

- " [TCS] may disclose Confidential Information relating to the Program Property to Epic's licensees to the extent necessary for such licensees' implementation of the Program Property . . . ."  (*Id.*, ¶ 3(c)(i)).

- TCS will "[u]se any Confidential Information only for the purpose of implementing the Program Property on an Epic customer's behalf."  (*Id.*, ¶ 3(c)(ii)).

- TCS will "[l]imit access to the Program Property to those of [TCS'] employees who must have access to the Program Property in order to implement the Program Property on Epic's or its customer's behalf." (*Id.*, ¶ 3(c)(iii)).

- TCS will "[s]tore all copes of the Program Property in a secure place." (*Id.*, ¶ 3(c)(iv)).

In addition, the Agreement provides that "Epic hereby grants [TCS] a non-exclusive license to use the Program Property that Epic makes available to [TCS] via dial-up or other access, subject to the terms and conditions of this Agreement." (*Id.*, ¶ 6(a)).

Accordingly, in the face of the TCS-Epic Agreement, pursuant to which Epic now brings a claim, Epic cannot plausibly allege that the access was without authorization. Epic's allegations to the contrary in the Complaint should therefore be disregarded. *See Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *4 (N.D. Ill. Apr. 19, 2006) (granting dismissal where Worldspan's allegation that Orbitz was "without authorization" to obtain Worldspan information was belied by an agreement between the parties that allowed Orbitz to access plaintiff's computers).

Nor does Epic plead facts from which the Court can infer that TCS exceeded its authorized access. While Epic vaguely contends that it "circumscribes consultants' access to a limited area that is necessary for the consultant to support Epic's customer", Epic does *not* specifically allege that it did so for TCS or any other consultants working for Kaiser. In addition, while Epic makes the conclusory allegation that a TCS employee "misrepresented himself as a Kaiser employee . . . for the purpose of gaining customer-level access authorization to Epic's UserWeb", Epic does not even allege that any of the documents allegedly downloaded were documents that were only available with "customer-level access". (Compl., ¶¶ 35, 37, 38).

Moreover, the TCS-Epic Agreement plainly allows for TCS to disseminate Epic information to its employees, so Epic's allegation to the contrary conflicts with the very

19

agreement Epic sues under.[7]  Epic's bare-bones allegation that "the majority of" the downloaded documents "were not required for TCS employees to perform job functions in support of Kaiser" is wholly conclusory and is not supported by any factual allegations as to how Epic made that determination, or any explanation of how Epic knows the identity of every document TCS could conceivably need in order to provide services to Kaiser.  Put simply, Epic has not plausibly alleged that TCS, or any of its employees, accessed any specific information that it was not authorized to access.

### D.    Epic Does Not Plead Fraud With Particularity As Required By Rule 9(b)

To the extent Epic seeks to assert a claim under Section 1030(a)(4) of the CFAA, it must sufficiently plead that TCS accessed Epic's documents "knowingly and with intent to defraud", and "by means of such conduct further[ed] the intended fraud." 18 U.S.C. § 1030(a)(4).  While fraudulent intent may be alleged generally, Epic must plead the "intended fraud" with particularity.  *Motorola*, 609 F. Supp. 2d at 765 (N.D. Ill. 2009). ("Rule 9(b)'s requirement that '[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud, . . . quite plainly applies to section 1030(a)(4)'s requirement that the defendant's acts further the intended fraud).  In the context of its CFAA claim, Epic does not say what the "intended fraud" is, or how TCS's allegedly unauthorized downloading of documents furthered the intended fraud.  As a consequence, any claim under Section 1030(a)(4) should be

---

[7]    For example, the TCS-Epic Agreement undermines Epic's allegation that it was wrongful for a TCS employee to share his password with other employees who Epic contends were not registered for UserWeb. (*See* Compl., ¶ 42).  The TCS-Epic Agreement provides that TCS can allow any of its employees to access Confidential Information as long as TCS informs those employees that "[TCS is] obligated to keep the Confidential Information confidential and that it is [TCS] policy to keep all such information confidential." Ex. B, ¶ 3(c)(v).  Epic does not plead that TCS failed to do this.

dismissed. [8]  Epic's allegations do not satisfy Rule 9(b).  For all of the reasons set forth above, Epic's First Cause of Action should be dismissed.

## II.      EPIC FAILS TO PLEAD A CLAIM UNDER THE COMPUTER CRIMES ACT

Epic's Second Cause of Action alleges that TCS "willfully, knowingly, and without authorization accessed, copied, and took possession of electronic data and information belonging to Epic from Epic's UserWeb, without Epic's consent and without lawful authority" in violation of Wis. Stat. § 943.70 (the "Computer Crimes Act").  (Compl., ¶¶ 54, 56).

At the outset, the Computer Crimes Act is a criminal statute.  Looking at the plain language of the statute, the only civil remedy available is injunctive relief.  Wis. Stat. Ann. § 943.70(5) ("Any aggrieved party may sue for injunctive relief under ch. 813 to compel compliance with this section").  Yet Epic alleges that is has suffered "damages and loss" as a result of TCS's alleged violation of this section.  (Compl., ¶ 57).  It is not clear that money damages are available to Epic under this statute.  *See Liturgical Publications, Inc. v. Karides*, 2006 WI App 101, ¶ 24, n.6, 293 Wis. 2d 361, 715 N.W.2d 240 (Ct. App.) (noting that the court "need not address whether money damages are an available remedy" under the Act where plaintiff failed to present evidence that computer data was taken by defendants).

In addition, the statute applies to "[w]hoever willfully, knowingly and without authorization" commits one of the offenses defined in Wis. Stat. Ann. § 943.70(2).  The Computer Crimes Act "was not meant to criminalize the disclosure of all types of information that could be stored on a computer, when that information was obtained with authorization in the first instance." *Burbank Grease Servs., LLC v. Sokolowski*, 294 Wis. 2d 274, 302, 717 N.W.2d

---

[8]      Although Epic also asserts claims for common law fraud and misrepresentation, those claims appear to be based on a TCS employee's alleged misrepresentation in registering for UserWeb. *See* § VI, *infra*. According to Epic's theory, that fraud occurred at the time of registration, so that downloading documents after that time could not have "furthered" the fraud.

781, 795 (Wis. 2006).  As demonstrated above, Epic's Complaint does not plead facts to plausibly allege that TCS's alleged access was "without authorization."  In fact, the TCS-Epic Agreement that Epic sues under provides that TCS was authorized to access Epic information of the type Epic alleges is available on UserWeb.  *See* Section I.C, *supra*.  Further, as discussed in Section V below, any Wisconsin civil action under this statute is preempted by the Wisconsin Uniform Trade Secrets Act to the extent Epic's allegations concern alleged trade secret information.  Accordingly, the Second Cause of Action should be dismissed.

## III.  EPIC FAILS TO PLEAD A CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

In its Third Cause of Action, Epic alleges that TCS violated Wisconsin's Uniform Trade Secrets Act, Wis. Stat. Ann. § 134.90 (the "UTSA").  This claim fails as a matter of law because: (i) Epic does not sufficiently allege misappropriation; and (ii) Epic's vague allegations do not put TCS on fair notice of the information Epic contends constitutes trade secrets within the meaning of the statute.

### A.  Epic Does Not Sufficiently Allege Misappropriation

In order to state a claim under the UTSA, Epic must make sufficient factual allegations of misappropriation.  Section 2 of the UTSA defines misappropriate as either "[a]cquiring the trade secret of another by means which the person knows or has reason to know constitute improper means" (Wis. Stat. Ann. § 134.90(2)(a))  or

> (b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:
>
> 1. Used improper means to acquire knowledge of the trade secret.
>
> 2. At the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:

a. Deriving it from or through a person who utilized improper means to acquire it.

b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

d. Acquiring it by accident or mistake.

Wis. Stat. Ann. § 134.90(2)(b). As with its CFAA claim, Epic again fails to specify which section of the statute it relies on. Nevertheless, Epic has not plead misappropriation under either subsection (a) or (b) of Section 134.90(2).

Subsection (a) requires well-pleaded allegations that TCS acquired Epic's alleged trade secrets by "improper means". "Improper means" is defined in the statute to include "espionage, theft, bribery, misrepresentation and breach or inducement of a breach of duty to maintain secrecy." Wis. Stat. Ann. § 134.90(1)(a). As set out above, looking at Epic's Complaint as a whole, and the TCS-Epic Agreement incorporated into the Complaint, Epic cannot plausibly allege that TCS obtained the documents by improper means. Epic itself alleges that TCS obtained the information by logging in to UserWeb. This does not plausibly allege espionage, theft, or bribery. [9]

With regard to misappropriation pursuant to subsection (b), Epic does not allege that TCS disclosed Epic's alleged trade secrets. Sections 2(b)(1) and 2(b)(2)(a) depend on improper means, which Epic does not allege. Sections 2(b)(2)(c) and (d) are not applicable. While Epic may purport to rely on Section 2(b)(2)(b), Epic has not alleged any facts from which

---

[9] To the extent Epic claims that TCS accessed the data through misrepresentation, that allegation fails for the reasons set forth in Section VI, *infra*.

this Court can plausibly infer that TCS has actually used any of Epic's information in connection with the Med Mantra program.

According to the Complaint, Epic has learned from an anonymous TCS employee that TCS was using information obtained from UserWeb "to benefit TCS' competing Med Mantra software." (Compl., ¶ 30). Epic also vaguely alleges that TCS sought "to use information and documents related to Epic's leading software to benefit TCS's creation of and improvements to TCS's competing Med Mantra product." (Compl., ¶ 34). Yet Epic alleges no facts from which the Court can reasonably infer that the anonymous employee — Epic's sole source of information — was in a position to know what he allegedly claims. Epic does not allege, for example, that the employee worked on Med Mantra. Nor does Epic identify any particular piece of information that it believes was used in connection with Med Mantra, or explain why it contends Med Mantra competes with any Epic products.

Moreover, Epic relies on allegations made solely upon information and belief. (*See* Compl., ¶ 60). Elsewhere in the Complaint, Epic substitutes guesswork for facts, claiming that "much of the data wrongfully taken from Epic, *if* used improperly, would provide an unfair development and design advantage for TCS's competing medical management software called Med Mantra." (Compl., ¶ 6) (emphasis added). This vague pleading suggests that Epic itself realizes the employee may not be telling the truth. Accordingly, Epic fails to "raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555; *see Share Corp. v. Momar Inc.*, No. 10-CV-109, 2011 WL 284273, at *10 (E.D. Wis. Jan. 26, 2011) (dismissing claim where the only thing plaintiff sufficiently alleged was "that the individual defendants had access to the confidential information", and plaintiff plead "no other facts plausibly suggesting . . . improper use" of the alleged trade secret); *see also nexTUNE, Inc. v. McKinney*, No. C12-1974

24

TSZ, 2013 WL 2403243, at *4 (W.D. Wash. May 31, 2013) (speculation that defendant "may have shared the documents with [co-defendant] for an improper purpose" was insufficient to state a claim for trade secret misappropriation). Thus, Epic has not sufficiently alleged misappropriation, and its UTSA claim should be dismissed.

**B.**  **Epic Does Not Sufficiently Allege That TCS Accessed Any Trade Secrets**

The UTSA defines a trade secret as follows:

(c) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:

1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. Ann. § 134.90(1)(c). Epic must plead the existence of trade secrets with enough specificity to put TCS on notice of the basis for its UTSA claim. Allegations that "echo § 134.90" and "are nothing more than legal conclusions" are not sufficient because they "fail to allege the ultimate facts showing the existence of a trade secret." *ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 349, 597 N.W.2d 479, 482 (Ct. App. 1999). The same is true under federal pleading standards. *Data Key Partners v. Permira Advisers LLC*, 356 Wis. 2d 665, 680, 849 N.W.2d 693, 701 (Wis. 2014) ("The Supreme Court's decision in *Twombly* is consistent with our precedent").

Epic's Complaint does not allege any details about the trade secrets it claims TCS misappropriated. Indeed, Epic's allegation is nothing more than a formulaic echo of the statute:

Certain files that Defendants downloaded without authorization from Epic's UserWeb contain "trade secrets" within the meaning of Wis. Stat. § 134.90(1)(c) and C.R.S. § 7-74-102(2). Specifically,

25

> the files contain data from which Epic derives economic value because it is not generally known and not readily ascertainable by proper means to Epic's competitors, and Epic takes significant steps to maintain the secrecy of the information, including by restricting access to Epic customers and requiring others to sign non-disclosure agreements and other use restriction agreements. Epic also uses physical and technological restrictions to protect its valuable trade secret information, as described partially in this Complaint.[10]

(Compl., ¶ 59). Earlier in the Complaint, when Epic is describing the information that TCS allegedly downloaded, Epic simply recites a laundry list of vague document descriptions:

> [D]ocuments detailing over twenty years of development of Epic's proprietary software and database systems, including programming rules and processes developed to produce optimal functionality of Epic's software; documents that decode the operation of its source code that would otherwise be unusable to those outside of Epic; and information regarding Epic's system capabilities and functions, including procedures for transferring data between customer environments, rules related to information collection, methods for limiting access to patient records, and processes for converting customer data, all of which reveal decades of work with its customers to determine the functionality desirable or required for Epic to provide successful products to those customers.

(Compl., ¶ 37). Epic does not allege that any of these documents contained information that derives economic value from not being generally known to its competitors (and, in fact, alleges that one of the categories would be "otherwise unusable" to those outside of Epic).[11]

---

[10]   Epic's reference to C.R.S. § 7-74-102(2), Colorado's Uniform Trade Secrets Act is confusing, at best, as the heading for this claim refers only to the Wisconsin statute and the Complaint contains no allegations regarding Colorado. To the extent Epic seeks to assert any claims under Colorado law, TCS reserves all rights with respect to such claims.

[11]   Nor has Epic provided any factual detail regarding its alleged trade secrets in its subsequent filings with the Court. The Saros Declaration (n. 4, *supra*) does not contain any discussion whatsoever regarding the nature of the documents that TCS allegedly downloaded from UserWeb. The Declaration of Stirling Martin dated November 5, 2014 (Dkt. 4-3), repeats the same conclusory allegations from the Complaint and adds broad statements about the purported value of the documents, as a whole, to Epic's competitors, without identifying any particular type of document or any specific trade secret that Epic contends has value to TCS.

Epic therefore fails to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant [and the court] to ascertain at least the boundaries within which the secret lies." *ECT Int'l, Inc.*, 228 Wis. 2d at 350, 597 N.W.2d at 482 (quoting *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 23 (Cal.Ct.App.1968)); *see also Lands' End, Inc. v. Genesys Software Sys., Inc.*, No. 13-CV-38-BBC, 2014 WL 266630, at *4 (W.D. Wis. Jan. 24, 2014) (assertion that "all information in or about [a party's] software" is a trade secret is "both too vague and too inclusive") (citation omitted).[12]

In *Share Corp.*, No. 10-CV-109, 2011 WL 284273, the plaintiff attempted to address its pleading deficiencies in an amended complaint that alleged that its trade secrets included, among other things, "reports compiling customer contact information, pricing, and sales history," a "Customer Account List", and "information . . . about customers, business information, and other confidential information". The court found that "Share's allegation that its trade secrets consist of information known to the defendants about 'business operations and other confidential information' is still too vague to put the defendants on notice of what they are accused of misappropriating." *Id.* at *8.

Moreover, other than its conclusory say-so, Epic does not allege any facts concerning its efforts to keep these particular documents secret. *See, e.g., Fail-Safe LLC v. A.O.*

---

[12] *ECT* and *Lands' End* are consistent with decisions from other jurisdictions. *Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*, No. CIV.A. 10-1363, 2011 WL 2650028, at *7 (W.D. Pa. July 6, 2011) (holding that "a conclusory description of the trade secrets at issue . . . fails to meet federal notice pleading standards and must be dismissed"); *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-CV-2796 PKC, 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014) ("conclusory assertion" that all "[d]eliverables" plaintiff provided to defendant constituted trade secrets was insufficient); *Baden Sports, Inc. v. Wilson Sporting Goods Co.*, No. C11-0603-MJP, 2011 WL 3158607, at *2 (W.D. Wash. July 26, 2011) ("vague description" of trade secret did not state a claim for relief).

*Smith Corp.*, 744 F. Supp. 2d 831, 856 (E.D. Wis. 2010) ("'[F]ailure to take reasonable steps to prevent gratuitous disclosure' of alleged trade secrets forfeits any protection for that information") (citation omitted).  While Epic makes general allegations regarding the UserWeb registration process, Epic also alleges that it makes its information available to competitors and consultants, and it entered into the broad TCS-Epic Agreement authorizing its alleged competitor, TCS, to access UserWeb.  Inexplicably, Epic does not even claim that the specific documents allegedly downloaded by TCS — the entire basis for Epic's claims — were only available to those who have "customer-level" access to UserWeb or should have been otherwise unavailable to TCS employees performing software consulting services to Kaiser, Epic's customer.  Thus, Epic's allegations are not sufficient to plausibly support its claims that the allegedly downloaded documents constituted trade secrets under the UTSA.  Therefore, Epic's UTSA claim should be dismissed.

## IV.   EPIC FAILS TO PLEAD A BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In its Fifth Cause of Action, Epic alleges that TCS breached the implied covenant of good faith and fair dealing.  This claim should be dismissed because it is completely duplicative of Epic's Fourth Cause of Action for breach of contract.  Wisconsin does not recognize the implied covenant as a cause of action separate and apart from a breach of contract claim.  Indeed, as this Court previously recognized:

> Defendants are correct that the implied duty of good faith and fair dealing does not provide an "independent" cause of action.  A failure to perform a specific obligation under the agreement in good faith constitutes not an independent breach but a breach of that obligation.

*Gilson v. Rainin Instrument, LLC*, No. 04-C-852-S, 2005 WL 955251, at *8 (W.D. Wis. Apr. 25, 2005) (granting defendant's motion for judgment on the pleadings as to plaintiff's covenant

claim) (internal citations omitted); *see also Alliance Laundry Sys. LLC v. Eaton Corp.*, No. 13-CV-687-JPS, 2013 WL 5719011, at *5 (E.D. Wis. Oct. 21, 2013).  Where, as here, the facts alleged in support of Epic's breach of contract claim are the same facts asserted in support of its covenant claim (*compare* Compl., ¶¶ 64, 67, 71, 72), the latter should be dismissed as a matter of law.

## V.   SEVERAL OF EPIC'S CLAIMS ARE PREEMPTED BY THE UTSA

In addition to being subject to dismissal as a result of Epic's pleading failures, many of Epic's claims against TCS are preempted by the UTSA and should be dismissed for that reason too.  That statute provides, in relevant part, that it displaces conflicting tort claims and state statutory claims based on trade secret misappropriation.  Wis. Stat. Ann. § 134.90(6).

Epic asserts several tort claims and state statutory claims under Wisconsin law, all of which are based on the same set of facts — TCS allegedly accessing Epic's trade secrets through User Web, and then using those trade secrets in connection with the development of TCS's allegedly competing product, Med Mantra.  These claims include the Second Cause of Action (Computer Crimes Act), Sixth Cause of Action (Fraud), Seventh Cause of Action (Misrepresentation), Eighth Cause of Action (Conversion), Ninth Cause of Action (Common Law Unfair Competition), Tenth Cause of Action (Injury to Business under Wis. Stat. § 134.01), and Eleventh Cause of Action (Wis. Stat. § 895.446).[13]  Epic's Twelfth Cause of Action, for unjust enrichment, likewise is based on TCS's alleged access and use of Epic's trade secrets. (Compl., ¶¶ 113-16).[14]

---

[13]  Epic appears to base its Eleventh Cause of Action on Wis. Stat. Ann. § 943.20.  No section of that statute is applicable here.  To the extent Epic relies on Section 1(a), its reliance is misplaced as that section only applies to "movable" property.

[14]  Epic's unjust enrichment claim fails for the additional reason that Epic alleges that the TCS-Epic Agreement governs the parties' conduct.  *See, e.g. Associated Banc-Corp v. John H. Harland Co.*, No. 06-

(footnote continued)

These claims are all preempted by the UTSA.  Wis. Stat. Ann. § 134.90(6).  *See also CardioNet, Inc. v. LifeWatch Corp.*, No. CIV.A. 07C6625, 2008 WL 567223, at *4 (N.D. Ill. Feb. 27, 2008) (Illinois Trade Secrets Act, substantially similar to the UTSA, preempted fraud allegations that "rest[ed] on the same conduct that is essentially misappropriation of trade secrets");  *Id.* at *3 (finding conversion claim "preempted to the extent it alleges conversion of confidential, proprietary, and trade secret information"); *First Fin. Bank, N.A. v. Bauknecht*, No. 12-CV-1509, 2014 WL 5421241, at *20 (C.D. Ill. Oct. 24, 2014) ("Plaintiff should not be permitted to do an end-run around the ITSA in this case and present a conversion claim based upon competitively secret information if it cannot succeed in its ITSA claim"); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974-75 (N.D. Ill. 2000) (finding that fraud, conversion, and unfair competition claims were all preempted); *New S. Equip. Mats, LLC* , 989 F. Supp. 2d at 532 ("[t]he plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret") (citation omitted).

Epic's reliance on *Burbank Grease Servs., LLC*, 294 Wis. 2d 274, 281, 717 N.W.2d 781, 785 (Wis. 2006) is misplaced.  That court held that Section 134.90(6)(a) "does not preclude all other civil remedies based on the misappropriation of confidential information, if the information does not meet the statutory definition of a trade secret under § 134.90(1) (c)."  In *Burbank*, however, prior rulings in the case had already determined that none of the information

---

(footnote continued)

C-1097, 2007 WL 128337, at *2 (E.D. Wis. Jan. 11, 2007) (dismissing unjust enrichment claim "given the existence of a contract between the parties"); *Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 22, 290 Wis. 2d 764, 714 N.W.2d 223 (Ct. App.) (holding that equitable claims were barred by plaintiff's allegations regarding the existence of a contract).

at issue constituted trade secrets, so the court was only dealing with confidential information outside the scope of the UTSA. *Id.* at 287. Here, Epic does not specify which information accessed by TCS allegedly constitutes trade secrets and which allegedly constitutes confidential information not protected by the UTSA. Without that specification, TCS is not on fair notice of Epic's tort and other statutory claims, and those claims should be dismissed.

## VI.   EPIC DOES NOT PLEAD CLAIMS FOR FRAUD OR MISREPRESENTATION WITH PARTICULARITY

The necessary elements of a claim for common law fraud in Wisconsin include: (1) a false representation; (2) made with intent to defraud; (3) reliance on the misrepresentation; and (4) injury resulting from the reliance. *Zimmerman v. Logemann*, No. 09-CV-210, 2011 WL 1674956, at *12 (W.D. Wis. Mar. 17, 2011) (citing *Batt v. Sweeney*, 2002 WI App 119, ¶ 13, 254 Wis.2d 721, 647 N.W.2d 868 (Ct. App.)). Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Accordingly, for a fraud claim,

> Rule 9(b) requires that facts such as "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff" be alleged in detail. . . . Stated another way, a complaint which alleges fraud must state the "the who, what, when, where, and how."

*Muwonge v. Eisenberg*, No. 07-C-0733, 2008 WL 753898, at *6 (E.D. Wis. Mar. 19, 2008) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Moreover, "[s]imply providing vague allegations which outline the elements of a breach of contract claim is insufficient to meet the heightened pleading standards of Rule 9(b)" in order to state a fraud claim. *Id.* at *8. Epic's Sixth and Seventh Causes of Action should be dismissed.

A.    **Epic's Sixth Cause of Action Fails To State A Claim**

Epic's Sixth Cause of Action is for common law fraud.  Epic makes vague and conclusory references to a "scheme", including that: "TCS leaders in the U.S. and India appear to be aware of and complicit in TCS's scheme to gain unauthorized access to Epic's UserWeb and information and misuse them for the benefit of TCS" (Compl., ¶ 33) and TCS had an "apparent scheme to steal confidential information, documents, intellectual property, and other information from Epic" (*Id.*, ¶ 79).  But Epic does not explain how this "scheme" meets the required elements of a fraud claim in Wisconsin.  Nor does Epic provide any factual detail whatsoever regarding the existence of this "scheme."

Instead, Epic alleges that: (i) one employee falsely claimed to be a Kaiser employee; and (ii) Epic granted the employee access to UserWeb.  (Compl., ¶¶ 79-81.)  Epic also claims that when the employee registered for his UserWeb credentials, he represented that he was a "customer employee" instead of a "consultant" and used an email address provided to the employee by Epic's customer, Kaiser, and that the employee downloaded documents from UserWeb that were not needed in order to service Epic's customer, Kaiser.  (Compl., ¶¶ 35, 38).  These allegations do not contain sufficient detail regarding the "who, what, when, where, and how" of the alleged fraud.  Instead, at best, they demonstrate that Epic has simply repackaged its breach of contract claim as a fraud claim.  It may not do so.  *See, e.g., Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011) ("breach-of-contract allegations dressed up in the language of fraud" cannot support common law fraud claims); *RxUSA, Inc. v. Capital Returns, Inc.*, No. 06-C-00790, 2007 WL 2712958, at *11 (E.D. Wis. Sept. 14, 2007) ("Failure to fulfill contractual obligations generally does not create tort liability"); *Ice Bowl, L.L.C. v. Weigel Broad. Co.*, 14 F. Supp. 2d 1080, 1082 (E.D. Wis. 1998) (dismissing fraud-based tort claims that "add[ed] no facts to the contract claims but merely invoke[d] new adjectives").

32

**B.**   **Epic's Seventh Cause of Action Fails To State A Claim**

Epic's Seventh Cause of Action is for intentional misrepresentation, and is entirely duplicative of its Sixth Cause of Action for fraud.  In addition to the elements of a misrepresentation of fact and reliance by Epic, intentional misrepresentation requires the following additional elements: (i) "the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false"; and (ii) "the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage." *Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 157, 677 N.W.2d 233, 239 (Wis. 2004).

Like Epic's "fraud" claim, Epic's "misrepresentation" claim is based on a TCS employee allegedly representing that he was a Kaiser employee in order to gain access to Epic's UserWeb, and is nothing more than a claim for breach of contract coupled with conclusory allegations of fraudulent intent.  *See Ice Bowl*, 14 F. Supp. 2d at 1084 (noting that it is "folly to claim that [a] breach of contract, accompanied by some putatively culpable mental state, becomes a tort").  As with its fraud claim, Epic fails to state a claim for misrepresentation with the particularity required by Rule 9(b), and this claim should likewise be dismissed.

## VII.   EPIC FAILS TO STATE A CLAIM FOR CONVERSION

In its Eighth Cause of Action, Epic claims that TCS "willfully took, controlled, interfered with, and/or deprived Epic of documents and information without Epic's consent and without lawful authority (including information and documents that do not comprise trade secrets)."  (Compl., ¶ 91).

As set forth above (*see* Section V, *supra*), this claim is preempted by the UTSA. While Epic states, without explanation, that the claim "does not depend on information that

meets the statutory definition of a trade secret" (Compl., ¶ 89), it also does not specify which information it contends is a trade secret, and which is not. This is insufficient.

In addition to being preempted, Epic's claim fails as a matter of law. The elements of a conversion claim in Wisconsin are: "(1) intentionally controlling/taking property belonging to another; (2) controlling/taking property without the owner's consent; and (3) those acts resulting in serious interference with the rights of the owner to possess the property." *Bruner v. Heritage Companies*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999). For the purposes of a conversion claim, "property" means tangible property. *Maryland Staffing Servs., Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1507 (E.D. Wis. 1996). A "common law action for conversion is limited to chattel." *Lands' End, Inc.*, 2014 WL 266630, at *2; *Third Educ. Grp., Inc. v. Phelps*, No. 07-C-1094, 2009 WL 2150686, at *7 (E.D. Wis. May 15, 2009) (because "[c]onversion is limited to chattels", intellectual property is necessarily precluded). A "chattel" is "an article of personal property—a thing personal and movable." *Maryland Staffing Servs.*, 936 F. Supp. at 1507 (citing Black's Law Dictionary (5th Ed.) at 215).

Epic's conversion claim is based entirely on intangible electronic files that Epic alleges TCS downloaded from UserWeb. While a conversion claim based on intangible rights may be available if there is "some tangible thing to which the intangible rights attach which is capable of being wrongfully controlled", Epic alleges no facts in support of such a theory. *Id.* The claim fails for this reason alone. Even if intangible property were subject to conversion, Epic has not alleged any interference with its possession of the allegedly downloaded files. Epic does not allege, for example, that TCS deleted or altered any files, or otherwise rendered them unavailable to Epic. The conversion claim therefore fails on this basis as well.

## CONCLUSION

For all of the reasons set forth above, TCS respectfully requests that the Court enter an order dismissing the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action for failure to state a claim upon which relief can be granted, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: January 5, 2015

By: _____

Philip D. Robben
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178
Email: probben@kelleydrye.com
Email: mbyroade@kelleydrye.com
Phone: (212) 808-7800
Fax: (212) 808-7897

David W. Long
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street NW
Washington, D.C.  20007
Email: dlong@kelleydrye.com
Phone: (202) 342-8400
Fax: (202) 342-8451

s/ Barbara A. Neider
Barbara A. Neider
Meg Vergeront
STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI  53701-1784
Email: bneider@staffordlaw.com
Email: mvergeront@staffordlaw.com
Phone: (608) 256-0226
Fax: (608) 259-2600

*Attorneys for Defendants Tata Consultancy Services Limited and Tata America International Corporation*