# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation;

Plaintiff,

v.

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation;
and TATA AMERICA INTERNATIONAL
CORPORATION (dba TATA AMERICA), a
New York Corporation;

Defendants.

Case No. 14-CV-748-wmc

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Philip D. Robben
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178

David W. Long
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street NW
Washington, D.C.  20007

Barbara A. Neider
Meg Vergeront
STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI  53701-1784

*Attorneys for Defendants Tata Consultancy
Services Limited and Tata America
International Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

SUMMARY OF FACTS ................................................................................................ 4

STANDARD OF REVIEW ............................................................................................ 12

ARGUMENT .................................................................................................................. 13

I.      EPIC FAILS TO PLEAD A CLAIM UNDER
THE COMPUTER FRAUD AND ABUSE ACT .......................................................... 13

     A.     The CFAA Does Not Apply To The Conduct Alleged In The Complaint ......... 14

     B.     Epic Does Not Plead Damage or Loss ................................................................ 16

     C.     Epic Does Not Sufficiently Plead An Intent To Defraud .................................. 19

     D.     Epic's Claim That TCS Was Not Authorized
To Access The Documents At Issue Is Implausible ........................................... 20

II.     EPIC FAILS TO PLEAD A CLAIM UNDER THE COMPUTER CRIMES ACT ....... 22

III.    EPIC FAILS TO PLEAD A CLAIM FOR
MISAPPROPRIATION OF TRADE SECRETS .......................................................... 23

     A.     Epic Does Not Sufficiently Allege Misappropriation ......................................... 24

     B.     Epic Does Not Sufficiently Allege That TCS Accessed Any Trade Secrets ....... 27

IV.    EPIC FAILS TO PLEAD A BREACH OF CONTRACT CLAIM ............................... 30

V.     EPIC FAILS TO PLEAD A BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING ............................................ 32

VI.    SEVERAL OF EPIC'S CLAIMS ARE PREEMPTED BY THE UTSA ....................... 33

VII.   EPIC DOES NOT PLEAD ITS CLAIM FOR FRAUD WITH PARTICULARITY ...... 35

VIII.  EPIC FAILS TO STATE A CLAIM FOR CONVERSION .......................................... 37

CONCLUSION ............................................................................................................... 38

Page(s)

**Cases**

*Alexander Interactive, Inc. v. Leisure Pro Ltd.*,
No. 14-CV-2796 PKC, 2014 WL 4651942 (S.D.N.Y. Sept. 16, 2014).................................29

*Alliance Laundry Sys. LLC v. Eaton Corp.*,
No. 13-CV-687-JPS, 2013 WL 5719011 (E.D. Wis. Oct. 21, 2013)......................................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................1, 12

*Associated Banc-Corp v. John H. Harland Co.*,
No. 06-C-1097, 2007 WL 128337 (E.D. Wis. Jan. 11, 2007) .................................................34

*AtPac, Inc. v. Aptitude Solutions, Inc.*,
730 F. Supp. 2d 1174 (E.D. Cal. 2010)..................................................................................19

*Baden Sports, Inc. v. Wilson Sporting Goods Co.*,
No. C11-0603-MJP, 2011 WL 3158607 (W.D. Wash. July 26, 2011)....................................29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................12, 26, 32

*Brownmark Films, LLC v. Comedy Partners*,
800 F. Supp. 2d 991 (E.D. Wis. 2011) *aff'd*, 682 F.3d 687 (7th Cir. 2012) .............................7

*Bruner v. Heritage Companies*,
225 Wis. 2d 728, 593 N.W.2d 814 (Ct. App. 1999) ................................................................37

*Burbank Grease Servs., LLC v. Sokolowski*,
2006 WI 103, 294 Wis. 2d 274, 717 N.W.2d 781 ............................................................23, 34

*CardioNet, Inc. v. LifeWatch Corp.*,
No. CIV.A. 07C6625, 2008 WL 567223 (N.D. Ill. Feb. 27, 2008) ........................................34

*Cassetica Software, Inc. v. Computer Sciences Corp.*,
No. 09 C 0003, 2009 WL 1703015 (N.D. Ill. June 18, 2009) .................................................18

*Data Key Partners v. Permira Advisers LLC*,
2014 WI 86, 356 Wis. 2d 665, 849 N.W.2d 693 ....................................................................27

*ECT Int'l, Inc. v. Zwerlein*,
228 Wis. 2d 343, 597 N.W.2d 479 (Ct. App. 1999) .........................................................27, 29

*Fail-Safe LLC v. A.O. Smith Corp.*,
  744 F. Supp. 2d 831 (E.D. Wis. 2010) .................................................................29

*First Fin. Bank, N.A. v. Bauknecht*,
  No. 12-CV-1509, 2014 WL 5421241 (C.D. Ill. Oct. 24, 2014) ........................17, 34

*Garelli Wong & Associates, Inc. v. Nichols*,
  551 F. Supp. 2d 704 (N.D. Ill. 2008) .............................................................15, 16

*Gilson v. Rainin Instrument, LLC*,
  No. 04-C-852-S, 2005 WL 955251 (W.D. Wis. Apr. 25, 2005) .............................33

*Greenberger v. GEICO Gen. Ins. Co.*,
  631 F.3d 392 (7th Cir. 2011) ...............................................................................36

*Ice Bowl, L.L.C. v. Weigel Broad. Co.*,
  14 F. Supp. 2d 1080 (E.D. Wis. 1998) ..................................................................37

*Int'l Airport Centers, L.L.C. v. Citrin*,
  440 F.3d 418 (7th Cir. 2006) ...............................................................................15

*Kluber Skahan & Associates, Inc. v. Cordogen, Clark & Assoc., Inc.*,
  No. 08-CV-1529, 2009 WL 466812 (N.D. Ill. Feb. 25, 2009) ...............................15

*Landmark Credit Union v. Doberstein*,
  746 F. Supp. 2d 990 (E.D. Wis. 2010) ..................................................................15

*Lands' End, Inc. v. Genesys Software Sys., Inc.*,
  No. 13-CV-38-BBC, 2014 WL 266630 (W.D. Wis. Jan. 24, 2014) .................29, 37

*Liturgical Publications, Inc. v. Karides*,
  2006 WI App 101, 293 Wis. 2d 361, 715 N.W.2d 240 .........................................23

*MacLean Fogg Company v. Edge Composites*,
  2009 WL 1010426, Civ. Action No. 08 C 6367 (N.D. Ill. April 14, 2009) ............32

*Marine Travelift, Inc. v. Marine Lift Sys., Inc.*,
  No. 10-C-1046, 2013 WL 6255689 (E.D. Wis. Dec. 4, 2013) ...............................31

*Maryland Staffing Servs., Inc. v. Manpower, Inc.*,
  936 F. Supp. 1494 (E.D. Wis. 1996) .....................................................................37

*McCauley v. City of Chicago*,
  671 F.3d 611 (7th Cir. 2011) ...........................................................................1, 12

*Meyer v. The Laser Vision Inst.*,
  2006 WI App 70, 290 Wis. 2d 764, 714 N.W.2d 223 ...........................................34

*Mintel Int'l Grp., Ltd. v. Neergheen*,
No. 08-CV-3939, 2010 WL 145786 (N.D. Ill. Jan. 12, 2010) ..........................................17, 18

*Motorola, Inc. v. Lemko Corp.*,
609 F. Supp. 2d 760 (N.D. Ill. 2009) ................................................................................15, 16

*Muwonge v. Eisenberg*,
No. 07-C-0733, 2008 WL 753898 (E.D. Wis. Mar. 19, 2008) ..............................................35

*New S. Equip. Mats, LLC v. Keener*,
989 F. Supp. 2d 522 (S.D. Miss. 2013)...........................................................................15, 34

*nexTUNE, Inc. v. McKinney*,
No. C12-1974 TSZ, 2013 WL 2403243 (W.D. Wash. May 31, 2013)...................................26

*RxUSA, Inc. v. Capital Returns, Inc.*,
No. 06-C-00790, 2007 WL 2712958 (E.D. Wis. Sept. 14, 2007)..........................................36

*Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*,
No. CIV.A. 10-1363, 2011 WL 2650028 (W.D. Pa. July 6, 2011) ........................................29

*Share Corp. v. Momar Inc.*,
No. 10-CV-109, 2011 WL 284273 (E.D. Wis. Jan. 26, 2011) ........................................26, 29

*Third Educ. Grp., Inc. v. Phelps*,
No. 07-C-1094, 2009 WL 2150686 (E.D. Wis. May 15, 2009) ............................................38

*Thomas & Betts Corp. v. Panduit Corp.*,
108 F. Supp. 2d 968 (N.D. Ill. 2000) ...................................................................................34

*Thulin v. Shopko Stores Operating Co., LLC*,
771 F.3d 994 (7th Cir. 2014) .........................................................................................12, 13

*Tierney v. Vahle*,
304 F.3d 734 (7th Cir. 2002) .................................................................................................7

*Von Holdt v. A-1 Tool Corp.*,
714 F. Supp. 2d 863 (N.D. Ill. 2010) ....................................................................................18

*Worldspan, L.P. v. Orbitz, LLC*,
No. 05 C 5386, 2006 WL 1069128 (N.D. Ill. Apr. 19, 2006).................................................21

*Zimmerman v. Logemann*,
No. 09-CV-210, 2011 WL 1674956 (W.D. Wis. Mar. 17, 2011)...........................................35

**Statutes**

18 U.S.C. § 1030.................................................................................13, 14, 15, 16, 19

Fed. R. Civ. P. 9(b) ............................................................................4, 35

Fed. R. Civ. P. 12(b)(6) ................................................................1, 4, 12

Wis. Stat. Ann. § 134.90 ............................................23, 24, 25, 27, 33, 34

Wis. Stat. § 134.01 ...............................................................................33

Wis. Stat. § 895.446 .............................................................................33

Wis. Stat. § 943.70 ...............................................................................22

**Other Authorities**

S. REP. 99-432, 1986 U.S.C.C.A.N. 2479 ................................................16

Defendants Tata America International Corporation ("Tata America") and Tata Consultancy Services Limited ("TCS Limited") previously moved to dismiss the Complaint filed by Plaintiff Epic Systems Corporation ("Epic"). (Dkt. 25). Instead of opposing TCS's well-founded motion, Epic decided to serve an Amended Complaint. While Epic attempted to address some of the obvious drafting problems that TCS pointed out (chiefly by adding more conclusory statements), Epic failed to rectify the major deficiencies that are fatal to its claims. Indeed, far from correcting the multitude of flaws found in the original Complaint, the changes and additions reflected in the Amended Complaint only underscore that this case should be dismissed. TCS, therefore, brings this second motion to dismiss, pursuant to Rule 12(b)(6) and Rule 9(b), seeking an order dismissing the Amended Complaint in its entirety.

## PRELIMINARY STATEMENT

No matter how couched, Epic's allegations do not state a claim under the Supreme Court's decisions in *Twombly* and *Iqbal* and their progeny in this Circuit. In order to survive a motion to dismiss under Rule 12(b)(6), Epic needed to "give enough details about the subject-matter of the case to present a story that holds together." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Epic's Amended Complaint, which is full of oft-repeated, conclusory allegations that unfairly accuse TCS of wrongful conduct, does not state a claim for damages or injunctive relief in connection with any of Epic's causes of action.

Tata America is the U.S. subsidiary of TCS Limited. (Tata America and TCS Limited will be collectively referred to in this brief as "TCS".) As Epic notes in the Amended Complaint, TCS Limited provides IT services, consulting and business solutions on a global scale. Tata America was hired as a consultant by Kaiser Foundation Hospitals ("Kaiser") to help

Kaiser test and implement software created by Epic. TCS Limited provided services in support of Tata America's work for Kaiser.

In connection with this work, Epic alleges that Epic and Tata America entered into a standard consulting agreement that, on its face, provides broad access to Epic's information, including Epic's confidential information. This included access to a web portal maintained by Epic called UserWeb that allegedly contains training, support, and other information regarding Epic's software. The consulting agreement restricted the use of Epic's information to services for Epic's clients (here Kaiser). Epic alleges that Tata America (and, by extension, TCS Limited) breached the use restrictions. This entire case revolves around the notion that TCS employees improperly accessed UserWeb, downloaded numerous unidentified Epic documents not needed for the Kaiser work, and that TCS then used trade secrets or confidential information allegedly found in those documents to illicitly aid the development of Med Mantra, a software product that was created by TCS Limited.

Epic has failed to allege sufficient facts to show that the core allegation underlying all of its claims — *i.e.*, that TCS used information downloaded from UserWeb in the development of Med Mantra — is plausible. Although Epic accuses TCS of engaging in a "scheme" and a "conspiracy" aimed at illicitly advancing Med Mantra, Epic does not allege any facts to demonstrate that even a single piece of the information allegedly accessed by TCS has been, or could be, used in connection with Med Mantra. Likewise, although Epic alleges that some of the documents allegedly downloaded were not needed for Kaiser work, and names a few of them, Epic fails to say why it contends those documents were not needed. Epic does not, in fact, identify with any detail the documents allegedly downloaded by TCS. While Epic alleges that trade secrets are at issue, the Amended Complaint, like the Complaint, does not allege

whether the documents allegedly downloaded by TCS constitute trade secrets, information required to be kept confidential, or simply information not protected under any legal theory.

Instead of alleging facts, Epic resorts to selectively quoting the "suspicions" of Philippe Guionnet, a so-called "informant". More than half of the 10 pages Epic added to the Amended Complaint are devoted to "discovery objections" Mr. Guionnet sent in response to a subpoena in this action.[1] Epic devotes page after page to quoting Mr. Guionnet's email without ever tying Mr. Guionnet's statements to any of its claim against TCS. However, even given the most generous construction, Mr. Guionnet's speculations cannot save Epic's case. The most that Mr. Guionnet avers about Med Mantra is that he has a "suspicion" that TCS used Epic's information because Med Mantra seems to have developed more rapidly than he expected it to. This allegation is not sufficient to overcome TCS's motion to dismiss.

Wholly absent are factual allegations that would suggest that Epic's claims concerning Med Mantra are plausible and should be allowed to proceed. For example, there is no allegation that TCS used a specific piece of Epic information to develop Med Mantra. There is no allegation that Med Mantra was augmented with any particular functionality by use of Epic's information. Allegations of fact concerning competition are similarly lacking. Epic does not allege, for example, that it has ever competed with Med Mantra for the business of any customer. Epic does not allege that it does business in India (the only place Mr. Guionnet says he saw Med Mantra in use). Without allegations of fact, all Epic is left with is speculation about a "scheme" and a "conspiracy". Speculation like this is simply not enough. Speculation is

---

[1] TCS issued the subpoena to Mr. Guionnet seeking documents he claimed to possess and that he claimed would substantiate his suspicions. In response to the subpoena, Mr. Guionnet sent the emails on which Epic focuses. Despite the passage of over a month since the subpoena was served, Mr. Guionnet has not produced a single document. TCS's motion to compel a response is pending in the U.S. District Court for the Central District of California.

particularly out of place here where the circumstances alleged — rapid development of software by a leading software company — are entirely consistent with lawful conduct.

Even setting aside the fundamental flaws at the core of Epic's case, the Amended Complaint should nevertheless be dismissed. As demonstrated below, dismissal is warranted because the Amended Complaint presents claims that: (i) are implausible on their face; (ii) fail to allege facts as to each required element of a cause of action; (iii) are based on nothing more than conclusory allegations that track the elements of a cause of action; (iv) are preempted by Epic's claim under the Wisconsin Uniform Trade Secrets Act; or (v) fail to meet the pleading standard set forth in Rule 9(b), which applies to Epic's allegations of fraud.

## SUMMARY OF FACTS

For purposes of a Rule 12(b)(6) motion such as this, the Court is, of course, required to accept "well-pleaded" facts in the Amended Complaint as true. While this Summary of Facts is drawn from Plaintiff's allegations, Defendants do not concede the truth of any particular allegations in the Amended Complaint. Indeed, as demonstrated below, key facts alleged in the Amended Complaint are not well-pleaded and this calls for the dismissal of all of Epic's claims.

### The Parties

Plaintiff Epic makes software for medical groups, hospitals, and integrated healthcare organizations. (Am. Compl., ¶ 2).[2] Its software provides for the collection and storage, into a common database, of patient and other data, including admissions records, pharmacy, specialty care, billing, insurance benefits, and referral information. (*Id.*)

---

[2]     A copy of Epic's Amended Complaint is annexed to the accompanying Declaration of Philip D. Robben, dated February 9, 2015 (the "Robben Decl."), as Exhibit A.

Defendant TCS Limited is a corporation organized and existing under the laws of India. (*Id.*, ¶ 9). TCS Limited provides information technology services, consulting and business solutions on a global scale, and offers wide portfolio of infrastructure, engineering and assurance services. TCS Limited has more than 318,000 employees worldwide and is part of the Tata group, India's largest industrial conglomerate. (*See* Am. Compl. at 1). Defendant Tata America is a New York corporation that is registered to do business in Wisconsin. (*Id.*, ¶ 10). Tata America is a wholly-owned subsidiary of TCS Limited that provides IT services, consulting and computer systems integration services in the United States. (*See id.*).[3] One of the many software products that TCS Limited develops and markets is a hospital management and information system called Med Mantra. (Am. Compl., ¶ 9).

**Epic's Agreement With Kaiser**

While it did not attach a copy to the Amended Complaint, or allege any details, Epic alleges it is party to an agreement with Kaiser dated February 4, 2003 (the "Kaiser Agreement"). (Am. Compl., ¶ 16). Pursuant to the Kaiser Agreement, Epic licensed computer software to Kaiser to support patient care delivery activities. (*Id.*) Epic provided Kaiser with access to UserWeb, an electronic workspace that Epic uses to provide training and other materials to its customers. (*Id.*, ¶ 17). The Kaiser Agreement allegedly contains limitations on the dissemination and use of Epic's confidential information. (*Id.*)

**Access To Epic's UserWeb**

Epic alleges that it limits access to UserWeb to those who require access in order to facilitate installation, maintenance, or support of Epic software in use by an Epic customer.

---

[3]     Epic's references to "Tata Group" and Tata Sons Limited in the introductory portion of the Amended Complaint have no relevance whatsoever to Epic's claims, as neither entity is a party to this lawsuit.

(*Id.*, ¶ 19). Epic's customers regularly hire consultants to assist in the configuration, operation, and support of Epic's software systems. (*Id.*, ¶ 18). Epic permits these consultants to access UserWeb in these circumstances.

According to the Amended Complaint, however, Epic will not allow a consultant to access UserWeb unless two contracts are in place: (i) a Consultant Access Agreement between the consultant company and Epic; and (ii) a UserWeb Access Agreement entered into by each individual employee of the consultant and Epic. (*Id.*, ¶¶ 20, 21). The Consultant Access Agreement is intended to limit the use of Epic's confidential information and protect Epic from any improper use or disclosure of information on UserWeb. (*Id.*, ¶ 21). The UserWeb Access Agreement allegedly provides that a user will only have access to UserWeb for the purpose of performing specific services on behalf of the Epic customer, that confidential Epic information will not be used for any purpose other than the specific project the consultant is supporting, and prohibits a user from sharing his or her login information. (*Id.*, ¶ 23). In order to access UserWeb, an individual must allegedly register as either an employee of an Epic customer or a consultant to an Epic customer. (*Id.*, ¶ 20).

**The Agreement Between Epic and TCS America**

Although it provides no specifics, Epic alleges that it is a competitor of TCS because it offers competing software systems and services. (*Id.*, ¶ 25). However, Epic provides no specifics regarding the alleged competition. To the extent that Epic and TCS compete at all, it could only be in the very narrow field Epic occupies, as this is the only point of commonality Epic alleges.

In August 2005, Tata America was working with Kaiser in connection with Kaiser's complex computer networks and software systems. (*Id.*, ¶ 26). Defendant TCS Limited provided services in support of Tata America's work with Kaiser. In connection with this work,

several individuals with TCS email addresses purportedly registered with Epic to receive training classes in connection with the work for Kaiser.  Epic does not specifically allege whether these were TCS Limited or Tata America employees.  Epic alleges that these employees claimed to be Kaiser employees.  (*Id.*)  Epic removed the TCS employees from the training course until an agreement could be put in place between Epic and TCS.  (*Id.*)

Epic alleges that on August 10, 2005, Epic and Tata America entered into a Standard Consultant Agreement (the "TCS-Epic Agreement"). (*Id.*, ¶ 27).  The TCS-Epic Agreement provided that TCS employees would have access to Epic training programs for the purpose of providing consulting services to Epic's customers in connection with the implementation of "Epic Program Property,"  defined as the "computer program object and source code and the Documentation for all of Epic's computer programs." (*Id.*, ¶ 28).  Although Epic relies on the TCS-Epic Agreement, makes allegations regarding the terms of the agreement, and asserts a claim for breach of the agreement, Epic did not attach a copy to the Amended Complaint.  A copy is therefore attached to the accompanying Robben Declaration as Exhibit B.[4]

In addition to "Program Property", the TCS-Epic Agreement defines broad categories of Epic information as "Confidential Information", "Documentation", and "Code" and governs TCS' access to that information.[5]  "Confidential Information is "any information [Tata America] or [Tata America] employees obtain from Epic or any Epic licensee as to the Program

---

[4]    The Court may consider the TCS-Epic Agreement in connection with this motion because Epic specifically references and relies on the TCS-Epic Agreement in its Amended Complaint and asserts a claim for breach of the TCS-Epic Agreement.  *See, e.g. Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (noting that on a motion to dismiss, the court can consider a contract not attached to the pleading but central to plaintiff's claim); *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 998 (E.D. Wis. 2011) *aff'd*, 682 F.3d 687 (7th Cir. 2012) (courts may rely on material outside of the pleadings "where the material in question is expressly referenced in the complaint and is central to the plaintiff's claim").

[5]    While Epic uses the term "Epic Program Property" in the Amended Complaint, it appears to be relying on the definition of "Program Property" in the TCS-Epic Agreement.  (Ex. B, ¶ 1).

7

Property, Epic or Epic's plans or customers . . .".  "Documentation" means "any instructions, manuals or other materials created by Epic, in any format, relating to the implementation, operation, or Code of the Program Property."  "Code" means "both the object and source code of the Program Property."  (Ex. B, ¶ 1). The Agreement further notes that Epic Program Property includes protected trade secrets.  (Am. Compl., ¶ 28).

The TCS-Epic Agreement contains restrictions on the use of Epic's Confidential Information and Epic Program Property.  With respect to Epic Program Property, TCS agreed to the following in the TCS-Epic Agreement, among other things: it would "[l]imit access to the Program Property to those . . . employees who must have access to the Program Property in order to implement the Program Property on Epic's or its customer's behalf" (Ex. B, ¶ 3(c)(iii)); it would "[n]otify Epic promptly and fully in writing of any person, corporation, or entity that [TCS] know[s] has copied or obtained possession or access to any of the Program Property without authorization from Epic" (Ex. B, ¶ 3(c)(vi)); and it would "[n]ot permit any employee . . . who has had access to the Program Property or any Confidential Information Relating to the Program Property to participate in any development, enhancement or design of . . . any software that competes with or is being developed to compete with the Epic Program Property for a period of at least two (2) years after the date such employee last has access to such Program Property or Confidential Information"  (Ex. B, ¶ 3(c)(vii)).  (*See also* Am. Compl., ¶ 29).  TCS further agreed to use Confidential Information "only for the purpose of implementing the Program Property on an Epic customer's behalf."  (Ex. B, ¶ 3(c)(ii); Am. Compl., ¶ 29).

With respect to Confidential Information, TCS agreed to either: (i) require any of its employees "who are given access to the Confidential Information to execute a written agreement . . . requiring non-disclosure of the Confidential Information and limiting the use of

the Confidential Information to uses within the scope of the employee's duties conducted pursuant to the agreement"; or (ii) "inform all such employees that [TCS is] obligated to keep the Confidential Information confidential and that it is [TCS's] policy to keep all such information confidential." (Ex. B, ¶ 3(v); Am. Compl., ¶ 29). The TCS-Epic Agreement was terminated by Epic shortly after filing this lawsuit, but Epic alleges that the confidentiality and use restrictions in the Agreement remain in effect "for the maximum duration and scope allowed by law." (Am. Compl., ¶ 30).

**TCS' Alleged Unauthorized Access to Epic Information**

Epic alleges that it learned from an informant, TCS employee Philippe Guionnet, that TCS personnel have been accessing UserWeb without authorization. Mr. Guionnet suspects those employees thereby obtained information used to benefit TCS' Med Mantra software. (Am. Compl., ¶ 33). Mr. Guionnet purportedly claims that unnamed "TCS leaders" in the U.S. and India were aware of and complicit in a "scheme" by TCS (without specification as to which Defendant these individuals are affiliated with) to gain unauthorized access to UserWeb and that such access began in 2012. (Id., ¶ 34). Mr. Guionnet has also allegedly informed Epic that someone used an access credential for UserWeb from India to download information from UserWeb, and that the purpose was to use information relating to Epic's software to benefit the creation of and improvements to Med Mantra. (Id., ¶ 35).

Epic alleges that it discovered that an account associated with a TCS employee, Ramesh Gajaram, who was located in Oregon for part of the time period at issue, had downloaded copies of 1,687 unique files from UserWeb. (Id., ¶ 36). Mr. Gajaram had authorized access to UserWeb because he worked on projects relating to Epic's provision of software and services to Kaiser. (Id.) Epic does not say when this downloading occurred, though it claims that the credentials were used in India during the time Mr. Gajaram resided in

Oregon, as well as from other IP addresses outside of Oregon but within the United States. (*Id.*, ¶ 37). [6] Epic makes no allegation that its access to or use of the downloaded documents was interfered with by either Defendant. Epic subsequently suspended Mr. Gajaram's login credentials. (*Id.*, ¶ 43).

According to the Amended Complaint, the documents downloaded included documents regarding Epic's proprietary software and database systems, and information regarding Epic's system capabilities and functions. (*Id.*, ¶ 39). Epic has not produced copies of the documents to TCS, despite the fact that the parties agreed to a protective order and the Court granted a joint motion for approval of that order with the Court on February 2, 2015. (Dkt. 41). In the Amended Complaint, Epic seems to suggest that it will not do so until "TCS discloses for the Court and parties the extent of its misconduct." (Am. Compl., ¶ 51).

In Epic's original Complaint, it alleged that the "majority" of the documents allegedly downloaded were not required for Mr. Gajaram to perform job functions in support of Kaiser. (Compl., ¶ 43). Now, Epic has dialed back its allegation and claims only that "many" of the documents were not required to perform Kaiser job functions. (Am. Compl., ¶ 40). Epic still does not specify any facts forming the basis for this conclusion. (*Id.*, ¶ 40). In the Amended Complaint Epic contends for the first time that the downloaded documents "include a guide containing confidential and/or trade secret information that provides a blueprint for understanding Epic's source code or competing with Epic's infrastructure." (*Id.*) Epic also alleges that Mr. Gajaram downloaded documents that "were not available to consultants for Kaiser" including "confidential and/or trade secret documents such as the Community Connect

---

[6]     On December 29, 2014, Epic's counsel produced a document that purportedly constitutes a log of this access. The document appears to indicate that the access took place between June 2012 and June 2014.

Install Summary, ADT End-User Proficiency Question Bank, ED Registrar Checklist, and the Physician EpicCare Ambulatory zip file." (*Id.*, ¶ 45). Epic does not explain which, if any, of these enumerated documents it contends contain Epic trade secrets.

In addition, in response to Epic's original Complaint, TCS pointed out that Epic does not allege that the documents downloaded included Epic Program Property or Confidential Information within the meaning of the TCS-Epic Agreement. Now, Epic alleges simply that the documents "included Program Property and Confidential Information within the meaning of the TCS America Agreement." (*Id.*, ¶ 36). Yet Epic does not point to a single document that it contends is Program Property or Confidential Information.

Epic further alleges that to obtain the login credentials for UserWeb, Mr. Gajaram represented that he was an employee of Epic's customer, and used a "kp.org" email address, in order to mislead Epic into thinking that he was an employee of Kaiser rather than TCS. (*Id.*, ¶ 41). However, Epic's argument that "Mr. Gajaram *appears* to have intentionally misrepresented himself" for the purpose of "gaining customer-level access authorization to Epic's UserWeb" is not supported by any factual detail. (*Id.*, ¶ 42) (emphasis added).

After his credentials were suspended, Mr. Gajaram allegedly emailed Epic seeking to have his access reactivated. (*Id.*, ¶ 44). Epic does not make any allegations concerning the contents of the email other than to allege that it was sent on June 24, 2014 and listed Mr. Gajaram's title as "QA Lead, Kaiser Permanente." Epic alleges that a second email, sent on June 30, 2014, included Mr. Gajaram's Kaiser title as well as "Onshore Test Lead" for TATA Consultancy Services. (*Id.*, ¶ 44). As with the first alleged email, Epic does not make any allegations as to its substance. Notwithstanding the fact that Epic alleges that Mr. Gajaram's second email plainly referred to his employment by TCS, Epic alleges, solely on information and

belief, that Mr. Gajaram was trying to hide the fact that he was a TCS employee purportedly in order to obtain access to UserWeb that exceeded what Epic would provide to a consultant. (*Id.*)

Kaiser allegedly "confronted" Mr. Gajaram regarding the downloading of Epic documents. (*Id.*, ¶ 46). Epic alleges that Mr. Gajaram initially denied downloading the information. Once Mr. Gajaram was shown unspecified download logs, he allegedly stated that he provided his access credentials to two other TCS personnel, Aswin Kumar Anandhan and Sankari Gunasekaram, and that those individuals did not need access to UserWeb to perform work for Kaiser. (*Id.*, ¶¶ 38, 47) Epic also alleges that on July 29, 2014, it suspended credentials for another unnamed TCS employee working with Kaiser. (*Id.*, ¶ 48). Epic claims this employee downloaded documents with "no apparent" relationship to his or her work for Kaiser. (*Id.*) Epic does not describe the documents downloaded or specify from where the downloading occurred.

## STANDARD OF REVIEW

To survive this Rule 12(b)(6) motion to dismiss, Epic's Amended Complaint must plead enough "factual matter" to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014). While the court must accept well-pleaded facts as true for the purposes of this motion, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *McCauley*, 671 F.3d at 618 (legal elements "are not factual allegations and as such contribute nothing to the plausibility analysis under *Twombly/Iqbal*").

Accordingly, courts in the Seventh Circuit perform a two-step analysis. First, the court "excis[es] the allegations not entitled to the presumption [of truth]." *McCauley*, 671 F.3d at 616. Second, the court determines whether the remaining factual allegations plausibly suggest

an entitlement to relief. *Id.* Epic must provide enough factual detail to "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "The degree of specificity required is not easily quantified, but 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.'" *McCauley*, 671 F.3d at 616-17 (citation omitted). "Whether a complaint states a claim upon which relief may be granted depends upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Thulin*, 771 F.3d at 997 (quoting *Iqbal*, 556 U.S. at 679). Applying these standards, Epic's claims fail to hold together and should be dismissed.

## ARGUMENT

## I. EPIC FAILS TO PLEAD A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT

Epic's First Cause of Action is based on the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). Epic does not cure the deficiencies of this claim in its Amended Complaint, despite the fact that TCS spelled them out in its initial Motion to Dismiss.

The CFAA is a criminal statute, but provides that any person " who suffers damage or loss" by reason of a violation may bring a civil action "to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).[7] In its Amended Complaint, Epic identifies for the first time which section of the CFAA it is pursuing its claims under. As TCS surmised in its initial Motion to Dismiss, Epic now asserts that it is pursuing a

---

[7] A civil action may only be brought, however, if the conduct involves one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). *Id.* The only clause in Section 1030(c)(4)(A)(i) that possibly applies to Epic's claims is subsection (I), which refers, in pertinent part, to "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). Damages for a violation involving only conduct described in that subsection are limited to economic damages. 18 U.S.C. § 1030(g). Epic is therefore limited to economic damages.

claim under subsection (a)(2)(C) and it has added a claim under subsection (a)(6).[8]  (Am. Compl., ¶ 71).  Section 1030(a)(2)(C) applies to whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  Section 1030(a)(6) applies to whoever "knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if – [A] such trafficking affects interstate or foreign commerce [.]" *Id*. § 1030(a)(6)(A).  Epic further alleges that Defendants' actions were "without Epic's knowledge, permission, or authorization" and that Epic "has suffered loss, injury, and damages far in excess of $5,000."  (Am. Compl., ¶¶ 72-74).

Notwithstanding Epic's effort to fix it, this claim continues to fail for several, independent reasons, including that: (i) the CFAA was not intended to cover the type of conduct Epic alleges; (ii) Epic fails to plead any specific "damage" or "loss" actionable under the CFAA; and (iii) Epic does not plausibly allege that TCS accessed UserWeb in a manner that was without authorization or exceeded authorization.

A.  **The CFAA Does Not Apply To The Conduct Alleged In The Complaint**

At the outset, the CFAA is not intended to cover the type of conduct alleged in the Amended Complaint.  The statute was intended to address computer hackers and disgruntled employees.  As the Seventh Circuit explained:

> Congress was concerned with both types of attack: attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled programmers who decide to

---

[8]    Epic apparently is not alleging a claim under 1030(a)(4), nor could it for the reasons set forth in TCS's initial Motion to Dismiss.  (*See* Dkt. 27 at 20-21).

trash the employer's data system on the way out (or threaten to do
so in order to extort payments), on the other.

*Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006); *see also Kluber Skahan*

*& Associates, Inc. v. Cordogen, Clark & Assoc., Inc.*, No. 08-CV-1529, 2009 WL 466812, at *8

(N.D. Ill. Feb. 25, 2009) ("the statutory purpose is to punish trespassers and hackers").  Put

differently,

> There is virtually no support for the proposition that merely
> accessing and disseminating information from a protected
> computer suffices to create a cause of action under the CFAA.  The
> CFAA claim borders on the frivolous, and the court can only
> surmise that the CFAA claim was alleged in an attempt to
> artificially create federal jurisdiction for this case.

*Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 994 (E.D. Wis. 2010).  Moreover,

several courts have noted that the CFAA does not prohibit misappropriation of trade secrets.  *See*

*e.g., Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) (definition of

damage in the CFAA does not include "disclosure to a competitor of its trade secrets and other

confidential information"); *Garelli Wong & Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704, 710

(N.D. Ill. 2008); *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 530 (S.D. Miss.

2013) (no CFAA claim where plaintiff alleged that defendant copied plaintiff's trade secrets and

confidential information and gave the information to plaintiff's competitor).

Nor does Epic state a claim under Section 1030(a)(6).  That section is designed to

target hackers that post and trade passwords that permit unauthorized access to someone else's

computer.  As the legislative history indicates, this section provides for:

> a misdemeanor offense aimed at penalizing conduct associated
> with 'pirate bulletin boards,' where passwords are displayed that
> permit unauthorized access to others' computers.  It will authorize
> prosecution of those who, knowingly and with intent to defraud,
> traffic in such computer passwords.

*See* S. REP. 99-432, at *13, 1986 U.S.C.C.A.N. 2479, 2490.  Thus, Section 1030(a)(6) has no

relevance here, where conduct of the sort targeted by the statute is not alleged.

### B.      Epic Does Not Plead Damage or Loss

Courts in this Circuit are split as to whether a plaintiff must plead both "damage"

*and* "loss" within the meaning of the CFAA in order to sustain a claim under the statute, or

whether a plaintiff need only plead damage *or* loss.  *See, e.g., Motorola*, 609 F. Supp. 2d at 766.

While Epic makes passing references to both in the Amended Complaint, it has not sufficiently

plead either.

The CFAA defines "damage" as "any impairment to the integrity or availability of

data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  The statute defines "loss"

as:

> any reasonable cost to any victim, including the cost of responding
> to an offense, conducting a damage assessment, and restoring the
> data, program, system, or information to its condition prior to the
> offense, and any revenue lost, cost incurred, or other consequential
> damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11).  Thus, both "damage" and "loss" relate to harm to the actual computer

system or data, or interruption of service, not simply copying information from a website as Epic

has alleged here.

For example, in *Garelli Wong & Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704,

710 (N.D. Ill. 2008), the plaintiff alleged that its former employee copied confidential and

proprietary information and emailed it to his personal email account.  Ruling on defendant's

motion to dismiss, the court found that the plaintiff failed to allege either loss or damage within

the meaning of the CFAA:

> [A] civil violation of the CFAA requires "impairment to the
> integrity or availability of data, a program, a system, or
> information" and "interruption in service." 18 U.S.C. § 1030.

> *Allegations of trade secret theft and misappropriation do not suggest such a violation*. . . . Though Garelli Wong would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

*Id.* at 710 (emphasis added).

In a later decision, the Northern District of Illinois similarly held that mere copying of data did not give rise to a CFAA claim:

> [T]he plain language of the statute appears to refer to situations in which data is lost or impaired because it was erased or otherwise destroyed, or in which computer networks or databases are disabled. Thus, this Court, like other courts in this district, finds that copying, e-mailing or printing electronic files from a computer database is not enough to satisfy the damage requirement of the CFAA. Rather, there must be destruction or impairment to the integrity of the underlying data

*Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-CV-3939, 2010 WL 145786, at *9 (N.D. Ill. Jan. 12, 2010). Because the defendant "did not erase any files from Mintel's database, nor did he install any destructive software that would compromise the integrity of the data or disable Mintel's computers or its networks", the court found that Mintel had not demonstrated "damage" under the CFAA. *Id.*; *see also First Fin. Bank, N.A. v. Bauknecht*, No. 12-CV-1509, 2014 WL 5421241, at *23 (C.D. Ill. Oct. 24, 2014) (finding no damage under the CFAA where all defendant did was "access documents to which he had no right" and did not "delete or corrupt those files").

With respect to "loss" under the CFAA, the "alleged loss must relate to the investigation or repair of a computer or computer system following a violation that caused impairment or unavailability of data or interruption of service." *Mintel*, 2010 WL 145786 at *10. "[E]conomic costs unrelated to computer systems do not fall within the statutory definition of the

term." *Cassetica Software, Inc. v. Computer Sciences Corp.*, No. 09 C 0003, 2009 WL 1703015, at *4 (N.D. Ill. June 18, 2009).

As the *Cassetica* court explained, "loss" under the CFAA must also be related to the impairment or unavailability of data:

> Because of the CFAA's definition of "loss," to state a claim based upon a loss, the alleged loss must relate to the investigation or repair of a computer system following a violation that caused impairment or unavailability of data. . . . Therefore, courts have found that costs that are not related to the impairment or damage to a computer or computer system are not cognizable "losses" under the CFAA. . . .

*Id.* at *4 (internal citations and quotations omitted). Cassetica alleged that it suffered "loss" within the meaning of the CFAA when the defendant, CSC, downloaded copies of Cassetica's software program after the agreement between the parties allowing access had expired. The court rejected the argument that simply downloading copies was "loss" under the CFAA:

> Similarly, Cassetica claims that it incurred costs in "assessing and responding to the improper actions of [CSC]." (Compl.¶ 54.) Again, Cassetica has not properly alleged that it incurred an interruption of service or an impairment of data. The CFAA only permits the recovery of costs incurred for damage assessment or recovery when the costs are related to an interruption of service. Although it makes the conclusory allegation that CSC's access "impaired [Cassetica's] data, programs and information," Cassetica does not allege any facts that would plausibly suggest that CSC's downloads caused any interruption of service or impairment of data. Therefore, Cassetica has failed to allege that it suffered a "loss" within the meaning of the CFAA.

*Id.* (internal citations omitted); *see also Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 875 (N.D. Ill. 2010); *Mintel*, 2010 WL 145786 at *10 (holding that fees incurred in hiring an expert to assess plaintiff's copying and emailing of files from defendant's system, and in preparation for the lawsuit, do not constitute "loss" under the CFAA).

Here, Epic has only alleged that TCS employees downloaded copies of documents. (Am. Compl., ¶ 35). Epic does not allege that TCS modified, deleted, or damaged any of Epic's data or Epic's computer systems. Nor does Epic allege any interruption in service or access to UserWeb. Epic has therefore failed to allege "damage" or "loss" within the meaning of the CFAA, and Epic's First Cause of Action should be dismissed.

### C. Epic Does Not Sufficiently Plead An Intent To Defraud

To state a claim pursuant to Section 1030(a)(6), Epic must plausibly allege that in sharing his password with other TCS employees, Mr. Gajaram "knowingly and with intent to defraud" trafficked in his UserWeb password. § 1030(a)(6)(A). While there are few federal cases analyzing this section of the CFAA, the Eastern District of California found that:

> Despite its pernicious connotation, "trafficking" in a password is the simple and, this court believes, very common act of giving someone else your password. **This is not a crime under the CFAA**. "Trafficking" becomes illegal only where it is knowing, with the intent to defraud, and of the sort such that the password can enable the password recipient to access a computer without authorization.

*AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F. Supp. 2d 1174, 1182-83 (E.D. Cal. 2010) (emphasis added). Here, Epic simply states that Mr. Gajaram "transferred his access credentials to at least two other TCS employees". (Am. Compl., ¶ 38). Epic does not allege any facts at all regarding Mr. Gajaram's intention in sharing his password, much less any facts indicating fraudulent intent on the part of Mr. Gajaram or TCS. This is insufficient to state a claim. *Id.* at 1183 ("'intent to defraud' in the § 1030(a)(6) context requires more than the intent to impermissibly give access to another").[9]

---

[9] Moreover, as set forth below, Epic has not plead a claim for fraud against TCS. (*See* § VII, *infra*).

**D.    Epic's Claim That TCS Was Not Authorized
To Access The Documents At Issue Is Implausible**

As set forth above, Section 1030(a)(2)(C) requires Epic to sufficiently allege that

TCS accessed information either "without authorization" or in a manner that "exceed[ed]

authorized access."  Section 1030(a)(6) applies only where such access is "without

authorization."  Epic's Amended Complaint lacks well-pled factual allegations regarding

authorization.  Moreover, the plain language of the TCS-Epic Agreement, which this Court can

consider in connection with this motion (*see* n. 4, *supra*) renders Epic's allegations concerning

TCS's authorization implausible on their face.

In the Amended Complaint, Epic repeatedly alleges that Epic authorized TCS to

access Epic's information, including Epic's UserWeb.  For example, Epic alleges that:

- "Epic shares its confidential information and trade secrets on a need-to-know basis with . . . certain customers subject to confidentiality obligations designed to protect Epic's computer network, software, documents, confidential information, and trade secrets."  (Am. Compl., ¶ 4).

- "[C]onsultants are not eligible to obtain access to the UserWeb until their consulting firm has entered a Consultant Access Agreement with Epic for the applicable customer."  (*Id.*, ¶ 22).

- "[O]n August 10, 2005, Epic and TCS America entered a Standard Consultant Agreement (the 'TCS America') . . . ."  (*Id.*, ¶ 27).

The TCS-Epic Agreement, which forms the basis for Epic's breach of contract

claim, is selectively quoted in Paragraph 29 of the Amended Complaint.  In fact, the Agreement

provides for far-reaching access to Epic's information.  It is not even limited to work for Kaiser

as it just refers generally to "Epic's customers".  The TCS-Epic Agreement provides for the

following:

- "Epic may provide [TCS] with access to some of the Documentation, the Program Property, and certain third party data or software."  (Ex. B, ¶ A).

- "Epic may disclose certain other confidential information to [TCS]."  (*Id.*, ¶ B).

- " [TCS] may make copies of Documentation for the purposes of disseminating such Documentation only to [TCS] employees who are or will be involved in the implementation of the Program Property for an Epic customer." (*Id.*, ¶ 3(a)(i)).

- TCS may use the Program Property for "in-house training of [TCS] employees to assist Epic customers in the implementation of the Program Property licensed by that Epic customer." (*Id.*, ¶ 3(a)(iii)).

- " [TCS] may disclose Confidential Information relating to the Program Property to Epic's licensees to the extent necessary for such licensees' implementation of the Program Property . . . ." (*Id.*, ¶ 3(c)(i)).

- TCS will "[u]se any Confidential Information only for the purpose of implementing the Program Property on an Epic customer's behalf." (*Id.*, ¶ 3(c)(ii)).

- TCS will "[l]imit access to the Program Property to those of [TCS'] employees who must have access to the Program Property in order to implement the Program Property on Epic's or its customer's behalf." (*Id.*, ¶ 3(c)(iii)).

- TCS will "[s]tore all copes of the Program Property in a secure place." (*Id.*, ¶ 3(c)(iv)).

In addition, the Agreement provides that "Epic hereby grants [TCS] a non-exclusive license to use the Program Property that Epic makes available to [TCS] via dial-up or other access, subject to the terms and conditions of this Agreement." (*Id.*, ¶ 6(a)).

Accordingly, in the face of the TCS-Epic Agreement, pursuant to which Epic now brings a claim, Epic cannot plausibly allege that the access was without authorization. Epic's allegations to the contrary in the Amended Complaint should therefore be disregarded. *See Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *4 (N.D. Ill. Apr. 19, 2006) (granting dismissal where Worldspan's allegation that Orbitz was "without authorization" to obtain Worldspan information was belied by an agreement between the parties that allowed Orbitz to access plaintiff's computers).

Nor does Epic plead facts from which the Court can infer that TCS exceeded its authorized access. The TCS-Epic Agreement plainly allows for TCS to disseminate Epic

information to its employees, so Epic's allegation to the contrary conflicts with the very

agreement Epic sues under.[10] Epic's bare-bones allegations that "many of" the downloaded

documents "were not required for Mr. Gajaram to perform his own job functions in support of

Kaiser" and that "additional TCS employee . . . downloaded Epic documents which have no

apparent relationship to the TCS employee's position as a consultant supporting Kaiser" are

wholly conclusory and are not supported by any factual allegations as to how Epic made that

determination, or any explanation of how Epic knows the identity of every document TCS could

conceivably need in order to provide services to Kaiser.  (Am. Compl., ¶¶ 40, 48).

For all of the reasons set forth above, Epic's First Cause of Action should be

dismissed.

## II.    EPIC FAILS TO PLEAD A CLAIM UNDER THE COMPUTER CRIMES ACT

Epic's Second Cause of Action alleges that TCS "willfully, knowingly, and

without authorization accessed, copied, and took possession of electronic data and information

belonging to Epic (*i.e.*, Epic's property) from Epic's UserWeb, without Epic's consent and

without lawful authority" in violation of Wis. Stat. § 943.70 (the "Computer Crimes Act").  (Am.

Compl., ¶¶ 76, 79).

After TCS pointed out in its initial Motion to Dismiss that the Computer Crimes

Act is a criminal statute and that the plain language of the statute provides that the only civil

remedy available is injunctive relief, Epic has now tacked on a request for injunctive relief to its

Second Cause of Action.  (Am. Compl., ¶ 81).  However, Epic continues to allege that it has

---

[10]    For example, the TCS-Epic Agreement undermines Epic's allegation that it was wrongful for a TCS employee to share his password with other employees who Epic contends were not registered for UserWeb. (*See* Am. Compl., ¶ 47).  The TCS-Epic Agreement provides that TCS can allow any of its employees to access Confidential Information as long as TCS informs those employees that "[TCS is] obligated to keep the Confidential Information confidential and that it is [TCS] policy to keep all such information confidential."  (Ex. B, ¶ 3(c)(v)).  Epic does not plead that TCS failed to do this.

suffered "damages and loss" as a result of TCS's alleged violation of this section (Am. Compl., ¶ 80), even though it is not clear that money damages are available to Epic under this statute. *See Liturgical Publications, Inc. v. Karides*, 2006 WI App 101, ¶ 24, n.6, 293 Wis. 2d 361, 715 N.W.2d 240 (noting that the court "need not address whether money damages are an available remedy" under the Act where plaintiff failed to present evidence that computer data was taken by defendants).

In addition, the statute applies to "[w]hoever willfully, knowingly and without authorization" commits one of the offenses defined in Wis. Stat. Ann. § 943.70(2). The Computer Crimes Act "was not meant to criminalize the disclosure of all types of information that could be stored on a computer, when that information was obtained with authorization in the first instance." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, 294 Wis. 2d 274, 302, 717 N.W.2d 781, 795. As demonstrated above, Epic's Amended Complaint does not plead facts to plausibly allege that TCS's alleged access was "without authorization." In fact, the TCS-Epic Agreement that Epic sues under provides that TCS was authorized to access Epic information of the type Epic alleges is available on UserWeb. *See* Summary of Facts, *supra*. Further, as discussed in Section VI below, any Wisconsin civil action under this statute is preempted by the Wisconsin Uniform Trade Secrets Act to the extent Epic's allegations concern alleged trade secret information. Accordingly, the Second Cause of Action should be dismissed.

## III. EPIC FAILS TO PLEAD A CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

In its Third Cause of Action, Epic alleges that TCS violated Wisconsin's Uniform Trade Secrets Act, Wis. Stat. Ann. § 134.90 (the "UTSA"). This claim fails as a matter of law because: (i) Epic does not sufficiently allege misappropriation; and (ii) Epic's vague allegations

do not put TCS on fair notice of the information Epic contends constitutes trade secrets within the meaning of the statute.

### A.    Epic Does Not Sufficiently Allege Misappropriation

In order to state a claim under the UTSA, Epic must make sufficient factual allegations of misappropriation.  Section 2 of the UTSA defines misappropriate as either "[a]cquiring the trade secret of another by means which the person knows or has reason to know constitute improper means" (Wis. Stat. Ann. § 134.90(2)(a)) or

> (b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:
>
> 1. Used improper means to acquire knowledge of the trade secret.
>
> 2. At the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:
>
> a. Deriving it from or through a person who utilized improper means to acquire it.
>
> b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.
>
> c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.
>
> d. Acquiring it by accident or mistake.

Wis. Stat. Ann. § 134.90(2)(b).  In response to TCS's Motion to Dismiss, Epic now claims that it is asserting misappropriation under both subsections (a) and (b) of Section 134.90(2).  (Am. Compl., ¶¶ 86, 87).  Nevertheless, Epic still has not plead misappropriation sufficiently under either theory.

Subsection (a) requires well-pleaded allegations that TCS acquired Epic's alleged trade secrets by "improper means".  "Improper means" is defined in the statute to include "espionage, theft, bribery, misrepresentation and breach or inducement of a breach of duty to

maintain secrecy." Wis. Stat. Ann. § 134.90(1)(a). As set out above, looking at Epic's Amended Complaint as a whole, and the TCS-Epic Agreement incorporated into the Amended Complaint, Epic cannot plausibly allege that TCS obtained the documents by improper means. Epic itself alleges that TCS obtained the information by logging in to UserWeb. This does not plausibly allege improper means.

With regard to misappropriation pursuant to subsection (b), Epic does not allege that TCS disclosed Epic's alleged trade secrets. Sections 2(b)(1) and 2(b)(2)(a) depend on improper means, which Epic does not allege. Sections 2(b)(2)(c) and (d) are not applicable. While Epic may purport to rely on Section 2(b)(2)(b), Epic has not alleged any facts from which this Court can plausibly infer that TCS has actually used any of Epic's information in connection with the Med Mantra program.

According to the Amended Complaint, Epic has learned from Mr. Guionnet that TCS was using information obtained from UserWeb "to benefit its competing Med Mantra software." (Am. Compl., ¶ 33). Epic also vaguely alleges that TCS sought "to use information and documents related to Epic's leading software to benefit TCS's creation of and improvements to TCS's competing Med Mantra product." (Am. Compl., ¶ 35). All of Epic's Med Mantra allegations hinge on Mr. Guionnet's assertions. Thus, Epic goes to great lengths to try to bolster the plausibility of Mr. Guionnet's story. Epic fails.

Epic now alleges that Mr. Guionnet was responsible for managing all aspects of TCS's contract with Kaiser to provide consulting services and reported directly to TCS executive management. (Am. Compl., ¶ 33). Further, Epic relies on Mr. Guionnet's own emails to counsel — emails that are substantively confusing and merely state Mr. Guionnet's suspicions — to support its allegation that TCS used Epic's information in the development of Med Mantra.

(Am. Compl., ¶¶ 58, 60; *see* Robben Decl., Ex. C).[11]  These emails alone do not permit the Court

to reasonably infer that Mr. Guionnet, Epic's sole source of information, was in a position to

know what he allegedly claims.  Mr. Guionnet's emails also do not provide any particular facts,

as opposed to speculation, to show that the assertions regarding Med Mantra development are

credible.  On the contrary, the substance of the emails suggests that Epic's allegations, based

almost entirely on Mr. Guionnet's statements, are not plausible.  Epic still does not identify a

*single piece* of information that it believes was or could be used in connection with Med Mantra,

or explain why it contends Med Mantra competes with any Epic products.  Epic cannot state a

claim for relief by simply relying on Mr. Guionnet's suspicions and speculation.

Epic also continues to rely on allegations made solely upon information and

belief.  (*See* Am. Compl., ¶ 87).  Elsewhere in the Complaint, Epic substitutes guesswork for

facts, claiming that "much of the data wrongfully taken from Epic, *if* used improperly, would

provide an unfair development and design advantage for TCS's competing medical management

software called Med Mantra."  (Am. Compl., ¶ 6) (emphasis added).  This vague pleading

suggests that Epic itself realizes Mr. Guionnet may not be telling the truth about Med Mantra.

Accordingly, Epic fails to "raise a right to relief above the speculative level."  *Twombly*, 550

U.S. at 555; *see Share Corp. v. Momar Inc.*, No. 10-CV-109, 2011 WL 284273, at *10 (E.D.

Wis. Jan. 26, 2011) (dismissing claim where the only thing plaintiff sufficiently alleged was

"that the individual defendants had access to the confidential information", and plaintiff plead

"no other facts plausibly suggesting . . . improper use" of the alleged trade secret); *see also*

*nexTUNE, Inc. v. McKinney*, No. C12-1974 TSZ, 2013 WL 2403243, at *4 (W.D. Wash.

---

[11]     Because Epic relies on and quotes from Mr. Guionnet's email in the Amended Complaint (¶¶ 56-68), the Court can consider the email for the same reasons set forth above with respect to the TCS-Epic Agreement. (*See* n. 4, *supra*).

May 31, 2013) (speculation that defendant "may have shared the documents with [co-defendant] for an improper purpose" was insufficient to state a claim for trade secret misappropriation). Thus, Epic has not sufficiently alleged misappropriation, and its UTSA claim should be dismissed.

**B.** **Epic Does Not Sufficiently Allege That TCS Accessed Any Trade Secrets**

The UTSA defines a trade secret as follows:

(c) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:

1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. Ann. § 134.90(1)(c). Epic must plead the existence of trade secrets with enough specificity to put TCS on notice of the basis for its UTSA claim. Allegations that "echo § 134.90" and "are nothing more than legal conclusions" are not sufficient because they "fail to allege the ultimate facts showing the existence of a trade secret." *ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 349, 597 N.W.2d 479, 482 (Ct. App. 1999). The same is true under federal pleading standards. *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, 356 Wis. 2d 665, 680, 849 N.W.2d 693, 701 ("The Supreme Court's decision in *Twombly* is consistent with our precedent").

Epic's Amended Complaint suffers from the same fatal flaw as its initial Complaint in that Epic does not allege any details about the trade secrets it claims TCS misappropriated. Indeed, Epic's allegation is nothing more than a formulaic echo of the statute:

> Certain files that Defendants downloaded without authorization from Epic's UserWeb contain "trade secrets" within the meaning of Wis. Stat. § 134.90(1)(c). The downloaded files contain data from which Epic derives economic value because it is not generally known and not readily ascertainable by proper means to Epic's competitors…Epic takes significant steps to maintain the secrecy of the downloaded files, including by restricting access to Epic customers and requiring others to sign non-disclosure agreements and other use restriction agreements. Epic also uses physical and technological restrictions to protect its valuable trade secret information, as described partially in this Complaint.

(Am. Compl., ¶¶ 83-85). Earlier in the Complaint, when Epic is describing the information that TCS allegedly downloaded, Epic simply recites a laundry list of vague document descriptions:

> [D]ocuments detailing over twenty years of development of Epic's proprietary software and database systems, including programming rules and processes developed to produce optimal functionality of Epic's software; documents that decode the operation of its source code that would otherwise be unusable to those outside of Epic; and information regarding Epic's system capabilities and functions, including procedures for transferring data between customer environments, rules related to information collection, methods for limiting access to patient records, and processes for converting customer data, all of which reveal decades of Epic's work with its customers to determine the functionality desirable or required for Epic to provide successful products to those customers.

(Am. Compl., ¶ 39). Other than parroting the language of the statute, Epic does not allege details that would show that any of these documents contained information that derives economic value from not being generally known to its competitors (and, in fact, alleges that one of the categories would "otherwise be unusable" to those outside of Epic). (Am. Compl., ¶ 39). Even after TCS pointed out this glaring deficiency in Epic's Complaint, Epic responded by simply naming a list of four files that Epic contends are "confidential and/or trade secrets", providing no information about the files. (Am. Compl., ¶ 45). To date, Epic has never alleged any specific trade secret that forms the basis for its Third Cause of Action

Epic therefore fails to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant [and the court] to ascertain at least the boundaries within which the secret lies." *ECT Int'l, Inc.*, 228 Wis. 2d at 350, 597 N.W.2d at 482 (quoting *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 23 (Cal.Ct.App.1968)); *see also Lands' End, Inc. v. Genesys Software Sys., Inc.*, No. 13-CV-38-BBC, 2014 WL 266630, at *4 (W.D. Wis. Jan. 24, 2014) (assertion that "all information in or about [a party's] software" is a trade secret is "both too vague and too inclusive") (citation omitted).[12]

In *Share Corp.*, the plaintiff attempted to address its pleading deficiencies in an amended complaint that alleged that its trade secrets included, among other things, "reports compiling customer contact information, pricing, and sales history," a "Customer Account List", and "information . . . about customers, business operations, and other confidential information".[13] 2011 WL 284273 at *7-8. The court found that "Share's allegation that its trade secrets consist of information known to the defendants about 'business operations and other

---

[12]    *ECT* and *Lands' End* are consistent with decisions from other jurisdictions. *Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*, No. CIV.A. 10-1363, 2011 WL 2650028, at *7 (W.D. Pa. July 6, 2011) (holding that "a conclusory description of the trade secrets at issue . . . fails to meet federal notice pleading standards and must be dismissed"); *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-CV-2796 PKC, 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014) ("conclusory assertion" that all "[d]eliverables" plaintiff provided to defendant constituted trade secrets was insufficient); *Baden Sports, Inc. v. Wilson Sporting Goods Co.*, No. C11-0603-MJP, 2011 WL 3158607, at *2 (W.D. Wash. July 26, 2011) ("vague description" of trade secret did not state a claim for relief).

[13]    Here, Epic claims the downloaded documents included, inter alia, "procedures for transferring data between customer environments, rules related to information collection, methods for limiting access to patient records, and processes for converting customer data, all of which reveal decades of Epic's work with its customers to determine the functionality desirable or required for Epic to provide successful products to those customers." (Am. Compl., ¶ 39).

confidential information' is still too vague to put the defendants on notice of what they are accused of misappropriating." *Id*. at *8.

Moreover, other than its conclusory say-so, Epic does not allege any facts concerning its efforts to keep these particular documents secret. *See, e.g., Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831, 856 (E.D. Wis. 2010) ("'[F]ailure to take reasonable steps to prevent gratuitous disclosure' of alleged trade secrets forfeits any protection for that information") (citation omitted). While Epic makes general allegations regarding the UserWeb registration process, Epic also alleges that it makes its information available to competitors and consultants, and it entered into the broad TCS-Epic Agreement authorizing its alleged competitor, TCS, to access UserWeb. Thus, Epic's allegations are not sufficient to plausibly support its claims that the allegedly downloaded documents constituted trade secrets under the UTSA and this claim should be dismissed.

## IV.    EPIC FAILS TO PLEAD A BREACH OF CONTRACT CLAIM

Epic's Fourth Cause of Action alleges that TCS has breached the TCS-Epic Agreement by:

> improperly utilizing UserWeb access credentials through non-registered employees and employees who do not require access to consult for an Epic customer; downloading Epic's confidential and proprietary information — including Program Property, Confidential Information, and Documentation as defined in the [TCS-Epic Agreement] — and then sending that information to India for purposes other than implementing the Program Property on Epic's or its customer's behalf; and using Epic's confidential and proprietary information — including Program Property, Confidential Information, and Documentation — to develop and enhance Defendants' software designed to compete with Epic products.

(Am. Compl., ¶ 94). While Epic has now added defined terms from the TCS-Epic Agreement to this allegation, Epic does not point to any particular document downloaded or used by TCS that

contends is "Program Property", "Confidential Information", or "Documentation" within the meaning of the Agreement. Nor does Epic point to any particular provision of the Agreement that it contends TCS has breached. The Fourth Cause of Action should fail for this reason alone, as the allegations fail to put TCS on sufficient notice of its allegedly wrongful conduct. *See Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at * 5, 9 (E.D. Wis. Dec. 4, 2013) (granting summary judgment on breach of contract claim where allegations regarding the disclosure of confidential information were "vague" and the plaintiff's case "offered more smoke than fire").

Epic's Fourth Cause of Action appears to be based on (i) the means through which TCS employees accessed and allegedly shared information from UserWeb; and (ii) the allegation that TCS used Epic information in connection with Med Mantra. Neither of these theories of breach are sufficiently alleged.

First, Epic's allegations that TCS employees wrongfully obtained access to UserWeb and sent documents to other TCS employees in India "for purposes other than" work on Kaiser's behalf are wholly conclusory. Epic does not cite a single downloaded document that it contends was not required for TCS's work for Kaiser. Moreover, the TCS-Epic Agreement specifically allows TCS to give its employees access to Epic's Confidential Information, with no mention of needing a UserWeb Access Agreement for each individual employee who is provided access.[14] (*See* Ex. B., ¶¶ 3, 6). In light of the broad provisions of the TCS-Epic Agreement and

---

[14] With respect to Confidential Information, TCS agreed to either: (i) require any of its employees "who are given access to the Confidential Information to execute a written agreement . . . requiring non-disclosure of the Confidential Information and limiting the use of the Confidential Information to uses within the scope of the employee's duties conducted pursuant to the agreement"; or (ii) "inform all such employees that [TCS is] obligated to keep the Confidential Information confidential and that it is [TCS's] policy to keep all such information confidential." (Ex. B, ¶ 3(v); Am. Compl., ¶ 29). There is no allegation that TCS breached these provisions.

Epic's own allegations that TCS was performing work for Kaiser, the allegation that TCS merely accessed and shared, within the company, Epic information does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Second, Epic's allegation that TCS breached the TCS-Epic Agreement by using Epic information in connection with Med Mantra is based entirely on the assertions of Mr. Guionnet. As set forth above, these assertions do not, standing alone, raise a plausible claim to relief. (*See* § III.A, *supra*). Epic does not allege a single piece of information that it contends was used — or even could be used — in connection with Med Mantra. Indeed, the only allegations made by Epic, outside of Mr. Guionnet's speculative assertions, are made on information and belief. (*See* Am. Compl., ¶ 87; *see also* ¶ 6) (alleging that "much of the data wrongfully taken from Epic, *if* used improperly, would provide an unfair development and design advantage for TCS's competing medical management software called Med Mantra") (emphasis added). This is insufficient to state a claim. *See MacLean Fogg Company v. Edge Composites*, 2009 WL 1010426, Civ. Action No. 08 C 6367, at *6 (N.D. Ill. April 14, 2009) (dismissing claim for breach of contract based on disclosure of confidential information plead on information and belief). Epic's Fourth Cause of Action should therefore be dismissed.

## V.    EPIC FAILS TO PLEAD A BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In its Fifth Cause of Action, Epic alleges that TCS breached the implied covenant of good faith and fair dealing. This claim should be dismissed because it is completely duplicative of Epic's Fourth Cause of Action for breach of contract. Wisconsin does not recognize the implied covenant as a cause of action separate and apart from a breach of contract claim. Indeed, as this Court previously recognized:

> Defendants are correct that the implied duty of good faith and fair dealing does not provide an "independent" cause of action. A

> failure to perform a specific obligation under the agreement in good faith constitutes not an independent breach but a breach of that obligation.

*Gilson v. Rainin Instrument, LLC*, No. 04-C-852-S, 2005 WL 955251, at *8 (W.D. Wis. Apr. 25, 2005) (granting defendant's motion for judgment on the pleadings as to plaintiff's covenant claim) (internal citations omitted); *see also Alliance Laundry Sys. LLC v. Eaton Corp.*, No. 13-CV-687-JPS, 2013 WL 5719011, at *5 (E.D. Wis. Oct. 21, 2013). Where, as here, the facts alleged in support of Epic's breach of contract claim are the same facts asserted in support of its covenant claim (*compare* Am. Compl., ¶¶ 91, 94, 98, 99), the latter should be dismissed as a matter of law.

## VI.    SEVERAL OF EPIC'S CLAIMS ARE PREEMPTED BY THE UTSA

In addition to being subject to dismissal as a result of Epic's pleading failures, many of Epic's claims against TCS are preempted by the UTSA and should be dismissed for that reason too. That statute provides, in relevant part, that it displaces conflicting tort claims and state statutory claims based on trade secret misappropriation. Wis. Stat. Ann. § 134.90(6).

Epic asserts several tort claims and state statutory claims under Wisconsin law, all of which are based on the same set of facts — TCS allegedly accessing Epic's trade secrets through User Web, and then using those trade secrets in connection with the development of TCS's allegedly competing product, Med Mantra. These claims include the Second Cause of Action (Computer Crimes Act), Sixth Cause of Action (Fraud), Seventh Cause of Action (Conversion), Eight Cause of Action (Common Law Unfair Competition), Ninth Cause of Action (Injury to Business under Wis. Stat. § 134.01), and Tenth Cause of Action (Wis. Stat. §

895.446).[15]  Epic's Eleventh Cause of Action, for unjust enrichment, likewise is based on TCS's alleged access and use of Epic's trade secrets.  (Am. Compl., ¶¶ 136-39).[16]

These claims are all preempted by the UTSA.  Wis. Stat. Ann. § 134.90(6).  *See also CardioNet, Inc. v. LifeWatch Corp.*, No. CIV.A. 07C6625, 2008 WL 567223, at *4 (N.D. Ill. Feb. 27, 2008) (Illinois Trade Secrets Act, substantially similar to the UTSA, preempted fraud allegations that "rest[ed] on the same conduct that is essentially misappropriation of trade secrets");  *Id.* at *3 (finding conversion claim "preempted to the extent it alleges conversion of confidential, proprietary, and trade secret information"); *First Fin. Bank, N.A.*, 2014 WL 5421241, at *20 ("Plaintiff should not be permitted to do an end-run around the ITSA in this case and present a conversion claim based upon competitively secret information if it cannot succeed in its ITSA claim"); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974-75 (N.D. Ill. 2000) (finding that fraud, conversion, and unfair competition claims were all preempted); *New S. Equip. Mats, LLC* , 989 F. Supp. 2d at 532 ("[t]he plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret") (citation omitted).

Epic's reliance on *Burbank Grease Servs., LLC*, 2006 WI 103, 294 Wis. 2d 274, 281, 717 N.W.2d 781, 785 is misplaced.  That court held that Section 134.90(6)(a) "does not

---

[15]     Epic appears to base its Tenth Cause of Action on Wis. Stat. Ann. § 943.20.  No section of that statute is applicable here.  To the extent Epic relies on Section 1(a), its reliance is misplaced as that section only applies to "movable" property.

[16]     Epic's unjust enrichment claim fails for the additional reason that Epic alleges that the TCS-Epic Agreement governs the parties' conduct.  *See, e.g. Associated Banc-Corp v. John H. Harland Co.*, No. 06-C-1097, 2007 WL 128337, at *2 (E.D. Wis. Jan. 11, 2007) (dismissing unjust enrichment claim "given the existence of a contract between the parties"); *Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 22, 290 Wis. 2d 764, 714 N.W.2d 223 (holding that equitable claims were barred by plaintiff's allegations regarding the existence of a contract).

preclude all other civil remedies based on the misappropriation of confidential information, if the information does not meet the statutory definition of a trade secret under § 134.90(1) (c)."  In *Burbank*, however, prior rulings in the case had already determined that none of the information at issue constituted trade secrets, so the court was only dealing with confidential information outside the scope of the UTSA.  *Id.* at 287.  Here, Epic does not specify which information accessed by TCS allegedly constitutes trade secrets and which allegedly constitutes confidential information not protected by the UTSA.  Without that specification, TCS is not on fair notice of Epic's tort and other statutory claims, and Epic's Second and Sixth through Tenth Causes of Action should be dismissed.

## VII.   <u>EPIC DOES NOT PLEAD ITS CLAIM FOR FRAUD WITH PARTICULARITY</u>

The necessary elements of a claim for common law fraud in Wisconsin include: (1) a false representation; (2) made with intent to defraud; (3) reliance on the misrepresentation; and (4) injury resulting from the reliance.  *Zimmerman v. Logemann*, No. 09-CV-210, 2011 WL 1674956, at *12 (W.D. Wis. Mar. 17, 2011) (citing *Batt v. Sweeney*, 2002 WI App 119, ¶ 13, 254 Wis.2d 721, 647 N.W.2d 868 (Ct. App.)).  Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Accordingly, for a fraud claim,

> Rule 9(b) requires that facts such as "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff" be alleged in detail. . . . Stated another way, a complaint which alleges fraud must state the "the who, what, when, where, and how."

*Muwonge v. Eisenberg*, No. 07-C-0733, 2008 WL 753898, at *6 (E.D. Wis. Mar. 19, 2008) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).  Moreover, "[s]imply providing vague allegations which outline the elements of a breach of contract claim is

insufficient to meet the heightened pleading standards of Rule 9(b)" in order to state a fraud claim. *Id.* at *8.

Epic makes vague and conclusory references to a conspiracy, fraudulent conduct, stealing, and a "scheme". For example, Epic alleges that: "TCS leaders in the U.S. and India were aware of and complicit in TCS's scheme to gain unauthorized access to Epic's UserWeb and information and misuse them for the benefit of TCS" (Am. Compl., ¶ 34) and TCS had an "apparent scheme to steal confidential information, documents, intellectual property, and other information from Epic" (*Id.*, ¶ 107). But Epic does not explain how this "scheme" meets the required elements of a fraud claim in Wisconsin.

Instead, the most that Epic alleges is that, in furtherance of the TCS "scheme"; (i) one employee falsely claimed to be a Kaiser employee; (ii) other TCS employees accessed UserWeb using "fraudulently obtained" access credentials to claim "to be persons other than themselves"; and (iii) Epic allowed the TCS employees to access UserWeb (Am. Compl., ¶ 106). Epic also claims that when the employee registered for his UserWeb credentials, he represented that he was a "customer employee" instead of a "consultant" and used an email address provided to the employee by Epic's customer, Kaiser, and that the employee downloaded documents from UserWeb that were not needed in order to service Epic's customer, Kaiser. (Am. Compl., ¶¶ 40, 41). These allegations do not contain sufficient detail regarding the "who, what, when, where, and how" of the alleged fraud. Instead, at best, they demonstrate that Epic has simply repackaged its breach of contract claim as a fraud claim. It may not do so. *See, e.g., Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011) ("breach-of-contract allegations dressed up in the language of fraud" cannot support common law fraud claims); *RxUSA, Inc. v. Capital Returns, Inc.*, No. 06-C-00790, 2007 WL 2712958, at *11 (E.D. Wis.

Sept. 14, 2007) ("Failure to fulfill contractual obligations generally does not create tort liability"); *Ice Bowl, L.L.C. v. Weigel Broad. Co.*, 14 F. Supp. 2d 1080, 1082 (E.D. Wis. 1998) (dismissing fraud-based tort claims that "add[ed] no facts to the contract claims but merely invoke[d] new adjectives"). Epic's Sixth Cause of Action should be dismissed.

## VIII. EPIC FAILS TO STATE A CLAIM FOR CONVERSION

In its Seventh Cause of Action, Epic claims that TCS "willfully took, controlled, interfered with, and/or deprived Epic of documents and information without Epic's consent and without lawful authority, including information and documents that do not comprise trade secrets." (Am. Compl., ¶ 114).

As set forth above (*see* § VI, *supra*), this claim is preempted by the UTSA. While Epic states, without explanation, that the claim "does not depend on information that meets the statutory definition of a trade secret" (Am. Compl., ¶ 112), it also does not specify which information it contends is a trade secret, and which is not. This is insufficient.

In addition to being preempted, Epic's claim fails as a matter of law. The elements of a conversion claim in Wisconsin are: "(1) intentionally controlling/taking property belonging to another; (2) controlling/taking property without the owner's consent; and (3) those acts resulting in serious interference with the rights of the owner to possess the property." *Bruner v. Heritage Companies*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999). For the purposes of a conversion claim, "property" means tangible property. *Maryland Staffing Servs., Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1507 (E.D. Wis. 1996). A "common law action for conversion is limited to chattel." *Lands' End, Inc.*, 2014 WL 266630, at *2. A "chattel" is "an article of personal property—a thing personal and movable." *Maryland Staffing Servs.*, 936 F. Supp. at 1507 (citing Black's Law Dictionary (5th Ed.) at 215). Accordingly,

intellectual property is necessarily precluded from being the subject of a conversion claim. *Third Educ. Grp., Inc. v. Phelps*, No. 07-C-1094, 2009 WL 2150686, at *7 (E.D. Wis. May 15, 2009).

Epic's conversion claim is based entirely on intangible electronic files that Epic alleges TCS downloaded from UserWeb. While a conversion claim based on intangible rights may be available if there is "some tangible thing to which the intangible rights attach which is capable of being wrongfully controlled", Epic alleges no facts in support of such a theory. *Id*. The claim fails for this reason alone. Even if intangible property were subject to conversion, Epic has not alleged any interference with its possession of the allegedly downloaded files. Epic does not allege, for example, that TCS deleted or altered any files, or otherwise rendered them unavailable to Epic. The conversion claim therefore fails on this basis as well.

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court enter an order dismissing the Amended Complaint for failure to state a claim upon which relief can be granted, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: February 9, 2015

By: s/Philip D. Robben
Philip D. Robben
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Email: probben@kelleydrye.com
Email: mbyroade@kelleydrye.com
Phone: (212) 808-7800
Fax: (212) 808-7897

and

David W. Long
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street NW
Washington, D.C.  20007
Email: dlong@kelleydrye.com
Phone: (202) 342-8400
Fax: (202) 342-8451

s/ Barbara A. Neider
Barbara A. Neider
Meg Vergeront
STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI  53701-1784
Email: bneider@staffordlaw.com
Email: mvergeront@staffordlaw.com
Phone: (608) 256-0226
Fax: (608) 259-2600

*Attorneys for Defendants Tata Consultancy Services Limited and Tata America International Corporation*