UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

EPIC SYSTEMS CORPORATION,
a Wisconsin corporation,

               Plaintiff,          Case No. 14-CV-748-WMC

     vs.

TATA CONSULTANCY SERVICES        Madison, Wisconsin
LIMITED, an Indian Corporation;   December 4, 2015
and TATA AMERICA INTERNATIONAL    9:23 a.m.
CORPORATION (dba TCA America),
a New York Corporation,

               Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF MOTION HEARING
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiff:
        Jenner & Block
        BY:  RICK L. RICHMOND
            NICK G. SAROS
            ANNAMARIE VAN HOESEN
        633 West Fifth Street, Suite 3600
        Los Angeles, California  90071

        Quarles & Brady
        BY:  ANTHONY A. TOMASELLI
            KRISTIN G. NOEL
        P.O. Box 2113
        33 East Main Street, Suite 900
        Madison, Wisconsin  53701

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street
Madison, Wisconsin  53703
1-608-255-3821

```
 1   APPEARANCES:    (Continued)

 2   For the Defendants:
             Kelley Drye & Warren LLP
 3           BY:   PHILIP D. ROBBEN
                   ALISON L. MACGREGOR
 4                 PAUL F. DOYLE
             101 Park Avenue
 5           New York, New York  10178

 6           Stafford Rosenbaum LLP
             BY:   BARBARA A. NEIDER
 7           222 West Washington Avenue, Suite 900
             P.O. Box 1784
 8           Madison, Wisconsin  53701

 9   Also Present:
             Erik Phelps, General Counsel
10           Mike Wokasch
             Kaija Hupila
11           Stirling Martin
             Brian Benz
12               Epic Systems Corporation

13           Vinod Verghese, Associate General Counsel
             Ajit Menon, Chief Security Officer
14               Tata Consultancy Services

15

16                            ***

17        (Called to order.)

18           THE CLERK:  Case No. 14-CR-748-WMC, Epic Systems

19   Corporation v. Tata Consultancy Services, Limited and

20   Tata American International Corporation, is called for a

21   motion hearing.  May we have the appearance, please?

22           MR. RICHMOND:  Good morning, Your Honor.  On

23   behalf of plaintiff Epic, I am Rick Richmond.  Sitting

24   next to me is Nick Saros.  And sitting next to him is

25   Erik Phelps, the general counsel of Epic.  And next to
```

1  Mr. Phelps we also have Tony Tomaselli from the Quarles

2  firm.  We have a number of other people in the room with

3  us.  I don't know if you want me to introduce them.  Some

4  of them are --

5          THE COURT:  I think whoever you've designated as

6  your principal for your client.

7          MR. RICHMOND:  It will be the four of us, Your

8  Honor, supplemented by any technical type or

9  document-type questions that you might have.  We have

10  people who can answer those questions as well.

11          THE COURT:  You have people from Epic?

12          MR. RICHMOND:  Yes, sir.

13          THE COURT:  Why don't you identify them.

14          MR. RICHMOND:  From Epic, in addition to

15  Mr. Phelps, we have Mr. Mike Wokasch, Kaija Hupila,

16  Stirling Martin, and Brian Benz.

17          THE COURT:  All right.  Thank you.  I'll hear

18  appearances for the defendant.

19          MR. ROBBEN:  Good morning, Your Honor.  Philip

20  Robben from Kelley Drye & Warren.  With me is my partner,

21  Alison MacGregor.  Seated next to her is Paul Doyle.  We

22  have Barb Neider, or *Neider*, excuse me, our local person.

23          THE COURT:  *Neider*.  You had it right the first

24  time.

25          MR. ROBBEN:  *Neider*.  I'm sorry.

4

```
 1            THE COURT:  In any event, why don't you

 2   continue.

 3            MR. ROBBEN:  Yeah.  We have behind

 4   Ms. MacGregor, this is Ajit Menon from TCS.  He's our

 5   representative that will speak to document issues.  And

 6   this is Vinod Verghese, who is the associate general

 7   counsel.

 8            THE COURT:  Very good.  Thank you.  We are here

 9   on three motions to compel filed by Epic.  I apologize

10   for my delay in coming out.  I wanted to make sure I at

11   least had a chance to understand the positions of Tata --

12   it's pronounced Tata?

13            MR. ROBBEN:  Correct.

14            THE COURT:  -- positions of Tata with respect to

15   the second and third motions as well as at least a

16   general sense of where we stand on discovery, given that

17   it appears that there may be some progress made by the

18   parties before this hearing.

19       The reason we're doing this in person and with the

20   participation of principals is that I won't say this is

21   an unprecedented number of occasions that you have been

22   before our magistrate judge without seeming progress, but

23   I would say you're approaching some of the more

24   substantial discovery disputes.  And I don't understand

25   why, in a case that in some ways should be
```

1   straightforward, that we continue to be unable to bring

2   this to a close.  I'm talking about discovery.

3       Discovery will close in January.  So to the extent

4   that Tata, and certainly Magistrate Judge Crocker has

5   repeated this many times, has failed to complete its

6   obligations with respect to discovery, you may be under

7   tremendous pressure to complete that discovery within the

8   deadline.  We have a trial in April and that will hold as

9   well.

10      So I don't know -- I'm not starting out by casting

11  aspersions other than by saying that to some extent, with

12  respect to certainly some of the discovery that still

13  seems not to have been provided, Tata is *behind the eight*

14  *ball*, because Magistrate Judge Crocker made very clear

15  what he expected in terms of production.

16      Having said that, I would like to close this out

17  without Epic expanding beyond what is a reasonable series

18  of requests for discovery.  I say that by way of

19  preliminary because we are here with respect to three

20  specific motions.

21      The first motion is Epic's.  And I have a general

22  understanding as to what it is that Epic believes it is

23  entitled to or, more accurately, is seeking.  But I want

24  to make sure that the parties are on the same page as to

25  what it is that is being requested and what it is that

1   both sides believe has or has not been provided.

2      I'm going to begin with the largest of those areas.

3   And now we're dealing with Epic's motion to compel

4   discovery regarding TCS investigations, which is the

5   request for immediate production of all relevant

6   documents about investigations.

7      In response, Tata has indicated that while there

8   have been -- Epic is not inaccurately describing the

9   various investigations that have occurred with respect to

10  an HR investigation, an Audit Committee investigation, a

11  Security Department investigation and a so-called, what

12  Epic would describe as, *Kelley Drye investigation.*

13     It is the representation of Tata that the law firm

14  of Loeb & Loeb had conducted a single investigation and

15  all of the other investigations, save Kelley Drye's,

16  falls within the rubric of the larger Loeb investigation.

17     Now, that may or may not place it outside of

18  discovery, that is to say these investigations outside of

19  discovery, but I don't have a good way of determining

20  that.  And even if I did, I'm not sure that the conduct

21  of Tata in failing to produce documents which later it

22  became clear were relevant, particularly with respect to

23  others who obtained information that was, for ill intent

24  or not, obtained in a manner which was not authorized,

25  and there's no dispute about that, it was not authorized.

 1       And so it is Tata's responsibility to insure, now

 2   having managed to prevent discovery for some time, to

 3   insure that Epic does get access to the information

 4   necessary to present its case at trial or frankly even in

 5   summary judgment.

 6       In any event, I don't see and I don't know that it

 7   was provided, but do we have the engagement letter that

 8   Loeb & Loeb entered into with Tata to conduct this

 9   investigation?

10           MR. ROBBEN:  It is not part of the record.

11           THE COURT:  All right.  You'll have until the

12   end of the day today to provide me with that.  You can do

13   it under seal.  But I want to see the actual engagement

14   letter that supposedly, and may well be accurate, created

15   this umbrella responsibility to do an internal

16   investigation on behalf of Tata.

17       And, you know, I'd be shocked, with a law firm of

18   Loeb's quality, that if they were really doing the kind

19   of internal investigation that was intended to create

20   privilege and to maintain privilege that you don't have

21   that and it's not -- it doesn't spell out exactly what

22   their role is.  If that's the case, then that would give

23   me some comfort as to the allegation or assertion of this

24   broad privilege with respect to their earlier

25   investigations.

1    Having said that, I still have the problem of

2  whether or not some of this should be produced, given

3  where we are in the course of discovery and the number of

4  times that Judge Crocker has insisted upon production of

5  additional information.  I do think there's been a

6  *cat and mouse* game as Epic has attempted to try to get to

7  the bottom of the information that they are entitled to

8  and I'd like to bring that to a head today.

9    Who is it that did -- let me start with Epic.  The

10  HR investigation in the spring and early summer of 2014,

11  as you have described it, who is it that conducted that

12  investigation, to the extent you know?

13        MR. RICHMOND:  Your Honor, all we know is that

14  the president of TCS, a man named *Suresh Muthuswami*,

15  shortly after Mr. Guionnet, the whistleblower, blew the

16  whistle, he told Mr. Guionnet that a human resources

17  investigation -- that an investigation would be conducted

18  by human resources.  That's what he said.  And he said

19  that when that investigation was done that Mr. Guionnet

20  would be told what happened as a result of that

21  investigation.

22    Shortly after that the head of human resources for

23  TCS for North America, a man they call -- I think they

24  call him *Narsi*, Your Honor -- the Indian names, sometimes

25  they shorten them to just a nickname or an abbreviation,

1   but they call him *Narsi* and I can find the page in the

2   brief that has his name -- but he corresponded -- the

3   head of HR corresponded with the whistleblower right away

4   and said, "We are going to do an investigation."  And

5   then indeed, from what we know, that investigation was

6   done.

7        And during Mr. Muthuswami's deposition he said and

8   described that as being a separate and distinct

9   investigation.  He thought that there were reports that

10  had come out of that investigation.  And we've quoted it

11  in our brief, but Mr. Muthuswami said that he assumed

12  Epic had been given the reports compiling the results of

13  that human resources investigation during the course of

14  this case.  And I told him, "You should not assume that

15  because we haven't obviously gotten it."

16       So that's what we know about the human resources

17  investigation.

18            THE COURT:  All right.  And has Tata confirmed

19  that there was an investigation done by Mr. Narsi or

20  others within a human resources department?

21            MR. ROBBEN:  The investigation came out of

22  Mr. Guionnet's allegations, which included allegations as

23  to his employment and also allegations --

24            THE COURT:  I didn't ask it very well because

25  I'm not -- do you know whether the Human Resources

1   Department did it's own investigation in the spring or

2   early summer of 2014?

3            MR. ROBBEN:  My understanding is that

4   investigation is the Loeb & Loeb investigation.

5            THE COURT:  And that is based on what?

6            MR. ROBBEN:  That is based on communications

7   that I've had with the client.

8            THE COURT:  With the client?

9            MR. ROBBEN:  Correct.

10           THE COURT:  Who at the client?

11           MR. ROBBEN:  Mr. Menon, Mr. Verghese, and I had

12   a call with Ms. La Mar early on, Ms. La Mar being the

13   person at Loeb & Loeb.

14           THE COURT:  All right.  Was a report prepared?

15   Did someone from HR write any document?

16           MR. ROBBEN:  I've never seen a document.

17           THE COURT:  That's not what I'm asking you.  I'm

18   asking you, as an officer of the court, can you tell me

19   whether or not a document was prepared by the Human

20   Resource Department.

21           MR. ROBBEN:  I cannot.

22           THE COURT:  I mean, I just -- the answer is

23   either "yes" or "no" and we're way down the line in

24   discovery.  It's not acceptable for the answer to be "I

25   don't know" at this point.  And there's no -- we're not

1   hiding the ball.  This has been briefed repeatedly.  It

2   goes back to earlier disputes with the magistrate judge.

3   I don't understand how I can't be given a straightforward

4   answer as to whether a report or reports were prepared by

5   Human Resource Department.

6           MR. ROBBEN:  But the answer is that -- I guess

7   what I'm saying is the answer I think is "no" because

8   whenever I've asked, the investigation that we've been

9   told was done was the Loeb & Loeb.

10          THE COURT:  Yeah, but that's a different

11  question.  Loeb may well have directed all of this and it

12  may be privileged.  But I'm asking whether there is a

13  Human Resource report reflecting its investigation in the

14  spring and early summer of 2014 as to what occurred here

15  in terms of accessing and downloading of the confidential

16  information.  And you're telling me, as you sit here

17  today, you don't have an answer to that straightforward,

18  basic question?

19          MR. ROBBEN:  There is a report about downloading

20  Epic confidential information, but it's not an HR report.

21          THE COURT:  That's the distinction.  So is there

22  an HR report?

23          MR. ROBBEN:  I don't believe there is.  There's

24  a --

25          THE COURT:  And you base that on the statements

1   that you were provided by Mr. Menon and Mr. Verghese and

2   by Loeb; is that correct?

3          MR. ROBBEN:  Correct.

4          THE COURT:  All right.  Is there a

5   representative from Loeb here?

6          MR. ROBBEN:  No, there is not.

7          THE COURT:  All right.  Let's -- at the break

8   you will get him on the phone and he will participate in

9   this discussion.  I take it that there is a Loeb report,

10  correct, a written report from Loeb & Loeb?

11         MR. ROBBEN:  I don't believe a Loeb & Loeb

12  report has been created yet.

13         THE COURT:  I don't know what that means, "yet."

14  They're still investigating?

15         MR. ROBBEN:  My understanding is that they

16  were -- they were -- they either had not prepared a

17  report or were not distributing the report for privilege

18  concerns.

19         THE COURT:  You have not seen -- if there is a

20  report, you haven't even asked for it?

21         MR. ROBBEN:  I have a -- I have a memorandum

22  that TCS prepared and sent to Ms. La Mar at Loeb & Loeb

23  detailing the company's investigation that she requested

24  they do, the company's fact finding that she requested

25  they do --

1          THE COURT:  "She" being?

2          MR. ROBBEN:  Ms. La Mar.

3          THE COURT:  All right.

4          MR. ROBBEN:  -- as to UserWeb and the Med Mantra

5     allegations that Mr. Guionnet made.

6          THE COURT:  And she did a memo to Loeb?

7          MR. ROBBEN:  TCS did a memo to her.

8          THE COURT:  And she is an attorney at Loeb?

9          MR. ROBBEN:  Correct.  Most of her investigation

10    is not this case; it's the other issues that Mr. -- or

11    her investigation in terms of, you know, what she's

12    responsible for primarily is that other stuff.  This case

13    came along --

14         THE COURT:  That "other stuff" being the other

15    issues with respect to Mr. --

16         MR. ROBBEN:  Guionnet.

17         THE COURT:  -- Guionnet?  Okay.

18         MR. ROBBEN:  This case came along shortly after.

19    This was in late August.  This case came in late October.

20         THE COURT:  Of 2014?

21         MR. ROBBEN:  Correct.

22         THE COURT:  So I guess what we really need is

23    Ms. Malimar *(verbatim)* to be available.

24         MR. ROBBEN:  La Mar.

25         THE COURT:  I'm sorry, La Mar.  Thank you.  And

 1   can she be available?

 2          MR. ROBBEN:  We can check with her.  She's in

 3   Los Angeles, so I don't know what the time difference or

 4   what her schedule is, but we could certainly inquire.

 5          THE COURT:  All right.  I will ask you to do

 6   that at the break.  With respect to this memo, TCS, who

 7   is it that prepared it?

 8          MR. ROBBEN:  The memo is from Mr. Menon; someone

 9   named *Paul Almalraj*, who is one of Mr. Menon's direct

10   reports; and someone named *Dr. Santosh Mohanty*, who is

11   the person who is responsible for IP issues at TCS.

12          THE COURT:  All right.  And, Mr. Menon, why is

13   it that you prepared that report?

14          MR. MENON:  We got a request from Ms. La Mar

15   stating that there were a list of allegations she was

16   looking into and --

17      (Reporter clarification.)

18          THE COURT:  Yeah, if you could bring the mic

19   closer to you.  You can also stand, if you want to --

20   there's a podium -- if you're comfortable.  Whatever you

21   prefer.

22          MR. MENON:  Okay.

23          THE COURT:  Thank you.  So she asked you -- she

24   presented you with a series of questions that had been

25   raised that she needed answers to; is that what you're

1   saying?

2          MR. MENON:  Yes.

3          THE COURT:  I don't want you to go into the

4   specifics of the questions.  I want to be respectful of

5   the privilege.  But you prepared this in response to the

6   questions that she posed; is that correct?

7          MR. MENON:  She had a request that we do an

8   investigation on two of these pieces: one piece being

9   download of information, et cetera; the second one being

10  misuse of that information for Med Mantra.  So they were

11  specific questions.  She said that these are two

12  allegations which she cannot investigate because it's

13  more specific to the act that is happening at Chennai, so

14  she wanted TCS to do that.  So she asked and we responded

15  with a report.

16         THE COURT:  What did you gather in response to

17  the download of information?

18         MR. MENON:  Initially when we spoke to the

19  team --

20         THE COURT:  The *team* being?

21         MR. MENON:  The team at the TCS Kaiser oversea

22  in Chennai.  We spoke to them and what we gathered from

23  that is that Ramesh Gajaram had indeed shared his

24  credentials with a few of his colleagues.

25         THE COURT:  And when you say "what we gathered

1  from that," you didn't personally gather this

2  information?

3          MR. MENON:  I did.

4          THE COURT:  You did.  Okay.  Thank you.  And in

5  learning that information, then you reduced that to a

6  memo form for Ms. Malimar *(verbatim)*?

7          MR. MENON:  Right.  That's correct.

8          THE COURT:  All right.  Any other direction that

9  she gave you other than that she needed information?

10  Again, I don't want specifics, but anything more than you

11  needed information on what -- how it happened that there

12  was a downloading of information and how that information

13  was used?

14          MR. MENON:  Right.  Not any more than that.

15          THE COURT:  It was just those two general

16  positions?

17          MR. MENON:  Right.  That's correct.

18          THE COURT:  And your position is?

19          MR. MENON:  I'm the chief security officer of

20  TCS.

21          THE COURT:  Okay.  And, Counsel, you withheld

22  that document; is that correct?

23          MR. ROBBEN:  Correct, on privilege.

24          THE COURT:  On the theory that it was prepared

25  at the direction of counsel and is work product as well

1   as attorney-client privilege?

2          MR. ROBBEN:  That's correct.

3          THE COURT:  Let me hear then from Epic.  Thank

4   you, very much, for your comments.  Let me hear from Epic

5   then.  Have you taken, and I'm going to butcher this

6   name, but Mr. Muthuswami's deposition?

7          MR. RICHMOND:  We have not, Your Honor.  We only

8   very recently became aware that this investigative

9   activity was done by Mr. Menon and Mr. Almalraj and the

10  Doctor, so we -- I believe we have them noticed.  We have

11  another trip to India scheduled tentatively in January

12  for a lot of depositions and I believe he is one.

13         THE COURT:  All right.  Mr. Menon, I apologize,

14  if you could rise again, but only for the benefit of the

15  court reporter.  I don't mean to make you jump up and

16  down.  But have you learned of a human resource

17  investigation or inquiry that began in the spring, early

18  summer of 2014?

19         MR. MENON:  With regards to the allegations of

20  Epic information download, no.

21         THE COURT:  Okay.  To your knowledge, there was

22  no formal investigation done?

23         MR. MENON:  Yes.

24         THE COURT:  Who would know, besides you, if

25  there had been?

1        MR. MENON:  I'm saying there was no such report.

2    I handle such investigations.

3        THE COURT:  All right.  So you would have known

4    about it had it been done?

5        MR. MENON:  Yes, very much.

6        THE COURT:  All right.  Can I ask you the same

7    with respect to the Audit Committee investigation in the

8    spring or early summer of 2014: was there an Audit

9    Committee investigation?

10        MR. MENON:  I may not completely know that, but

11    that's exactly what Michelle La Mar was doing on behalf

12    of the Audit Committee.

13        THE COURT:  So your understanding is that she

14    was engaged by the Audit Committee to prepare or to do an

15    investigation?

16        MR. MENON:  Right.

17        THE COURT:  And do you know whether someone

18    within the Audit Committee, a CPA or someone with an

19    accounting background or other investigative experience,

20    participated in that investigation on behalf of Tata?

21        MR. MENON:  I wouldn't know that.  So I think it

22    started much before I got into this.

23        THE COURT:  "It started" meaning?

24        MR. MENON:  Ms. La Mar's engagement started

25    before I was informed about this issue.  So as

1    Mr. Guionnet informed her about many of his allegations,

2    these two is what she handed off to us.  My involvement

3    start then.  I'm not privy to what happened prior in

4    terms of if there was a direct connect with --

5              THE COURT:  The easier part about that is that

6    would have been true with respect to a human resource

7    investigation as well, but you're confident you know

8    about that?

9              MR. MENON:  Yes.

10             THE COURT:  And the reason is because?

11             MR. MENON:  Any such investigation with regards

12   to misuse of information is my responsibility at TCS.

13             THE COURT:  But the Audit Committee

14   investigation is not?

15             MR. MENON:  The Audit Committee investigation

16   was primarily on a whole other set of allegations, so the

17   whole thing was taken to Ms. La Mar.

18             THE COURT:  So the Audit Committee investigation

19   would have been concerned with other matters than the

20   access or downloading of Epic confidential information by

21   someone associated with Tata, or you just don't know?

22             THE DEFENDANT:  I wouldn't know.  I wouldn't

23   want to answer that.

24             THE COURT:  That's all right.  I'm with you.

25             MR. ROBBEN:  Your Honor?

1          THE COURT:  Hang on just a second.

2          MR. ROBBEN:  Sure.

3          THE COURT:  With respect to the Security

4   Department investigation, you would have been the

5   person -- you would be familiar with any investigation

6   conducted by that group, correct?

7          MR. MENON:  Yes.

8          THE COURT:  All right.  And so you were involved

9   in any follow-up resulting from Kaiser's request.  Did

10  Kaiser contact Tata and ask for a follow-up to determine

11  what had occurred with respect to accessing or

12  downloading information?

13         MR. MENON:  Kaiser conducted their own

14  investigation.

15         THE COURT:  Kaiser did?

16         MR. MENON:  Yes.

17         THE COURT:  All right.  And that's now been

18  produced, that report has been produced, correct?  You

19  wouldn't be familiar?

20         THE DEFENDANT:  I don't know.

21         THE COURT:  All right.  I was under the

22  impression, but we'll come back to counsel for that.

23         MR. ROBBEN:  I think there could be a

24  misunderstanding, I will say.

25         THE COURT:  All right.  You can clarify,

 1  Counsel.

 2      MR. ROBBEN:  I think what Mr. Menon said is that

 3  Kaiser did its own investigation of the UserWeb

 4  allegations and that is true.  TCS, at Michelle La Mar's

 5  request, did a parallel investigation of its own.  And

 6  then the portion of that that related to UserWeb access

 7  was provided to Kaiser by TCS in September of 2014.

 8      THE COURT:  All right.  Let me hear from Epic's

 9  counsel on that subject.  And I'll let you sit down a

10  moment, Mr. Menon.  No, I appreciate it.  No, no, you're

11  welcome to stand, all right, rather than have you go up

12  and down.  I'm just apologizing.  I usually don't have a

13  witness stand while counsel are speaking.

14      Can you advise me as to your understanding with

15  respect to this so called *Kaiser investigation*?

16      MR. RICHMOND:  Yes, Your Honor.  Let me just put

17  it in context, if I may.  What we know is in late April

18  Mr. Muthuswami wrote to Mr. Guionnet and said, "Human

19  resources will be conducting a prompt and thorough

20  investigation into your allegations.  You will be

21  contacted at the conclusion of the investigation."

22      And then, as I said, Narsi, the head of human

23  resources, began to contact Mr. Guionnet.  So there

24  clearly was a human resources investigation.  Whether

25  Mr. Menon knows about it or not, there clearly was,

1  unless the TCS president was just making it up.

2      So where that is, where the papers are, I don't

3  know.  But even if there was some piece of that that was

4  privileged, like a lawyer's comment that said, "Wow, we

5  are really in trouble; we broke the law; we violated a

6  contract"; maybe that part is privileged, maybe we would

7  talk about waiver here.

8      But beyond that, all the facts that were uncovered

9  in that human resources investigation, we're entitled to

10  know.  We need to know that: who did they talk to, what

11  documents did they look at, et cetera.

12          THE COURT:  I get it.  Hang on a second.

13          MR. RICHMOND:  Okay.

14          THE COURT:  Mr. Menon, is it possible that there

15  could have been an investigation followed -- are you

16  familiar with what he's just described --

17          MR. MENON:  Very much.

18          THE COURT:  -- having occurred?  Okay.  So there

19  was some kind of examination made.  Did that involve you

20  or did not involve you?

21          MR. MENON:  There was no a char (ph)

22  investigation or there was no valid investigation by

23  anybody in TCS.

24          THE COURT:  No valid?

25          MR. MENON:  No valid investigation by any other

1  team in TCS into Epic and downloaded Epic.

2       THE COURT:  So what was occurring within HR at

3  that time?

4       MR. MENON:  So, as I said before, Philippe

5  Guionnet had a list of allegations.  The whole thing was

6  taken to Michelle La Mar.  She heard him out.  And as she

7  conducted her own assessment on the entire list of

8  allegations, these two pieces were handed off to me.

9       MR. ROBBEN:  Your Honor, could I make a point on

10 timing that I think might be helpful?

11      THE COURT:  He said April of 2014.  And your

12 point is what?

13      MR. ROBBEN:  My point is that Mr. Guionnet

14 raised allegations in April and those allegations

15 concerned his own employment, homeland security, billing

16 fraud, et cetera.

17      THE COURT:  Understood.

18      MR. ROBBEN:  Later on he raised allegations as

19 to Epic and UserWeb and Med Mantra.  And at that point

20 those allegations became part of an investigation that

21 was already ongoing.  So the HR part --

22      THE COURT:  I'm with you.  Do you have any

23 information, Mr. Richmond, that indicates that this

24 initial investigation involved the possible unauthorized

25 access to Epic?

1          MR. RICHMOND:  It absolutely should have, but I

2     don't have visibility into whether it did in fact.  I

3     don't know that.

4          THE COURT:  It certainly sounds plausible that

5     they would have had lots of things to investigate and

6     that this issue didn't come up until later, right?

7          MR. RICHMOND:  Well, no, the issue did come up,

8     because Mr. Guionnet sent very clear emails.

9          THE COURT:  Mr. Guionnet sent a lot of stuff.

10         MR. RICHMOND:  Yes, he did.

11         THE COURT:  So they had to prioritize as to what

12    they were going to investigate.  It's plausible that they

13    didn't get on to Epic's concern -- that is, access to

14    Epic information -- until later.

15         MR. RICHMOND:  I don't have the record citations

16    right in front of me, but I think that's not quite right

17    because they pestered, I'll use the word *pestered*, TCS

18    human resources people pestered Mr. Guionnet and said,

19    "You're not going quick enough.  You need to give us more

20    detail.  You need to be more clear.  And if you don't" --

21         THE COURT:  More clear about Epic?

22         MR. RICHMOND:  I believe it does say about Epic.

23         THE COURT:  Why do you say that?

24         MR. RICHMOND:  Because of the nature of the back

25    and forth emails between Mr. Guionnet and Narsi, the head

1    of human resources.  And Narsi was saying, "You're not

2    being clear enough, you need to be more clear, and you

3    need to give it to me within 48 hours."  And that was

4    happening in the April-May time frame of 2014.

5            THE COURT:  All right.  And as you sit here

6    today, Mr. Robben, you can assure the Court that none of

7    that exchange or investigation by HR dealt with Epic's --

8    or access to Epic's confidential information?

9            MR. ROBBEN:  That is my understanding, because

10   I'm looking for the exhibit because we put it in the

11   opposition to the motion, Mr. Guionnet's correspondence,

12   and Epic doesn't come up until later on.

13           THE COURT:  And this is in your response?

14           MR. ROBBEN:  I believe it's in the

15   declaration -- it's exhibits to the declaration and

16   that's what I was trying to prove.

17           THE COURT:  Mr. Richmond, can you tell me where

18   it is that -- where and when the Epic issue began to be a

19   focus of Tata?

20           MR. RICHMOND:  Yes.  If you look at our brief,

21   on page 10, Your Honor, it's partly in the deposition

22   transcript of Mr. Guionnet, which we've cited.  It's also

23   in Exhibit 12 to my --

24           THE COURT:  I'm on page 10.

25           MR. RICHMOND:  Yes.

 1          THE COURT:  And you say it's part of -- what are

 2   you referring to?

 3          MR. RICHMOND:  If you look at the carryover

 4   paragraph on top of the page, Your Honor.

 5          THE COURT:  I'm sorry.  In your motion to

 6   compel?

 7          MR. RICHMOND:  In the brief in support of our

 8   motion to compel on page 10, yes.

 9          THE COURT:  All right.  And I'm on page 10 of

10   that brief.

11          MR. RICHMOND:  All right.  Then --

12          THE COURT:  There is no carryover paragraph on

13   page 10.

14          MR. RICHMOND:  Oh, I'm sorry.  My clip was

15   holding it down.  It's a new paragraph that starts out

16   just after "receiving."

17          THE COURT:  Now we're on the same page.

18          MR. RICHMOND:  Okay.  My clip covered up the

19   indentation.  My apologies, Your Honor.

20          THE COURT:  It's fine.  I just want to make sure

21   we're --

22          MR. RICHMOND:  Second line is where it really --

23   well, that whole paragraph really describes what I'm

24   talking about.  So Mr. Guionnet received the top

25   performance rating for his -- the year ended March 31st,

1   2014.  And he wrote to Mr. Sundar about the "Epic

2   situation," and you'll see the quote there.  He accused

3   Mr. Sundar of having corrupted an individual in a foreign

4   country in order to obtain his access code to "render

5   your services fraudulently and knowingly and

6   deliberately.  As if this was not enough, the Offshore

7   Team that has access to the Epic information we're not

8   supposed to access is the same team allegedly also linked

9   to Med Mantra, a competitor of Epic."

10      And that e-mail, I don't see the date exactly of

11   that e-mail here.  But if we looked at the documents, we

12   could figure it out.

13            THE COURT:  Could you do that while --

14            MR. RICHMOND:  It's April 20th, 2014, Your

15   Honor.

16            THE COURT:  All right.  So we know that

17   Mr. Guionnet made these accusations.  What do we know

18   about Tata's follow-up?

19            MR. RICHMOND:  The follow-up took two forms,

20   Your Honor.  One was some back-and-forth correspondence

21   by email between Mr. Guionnet and Narsi, the head of

22   human resources.  The other one was that he was contacted

23   by a man named *Curt Bajak* from the Loeb law firm.  And

24   you'll see in the record an exchange of emails between

25   Mr. Guionnet and Mr. Bajak.

1       And Mr. Guionnet, in his deposition, said that for

2   allegations of the type he was raising, it was his belief

3   that the Audit Committee would get involved.  Now, why is

4   that?  Audit committees are supposed to be independent.

5   You can't have the *fox guarding the hen house*.

6       So responsible large corporations, when they are

7   accused of wrongdoing, they don't necessarily rely on

8   their in-house staffs to figure out what went wrong.  If

9   they really are serious about trying to figure something

10  out, the audit committee, in its role of protecting the

11  company in an auditing fashion, will conduct its own

12  independent investigation.

13      Mr. Guionnet was wise to those distinctions and the

14  kinds of investigations that companies do either by your

15  human resources department.  But if that's the *fox

16  guarding the hen house* --

17          THE COURT:  I think we're going far afield from

18  what I'm trying to ask you, which is what do you know

19  about --

20          MR. RICHMOND:  Let me get right to it.

21          THE COURT:  -- Tata's follow-up with respect to

22  this specific accusation.

23          MR. RICHMOND:  Yes.  Mr. Bajak contacted

24  Mr. Guionnet.  Mr. Guionnet thought it was part of the

25  human resources investigation.  But when he asked,

 1   Mr. Bajak said "no."

 2          THE COURT:  And Mr. Bajak being from Loeb?

 3          MR. RICHMOND:  He's a Loeb partner in Los

 4   Angeles.

 5          THE COURT:  I just wanted to confirm.  Okay.

 6          MR. RICHMOND:  Yes.  When he had his

 7   back-and-forth with Mr. Bajak, he said that he was "under

 8   the representation that you are acting as an outside

 9   investigator and not a lawyer and that your report would

10   not be protected by attorney-client privilege."

11   Mr. Bajak wrote --

12          THE COURT:  I'm sorry.  Who said that?

13          MR. RICHMOND:  Mr. Guionnet said that to

14   Mr. Bajak.  Mr. Bajak said to Mr. Guionnet, "Can we meet

15   and talk?"

16      And before he would talk, Mr. Guionnet said, "I want

17   to understand exactly what your role is."

18      And so Mr. Guionnet, in trying to confirm his

19   understanding, this is the bottom of page 12 --

20          THE COURT:  So clearly the communication between

21   Mr. Bajak and Mr. Guionnet was not privileged.

22          MR. RICHMOND:  No.

23          THE COURT:  But I don't know how in the world I

24   can rely on Mr. Guionnet's statement -- hearsay statement

25   by an attorney from Loeb & Loeb that what he is doing is

1    not privileged.  I mean, come on.

2            MR. RICHMOND:  No, no.  Let me -- I'm just

3    trying to set the context, Your Honor, for what --

4            THE COURT:  Well, you're doing a poor job if

5    that's what you're relying on.  I'm trying to understand

6    what evidence you have.  And I guess your response is, it

7    all depends on Mr. Guionnet's statement that Mr. Bajak

8    was doing this investigation with regard -- including the

9    issues with regard to Epic back in -- and when was this

10   conversation?

11           MR. RICHMOND:  This is an email exchange.  And

12   this happened -- you'll see at the bottom of page 12 of

13   our memorandum, that's what I was talking about, it's

14   Exhibit 17 to the declaration.  And in response to that,

15   Mr. Bajak said, "I'm not acting as counsel either to TCS

16   or to you."

17           THE COURT:  That's in an email?

18           MR. RICHMOND:  Yes.  These are emails.

19           THE COURT:  "I'm not acting as counsel to" --

20           MR. RICHMOND:  This is the top of page 13 of our

21   brief, Your Honor.  Mr. Bajak, said in an email, "I am

22   not acting as counsel either to TCS or to you with

23   respect to this matter."  And he said he was acting "on

24   behalf of the Audit Committee."

25           THE COURT:  I don't understand how that answers

1 | my question, which is what do we --

2 |        MR. RICHMOND:  That's all I know, Your Honor;

3 | that's the problem.  I don't know much more than you do.

4 |        THE COURT:  His statement is confirmatory that

5 | he is engaged in an internal investigation.

6 |        MR. RICHMOND:  I agree.  I agree.

7 |        THE COURT:  So I -- let's start --

8 |        MR. RICHMOND:  So the point of this, Your Honor,

9 | is if there was an investigation for the Audit Committee,

10 | we're not saying that every single thing that was said to

11 | the Audit Committee is discoverable.  There may be

12 | ultimate conclusions reached about the size of liability

13 | for TCS that this presents or creates.  There may be

14 | other privileged kinds of conclusions.

15 |    But whatever Mr. Bajak collected, who did he talk

16 | to?  What documents did he get?  What are the facts?

17 | Those are not privileged.  The facts are the facts,

18 | whatever they are.  And TCS has gathered them up I

19 | believe in two or three or four different kinds of

20 | investigations and we should have access to those facts.

21 |        THE COURT:  Okay.  And Mr. -- Tata, with respect

22 | to -- I'm sorry -- with respect to the investigation that

23 | was being conducted, to the extent that counsel was

24 | gathering information, that's not privileged unless it

25 | was -- well, it's not going to be subject to work product

1  privilege; it was in anticipation of litigation between

2  Mr. Guionnet and Tata, correct?

3          MR. ROBBEN:  Well, yes, but I think an important

4  point is that the correspondence that Mr. Richmond

5  referred to was fairly early on, but it's kind of like a

6  little crumb.  And when Mr. Bajak went out to

7  Mr. Guionnet, he -- and we talk about this on page 8 of

8  our opposition, he wrote to him in early May and said,

9  "I'd like to talk to you; I'd like to talk to you," and

10 he didn't get a response.

11     And then later on in June, that's when Mr. Guionnet

12 starts to sort of flesh out what he's alleging as to

13 UserWeb and Med Mantra, and so the investigation now

14 starts to include those details.

15     I mean, for him to say in April all this illegal

16 activity, and he does a laundry list and he throws in a

17 reference to Epic, isn't the same as saying, "This is the

18 illegal activity I'm claiming."  So the investigation

19 didn't turn to that until later.  The investigation prior

20 to that, whatever Mr. Bajak was doing, was about things

21 that aren't at issue in this case.

22          THE COURT:  And again, I'll come back, since

23 that is where I started, any information you have to

24 suggest that that's not true?

25          MR. RICHMOND:  I just don't have the information

 1   one way or the other, Your Honor.

 2            THE COURT:  Because you don't have any

 3   information from Loeb & Loeb?

 4            MR. RICHMOND:  Correct.  And I have not yet

 5   taken the deposition of Mr. Menon or Mr. Almalraj or

 6   Dr. Mohanty.

 7            THE COURT:  All right.  And while we continue

 8   this discussion, could someone step out and see if both

 9   Mrs. Malimar and Bajak are available?  Thank you.  And if

10   you do, you could get a number at which they could be

11   reached.  Thank you, very much.  All right.

12        Tell me what you have received with respect to the

13   Kaiser investigation.

14            MR. RICHMOND:  Yes, Your Honor.  Kaiser --

15            THE COURT:  I'm sorry.  You can sit down,

16   Mr. Menon.  Thank you, very much.

17            MR. RICHMOND:  Kaiser received notice from the

18   whistleblower just shortly before Epic did.  Kaiser began

19   to conduct its own investigation, as we understand it, in

20   the summer of 2014.

21            THE COURT:  And have you sought discovery from

22   Kaiser?

23            MR. RICHMOND:  We have.  We have not gotten that

24   report.  We've gotten from Kaiser, information from

25   computers and from emails.

1          THE COURT:  And what did Kaiser -- and have you

2   asked for the report?

3          MR. RICHMOND:  We have talked about it.  They

4   are resisting it thus far on privilege grounds,

5   privilege.

6          THE COURT:  Okay.  They were doing their own

7   internal investigation?

8          MR. RICHMOND:  Yes, Your Honor.

9          THE COURT:  And they're claiming the same

10  privilege as Tata is claiming?

11         MR. RICHMOND:  Well, yes -- yes and no.

12         THE COURT:  By name.

13         MR. RICHMOND:  By name, yes.

14         THE COURT:  Work product and attorney client?

15         MR. RICHMOND:  Yes, by name, yes.

16         THE COURT:  All right.  So you don't have their

17  actual report?

18         MR. RICHMOND:  I don't.  But what I do have is

19  the report that TCS gave to Kaiser.  So Kaiser, when it

20  was doing its investigation, reached out to TCS and said,

21  "We want your help with this investigation to figure out

22  what happened."  TCS did an investigation.  I believe

23  that's what I'd call the *security department*

24  *investigation*.

25         THE COURT:  But you have that?

1           MR. RICHMOND:  We have a report dated September

2    14th, 2014, which was sent to Kaiser shortly after its

3    preparation.  So let me just -- we're not quite to that

4    part of the discussion, but in terms of even if things

5    are privileged, have they been waived or not, if there

6    truly is only one investigation and somehow I'm wrong

7    about this and there was only one grand investigation;

8    well, the report about that investigation was always

9    being prepared to give to a third party, Kaiser, with no

10   protection at all with any kind of privilege.  And it

11   contains not only some facts, but it contains ultimate

12   conclusions.

13           THE COURT:  Mr. Robben.

14           MR. ROBBEN:  The report was not being prepared

15   for Kaiser; it was being prepared -- the internal

16   investigation TCS was doing was for itself.  Kaiser did

17   ask along the line, "Can we have your conclusion?"  And

18   the portion of that that related to UserWeb access or a

19   write-up on that was given to Kaiser.

20       But the investigation that TCS did was broader

21   because it contained not only the access part, the

22   UserWeb part, but did that UserWeb information make its

23   way to Med Mantra.  And that part Kaiser was not

24   interested in and we did not give them.

25           THE COURT:  Okay.  But you'll agree that there

 1   was at least a partial waiver of the attorney-client

 2   privilege when you disclosed to Kaiser the access

 3   information?

 4         MR. ROBBEN:  No, I wouldn't agree that there's a

 5   partial waiver --

 6         THE COURT:  Why not?

 7         MR. ROBBEN:  -- as to that document.

 8         THE COURT:  Why wouldn't that constitute a

 9   waiver?  You just disclosed exactly what you're asserting

10   is privileged here to a third party.

11         MR. ROBBEN:  Well, it's not disclosing the --

12   it's not waiving the privilege as to the entire

13   investigation.

14         THE COURT:  I didn't say it was a waiver of the

15   entire investigation; I said it's a waiver of the

16   privilege with respect to information about access to

17   Epic through Kaiser.  How is it not?

18         MR. ROBBEN:  Because it's just a summary of --

19         THE COURT:  Of the privileged information that

20   was obtained.  You've waived that.  That much is decided

21   today.  You've waived any information that was gathered

22   by the Loeb firm or in any other subsidiary investigation

23   or separate investigation by Tata with respect to

24   accessing information.  That privilege is gone.  And all

25   information needs to be produced within the next 14 days.

1        Now, you may not have waived the broader privilege,

2   but I don't understand how you could take a position that

3   if you disclosed a clear subject matter to a third party

4   that you get to continue to assert that privilege against

5   Epic in this case.  That's not defensible.  So that will

6   be done.  Are we clear?

7               MR. ROBBEN:  We're clear.

8               THE COURT:  All right.  Now, as to the report

9   provided Kaiser, has that now been produced?

10              MR. ROBBEN:  Yes.

11              THE COURT:  And within that report, the only

12  thing you produced was information regarding access?

13              MR. ROBBEN:  Correct.

14              THE COURT:  So it was a portion of the larger

15  report prepared by Loeb, correct?

16              MR. ROBBEN:  It was a -- it's a -- it's not a

17  portion of something prepared by Loeb; it's a --

18              THE COURT:  I want to know what was it that was

19  produced.  Did Loeb prepare it?

20              MR. ROBBEN:  They did not.

21              THE COURT:  How was it prepared?

22              MR. ROBBEN:  It was prepared -- the memo that

23  was prepared for Ms. La Mar was --

24              THE COURT:  I'm sorry.  That was prepared by

25  Ms. La Mar?

```
 1              MR. ROBBEN:  For her.

 2              THE COURT:  For her.  In other words --

 3              MR. ROBBEN:  Factual memo.

 4              THE COURT:  -- the May memo to her that was

 5   provided based on the two questions that she posed?

 6              MR. ROBBEN:  August, yes.

 7              THE COURT:  All right.

 8              MR. ROBBEN:  August.  She requests that TCS look

 9   into this matter and give her facts.  TCS does that

10   between late July and August.  On August 22nd they send

11   her a memo.  The memo concerns matters that cover her

12   questions.

13              THE COURT:  Well, I think we're at the point

14   where you can certainly disclose the subject matter, the

15   headings, which is it included what information was

16   accessed through Kaiser by Tata employees, right?

17              MR. ROBBEN:  It didn't include what information;

18   it included who might have done it.

19              THE COURT:  Okay.

20              MR. ROBBEN:  And from that memo that was created

21   for her, a separate document was adapted and that's what

22   was provided to Kaiser.

23              THE COURT:  Who adapted that memo?

24              MR. ROBBEN:  I believe it was Mr. Menon and his

25   team.
```

1          THE COURT:  All right.  So he did a second memo

2    to Kaiser using information that he had created at the

3    time he provided a report to Ms. Malimar?

4          MR. ROBBEN:  But only as to the UserWeb access

5    piece, not as to the Med Mantra piece.

6          THE COURT:  No, no.  You're quite clear.  The

7    problem I'm having is I'm really uncomfortable when you

8    then turn around and provide half of the Malimar memo

9    regarding the accessing of information to a third party,

10   Kaiser, that the remainder of the memo stays privileged

11   under a general rubric of attorney-client work product,

12   particularly when we've now been dancing for almost a

13   year -- the clients have been dancing for almost a year

14   repeatedly going to the magistrate to get exactly the

15   information that's being sought in that memo.

16       And at best, your client has done a poor job of

17   providing the right people at the right time with

18   information at depositions, particularly the 30(b)(6)

19   depositions, that we should be dancing any more and I

20   shouldn't just order that the Menon report be produced.

21   It's simply a factual report, isn't it?  It's answering

22   very general questions as to what are the facts.

23          MR. ROBBEN:  It discusses the facts, but it

24   discusses interviews and what people said at interviews

25   and has that type of content as well.

1        THE COURT:  All right.  At the break I will ask

2   that you provide me -- you have a copy of that today?

3        MR. ROBBEN:  We should have a copy of it or can

4   obtain one.

5        THE COURT:  All right.  I would ask that you

6   provide it under seal.  If you need to print out a

7   version, we have an attorney's work room where you can

8   have it sent to you and you can use the printer there to

9   point it out.  I would like to see a copy of the entire

10  memo.

11       In any event, and in addition, I would ask Epic to

12  provide me with the memo which was or the report which

13  was finally produced to you.  I take it, it was -- you're

14  calling them *TCS* and you refer to them as *Tata*.  Is there

15  a legal distinction between the two entities?

16       MR. RICHMOND:  Your Honor, I hope that never

17  becomes a question in this case, but I have wondered.

18       THE COURT:  Well, let's leave you out of it.

19  When you say *Tata*, do you intend something different than

20  *TCS*?

21       MR. ROBBEN:  No.  I mean, well, there is a Tata

22  Group, but I'm referring to the defendants in this case.

23       THE COURT:  The TCS defendant?

24       MR. ROBBEN:  Correct.

25       THE COURT:  All right.  We're on the same page.

1    But then I think it's probably better to use *TCS* for

2    purposes of our discussion.

3              MR. ROBBEN:  Sorry about that.

4              THE COURT:  No, no.  No one needs to apologize

5    to me.  I'm just trying to assist the parties in getting

6    to the bottom of this so we can complete this case.

7         With respect to TCS, you've now been provided, I

8    take it, with a report as to downloaded information.

9              MR. RICHMOND:  What we received, Your Honor --

10             THE COURT:  I should say, as to who may have

11   accessed that information.

12             MR. RICHMOND:  We did receive the report that

13   TCS gave to Kaiser.  We received it in an unusual way

14   only very recently.

15             THE COURT:  I know that it came only in the fall

16   of this year and as a result of repeated requests for

17   information.

18             MR. RICHMOND:  Yes.  And the only way we got it,

19   Your Honor, was you had asked earlier, have we asked

20   Kaiser for information.  The answer is "yes."  A man

21   named *Anmol Gupta's* laptop, which had been issued by

22   Kaiser to help him do his work, was produced to us.  And

23   on that laptop of Anmol Gupta, there was a document that

24   was somewhat similar to the report eventually given to

25   Kaiser.  It was a PowerPoint.  We had noticed that and

1    put a Bates number on it.

2            THE COURT:  I understand.

3            MR. RICHMOND:  Okay.

4            THE COURT:  Do you know when that -- when was

5    the report prepared that was provided to Kaiser?

6            MR. ROBBEN:  I believe the date is September

7    12th, 2014.

8            THE COURT:  All right.  How was that not

9    produced until a year after?

10           MR. ROBBEN:  When we had that report, we thought

11   it was a privileged document.  And it wasn't until --

12           THE COURT:  And so you thought that it was only

13   internal to TCS, that it had never been provided to

14   Kaiser?

15           MR. ROBBEN:  Correct.  And the document --

16           THE COURT:  Mr. Menon knew at the time he

17   prepared it who it went to, correct?

18           MR. ROBBEN:  Yes.

19           THE COURT:  So did anyone ask him?

20           MR. ROBBEN:  No.  Because of the context in

21   which we got it, it suggested that it was confidential,

22   it was privileged.  And so it wasn't until we realized --

23           THE COURT:  Who was it addressed to?

24           MR. ROBBEN:  It was addressed to somebody named

25   David McLeod at Kaiser.  But all of the people on the

 1  email were --

 2        THE COURT:  It was addressed to a *David McLeod*.

 3  Did it say *Kaiser*?

 4        MR. ROBBEN:  Well, we didn't have the email

 5  because we were searching email.  We had agreed on

 6  certain custodians of email and none of those custodians

 7  of email were involved with this document.  And so it

 8  wasn't until later when we saw the email --

 9        THE COURT:  I guess what this really highlights

10  is you're not creating confidence and you certainly did

11  not -- you shuck any confidence by the magistrate judge

12  as to the quality of the investigation that you did in

13  terms of responsive documents.  You've produced 30(b)(6)

14  witnesses who were not adequately prepared to answer

15  questions and those had to be done again.  And you're

16  building a record -- you've built a record over the last

17  year of not doing an adequate job in production of

18  relevant information to this lawsuit.

19      And so if it's a close question, I'm inclined -- and

20  I'm strongly inclined, although I will look over the

21  document -- to simply require the disclosure of the

22  entire Menon report to the Loeb law firm, which, from

23  what it sounds like, is pretty much just a factual

24  summary.  It is information that would be very difficult

25  for Epic to gather on its own, as demonstrated by the

1    last year of its attempt to reconstruct the same

2    information.  And I'm having trouble viewing that as a

3    more than -- viewing that as anything other than an

4    appropriate sanction, if nothing else, for what's

5    occurred to date.

6             MR. ROBBEN:  May I respond to that?

7             THE COURT:  Of course.

8             MR. ROBBEN:  I think that we've done a proper

9    job of responding to discovery.

10            THE COURT:  Well, I disagree.  I mean, you can't

11   read the transcripts before Magistrate Judge Crocker or

12   his subsequent orders indicating that you had to redo

13   discovery repeatedly and come to that conclusion.

14            MR. ROBBEN:  Well, on the, you know, *who*

15   *accessed the information* piece of this, there are certain

16   facts that I think are important.

17            THE COURT:  I'm much more concerned over who

18   used the information, which is where the real disputes

19   are.

20            MR. ROBBEN:  Well, that I think we have given

21   them full access to inspect the product that they say we

22   improved, the Med Mantra product.  They have deposed the

23   person who --

24            THE COURT:  We'll come to that in a moment.

25            MR. ROBBEN:  Well, they've deposed the person

1  who ran the program.  We told them that we did a scan of

2  all the computers that those Med Mantra people used and

3  didn't find any documents of theirs.

4      We have an expert report that says all of this

5  information that was downloaded, whether proper or not,

6  was the type of information tester people would need.  So

7  it's not like this information was something that we had

8  absolutely no need for.  And we've given the names of the

9  people who we could get to concede that they looked at

10  it.  Now, that's changed over time.  Some more --

11          THE COURT:  That's my problem, it's changed over

12  time.

13          MR. ROBBEN:  But that -- sorry.

14          THE COURT:  And at the end of the day, you know,

15  without concluding that it was in any way deliberate or

16  even haphazardly done, the fact is we're a year into the

17  discovery process and we're only now getting the

18  information that should have come out earlier.  So there

19  has to be some remedy for that.  And it seems to me this

20  might be the most appropriate remedy I could fashion.

21          MR. ROBBEN:  We've never taken issue with the

22  fact that there was downloading or password sharing.

23  It's never been an issue.

24          THE COURT:  But they want to know who and how it

25  was used and that's never been an issue either.  I mean,

1  from the beginning of the lawsuit it's been clear what

2  their complaint is.   Whether or not you believe it has

3  merit, it caused damage or anything else, they were

4  entitled to that discovery.   So we're just sort of

5  spinning wheels to have a further discussion about that.

6  That's what the lawsuit was about.

7      And whether you thought it had merit or not, you had

8  an obligation to provide timely discovery in response or

9  to seek a remedy from the Court.   You didn't do that, so

10 there has to be a consequence for not having acted

11 diligently.   But again, I want to review that report

12 before I decide.

13          MR. RICHMOND:   Your Honor, may I add one thing

14 about this Kaiser report?

15          THE COURT:   Very briefly.

16          MR. RICHMOND:   The Kaiser report was delivered

17 to Mr. David McLeod via an email.   He's clearly a Kaiser

18 guy.

19          THE COURT:   We've just gone over that, yes.

20          MR. RICHMOND:   But the people who delivered it

21 were these two men sitting here and Mr. Almalraj, so they

22 knew --

23          THE COURT:   They've been very upfront.   I've

24 only heard from Mr. Menon, but he hasn't fit any of

25 that --

 1          MR. RICHMOND:  The only point --

 2          THE COURT:  -- so there's no need to point to

 3   him like he's a defendant in a criminal case.

 4          MR. RICHMOND:  No, no.

 5          THE COURT:  In any event, your point is what?

 6          MR. RICHMOND:  My point is that to the extent

 7   that counsel thought it was privileged and had never gone

 8   outside of TCS, when the in-house lawyer and the top

 9   person for security in that company knew otherwise and

10   somehow no one asked them for a whole year --

11          THE COURT:  I think I just said that.

12          MR. RICHMOND:  Okay.

13          THE COURT:  I don't know why we're spending any

14   more time on it.

15          MR. RICHMOND:  Thank you, Your Honor.

16          THE COURT:  Thank you very much though for

17   repeating my point.  In any event, we can go on to the

18   next issue, which is, as I understand it, a desire, and

19   I'm not sure if this is how this would be fashioned and

20   what exactly it would get at, but a desire to prepare a

21   properly prepared 30(b)(6) witness to talk in detail

22   about -- and here, without artificial limitations, about

23   TCS's investigations and their findings and conclusions

24   to date.

25       It seems to me that the appropriate person to do

1    that is Mr. Menon.  Is there some one else that you think

2    you would need to speak to?  We've established the

3    30(b)(6) depositions have not been particularly helpful

4    in this case to date, so I'm hesitant to order some

5    general witness to be produced.

6        I mean, the problem with 30(b)(6) is counsel is

7    entitled to choose various people with information and to

8    advise them of additional information so that they can

9    speak for the company.  The advantage of 30(b)(6) is you

10   now have the company speaking.  But I don't see that as a

11   remedy for you here or at least one that is going to be

12   meaningful.

13       You have Mr. Menon scheduled for deposition.  At

14   this point, anyway, you're probably going to have his

15   memo and you can use that memo to explore as you wish.

16   But if one thing has been demonstrated, a lengthy -- a

17   long list of topics in a 30(b)(6) deposition is not going

18   to get you anywhere.  Is there someone else that you

19   think should be produced for that purpose?

20           MR. RICHMOND:  Yes, Mr. Almalraj.

21           THE COURT:  And you have him noticed for

22   deposition?

23           MR. RICHMOND:  I believe we do, but let me just

24   look over my shoulder.

25           THE COURT:  You don't need to do it this

1   second --

2           MR. RICHMOND:  Okay.

3           THE COURT:  -- because we're not going to

4   obviously resolve this before we take our morning break.

5           MR. RICHMOND:  Dr. Mohanty.

6           THE COURT:  All right.  Why don't you decide if

7   there's some further relief -- I don't know what it would

8   be -- with respect to that part of your request.

9           MR. RICHMOND:  Yes, Your Honor.

10          THE COURT:  As to the third category, you're

11  asking for the presentment of deposition of Pushpa Hedge,

12  who was originally designated the general manager, but

13  apparently is also in-house counsel --

14          MR. ROBBEN:  Your Honor?

15          THE COURT:  Hang on a second.

16          MR. ROBBEN:  All right.

17          THE COURT:  -- to respond to specific

18  interrogatories identified -- which originally identified

19  only four TCS employees who had access and apparently

20  there now are a number of others.  Is that a request

21  that's still necessary to be addressed today?

22          MR. RICHMOND:  I believe we should be able to

23  ask her what she did to investigate the basis for her

24  interrogatory answer that there were four people who

25  accessed our Epic's UserWeb when the count today stands

1  at 27 people and it could be scores or hundreds.

2            THE COURT:  All right.  Mr. Robben.

3            MR. ROBBEN:  Ms. Hedge is not a lawyer.  She's a

4  general manager at the TCS --

5            THE COURT:  Have you refused to produce her for

6  deposition?

7            MR. ROBBEN:  Well, what we -- I think *refuse* is

8  a stronger word.  What we said is --

9            THE COURT:  What would you describe -- how would

10  you describe -- what word would you use?

11            MR. ROBBEN:  What we said is that we would be

12  happy to designate Mr. Menon to talk about how those

13  interrogatory responses --

14            THE COURT:  But why wouldn't you produce -- I

15  mean, she signed them.  You can't -- it's obvious, if you

16  have someone sign the interrogatory response, you've

17  opened them up to deposition.  So I don't understand,

18  however you phrase it, whatever else you've offered, why

19  wouldn't they be entitled to take her deposition.

20            MR. ROBBEN:  I mean, she has no substantive

21  knowledge of the underlying facts, whereas the people

22  we'd be willing to put up about the preparation of those

23  responses do.

24            THE COURT:  I understand that and I think that's

25  a fair point; that you offered those who had the

1    underlying information.  And as to that, I don't want to

2    waste her time, but you're going to be there anyway.

3    Your only purpose is to discover what she did to confirm

4    the accuracy of the interrogatories she signed.  And her

5    answer may well be "I listened to counsel and they told

6    me that's what happened."

7          MR. RICHMOND:  It could be a very short

8    deposition, Your Honor.

9          THE COURT:  All right.  They're entitled to find

10   that out and so you'll produce her for deposition.

11         MR. ROBBEN:  Your Honor, could we produce her by

12   phone or by video?

13         THE COURT:  Where is she?

14         MR. ROBBEN:  She's in New York.  But if it's

15   such a -- if it's going to be such a short deposition, it

16   just might be --

17         THE COURT:  And that's what you're representing,

18   that she has no -- she did no independent investigation?

19         MR. ROBBEN:  She -- other than talking to

20   counsel or interacting with counsel.

21         THE COURT:  That's what I meant.  So she did no

22   independent investigation; she simply relied on counsel

23   and then she was chosen to sign the interrogatory

24   responses?

25         MR. ROBBEN:  Correct.  And the company is not

1    backing away from the response.

2          THE COURT:  I know that.  I assume, and I

3    apologize because I didn't look at the specific signature

4    page, but it's probably the signature is preceded by a

5    paragraph saying, "I may not know any of this by personal

6    information" or "much of this may not be by personal

7    information," et cetera.

8          MR. ROBBEN:  I don't remember the exact

9    language, but it is a boiler plate --

10         THE COURT:  Pro forma, boiler plate.  All right.

11         MR. RICHMOND:  But, Your Honor, here's what she

12   said: she said that her answers are being verified based

13   on "review of pertinent files and discussions with

14   appropriate personnel."  So that's what I'm going to ask

15   her: "What were the files you looked at and who were the

16   people you talked to?"

17         THE COURT:  When is the next time that you're

18   going to be in New York?

19         MR. RICHMOND:  There are so many depositions

20   happening so quickly, I believe it's next week, but I'm

21   not sure.

22         THE COURT:  You can produce her live in New

23   York --

24         MR. ROBBEN:  All right.

25         THE COURT:  -- and you will at a time convenient

1   to the plaintiff's counsel.  And you may be wasting your

2   time --

3          MR. RICHMOND:  I understand it may be a short

4   deposition.

5          THE COURT:  -- but I will not preclude you from

6   having that deposition.

7          MR. RICHMOND:  We understand.

8          THE COURT:  Okay.  I believe then that resolves

9   the -- except for this open issue with respect to the

10  other investigation, that addresses the principal issues

11  with respect to Epic's first motion, but I'll hear from

12  Epic if there was something more that needs to be

13  addressed.

14         MR. RICHMOND:  In this one respect, Your Honor:

15  It may be that you wish to have this discussion later

16  today, but part of the opposition to that particular

17  motion was TCS's description of Epic's focus on the three

18  liability questions as being just a mere distraction.

19         THE COURT:  Yeah.  I'm more -- I'm much more

20  interested in what relief you're seeking.  That's a

21  relief you sought.  I think I've addressed all of it

22  except for the open issue as to what more you may be

23  entitled to with respect to the investigation.

24         MR. RICHMOND:  On this particular motion there's

25  nothing more to be done.  But I think there is some

 1   further discussion warranted at some point on --

 2          THE COURT:  I will give both sides an

 3   opportunity to raise the larger issues, including the

 4   astounding letter that was sent at the end of the day

 5   yesterday, which I've already -- which was treated as a

 6   motion by the clerk's office and so I've already denied

 7   it.  We'll take up those larger issues.  But I am certain

 8   that we will not have a productive resolution of the

 9   motions before the Court if we stray into that at this

10   point.

11          MR. RICHMOND:  Then Epic has nothing further on

12   the motion to compel with respect to the investigations,

13   Your Honor.

14          THE COURT:  All right.  And I assume that TCS or

15   Tata does not either?

16          MR. ROBBEN:  That's correct.

17          THE COURT:  Very good.  All right.  As to the

18   second motion before the Court, it is one seeking to

19   produce all outside counsel's -- and from that I believe

20   we're talking about Loeb & Loeb; we're not talking about

21   the Kelley firm?

22          MR. RICHMOND:  Actually, we are, Your Honor.

23          THE COURT:  Well, I'm not talking about the

24   Kelley firm unless you advance some better argument than

25   I've read so far.  But I certainly agree we're talking

1    about the Loeb & Loeb firm and I will delay that until

2    after the break.  Do we have any indication whether

3    either were available?

4         MS. MCGREGOR:  Yes.  I'm sorry.  Mr. Verghese

5    called Ms. La Mar.  Her cell phone was off.  I think it's

6    two hours early in Los Angeles.  He sent an email to her

7    and we'll check with her when we take a break.

8         THE COURT:  All right.  Very good.  I will

9    postpone the discussion as to the information as to

10   outside counsel's investigation.

11       I am having trouble understanding -- I grant you

12   that what TCS did in choosing a 30(b)(6) representative

13   who had no involvement in these matters, was not involved

14   in the investigation of these matters and was going to

15   simply be testifying from what an attorney told them, is

16   poor form and perhaps even approaches obstruction.

17       I'm not sure what relief I can give you, for the

18   reasons I've already said, other than sanctions.  And

19   I'll certainly hear from counsel for TCS before I

20   consider sanctions.

21       But in terms of requiring a further production of

22   30(b)(6), as I've already said, I think that's been

23   demonstrated to be a pyrrhic victory for Epic and I don't

24   really intend to continue to go through it.  But I will,

25   as I've already indicated you can consider at break,

 1   agree to your taking more depositions than I probably

 2   would have but for this conduct.  And if there is

 3   specific individuals who you believe have information

 4   that you're entitled, I will support your ability to take

 5   them, unless it becomes punitive.

 6      I'm not going -- given that you're travelling to the

 7   various locations, I'm not going to give any direction as

 8   to where those specific depositions take place other than

 9   to say that there should be full cooperation from TCS in

10   terms of accommodating schedule and location when you're

11   there.

12      And I will I guess then just take up the question of

13   why this isn't evidence of a continued failure by TCS and

14   its counsel to make available people who actually know

15   something about this case when producing 30(b)(6)

16   representatives.

17         MR. ROBBEN:  Your Honor, if it's acceptable to

18   you, Ms. MacGregor, will handle that response.

19         THE COURT:  Absolutely.

20         MS. MCGREGOR:  Your Honor, we had given Mr. --

21   primarily Mr. Richmond's motion focuses on the fact that

22   we provided Mr. Muthuswami, who's a high-level executive

23   of TCS.

24         THE COURT:  I have no problem with your

25   providing any 30(b)(6) witness with a summary of

1  information that has been gathered by counsel that he can

2  speak to.

3            MS. MCGREGOR:   Okay.

4            THE COURT:   I have no problem with that,

5  particularly because you produced it and it was available

6  during the deposition.   That's my understanding, correct?

7            MS. MCGREGOR:   That's correct.   We provided --

8            THE COURT:   So I'm not concerned about that.

9  What I'm concerned about is the decision to produce

10  someone who had no involvement in the subject matter that

11  he is being asked about.   And I really do think that if

12  nothing else, it's a cynical approach to a 30(b)(6)

13  notice.

14            MS. MCGREGOR:   Certainly, Your Honor.   I just

15  want to point out that in terms of working with Epic's

16  counsel, we have agreed that there are three notices at

17  issue.   So one of them is security topics.   We've agreed

18  that Mr. Menon will be that witness.

19            THE COURT:   But he should have been to begin

20  with.   He should have been your witness.   His deportment

21  today demonstrates he's forthcoming, he's clear, he

22  didn't have to be prepped, he would have been able to

23  answer the questions, and you chose not to have him there

24  for the 30(b)(6).   Instead, you chose someone with no

25  information because it was easier and frankly safer

1   because you, counsel, can control what information is

2   disclosed, since the only information the person has is

3   what you give them.

4        MS. MCGREGOR:  Mr. Muthuswami did testify that

5   he had general knowledge of the security practices on at

6   least two different occasions during the deposition.

7        THE COURT:  But he almost totally relied on the

8   information that was provided him during the course of

9   the deposition.

10        MS. MCGREGOR:  He also, when he was asked about

11   what was done to create I think the list of UserWeb

12   individuals -- which we have agreed to produce these

13   people for depositions, we've agreed to produce the

14   communications with them by TCS -- all this information

15   has been offered to Epic and will be produced.

16        THE COURT:  But you could have found someone --

17   one of those people, for example -- who was directly

18   involved in the accessing of information or disseminating

19   of the information to be your 30(b)(6) representative

20   rather than choosing carefully and frankly to delay the

21   inevitable.  And had you done that, you wouldn't be

22   facing sanctions today.

23        MS. MCGREGOR:  We disagree that it was to delay,

24   Your Honor.  You know, we were very frank.  We put

25   somebody who was a high-level executive.  He did testify

1    that he's been working with the legal team getting

2    details that the legal team wants for some time.  You

3    know, he's a high-level person.  He's someone who's in

4    contact with in-house counsel.  He was aware of what TCS

5    took very seriously the magistrate's direction that we

6    look further and he was aware of that.  I actually asked

7    him at the deposition the direct question: "What was done

8    to generate this list?"  And he testified that TCS did a

9    reach-out.  I think, you know, some of the --

10           THE COURT:  That TCS did a reach-out is

11    different than he did a reach-out.  I did not see

12    anything, and I apologize to the extent I missed

13    statements about his direct participation, but I didn't

14    see references to his direct participation in gathering

15    information.  On the contrary, the strong impression from

16    most of his responses was that he didn't engage in any

17    direct investigation.

18       He may well have been involved at the very top in

19    terms of discussing with counsel what happened.  But they

20    weren't looking for a 30(b)(6) representative who had

21    discussions with counsel or was ultimately responsible

22    for the process; they were looking for someone who could

23    speak as to the subject matter.

24       And I agree, I don't know that what you did -- I

25    don't think it violates a specific rule.  I'm just

60

1  concerned that it was a pointless exercise and one that

2  could have been avoided had you produced people who had

3  some real information on these topics, which is really

4  what a 30(b)(6) deposition is for: you designate someone

5  who's generally familiar with the topic.  And you may

6  designate five people and they may have to take that

7  deposition and complete it over time, but you don't

8  designate someone who has no real direct information.

9       So if there's something specific you want to point

10  me to in his deposition that concerns his own involvement

11  and his own efforts at investigation, that would be

12  helpful.

13          MS. MCGREGOR:  I mean, I can point you to a

14  general statement, Your Honor, where he did say on page

15  14 that he was directly involved in getting details that

16  the legal team wants.  But I don't think that, I don't

17  want to waste your time, I don't think that's the type of

18  statement that you were looking for.  But I do want to

19  make one point, with your indulgence, that many of these

20  topics --

21          THE COURT:  I know I'm coming on strong and I

22  don't -- I don't want to overstate my concern.  I don't

23  doubt that both TCS and its counsel were making efforts

24  to comply with the letter of the law.  I'm just not sure

25  that in this instance you complied with the spirit of it.

1    And you're not the first client or firm that -- and

2    perhaps motivated by the fact that you think there's

3    nothing to this case and that how many people's lives are

4    you going to interrupt while you proceed.

5         Whatever the motivations, I'm just concerned that --

6    the other thing is, that this wasn't the first time that

7    you produced a 30(b)(6) individual who the magistrate

8    concluded wasn't knowledgeable and shouldn't have been

9    produced and required you to produce someone else.  So

10   this is the second time that we've got this same

11   assertion.

12        MS. MCGREGOR:  If I just may say, as to the

13   topics themselves, you know, I think we pointed this out

14   in our brief and I don't want to repeat that, but some of

15   them are asking very specific to name the titles, names

16   and positions of something like 14 individuals; the

17   titles, names, positions and responsibilities of --

18        THE COURT:  I agree there are any number of

19   matters where it would have been appropriate to refer to

20   specific information.  I just don't understand why you

21   wouldn't have chosen individuals who are more directly

22   involved.  And you put your finger on one of those

23   obvious people, which is Mr. Menon.

24        A human resource person might have been someone,

25   particularly if there was a human resource person who was

1   actually doing some of the initial investigation.  And

2   I'm not sure how or why that was done, but it sounds like

3   at some point Loeb & Loeb involved someone from human

4   resources in their overall investigation on these subject

5   matters.  Why wouldn't you have produced them as one of

6   the 30(b)(6) representatives?

7           MS. MCGREGOR:  Your Honor, I mean, I think that

8   our final point is that we did prepare the witness, he

9   did have knowledge.  I went through and made a list of

10  the specific things he talked about.

11      He talked about he's familiar with the Kaiser

12  complaint assessment.  He's one of the people that

13  received some of the emails from Philip Guionnet,

14  Mr. Muthuswami was; as was Mr. Sundar, who was the direct

15  boss of Mr. Guionnet.

16      He talked about who was responsible for making sure

17  which employees agreed to the 2005 contract, which

18  Mr. Richmond said was related to keeping information

19  secure.

20      He talked about who takes care of protecting

21  confidential information, including Epic information.

22  That was the account team.

23      He talked about policies and specific efforts by TCS

24  that are not covered in the security document to make

25  sure that passwords are not shared.  And I think our

1    first witness said, you know, very forthcomingly, that,

2    you know, this was against the policy, the password

3    sharing; when we became aware that the password had been

4    shared and how; the company's position that the

5    comparative analysis --

6             THE COURT:  When you say he talked about it --

7             MS. MCGREGOR:  He testified about it.  I'm

8    sorry.

9             THE COURT:  He provided information as set forth

10   in the summary documents.

11            MS. MCGREGOR:  I mean, he did say that he had

12   information about the security general knowledge.

13            THE COURT:  But, I mean, he didn't testify from

14   his own knowledge; he just referred to the materials that

15   were prepared, at least for the most part, in his

16   deposition.

17            MS. MCGREGOR:  The information that I was

18   reading to you is not from the December documents.

19            THE COURT:  These are separate.

20            MS. MCGREGOR:  These are separate.  I went

21   through the --

22            THE COURT:  Where in your brief is that set

23   forth?

24            MS. MCGREGOR:  I don't have it right in front of

25   me.

 1          THE COURT:  That's fine.  But it's in your

 2  briefing on the subject which we got yesterday?

 3          MS. MCGREGOR:  Yes, it is.  And I can -- I

 4  actually only have a draft because I was on a plane when

 5  that was filed.

 6          THE COURT:  I understand.  So we're are both in

 7  the same position.  What I'm going to do is I'm going to

 8  reserve as to sanctions.  And I will, once I have a

 9  chance to put that in context, I will consider it.  I do

10  think it was a poor choice.  Whether it's sanctionable or

11  not, I will leave to my review of that specific material.

12          MS. MCGREGOR:  Okay.  Thank you, Your Honor.

13          THE COURT:  Thank you.  All right.  That brings

14  me to the third of Epic's motions, which is to compel

15  information related to electronic health records products

16  other than Med Mantra.  One of those the Court, in a

17  previous order, required be produced.  And it seems like

18  the crux of this motion is whether or not it should be

19  limited to that product.  Was Apollo Hospitals the

20  subject of the last motion?

21          MR. RICHMOND:  DaVita.

22          THE COURT:  DaVita.  Okay.  So is your principal

23  concern now -- I realize that you may view there are

24  others, but to the extent you are aware of them at this

25  point -- is your principal concern with respect to

1  Apollo?

2          MR. RICHMOND:  No, Your Honor.

3          THE COURT:  Can you tell me -- I'm hesitant to

4  order, as it's described, "broad scope of information."

5  It's a little too vague at this point in the case.  I've

6  already indicated in the earlier ruling in the earlier

7  motion that to the extent Med Mantra product was used to

8  develop others that you're at least entitled to knowledge

9  as to however it was used or how it was used with respect

10 to other products.

11     I would like to get discovery to a close, so I'm

12 going to ask you to be a little more specific as to

13 exactly what you think you're entitled to.  For example,

14 discovery and inspection of products would only occur

15 after you've established meaningful use of the -- this

16 Med Mantra information.  And I'm using that as a stand-in

17 for that part of the Med Mantra product which arguably

18 used Epic information in its development.  So what is it

19 exactly that you would want me to order at this point?

20          MR. RICHMOND:  I would want you to order them to

21 produce information to us about any of their products,

22 applications, accelerators, anything like that, that

23 potentially could have used Epic's information.  We don't

24 know where our -- Epic's information went.  If I knew

25 that, I could answer your question with great precision.

1    If I had been able to trace the electronic paper

2  trail from the access to the UserWeb to the ultimate end

3  of that information, where those documents went, and

4  let's say it went to three out of six products, I

5  wouldn't be asking you to let us look at all six

6  products; I'd be asking you to let us look at those three

7  products.

8    But we don't know where the information went

9  exactly.  All we know is they call all their stuff

10 *Med Mantra*.  That's what they say on their website.  It's

11 called *Med Mantra*.

12    We asked them in Interrogatory No. 16, "Tell us all

13 the different electronic kinds of stuff you have."

14    And their answer was, "Go look at our website and

15 that will tell you."  So we go back to the website again

16 and it says "Med Mantra," so that's what we know.

17    What they've done now is to take that label of

18 *Med Mantra* and say, "That just applies to this very

19 specific product we developed with Apollo."

20         THE COURT:  I've already rejected that with

21 respect to DaVita.

22         MR. RICHMOND:  Right.  They continue with that

23 distinction in many other parts of the case.  In fact I

24 won't say "all," but a great deal of the discovery we're

25 stuck right now with them trying to --

1          THE COURT:  I get it.  Mr. Robben or perhaps

2   someone else is speaking to this.

3          MR. ROBBEN:  This one is me.  Your Honor, I

4   mean, obviously the main product at issue is Med Mantra.

5   We've given stuff as to that.

6          THE COURT:  And that's obvious.  But I've now

7   made clear that to the extent there is use of that same

8   information in developing other products that that too

9   will have to be disclosed.  And to the extent that there

10  is proof that it's been used in development of other

11  information, Epic is entitled to discover how it was

12  used.  So if that's -- if that's in dispute by TCS, I'm

13  not sure how after the last ruling by the court.

14         MR. ROBBEN:  I mean, the DaVita materials have

15  been collected, they're going to be produced.  We

16  understood the order.

17         THE COURT:  But the same ruling would apply with

18  respect to other products that used Med Mantra as a

19  model.  That's the problem with telling people you can

20  just go to a website.  Sometimes that means you're stuck

21  with that answer.  If the website says that Med Mantra is

22  used in all this other -- in all of these other products,

23  they're halfway to being entitled to inspect those

24  products.

25         MR. ROBBEN:  Well, one of the products that

1  we've told them they could see or we'd be happy to

2  demonstrate is an installation at British-American

3  Hospital in Mauritius.  We said in our response to their

4  notice of inspection, "It's a Med Mantra product.  You

5  can look at it."  They've never tried to look at it.  I

6  mean, they've looked at Med Mantra; they've never tried

7  to look at that.  We've given them --

8           THE COURT:  I'm sorry.  That is where, in

9  Philadelphia, and what's the name?

10          MR. ROBBEN:  No, no.  It's in Mauritius.

11          THE COURT:  Okay.  Mauritius?

12          MR. ROBBEN:  Mauritius.  We would need to make

13 it available --

14          THE COURT:  I apologize.  I don't know where

15 Mauritius is at.  Is that near anywhere?

16          MR. ROBBEN:  It's sort of near Africa,

17 southern -- it's on the southern portion of the coast.

18          THE COURT:  My son would be very disappointed in

19 me then.  All right.  I'm familiar with parts of Africa.

20 Can you help me there?

21          MR. ROBBEN:  It's in the southern -- southeast.

22 It's an island.

23          THE COURT:  And would they have to go there to

24 inspect it?

25          MR. ROBBEN:  We can make it available, as we

1  have with Med Mantra in what the people at TCS call

2  *system integration environment*.  And so they can supply

3  it by webcast.

4         THE COURT:  I understand environmental or a web

5  version of the product.

6         MR. ROBBEN:  Correct.

7         THE COURT:  So you're offering that with respect

8  to all of the TCS EHR products that refer to Med Mantra

9  as -- or refer to the Med Mantra approach or software?

10        MR. ROBBEN:  Yes.  I mean, they reference a

11 cancer institute in Chennai.  The cancer institute in

12 Chennai, it's a charitable installation.  It's something

13 that TCS did as a pro bono.  It's a derivative of

14 Med Mantra, is my understanding, that we could make

15 available in the same type of webex environment.

16        THE COURT:  All right.  Mr. Richmond, they're

17 bending over backwards to make anything available you

18 want.

19        MR. RICHMOND:  They took one baby step

20 backwards, Your Honor.  They haven't bent yet.  Let me

21 tell you what else we need.

22        THE COURT:  Okay.

23        MR. RICHMOND:  There is a facility in Kolkata

24 that Mr. Guionnet visited which opened his eyes after he

25 had seen the version of Med Mantra in place at Apollo.

1   He was shocked, thought it had been developed and

2   improved dramatically over a short period of time.  And

3   to make sure he was right, he went to the cancer facility

4   in Kolkata that he had seen before to make sure that his

5   image or his memory of the --

6           THE COURT:  Without the background, what is it

7   you want?

8           MR. RICHMOND:  I want an inspection of the

9   software in use at the Kolkata cancer hospital.

10          THE COURT:  All right.  And you'll go there to

11  do that?

12          MR. RICHMOND:  We'll do whatever it takes, Your

13  Honor.

14          THE COURT:  Why can't they have that?

15          MR. ROBBEN:  I would need to check the technical

16  aspect just to make sure we can provide it.  I know the

17  others.  But it's not Med Mantra and the testimony in the

18  case is that it's not Med Mantra.

19          THE COURT:  Well, except for one individual in

20  particular who said that he can see the echoing of the

21  same information and an unusual increase in ability.  I'm

22  not overwhelmed by that, but it may be enough to get them

23  a chance to inspect it.

24          MR. ROBBEN:  If we can make it available --

25          THE COURT:  Well, why wouldn't you be able to

1 make it available?

2         MR. ROBBEN:  I'm just -- I don't want to commit

3 to you today that I can and then I find out, oh, that one

4 is different and we don't have the right environment.

5         THE COURT:  Well, you are going to have to

6 commit to me today, but you can advise me after the break

7 whether or not that can be made available.

8         MR. RICHMOND:  Your Honor, there's another one.

9         THE COURT:  I imagined there was.  I wasn't

10 precluding others.  What is that you --

11         MR. RICHMOND:  After Mr. Guionnet went to

12 Apollo, he went to Kolkata.  He went to the headquarters

13 of the Med Mantra team in Hyderabad, India.  And there he

14 was shown on a laptop computer, he got what was called a

15 *deep dive* of Med Mantra.  And in the course of describing

16 for him how great Med Mantra was, he was shown a great

17 deal of information on a laptop computer with very many

18 layers of comparisons and contrasts and very rich detail

19 of information comparing Med Mantra and Epic and

20 essentially showing how Med Mantra now looked a lot more

21 like Epic.  That --

22         THE COURT:  This is different from the -- your

23 argument is you don't know if it's different than this

24 Exhibit 5 that had been the subject of our earlier

25 discussions?

 1          MR. RICHMOND:  Mr. Guionnet testified that that

 2  comparative analysis, which has got an exhibit sticker of

 3  39, was something that appeared to him to be a very

 4  boiled down or --

 5          THE COURT:  I think I referred to it as Exhibit

 6  5 in the last transcript.  So rather than confuse things,

 7  we're going to continue to refer to it as Exhibit 5 for

 8  purposes of the Court.

 9          MR. RICHMOND:  Very good, Your Honor.

10          THE COURT:  But in any event, his testimony was

11  that what he described here, the deep dive --

12          MR. RICHMOND:  Yes.

13          THE COURT:  -- in Med Mantra, was more

14  substantial than what is an exhibit here?

15          MR. RICHMOND:  Much much more substantial.  And

16  that deep dive at Med Mantra, so far as we understand it,

17  is showing new products which they call *HIS*, and maybe a

18  couple of other names, which are just now being developed

19  and maybe are ready to be implemented at some new

20  facilities, but our understanding is they have not yet

21  been.  So we need to go to Hyderabad and get our own deep

22  dive like Mr. Guionnet did.

23          THE COURT:  All right.  Mr. Robben.

24          MR. ROBBEN:  We've made the TCS HIS

25  demonstration available.  We've produced documents as to

 1   TCS HIS.  We've asked about whether or not this laptop

 2   with this other comparison exists and no one knows what

 3   that is.  No one -- it's -- it doesn't exist.

 4          THE COURT:  It doesn't exist.

 5          MR. RICHMOND:  Maybe not today, Your Honor, but

 6   that's not the testimony under oath of Mr. Guionnet, who

 7   has revealed many things that we've been able to track

 8   down and prove to be completely true.  He said there was

 9   such a laptop; he saw it; he described what was on it.

10          THE COURT:  Well, that would be the subject of a

11   different motion as we approach trial --

12          MR. RICHMOND:  Yes, I understand.

13          THE COURT:  -- and maybe the subject of a jury

14   instruction at the appropriate time in the case.

15          MR. RICHMOND:  Yes.  Right.

16          THE COURT:  But the representation is it doesn't

17   exist.  I'm not going to order it to be produced.  If you

18   can establish that it does exist or that it did exist to

19   the Court's satisfaction, then obviously there would be

20   serious consequences to that.  But I can't -- I'm not

21   going to order it if it doesn't exist.

22          MR. RICHMOND:  I understand, Your Honor.  With

23   respect to --

24          THE COURT:  I won't do that without prejudice.

25   If you, during your discovery in India, are able to

1    establish its existence through other witnesses or

2    elsewhere, I'll certainly revisit that and impose

3    sanctions as appropriate.

4         MR. RICHMOND:  I understand, Your Honor.  With

5    respect to these inspections of the different places

6    where Med Mantra varieties have been implemented or have

7    been developed, one thing we will need is the appropriate

8    documentation ahead of time to understand how those work

9    and how they were developed.  And that comes a lot in the

10   form of what's called *release notes*.

11        And, for example, with respect to the inspections

12   that were just referenced, which was the inspection of

13   the Apollo hospital system and the HIS system, yes, we

14   took an initial inspection of those because we felt like

15   we just should and we needed to.  But we reserved our

16   objection, which was you have not produced all the

17   release notes that we need to fairly evaluate those

18   systems.  So what we need is the appropriate

19   documentation and information given to us before we do

20   those inspections.

21        THE COURT:  Do you have an independent expert

22   who can review those notes?

23        MR. RICHMOND:  Yes.

24        THE COURT:  In other words, someone who's not

25   affiliated with Epic or isn't working with Epic?

1          MR. RICHMOND:  We have a retained expert.

2          THE COURT:  That's what I'm talking about.

3          MR. RICHMOND:  Yes, we do have a retained

4    expert.

5          THE COURT:  And that retained expert doesn't do

6    regular work with Epic?

7          MR. RICHMOND:  No.  He's been retained as an

8    outside third-party consultant, not an Epic employee who

9    would be preparing and has prepared.

10          THE COURT:  All right.  I'll hear briefly,

11   Mr. Robben, but I don't know why you shouldn't be

12   required to produce in advance of each inspection the

13   release notes attorney's eyes and the independent

14   expert's only.

15          MR. ROBBEN:  We can do it.

16          THE COURT:  All right.  Then that shall be done.

17   You need that a week before inspections, 14 days, what?

18          MR. RICHMOND:  14 days would be preferable, Your

19   Honor.

20          THE COURT:  All right.  So 14 days before any of

21   these inspections you will provide, on the circumstances

22   I've just ordered, the release notes for that product or

23   facility, as appropriate.

24          MR. RICHMOND:  And again, Your Honor, I don't

25   want to get caught in, you know, a fine parsing of words.

1  When we say the *release notes*, it's the development

2  documents, what was happening as the product was being

3  developed.   Sometimes it's called *release notes*.

4  Sometimes it's called *development plans*.

5         THE COURT:  You're not going to be caught in

6  word play, because if you feel like you haven't had

7  produced what you're entitled to -- and I agree it should

8  be whatever background information -- either side is

9  welcome to come back to the Court.  I will be available

10 and we'll hold an immediate conference call to make sure

11 that after you've met and conferred, and by that I mean

12 you've written or called and asked for clarification and

13 have come -- have realize you disagree, either side is

14 welcome to get me on the phone and we'll resolve that.  I

15 don't expect this to delay completion of discovery and I

16 don't see why it should.

17        MR. RICHMOND:  Thank you, Your Honor.

18        THE COURT:  All right.  Was there anything more

19 with respect to this motion to compel?

20        MR. RICHMOND:  I don't think so, Your Honor.

21        THE COURT:  All right.  What we'll do is we'll

22 take our break now.  We'll break for 15 minutes.  When we

23 return I will take up the two remaining issues, which are

24 what disclosures will be made with respect to the Loeb

25 investigation or subset of investigations and, to the

1    extent applicable, other outside documents had by virtue

2    of outside counsel's investigations that are the subject

3    of the second motion we addressed today, Docket 256

4    concerning the Rule 30(b)(6) deposition and compelling

5    documents.  I will also then hear from the parties if

6    there's anything more that is appropriately addressed

7    today.

8         Before we take our break, I believe I have a couple

9    of documents that hopefully you can provide me.  And so

10   immediately after we take our break, I'd ask you to

11   approach and provide those to me.  And I'll ask plaintiff

12   if there's anything else you want to address today.

13        MR. RICHMOND:  Yes, but we can do it after the

14   break, Your Honor.  I specifically would like to address

15   the issue you raised at the last hearing, which was in

16   terms of where is information kept and how can we get at

17   it.  We do have some clear ideas about what TCS should

18   have done electronically to find the people who accessed

19   the UserWeb, where the information went and how it was

20   used.  And I'll describe more of that after the break.

21        THE COURT:  All right.  I would encourage you --

22   I assume you've already had that discussion with opposing

23   counsel, but I would encourage you to have it again at

24   the break to see if it can't be refined.  It may not be

25   maybe on the scope of this hearing, but I'll certainly

1   hear the nature of the disagreement.  Anything more that

2   Tata wants to raise -- TCS, I should say?

3           MR. ROBBEN:  We have some discovery issues.

4   Epic served some supplemental discovery.

5           THE COURT:  If you have discovery issues, they

6   should be the subject of a written motion.

7           MR. ROBBEN:  Okay.

8           THE COURT:  And that may be my response as well

9   with respect to this other aspect.  But we will take

10  up -- I will hear other matters that the parties may wish

11  to raise.  What I really meant was if there's some key

12  issue that you had wanted to make sure I was addressing.

13  So we'll take our break now.  We will reconvene at 11:15.

14  And we are off the record.

15      (Recess at 11:02 a.m. until 11:15 a.m.)

16          THE COURT:  All right.  I do have the copy of

17  the assessment report as well as the Kaiser report, the

18  latter being provided by Epic and is also Document 269 --

19  Document No. 269-12 in this case.  The full report, which

20  is now in the Court's possession and will not yet be --

21  well, I may end up docking it under seal, but I will not

22  require a disclosure today because I understand that

23  Ms. La Mar is not available; is that correct?

24          MS. MCGREGOR:  We've contacted her office and I

25  spoke with her assistant who told me she's on a flight

1  right now from New York to Los Angeles.

2          THE COURT:  So what you will do is coordinate

3  with opposing counsel and have her available for a

4  telephonic conference call with the Court on Monday at a

5  time convenient to the parties.

6      At this point perhaps, Joanne, you could confirm.  I

7  don't think I have anything on my calendar other than

8  something perhaps at one o'clock.  But other than one to

9  two -- actually, I can do it here.  I apologize.

10         THE CLERK:  There's nothing on.

11         THE COURT:  Yeah.  So you can choose --

12  actually, you can choose anytime during the day

13  convenient to the parties and to Ms. La Mar.  I would ask

14  that you also arrange to have Mr. Mohanty on that same

15  call.  And we will take up the question of waiver of

16  portions of this report.

17     It looks like, just for the Epic's information, it

18  looks like the Kaiser report that has been disclosed

19  includes all of the relevant information with respect to

20  the assessment of access to Epic that is contained in the

21  report itself.  There are two appendices or described as

22  annexures, A and B.  One contains *Details of discussion*

23  *of various teams* and B being *Team interviewed*.

24     And I'll simply ask, Mr. Mohanty *(sic)*, if you

25  could, do you have a copy of your report?  Just to

1   confirm, in the -- is there any way to discern, in

2   Annexure A, which portions of the -- well, it appears on

3   the first page -- I'm sorry, the second page of Annexure

4   A, because it's two-sided -- I don't know if you have a

5   two-sided copy or not -- is a summary of your discussions

6   with the Kaiser teams, the first being the discussions

7   with TCS Kaiser Onsite team and then the second being the

8   discussions with Kaiser Offshore team.  Am I reading

9   those accurately?

10          MR. MENON:  Yes.

11          THE COURT:  So, in other words, this is

12   information that you gathered in discussion with Kaiser

13   individuals?

14          MR. MENON:  The team working for Kaiser; yes,

15   sir.

16          THE COURT:  All right.  That wasn't appended,

17   and no criticism and to reason why it should have been,

18   to the information you gave directly to Kaiser.  But it

19   does reflect your actual discussions with Kaiser

20   individuals, correct?

21          MR. ROBBEN:  Your Honor?

22          MR. MENON:  Yes, the TCS team working for

23   Kaiser.

24          THE COURT:  Right.  Okay.  I am not going to

25   order today, but I am inclined to think that at least

1   that will be disclosed once I have a chance to explore

2   this further.  And counsel for TCS should be aware that

3   that's the Court's inclination.

4        I am also reserving on whether or not this report is

5   subject to privilege, whether or not the disclosure of a

6   substantial portion of this report to Kaiser constitutes

7   a waiver of privilege, whether or not the use of this

8   report in preparing the summary documents for the

9   30(b)(6) -- and I haven't made a comparison, so I can't

10  say this is even really applicable -- but as to whether

11  or not its use in preparing the reports that were

12  disclosed could constitute a waiver; and really, from the

13  Court's point of view, most importantly, whether or not

14  an appropriate sanction is to require production of this

15  report.

16       I will reserve on all of those until I have heard

17  further from Ms. La Mar and perhaps a little further from

18  Mr. Mohanty and I will decide those on the -- well,

19  either during or shortly after the call on Monday, as

20  well as the larger question as to whether -- well, I

21  think first, whether there is such a thing as a Loeb

22  report and whether there's any appropriate disclosure of

23  some or all of that report or the work product prepared

24  by Loeb & Loeb.

25       I believe the only other document I need is the one

1   that is required to be filed by the end of the day under

2   seal, although I may break that seal if it's simply a

3   straightforward engagement letter, would be the

4   engagement letter between Loeb & Loeb and TCS.

5        So that is -- I'll just ask both sides if there's

6   anything further.  And thank you again, Mr. -- you've

7   been very patient with me and I appreciate it.  I will

8   ask both sides if they have anything more with respect to

9   the motions that are before the Court this morning.

10  We'll begin with plaintiff.

11            MR. RICHMOND:  Yes, Your Honor.

12            THE COURT:  I was afraid that would be the

13  answer.

14            MR. RICHMOND:  Don't be afraid, Your Honor.

15  You'll like it.  I believe, based on the correspondence

16  that we see in the email traffic, that the investigation,

17  whatever it was that was being done in the early stages

18  by Loeb & Loeb, at least with respect to Mr. Guionnet's

19  allegations, was being done by Curt Bajak.

20       So my only recommendation is if the Court is going

21  to convene a conference call and trying to have all the

22  necessary people on that call who might be able to answer

23  questions about what that relationship was --

24            THE COURT:  I understand.  And I think that's

25  probably appropriate.  He should be available to

 1   participate as well.  I should tell you, too, this

 2   assessment report that was provided by Mr. Mohanty and

 3   his team to Ms. La Mar is dated August 22nd, 2012.  I

 4   assume that should have been 2014?

 5            MR. MENON:  Correct.

 6            THE COURT:  But otherwise that was the date,

 7   August 22nd, 2014.

 8            MR. RICHMOND:  Another item, Your Honor.

 9            THE COURT:  I'm just asking about the motions at

10   this point.

11            MR. RICHMOND:  Yes.  And this relates to the

12   motions.

13            THE COURT:  Very good.

14            MR. RICHMOND:  Before our break you had ordered

15   TCS to provide the necessary documentation before the

16   inspections.  We talked about a 14-day time frame.  Our

17   view is that it would be much better, given the holiday

18   season and everything else that's happening, if we could

19   have all of those documents 14 days from now so that we

20   can get properly prepared for those inspections.  Instead

21   of waiting to see when the inspection happens to get

22   scheduled and then backing up 14 days, it would be

23   crisper and better.

24            THE COURT:  Have you discussed that with

25   counsel?

 1          MR. RICHMOND:  I did not have a chance to

 2   discuss that.  I did discuss our other --

 3          THE COURT:  All right.  Here's what I'm going to

 4   require: that you confer and see if you can reach an

 5   agreement as to the timing of those disclosures -- I

 6   don't know what it entails -- but if you can reach

 7   agreement on a reasonable time.

 8      I certainly agree it would be extremely helpful,

 9   going into the holidays, that you make every

10   accommodation to get them to them in advance rather

11   than -- nothing has worked very well in this case by

12   waiting for a trigger date, so you should confer.  If you

13   can't reach agreement, then you can advise me on Monday.

14          MR. RICHMOND:  Very good.

15          THE COURT:  Very well.  Was there anything more

16   with respect to the motions?

17          MR. RICHMOND:  No.  There's one little

18   housekeeping matter that's not these three motions and we

19   can work that out later.

20          THE COURT:  We'll come back to that.  Fine.

21   Anything more with respect to the motions for the

22   defendant?

23          MS. MCGREGOR:  Just one point, Your Honor.  You

24   had stated a few minutes ago that there was a question as

25   to whether the report that we had provided to you for

 1  your in camera review was used in preparing the Rule

 2  30(b)(6) documents and witness, and it was not.  That was

 3  the -- there's two separate -- I mean, there's not two

 4  separate things, but that that document was not used.  It

 5  was the recent look-back engagement by TCS to identify as

 6  many additional people as possible.  So the Loeb

 7  document, the document prepared for Loeb, was not

 8  involved in that.

 9          THE COURT:  And you know that, Ms. MacGregor,

10  because you prepared those three documents to assist?

11          MS. MCGREGOR:  In working with others and having

12  input from others, but I did prepare those documents.

13          THE COURT:  All right.  I'll take that

14  representation.  We will take that part of the waiver

15  question off the table for Monday.

16          MR. ROBBEN:  Your Honor, two other points.

17          THE COURT:  Related to the motions?

18          MR. ROBBEN:  Yes, yes.

19          THE COURT:  Yes.

20          MR. ROBBEN:  For the call on Monday, I think you

21  had said you wanted Mr. Mohanty on the call.

22          THE COURT:  I did.

23          MR. ROBBEN:  This is Mr. Menon.  Mr. Mohanty

24  performed the memo.

25          THE COURT:  Oh, I'm sorry.  Exactly.  I should

1  have said Mr. Menon, Chief Security Officer.  And my

2  apologies.  I just thought maybe I was butchering your

3  name earlier and I -- but, in any event, you're exactly

4  right.  It is Chief Security Officer Menon who should

5  participate.  If nothing else, I think Epic would agree

6  that Mr. Mohanty is not the person who needs to be on the

7  call.  And so I appreciate that clarification.  Thank

8  you.

9          MR. ROBBEN:  Your welcome.  The other point I

10  wanted to raise in terms of when the materials will be

11  produced, we have no objection to trying to produce them,

12  you know, quickly before the holidays.

13      I just would point out there was a huge flood in

14  Chennai this week and it's flooded out the entire city.

15  Many, if not all, of the TCS offices are closed.

16  Mr. Menon can talk to that.  It could impact our ability

17  to do this.  And I just --

18          THE COURT:  And just so we're clear, "to do

19  this," you're referring to the specific coding material,

20  or I think we've been calling it -- I should say Epic has

21  been calling it --

22          MR. ROBBEN:  The release notes and such.

23          MR. RICHMOND:  Release notes, Your Honor, and

24  design and development documents.

25          THE COURT:  Design and development documents.

1    You're saying that there could be a delay.  Is that

2    information backed up somewhere on *the cloud* or

3    otherwise?

4         MR. MENON:  I think what we heard from the team

5    was they wanted information about the building in

6    Kolkata.  That's not impacted.

7         THE COURT:  I'm sorry.  Predicting --

8         MR. MENON:  There is a cancer hospital in

9    Kolkata for which they asked for information, if that's

10   available.  That's not impacted by the deluge that has

11   happened in Chennai.

12        THE COURT:  No.  I was asking, with respect to

13   Chennai, is that information that would be normally

14   backed up?

15        MR. MENON:  No.  None of our customers host

16   anything on *the cloud* and neither do we.

17        THE COURT:  All right.  Very good.  Then I would

18   encourage you to discuss that and if some portion of the

19   disclosure is going to be delayed as a result that you

20   reach whatever accommodation you can or advise me if

21   there's an issue.

22        MR. MENON:  Sure.

23        THE COURT:  Very good.

24        MR. MENON:  Thank you.

25        THE COURT:  Further clarification then, Mr.

1   Robben.   Thank you.

2            MR. RICHMOND:   Your Honor -- oh, I'm sorry.

3            THE COURT:   I am asking the defense if there's

4   anything more.

5            MR. ROBBEN:   No.

6            MR. RICHMOND:   Your Honor, what was said raises

7   one sort of final point then, which is this is a tech

8   company.   And so whether it's on *the cloud* or something,

9   I can't imagine they don't have backups sufficient.   But

10  we'll find out what they say on that.

11       But it does lead me, to make sure that I haven't

12  foreclosed myself somehow in our later discussion;

13  because our 30(b)(6) motions, in the Court's view, have

14  not been entirely successful and we're trying to get

15  individual depositions and documents and information, I

16  want to make sure that when we give you our proposal for

17  how we can finally figure out, once and for all,

18  electronically who accessed the UserWeb, what documents

19  were downloaded, where did they go, how were they used,

20  that we need that to be done very quickly so that when we

21  go to India and take these depositions, we will have the

22  information we finally need.

23            THE COURT:   And have you discussed that now with

24  TCS?

25            MR. RICHMOND:   I have.

 1              THE COURT:  And is there a point of dispute, in

 2  your view?

 3              MR. RICHMOND:  I believe I just don't have an

 4  answer yet.  I don't know if this is the right time, but

 5  I'm prepared to describe to you my proposal and why.

 6              THE COURT:  I think it's within the realm of

 7  these three motions because I am trying to find a way to

 8  complete discovery in an orderly fashion.  And since one

 9  of the two key issues for your client is who obtained

10  access to the information and that's what you're

11  addressing, I think it's appropriate to take it up.

12              MR. RICHMOND:  May I approach the podium then,

13  Your Honor, and spend a little time doing that?  It will

14  take just a few minutes.

15              THE COURT:  Yes.

16              MR. RICHMOND:  Thank you.  A key question is who

17  accessed Epic's information in the UserWeb.  Four people

18  were identified in the interrogatories.

19              THE COURT:  We don't need to go through the

20  history of that and how it developed.  And I'm not in a

21  position today to decide, of the additional people who

22  have now been named, how significant or inappropriate it

23  was that they weren't named earlier.  But if you have a

24  point as to what relief you think would move this along,

25  that's what I'd really like to hear.

1              MR. RICHMOND:  Yes.  The number is up to 27.  It

2    could go to scores or hundreds.

3              THE COURT:  You know, that's a meaningless

4    number to the Court at this point.  It's a rhetorical

5    point, but it doesn't help me.  So if you have something

6    specific --

7              MR. RICHMOND:  Let me try to be more specific.

8              THE COURT:  Thank you.

9              MR. RICHMOND:  The way TCS has approached

10   figuring this out so far has just been essentially

11   witness interviews and it's not electronic.

12             THE COURT:  And you think there is a much more

13   efficient way --

14             MR. RICHMOND:  I do.

15             THE COURT:  -- to accomplish that and it can be

16   done by a company whose expertise is in information

17   gathering and discovery and you have a proposal.

18             MR. RICHMOND:  That is my proposal, Your Honor.

19   There are companies like that.  They make --

20             THE COURT:  That's not a proposal; that's just a

21   statement.  What do you want me to order?

22             MR. RICHMOND:  I want you to order, in the way

23   of a special master or a monitor or somebody who can

24   actually figure this out electronically, to go figure out

25   who accessed the information, what was downloaded, where

1   it went and what was eventually done with it.  And you

2   can do it --

3           THE COURT:  Frankly, early on I would have

4   thought that this would have been asked of the Court.  I

5   don't know that a special master is required.  I think

6   surely Epic has access to experts who would know how to

7   do this and that that would have been proposed.  We're

8   late in the game, but it's not entirely your fault that

9   we're late in the game.

10      So if you're now proposing that you -- that one of

11  your experts be given access -- it would have to be a

12  non-Epic person -- be given access to their information

13  in order to make a discovery, including being able to

14  consult with -- I don't know if Mr. Menon has been given

15  too many tasks already today, but he seemed like he might

16  be the perfect person to coordinate and to come up with

17  appropriate search terms -- that seems like an

18  appropriate approach.

19          MR. RICHMOND:  That's what we're asking.  I can

20  put more definition on it if you would like.  We need an

21  outside firm.

22          THE COURT:  I understand.  When you say you

23  "need an outside firm," you can retain one.

24          MR. RICHMOND:  Yes --

25          THE COURT:  Right.

 1          MR. RICHMOND:  -- that's what we would like to

 2  do.

 3          THE COURT:  Okay.  You said you were going to

 4  put more --

 5          MR. RICHMOND:  In terms of the process, so

 6  there's this ODC.  It's supposed to be, I'll call it, a

 7  *clean room*.  There's three kinds of credentials being

 8  used in that ODC.  There's Kaiser machines and people

 9  were issued credentials by Kaiser to do their work.

10  There are some other machines that we think is really

11  inappropriate called *kiosk* machines, which are TCS

12  machines.

13      When people go over -- and let me add that the

14  Kaiser machines are in a virtual private network, a VPN:

15  You can't get Internet, you can't put memory cards or any

16  of that.

17      The TCS machines, when you go to those, you have to

18  type in your TCS credentials.  So every person who ever

19  used one of those kiosk machines has to identify

20  themselves and who they are and it starts an electronic

21  record of what's happening on those machines.  It was on

22  those machines that Epic's UserWeb was accessed.  And

23  then people are typing in yet a third set of credentials,

24  a lot of times it was Ramesh Gajaram's credentials, to

25  get into the UserWeb.

1        Documents are taken off the UserWeb, put on those

2   kiosk machines, and then who knows where they went;

3   because those kiosk machines, we understand, gives access

4   to not just the Internet, but TCS email, TCS servers, TCS

5   shared drives or whatever it is that gives access to

6   their computer system.

7        So when we hire somebody to do this, they are

8   probably going to want to know where are all the kiosk

9   machines from mid 2011 to mid 2015, give me images of

10  those; let me talk to people to see, once we have that

11  information, where possibly does this information go;

12  describe the server system, describe how you save

13  documents.

14           THE COURT:  I would have thought this would have

15  been done early in discovery.

16           MR. RICHMOND:  We have tried with every other

17  discovery device except this.

18           THE COURT:  It just goes without saying.  You're

19  exactly right.  This would have been the way to do it

20  from the beginning.  Every other discovery device has all

21  kinds of limitations.  This would have given you

22  hopefully definitive answers or at least the best

23  complete answer to the question you were posing.  In any

24  event, I'll hear from opposing counsel on this proposal.

25           MR. ROBBEN:  Your Honor, there's -- we don't

 1  have an objection to cooperating with them on this,

 2  although I think there might be limits to what we can

 3  provide them just because of the passage of time.  I

 4  mean, for example, mid 2011 to mid 2015, I'm not sure if

 5  we have the kiosk machines for that whole entire period

 6  of time.

 7          THE COURT:  You may not have the machines, but

 8  you may have the underlying data stored somewhere.

 9      Mr. Menon, do you know if that information -- first

10  of all, I guess the simplest question is, did you do that

11  as part of your follow-up investigation; did you attempt

12  to discover who had access to it?

13          MR. MENON:  We did look at that machine to see

14  if there was any Epic information on that machine at that

15  point in time and we did not see any.

16          THE COURT:  You didn't find it on the machine,

17  but did you look for records of who accessed -- went

18  into, coded into or entered?

19          MR. MENON:  We have that information.

20          THE COURT:  You have that information?

21          MR. MENON:  Yes.

22          THE COURT:  Okay.  So that's still available.  I

23  guess I'm not sure why that wouldn't have been produced

24  in response to discovery requests already.

25          MR. ROBBEN:  I'm not sure what the information

1    is that --

2            THE COURT:  Who it is who actually accessed,

3    with using TCS credentials, into the Kaiser database to

4    get to Epic.

5            MR. ROBBEN:  We don't have information that

6    shows this TCS person accessed UserWeb sharing

7    Mr. Gajaram's credentials.

8            THE COURT:  Is that correct?

9            MR. MENON:  Yes.  I have information about who

10   logged onto that machine, but who accessed UserWeb from

11   there is not available.

12           THE COURT:  All right.  And you suspect that's

13   available somehow?

14           MR. RICHMOND:  I believe it is, Your Honor, but

15   I don't know.  That's the purpose of the investigation

16   that needs to be done.

17           THE COURT:  Here's what I'm going to require:

18   I'm going to require that you designate a non-Epic

19   affiliated expert, disclose it as soon as you're able to

20   to counsel for the Kelley law firm.  And then at that

21   point that person will discuss the issues, without

22   counsel involved, as to what's available and what can be

23   discovered, directly with Mr. Menon.

24           MR. RICHMOND:  Very good, Your Honor.  There

25   will be some lingering issues toward the end of this

1  process, I don't know that they need to be resolved

2  today, in terms of --

3          THE COURT:  It doesn't sound like they can be

4  resolved today.

5          MR. RICHMOND:  But let me just preview two tiny

6  issues.  One is Loeb & Loeb was hired in May of 2014,

7  we've just learned in this briefing.  And so we will be

8  very desirous of knowing what kind of litigation holds

9  went out and all that because they say they were

10  anticipating litigation at that time.  So we need to know

11  what kiosk machines still exist and when they stopped

12  being in existence as part of the process.

13          THE COURT:  Have you posed discovery on that

14  subject?

15          MR. RICHMOND:  We have.  The answers haven't

16  come back.  The answers haven't come back yet.

17          THE COURT:  Well, then it's premature.

18          MR. RICHMOND:  And then secondly, Your Honor, in

19  terms of the cost of this exercise, we will come to you I

20  think in a later iteration to talk about that issue.

21          THE COURT:  You're wasting your time.  You could

22  have done this at anytime during discovery.  Why would

23  I -- why would that be a cost to them?

24          MR. RICHMOND:  Your Honor, this investigation,

25  frankly --

1        THE COURT:  I mean, if your point is that you

2    specifically asked for this information in discovery

3    requests --

4        MR. RICHMOND:  Yes.

5        THE COURT:  -- and it was not provided --

6        MR. RICHMOND:  Correct.

7        THE COURT:  -- I will hear that motion.

8        MR. RICHMOND:  Okay.

9        THE COURT:  But the way to have dealt with this

10   efficiently would have been for you to specifically have

11   sought discovery on this subject matter early on in the

12   more efficient way.

13       MR. RICHMOND:  Your Honor, with the benefit of

14   hindsight, we maybe wish that we had.  We asked in every

15   which way that we could to get this information.  We've

16   been trying to get it for a year.  This is what we're

17   left with.  But I've heard loud and clear that you're not

18   moving the discovery deadline, so I need to do everything

19   I can right now to get that information.

20       THE COURT:  Understood.  And I will support that

21   effort.  And if at some point you want to bring a motion

22   for sanctions because, in your view, it should have been

23   done more efficiently by the defendant, I will certainly

24   consider that, particularly if you can establish that

25   they're very clear requests for information.

1      I'm not sure, perhaps there isn't that information

2   and that's what you're going to discover through this

3   expert.  I'm not going to speculate about it.

4          MR. RICHMOND:  None of us know until it happens,

5   Your Honor.

6          THE COURT:  All right.  Any other matters that

7   the plaintiff wanted to raise today, including

8   housekeeping?

9          MR. RICHMOND:  Oh, yes, the one housekeeping

10  issue, Your Honor.  When we filed our summary judgment

11  brief, we were doing it under a schedule that initially

12  was set by Magistrate Judge Crocker.  But then the

13  automatic system produced some different dates.  You

14  commented on that and said the different dates could

15  comply.  It just puts us in a bad position.  It makes our

16  reply brief due on New Year's Eve.  And we're asking for

17  a one-week extension until Friday, January 8th, to file

18  our reply brief in support of our own summary judgment

19  motion.

20         THE COURT:  That sounds reasonable.  Any

21  objection to that?

22         MR. ROBBEN:  Of course not.

23         MR. RICHMOND:  All right.  Thank you.

24         THE COURT:  All right.  For the defense,

25  anything further you wanted to address?  And you may sit

1   down again, Mr. Menon.  With apologies, I may ask you up

2   again.  I hope not.

3           MR. ROBBEN:  The only question I had is on this:

4   They're going to appoint an expert, we're going to talk

5   to the expert.

6           THE COURT:  No, you're not going to talk to the

7   expert.  Mr. Menon and the expert will talk after he's

8   been disclosed and you have a chance to vet whoever that

9   person he or she is.

10          MR. ROBBEN:  To the extent there's disputes that

11  arise during that, are those things we bring to you?

12          THE COURT:  Disputes being what?  There's not

13  going to be any dispute that Mr. Menon will be made

14  directly available, without counsel's participation, to

15  discuss with that expert what information is or isn't

16  available within the system.

17      And if they then make a request to you that they

18  want this information done, whatever -- however the

19  expert styles it, and you disagree, that would be a

20  disagreement you'd bring to me.  But until they've talked

21  and he's been satisfied -- and I expect full cooperation

22  from Mr. Menon, which he's done very well today already,

23  and I would expect nothing less in his discussions with

24  this independent expert to complete the discovery.

25          MR. ROBBEN:  Well, I was leaning more toward the

 1   latter; that not that we object to Mr. Menon talking,

 2   although I would like to participate.

 3          THE COURT:  You're not allowed to participate.

 4   It's going to be between those experts.

 5          MR. ROBBEN:  Can I be listening?

 6          THE COURT:  No, no.  They will have a discussion

 7   about what information is available and the lawyers

 8   aren't going to be involved.

 9          MR. ROBBEN:  Okay.  So Epic --

10          THE COURT:  Neither side.  There will be -- I

11   said "the lawyers."  I didn't mean one side; I meant all

12   lawyers.  The only people that will be in those

13   discussions, however they're arranged, will be the

14   independent expert and Mr. Menon for the purpose of

15   determining what information may be efficiently obtained

16   from data available to TCS.

17          MR. ROBBEN:  Thank you.

18          THE COURT:  Anything further then for today?

19          MR. ROBBEN:  No.

20          THE COURT:  All right.  I'll await an indication

21   from the parties as to when everyone will be available on

22   Monday and I will await by the end of the day a copy of

23   the Loeb & Loeb engagement letter.  I don't think there's

24   any other materials that I need from the parties.

25          I will attempt to reduce to writing those matters

1  which we have resolved today, but that may actually await

2  our discussion on Monday as well.

3      Unless there's something further for the parties, I

4  thank you for your efforts today in trying to advise the

5  Court about where we stand.  If I have not said it

6  already, I hope it is clear that I expect full

7  cooperation going forward.  And I don't say that just as

8  to TCS, although I do think that more efforts could have

9  been made to date and some of this could have been

10 avoided.  I say it to both sides because we are going to

11 have a trial on this matter.

12      I do note in the letter that I received yesterday,

13 which was the oddest request for mediation I've ever

14 received, because it started out with a sentence seeking

15 mediation and then telling me that the other side's case

16 was completely meritless, which is an odd way to approach

17 a court to ask for mediation.

18      But, in any event, we have someone on staff, who is

19 as qualified as any private mediator, to mediate disputes

20 between the parties.  He is our

21 clerk/magistrate/mediator, Peter Oppeneer, who's very

22 talented, has tremendous experience; some of it as an

23 elbow clerk, much of it in his capacity as the chief

24 clerk in this court.

25      And I would encourage the parties, if they wish to,

1   to have that discussion.  But these are very -- both

2   companies have the ability to hire a private mediator.

3   I'm not going to order mediation by the parties unless

4   there's something to mediate, and the letter itself

5   indicates that there isn't.

6       To the extent that TCS, at this late date, wants to

7   expand this case into a much larger one, I guess they're

8   entitled to attempt to do that, but I can't imagine that

9   there's sufficient time to complete discovery on other

10  claims.  And so likely that would be severed if it would

11  become necessary or I will simply require a separate

12  lawsuit.  I can't imagine that there's a basis to require

13  that to be litigated in this case.  I just -- it's just

14  too late.

15      So with that, I'll look forward to hearing from the

16  parties on Monday.  Thank you.

17      (Adjourned at 12:02 p.m.)

18                          * * *

19

20

21

22

23

24

25

1           I, CHERYL A. SEEMAN, Certified Realtime and

2    Merit Reporter, in and for the State of Wisconsin,

3    certify that the foregoing is a true and accurate record

4    of the proceedings held on the 4th day of December, 2015,

5    before the Honorable William M. Conley, Chief Judge of

6    the Western District of Wisconsin, in my presence and

7    reduced to writing in accordance with my stenographic

8    notes made at said time and place.

9    Dated this 10th day of December, 2015.

10

11

12

13

14

15                          _____
                                        /s/

16                          Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter

17

18

19

20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25