UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation,

       Plaintiff,

    v.                                    Case No. 14-CV-748-WMC

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation; and TATA
AMERICA INTERNATIONAL                  **REDACTED**
CORPORATION (dba TCS AMERICA), a
New York Corporation,

       Defendants.

---

**EPIC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SANCTIONS**

---

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

EXECUTIVE SUMMARY ......................................................................................................3

EVIDENCE AND ARGUMENT IN SUPPORT OF SANCTIONS ..............................................12

I.   TCS Destroyed Evidence that it Knew was Critical to Epic's Case..............................12

    A.  Relevant Factual Background. ................................................................................13

        1.  ████████████████████████████████.......................................13

        2.  ████████████████████████████████.....................14

        3.  ████████████████████████████.......................15

            a.  ████████████████████████████...........................16

            b.  ███████████████████...........................18

            c.  █████████████████████████████..............22

            d.  TCS Failed to Conduct a Reasonable Search of the Electronic Data. ...................23

    B.  TCS Knew it Had a Duty to Preserve Relevant Evidence at Least in April 2014.............24

    C.  TCS Breached Its Duty To Preserve Evidence.............................................................25

    D.  TCS's Spoliation Warrants Sanctions....................................................................28

    E.  At a Minimum, TCS's Spoliation Warrants an Adverse Inference or Adverse Jury Instruction. ......................................................................................................30

        1.  This Court Should Draw Its Own Inference Against TCS ..........................................31

        2.  Alternatively, the Court Should Provide an Adverse Inference Jury Instruction ........32

II.  TCS Made Misrepresentations and Delayed Production of Key Evidence Related to its Investigations. ......................................................................................................33

    A.  Relevant Factual Background. ................................................................................33

2411754

B. At a Minimum, TCS's Misrepresentations and Delayed Discovery Warrant Sanctions in the Form of an Adverse Jury Instruction....................................................40

III. TCS Violated the Court's Order to Identify the TCS Employees Who Accessed UserWeb. .44

A. Relevant Factual Background. ...........................................................................44

B. TCS's Conduct Violated the Court's Order, Precluded Epic from Uncovering the Truth, and Warrants Sanctions.........................................................................49

C. At a Minimum, TCS's Violation of the Court's Orders Warrants the Preclusion of TCS's Argument that it Only Used UserWeb Materials for Testing Purposes. ...............50

IV. TCS Hid Key Fact Witnesses. ...............................................................................52

A. Factual Background. ......................................................................................53

1. Mahendra Pandian. .................................................................................53

2. DV Prasad. ...........................................................................................55

3. ███████████████████████████████████. .............58

4. Syama Sundar and Suresh Muthuswami...........................................................60

B. TCS's Efforts to Hide Witnesses and Evidence Warrant Sanctions Under Rule 37 and the Court's Inherent Authority. .....................................................................60

C. At a Minimum, TCS's Scheme to Hide Witnesses Warrants a Presumption that Epic's Stolen Information Was Used for Improper Purposes.............................................62

V. TCS Misrepresented and Hid its U.S. Med Mantra Products, Refused to Allow Court-Ordered Inspections, and Failed to Produce Documents it Was Ordered to Turn Over.........63

A. Relevant Factual Background. ...........................................................................64

1. TCS Refused to Identify and Provide Discovery about its Med Mantra Products.................................................................................................64

2. TCS Violated the Court's Order to Produce Technical Med Mantra Documents. ............................................................................................68

3. TCS Violated the Court's Order to Permit Med Mantra Inspections. ........................70

B. At a Minimum, TCS's Violation of the Court's Orders to Produce Product Development Information and Allow Inspections Warrant a Presumption that Epic's Confidential Information was Used to Help TCS Develop its EHR Products.............................................................................................................74

2411754

VI. Together, TCS's Misconduct Warrants Default Judgment.......................................................76

    A.  TCS Engaged in Additional Misconduct that Delayed Discovery and Prejudiced Epic. ................................................................................................................................77

        1.  TCS Opposed Discovery and Moved to Dismiss on the Ground that Epic's Allegations were Implausible. ...................................................................................77

        2.  TCS Delayed Rule 30(b)(6) Depositions and Produced Unprepared Witnesses.........79

    B.  Default Judgment is Appropriate Where, as Here, Discovery Misconduct is Rampant. ...............................................................................................................................83

CONCLUSION...............................................................................................................................87

2411754

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aktipis v. Loyola University of Chicago*,
    175 F3d 1019 (7th Cir. 1998) ...................................................................41, 43, 76

*Am. Family Mut. Ins., Co. v. Roth*,
    No. 05-3839, 2009 WL 982788 (N.D. Ill. Feb. 20, 2009) ......................................29

*Barnhill v. United States*,
    11 F.3d 1360 (7th Cir. 1993) ...............................................................................86

*Breuer Elec. Mfg. Co. v. Toronado Sys. of Am.*,
    687 F.2d 182 (7th Cir. 1982) ...............................................................................33

*Bryden v. Boys & Girls Club*,
    No. 09-50290, 2011 WL 843907 (N.D. Ill. Mar. 8, 2011) ....................................24

*CAT3, LLC v. Black Lineage, Inc.*,
    No. 14-5511, 2016 WL 154116 (S.D.N.Y. Jan. 12, 2016) ....................................13

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011).....................................................................24

*Chandler v. Buncich*,
    No. 12-175, 2012 WL 4343314 (N.D. Ind. Sept. 24, 2012) ...................................26

*Christou v. Beatport, LLC*,
    No. 10-2912, 2013 WL 248058 (D. Colo. Jan. 23, 2013) ......................................30

*CNA Fin. Corp. v. Brown*,
    162 F.3d 1334 (11th Cir. 1998) ...........................................................................34

*Crown Life v. Craig*,
    995 F.2d 1376 (7th Cir. 1993) .............................................................50, 76, 84, 85

*Danis v. USN Commc'ns, Inc.*,
    No. 98-7482, 2000 WL 1694325 (N.D. Ill. Oct. 20, 2000) ....................................26

*Domanus v. Lewicki*,
    742 F.3d 290 (7th Cir. 2014) ...................................................................... passim

*Dotson v. Bravo*,
    321 F.3d 663 (7th Cir. 2003) ...........................................................................41, 85

iv

*e360 Insight, Inc. v. Spamhaus Project*,
    658 F.3d 637 (7th Cir. 2011) ...................................................................... passim

*Eisenberg v. Univ. of New Mexico*,
    936 F.2d 1131 (10th Cir. 1991) ...................................................................34

*Govas v. Chalmers*,
    965 F.2d 298 (7th Cir. 1992) .......................................................................84

*Greviskes v. Universities Research Ass'n, Inc.*,
    417 F.3d 752 (7th Cir. 2005) .......................................................................84

*Hal Commodity Cycles Mgmt. v. Kirsh*,
    825 F.2d 1136 (7th Cir. 1987) .....................................................................84

*Halas v. Consumer Servs., Inc.*,
    16 F.3d 161 (7th Cir. 1994) .........................................................................85

*Haley v. Kolbe & Kolbe Millwork Co.*,
    No. 14-99, 2014 WL 6982330 (W.D. Wis. Dec. 10, 2014)....................................28

*Hindmon v. Nat'l-Ben Franklin Life Ins. Corp.*,
    677 F.2d 617 (7th Cir. 1982) .......................................................................85

*In re Golant*,
    239 F.3d 931 (7th Cir. 2001) .......................................................................31

*Jones v. Bremen High Sch. Dist. 228*,
    No. 08-3548, 2010 WL 2106640 (N.D. Ill. May 25, 2010)....................................28

*Jones v. Goodyear Tire & Rubber Co.*,
    137 F.R.D. 657 (C.D. Ill. 1991) ...................................................................63

*Kraemer v. Hoffman*,
    No. 13-860, 2014 WL 4978225 (W.D. Wis. Sept. 6, 2014) .............................51, 85

*Krumwiede v. Brighton Assocs., LLC*,
    No. 05-3003, 2006 WL 1308629 (N.D. Ill. May 8, 2006)................................25, 29

*Long v. Steepro*,
    213 F.3d 983 (7th Cir. 2000) ...................................................................30, 84

*Marrocco v. Gen. Motors Corp.*,
    966 F.2d 220 (7th Cir. 1992) ...............................................................28, 31, 86

*Marten Tranps. Ltd. v. Platform Advert., Inc.*,
    No. 14-2464, 2016 WL 492743 (D. Kan. Feb. 8, 2016)................................25, 26

*Melendez v. Illinois Bell Tel. Co.*,
  79 F.3d 661 (7th Cir. 1996) ....................................................................... passim

*Motown Record Co. v. DePietro*,
  No. CIV. 04-CV-2246, 2007 WL 1725604 (E.D. Pa. June 11, 2007) ....................................51

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
  692 F.2d 214 (1st Cir. 1982) ....................................................................31

*Neverson-Young v. BlackRock, Inc.*,
  No. 09-6716, 2011 WL 3585961 (S.D.N.Y. Aug. 11, 2011).................................30

*Newman v. Metro. Pier & Expo. Auth.*,
  962 F.2d 589 (7th Cir. 1992) ..............................................................30, 84

*Niehus v. Liberio*,
  973 F.2d 526 (7th Cir. 1992) ....................................................................31

*Oleksy v. Gen. Elec. Co.*,
  No. 06-1245, 2013 WL 3944174 (N.D. Ill. July 31, 2013) ....................................28

*Ovebade v. Boston Sci. Corp.*,
  No. 11-968, 2012 WL 4020971 (S.D. Ind. Sept. 12, 2012)...............................32, 87

*Patterson v. Coca-Cola Bottling Co.*,
  852 F.2d 280 (7th Cir. 1988) ....................................................................84

*Philips Med. Sys. Int'l, B.V. v. Bruetman*,
  982 F.2d 211 (7th Cir. 1992) ....................................................................85

*Powers v. Chicago Transit Auth.*,
  890 F.2d 1355 (7th Cir. 1989) ..................................................................84

*Profile Gear Corp. v. Foundry Allied Indus., Inc.*,
  937 F.2d 351 (7th Cir. 1991) ....................................................................84

*Partington v. Broyhill Furniture Indus., Inc.*,
  999 F.2d 269 (7th Cir. 1993) ....................................................................32

*Quela v. Payco–Gen. Am. Creditas, Inc.*,
  No. 99-1904, 2000 WL 656681 (N.D. Ill. May 18, 2000)....................................86

*Resolution Trust Corp. v. S. Union Co.*,
  985 F.2d 196 (5th Cir. 1993) ....................................................................81

*Rodgers v. Lowe's Home Centers, Inc.*,
  No. 05-502, 2007 WL 257714 (N.D. Ill. Jan. 30, 2007)...............................32, 33, 52

2411754

*Roland v. Salem Contract Carriers, Inc.*,
   811 F.2d 1175 (7th Cir. 1987) ....................................................................85

*Salmeron v. Enterprise Recovery Systems*,
   579 F.3d 787 (7th Cir. 2009) ................................................................61, 62

*Secrease v. W. & S. Life Ins. Co.*,
   800 F.3d 397 (7th Cir. 2015) ....................................................................86

*Sentry Ins. A Mut. Co. v. B & H Health Care Servs., Inc.*,
   No. 13-386, 2014 WL 348182 (W.D. Wis. Jan. 31, 2014) ....................87

*Smithfield Foods, Inc. v. United States*,
   No. 13-651, 2015 WL 6965213 (E.D. Wis. Nov. 10, 2015)..................31

*State Farm Fire & Cas. Co. v. Broan Mfg. Co.*,
   523 F. Supp. 2d 992 (D. Ariz. 2007) ......................................................30

*Stevenson v. Union Pac. R. Co.*,
   354 F.3d 739 (8th Cir. 2004) ....................................................................63

*Trask-Morton v. Motel 6 Operating L.P.*,
   534 F.3d 672 (7th Cir. 2008) ......................................................12, 13, 28

*Turner v. Rataczak*,
   No. 13-48, 2014 WL 5023095 (W.D. Wis. Oct. 8, 2014)......................32

*United States v. Approximately $7,400 in U.S. Currency*,
   276 F.R.D. 596 (E.D. Wis. 2011) ............................................................76

*Wiginton v. Ellis*,
   No. 02-6832, 2003 WL 22439865 (N.D. Ill. Oct. 27, 2003) ......25, 28, 29

*Williams v. Chicago Bd. of Educ.*,
   155 F.3d 853 (7th Cir. 1998) ....................................................................84

*Zbylski v. Douglas Cty. Sch. Dist.*,
   No. 14-01676, 2015 WL 9583380 (D. Colo. Dec. 31, 2015) ................24

*Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*,
   395 F.3d 416 (7th Cir. 2005) ....................................................................52

## OTHER AUTHORITIES

Fed. R. Civ. P. 37(e) ....................................................................................13

Fed. R. Evid. 408 ..................................................................................33, 34

Rule 30(b)(6)................................................................................... passim

Rule 37 ................................................................................................................................... passim

2411754

## INTRODUCTION

The Court should impose significant sanctions on TCS.  Epic does not ask the Court to do this lightly, and recognizes the seriousness with which the Court will review this kind of request. Epic bases this request on a complete record of TCS's misconduct that permeated the entire case, including newly-learned and deeply concerning evidence destruction issues that cannot be cured. As the Seventh Circuit has explained, in rare cases like this one, where there has been a "drumbeat of discovery abuse," the Court will "look to more than just isolated instances of abuse" and "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit.'" *Domanus v. Lewicki*, 742 F.3d 290, 300, 301 (7th Cir. 2014) (affirming $413 million default judgment for discovery misconduct).

TCS has steadily beaten the drum of discovery abuse in this case.  TCS has done so in several significant ways that, individually, warrant sanctions, but collectively pound home the point that significant sanctions – including default – are appropriate here.

The Court should impose sanctions because TCS failed to preserve critical evidence that existed while TCS was under a legal obligation to preserve it.  Among other things, ██████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████.  That critical evidence could and should have been preserved and produced, but is now gone forever.

The Court should impose sanctions because TCS failed to produce evidence in its possession that *the Court ordered it to produce* after motions to compel.  This includes, among other things, an interrogatory response identifying the TCS employees who accessed UserWeb, all of TCS's release notes related to its EHR products, and inspections of Med Mantra products

1

that may have incorporated Epic's confidential information.  Epic should have that evidence for trial, as the Court ordered, but does not.

The Court should impose sanctions because TCS prevented Epic from discovering critical evidence, including by hiding key witnesses and documents until the close of discovery. TCS could and should have produced that critical information many months earlier, which would have allowed Epic to properly pursue follow-up discovery.  Epic instead conducted discovery in the dark.  It is now too late for Epic to discover that evidence for trial.

Finally, the Court should impose sanctions because TCS management and supervisors instituted and maintained what one TCS employee recently described as a plan to ███████████ █████ to ensure that Epic would not discover the facts.  Given the breadth and depth of TCS's discovery abuses, Epic had long suspected there was a coordinated effort within TCS to keep Epic away from critical evidence that would prove the truth of the whistleblower's allegations. Yet it was not until February 12, 2016, that TCS employee Mahendra Pandian finally revealed the existence of TCS's ███████████████ stratagem.  Epic had been seeking Mr. Pandian's deposition since the case first started.  But TCS refused to produce Mr. Pandian for deposition when Epic asked, hid him for many months under the guise that it could not "locate" him, and then cancelled his deposition on less than two days' notice (after Epic's counsel had traveled to India to depose him), thereby preventing Epic from obtaining his damning admissions until after the close of discovery.

What follows is an executive summary of TCS's abuses, which previews the more complete presentation of those abuses in the "evidence and argument" section of this memorandum.  For the Court's convenience, we have grouped TCS's abuses into several categories.  Within each category, we set forth the facts of TCS's abuses, state the applicable

2

law, and then provide a suggestion with respect to an appropriate sanction for each specific category of discovery abuses. Based on the collective weight of TCS's abuses, however, Epic ultimately requests that the Court enter default against TCS.

**EXECUTIVE SUMMARY**

This is a highly unusual case. Neither Epic nor its counsel have ever been involved in a case like this one, with so many discovery abuses warranting serious sanctions. But the most egregious conduct came to light just days ago when TCS finally produced a witness it had been hiding for a year. That witness, Mr. Pandian, confirmed what Epic had suspected all along.

In Mr. Pandian's own words, TCS managers employed a scheme to ▮▮▮▮▮▮▮▮▮▮ That revelation provided the explanatory glue holding together all of the individual instances of TCS's discovery misconduct. Mr. Pandian explained that ▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮ As Mr. Pandian explained:

Q. ▮▮▮▮▮▮▮▮▮▮

A. ▮▮▮▮▮▮▮▮▮▮

Q. ▮▮▮▮▮▮▮▮

A. ▮▮▮▮▮▮

Dkt. No. 510 at 110:11-21.

When asked to provide specificity, Mr. Pandian recounted: "▮▮▮▮▮▮

2411754

████████████████████████████████████████   *Id.* at 114:10-16.

████████████████████████████████████████████████████

████████████████████████████████████████   *Id.* at 133:14-

134:18.

   The deposition of Mr. Pandian included ██████████████████████

██████████████████████████████████████████████████████

████████████████████.   In view of what had happened during the deposition,

Epic's counsel gave Mr. Pandian one final, wrap-up opportunity to come clean, which resulted in

the following exchange:



*Id.* at 136:23:137:16.

   With that ██████████████ stratagem in mind, this brief addresses six sanctions

requests.

   **First**, beginning on page 12, Epic explains that TCS allowed critical evidence to be

destroyed, notwithstanding TCS's legal obligation to preserve it.  TCS acknowledged that it

███████████████████████████████████████████████████████

████████████████████████████   Yet TCS failed to preserve critical evidence.

TCS failed to preserve ███████████████████████████████████

████████████████████████████████████████████████████████████

███ ██████ ████████ ███ ████████ ██ ███████ ██████ █████████ ██

██████████████████████████████████ would have revealed who accessed Epic's information and, from this starting point, their emails and computers could have been reviewed to see how that information was used and disseminated. █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ In fact, TCS did not even look for ████████████████████████████████████████████████████████████

████████████████████████ █████████████████████████████████, TCS severely prejudiced Epic's ability to determine which TCS employees accessed its confidential information via UserWeb and, as a result, to determine how TCS used that information.

TCS also failed to properly preserve █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████. In other words, there was, but is no longer, a history of the use of two of the most important computers in the case.

Critically, what few records TCS did preserve were █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Put simply, TCS breached its duty to preserve evidence.  Especially in light of TCS's sophistication as a high-tech company in the business of dealing with electronic information, the failure to preserve this critical evidence is the kind of spoliation that warrants sanctions.  At a minimum, Epic requests that the Court (i) draw its own inference that the evidence not preserved by TCS contained information harmful to TCS's case or, alternatively (ii) provide an adverse inference instruction to the jury, allowing the jury to draw its own inference that the evidence not preserved by TCS contained information harmful to TCS's case.

**Second**, beginning on page 33, Epic outlines how TCS made misrepresentations about, and improperly withheld discovery regarding, TCS's internal investigations and knowledge of its wrongdoing.  TCS asserted on several occasions at the outset of this case that "its investigation" had revealed no evidence of wrongdoing, going so far as to argue that Epic's allegations of unauthorized access were "implausible."  However, long before Epic filed its complaint and TCS made these assertions to the Court, ████████████████████████████████████████████████ ████████████████████████████████

TCS hid information about its investigations from Epic for many months, contending that ███████████████████████████████████████████████.  But after Epic filed motions to compel, Epic and the Court discovered that ███████████████████████ ███████████████████████████████████████████████) were not

6

privileged, and TCS had no basis to have withheld them.  Epic and the Court also discovered that



.  But then, when it was too late to conduct any

discovery on its latest version of the truth, TCS swore that t

Had TCS timely produced copies of the indisputably non-privileged documents, such as

Epic would have had a clear road map for discovery.  Rather

than groping around in the dark, Epic would have known who the key witnesses were, what they

had said about their and others' access to UserWeb, how to test their testimony, and where to

look for more information.  Epic would have known that TCS's investigation was inadequate,

would have been able to depose Mr. Menon, Mr. Amalraj and Dr. Santosh Mohanty earlier, and

may have been able to obtain at least *some* of the critical evidence that has since been destroyed.

As it is, TCS did not produce documents such as

until the end of

December 2015, and TCS did not produce

.

TCS has never come clean with the truth about its investigations.  It hid them behind the

cloak of privilege for a long time, only revealing certain (still incomplete) information after the

close of discovery.  Without this key discoverable information, TCS effectively delayed Epic's

depositions of these key witnesses, and precluded Epic from conducting any follow-up discovery

based on the belatedly-produced documents and testimony of Mr. Menon, Mr. Amalraj, and Dr.

Mohanty.  As a result of the delay tactics, TCS hid the need for an independent forensic analysis

and preservation effort by Stroz Friedberg.  Meanwhile,

7

████████████████████   As a result, at a minimum, Epic requests that the Court (i) instruct the jury that it is to presume that Epic's confidential information was used by TCS for improper purposes or, (ii) provide an adverse inference instruction to the jury, allowing the jury to draw its own inference that the evidence not preserved by TCS contained information harmful to TCS's case.

**Third**, beginning on page 44, Epic explains that TCS failed to provide a full list of employees who had access to UserWeb — even after the Court ordered TCS to use "any and all means" and "turn over every stone in the field" to produce it.  TCS had this information all along ██████████████████████   and other electronic records, but TCS failed to review or provide it.  TCS compounded this failure by providing a knowingly incomplete discovery response to the question, which TCS employees accessed UserWeb?  Specifically, TCS responded in May 2015 by ██████████████████.  But by that time, even without looking at the proxy logs, TCS knew that list was incomplete because ████████████████████████████████ ████████████████████████████████████████████████.  This information remained suppressed for months until TCS produced Mr. Andahan for deposition at the end of September 2015.

TCS never complied with the Court's order to provide a complete list of the TCS employees who accessed and downloaded Epic's confidential information from the UserWeb.  As a result, Epic *still* has not received even this most basic of information.  Epic has, thus, been hamstrung in steps two and three of its investigation:  who was the information shared with, and how was it used?  Obtaining complete answers to those questions is foreclosed because TCS destroyed the key electronic data.

Epic also recently learned that TCS has had in its possession since beginning of this case at least 32 of Epic's confidential and trade secret documents, which TCS never produced in

8

discovery.  While this is a small fraction of the thousands of Epic documents TCS downloaded, it is very significant. TCS has only produced a slightly larger fraction in discovery, leaving many thousands of the Epic documents downloaded by TCS unaccounted for. ███████████████████ ████████████████████████████████████████████████████. TCS's failure to produce these ████████████, along with the electronic records associated with them, at the commencement of discovery has prevented Epic from questioning any TCS witnesses about how the documents were obtained and used, and who they were shared with.  It has also foreclosed Epic from obtaining and analyzing the electronic record, including emails, of all of the TCS employees who had possession of these Epic documents.

In light of TCS's misconduct, Epic requests that, at a minimum, the Court preclude TCS from arguing that TCS used Epic's confidential information downloaded from the UserWeb only for testing purposes.

**Fourth**, beginning on page 52, Epic explains how TCS hid the location of critical witnesses for several months, impeding Epic's ability to take early depositions of these individuals and then follow up as appropriate.  Here are just two of the examples explained in detail in the section about TCS hiding critical witnesses:

Epic asked to depose Mahendra Pandian at the beginning of the case.  TCS claimed Mr. Pandian had no "responsive information" and claimed it could not "locate him" even though ███ ███████████████████████████████████████████████ As a result of a months-long effort to depose him, Mr. Pandian's deposition finally occurred more than a year later, on February 12, 2016.  Represented by independent counsel, Mr. Pandian dropped a bombshell: ████████████████████████████████████████████████████████████ ███████████████████████████████. TCS had successfully hidden Mr. Pandian

from Epic until the eve of trial.  As a result, the testimony of most of the TCS witnesses in this case was provided pursuant to this ███████████ stratagem and, due to TCS's misconduct, it is now too late to revisit it all.

TCS also disclaimed knowledge of an employee named DV Prasad for months, even though it later acknowledged that Mr. Prasad lived in California.  Even then, TCS refused to produce Mr. Prasad for deposition for several months.  When TCS finally produced documents and permitted DV Prasad to be deposed, it became clear why TCS had hidden him for so long:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████.  When deposed earlier in the case, Mr. Reddy had
███████████████████████████████████████████████████████.
But because TCS had inordinately delayed Mr. Prasad's deposition, it was too late for Epic to reopen Mr. Reddy's deposition; he had since left the company and could not be compelled to reappear (because he resides in India, beyond the Court's subpoena power).

TCS hid some of its most critical witnesses from Epic throughout the case, preventing Epic from discovering the truth about who accessed its confidential information, where that information went, and what was done with it.  Accordingly, Epic requests that the Court sanction TCS by, at a minimum, instructing the jury that it is to presume that Epic's confidential information was used by TCS for improper purposes.

**Fifth**, beginning on page 63, Epic discusses TCS's misconduct with regard to discovery related to its Med Mantra products.  TCS for months refused to provide even the names of its EHR products, which Epic later learned were all derivative of Med Mantra.  TCS repeatedly

2411754

asserted in this case that ██████████████████████████████████ which Epic

discovered was not true.  TCS had in fact ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████        When TCS finally produced the relevant DaVita documents, it did so in a

document dump days before Christmas — and a week after the Court had ordered TCS to

complete its production.  TCS made a huge dump of Med Mantra and TCS-HIS documents at the

same time, which consisted of documents that TCS should have produced no later than August

2015.  That production was not only extremely tardy, but remains incomplete.  Despite a Court

order requiring full disclosure, TCS *still* has not produced release notes for the beginning period

of development for TCS-HIS, which is a key time period for analyzing whether Epic's

confidential information was used in the development of TCS-HIS.  TCS's discovery also failed

to reveal that ██████████████████████████████████████████████████████████████

████████████████████████, a fact Epic learned only after the close of discovery.

Moreover, TCS violated the Court's order to allow Epic to inspect its Med Mantra

installations in several medical facilities, including the Med Mantra version used at the British

American Hospital in Mauritius ████████████████████████████, as well as the

DaVita product itself.  Despite the Court's order that the inspections take place, and repeated

requests from Epic to conduct the inspections, TCS refused to allow Epic to conduct the

inspections.  Because Epic and its expert were prevented from inspecting the evidence that

would allow Epic to show that its confidential information was incorporated in TCS's competing

products, Epic is at a severe disadvantage in making this showing at trial.

TCS effectively prevented Epic from obtaining critical evidence showing how TCS used

Epic's confidential information to compete against Epic.  As a result, Epic requests that, at a

minimum, the Court sanction TCS by instructing the jury that it is to presume that Epic's confidential information was used by TCS to help it develop TCS-HIS as well as a U.S. laboratory product for DaVita and Quest Diagnostics.

**Sixth**, beginning on page 76, Epic outlines a few of TCS's many other discovery abuses. As but one example, because of TCS's repeated refusals to provide sufficient information for Epic to determine who the key witnesses in the case would be (and to produce them in a timely manner), Epic served Rule 30(b)(6) deposition notices.  The intent of such notices was clear: because Epic did not know who at TCS had the relevant knowledge, it expected TCS to identify the relevant individuals.  Yet, rather than producing the individual – Mr. Menon – who possessed unique personal knowledge of ███████████████████████████████████████ ████████████████████████████████ TCS repeatedly offered corporate designees with no knowledge of the underlying facts.  TCS's plan ensured that Epic would only be able to discover the words its counsel had prepared the witnesses to say, and resulted in Epic not learning until the end of the discovery what TCS should have disclosed early on.

TCS's discovery abuses are extensive and pervasive.  Although individual sanctions could be imposed with respect to each one of the abuses, taken together the abuses are evidence of a clear strategy to ██████████████ throughout the case.  This is the rare case in which the ultimate sanction of default is warranted.  As a result, Epic requests that the Court enter default against TCS.

## EVIDENCE AND ARGUMENT IN SUPPORT OF SANCTIONS

### I.    TCS Destroyed Evidence that it Knew was Critical to Epic's Case.

Potential litigants have an affirmative duty under the law to preserve evidence that they know or reasonably should know is relevant to potential litigation.  *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008).  TCS failed to satisfy its duty to preserve

12

when it allowed the deletion of evidence it knew was directly relevant to potential (and then actual) litigation with Epic.  This is spoliation.  *See id.*; *see also* Fed. R. Civ. P. 37(e).[1]

## A.   Relevant Factual Background.



1.

Dkt. No. 176 at 297:4-298:6; Ex. 1[2] at PG0001082; Dkt. No. 306-5; Dkt. No. 177 at 492:17-495:2, 495:16-19, 523:25-528:22.

On April 27, 2014,

Dkt. No. 294 at 7:2-10:2, 16:12-21.

*Id.* at 16:5-11.

*Id.* at 11:7-13:15 (explaining

.

---

[1] Federal Rule of Civil Procedure 37(e), amended on December 1, 2015, provides an alternate basis for imposing sanctions, and does not impact the Court's inherent authority to appropriately remedy abuse of the judicial process.  *CAT3, LLC v. Black Lineage, Inc.*, No. 14-5511, 2016 WL 154116, at \*6-7 (S.D.N.Y. Jan. 12, 2016) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).  "The new rule takes the duty as it is established by case law, which uniformly holds that a duty to preserve information arises when litigation is reasonably anticipated."  *Id.* at \*5.

[2] Documents cited as "Ex. __" are attached to the concurrently-filed Declaration of Rick Richmond.

On or around May 5, 2014, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████ *Id.* at 9:22-10:14, 20:14-22:12, 30; Ex. 4 at L&L001007; Ex. 5.[3]  In early

June 2014, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 11 at L&L000181; Ex. 8-10; Dkt. No. 472

at 100:1-25, 123:21-124:4.  █████████████████████████████████████████

██████████████████████████████████ Exs. 7, 12, 13.  ███████████████████

███████████████████████████████████████████ Ex. 7 at TCS00302585.

      **2.**  ███████████████████████████████████████ **Which  TCS**

**Ignored.**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Dkt. No. 236-18.

████████████████████████████████████████████████████████████████████████

████████████████████████████████ *See* Dkt. No. 9 ¶¶ 4-8; Dkt. No. 236-20; Dkt. No. 127 at

115:4-12,16-25, 126:17-127:4;  Dkt. No. 412 at 163:10-12.  ████████████████████

---

[3] Contrary to TCS's representations at the December 4, 2015 hearing (*e.g.,* Dkt. No. 293 at 18:6-16, 19:15-17), ███████████████████████████████████████████████████████████████ ███████████████████████ *See, e.g., id.*; Dkt. No. 294 at 9:22-10:2, 21:1-7, 31:2-7, 33:1-15; Dkt. No. 472 at 38:1-3, 39:1-18, 46:6-15, 62:3-25, 125:7-24; Ex. 6 at TCS00020129-31; Ex. 7 at TCS00302576; Dkt. No. 403 at 87:5-17.  But TCS now claims ██████████████████████████ ███████████████████████████████ Dkt. No. 437-3 at 249:21-252:4; Dkt. No. 430 at 5, 11.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████   Dkt. No. 237; Dkt. No. 158 at 268:12-269:7.

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Ex. 14 at TCS00020218 (emphasis added).   █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████   *Id.* at

TCS00020218-19 (emphasis added).

TCS did not abide by ████████████████ or its own obligation to take reasonable steps to preserve all relevant documents and data. Indeed, as explained in detail below, TCS destroyed critical data even though it knew it was obligated to preserve the materials for use in potential litigation.

**3.**   ████████████████████████████████████.

███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████. Dkt. No. 294 at 12:16-25; Dkt. No. 273 at 9; Dkt. No. 508 at 143:6-144:12, 184:10-185:6; Ex. 19. ██████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ .” Dkt. No. 271 at ¶ 16; Dkt. No. 273 at 9.

However, as Epic has learned in bits and pieces during the discovery period, TCS's investigation was *not* designed to actually determine which of its employees had accessed UserWeb. For example, TCS admits that ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ What is worse, TCS allowed ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

      **a.**   ███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ *See* Dkt. No. 396 at 9:19-23, 91:8-93:10; Dkt. No. 412 at 5:5-15, 20:11-21:14.   Mr. Menon, as TCS's corporate representative, admitted that ██████

███████████████████████████████████████████████████████████

█████████████████████████████ Dkt. No. 437 at 12:8-11; 26:18-28:6.  TCS also admits that

███████████████████████████████████████████████████████████

███████████ *See* Dkt. No. 412 at 93:22-94:19; Dkt. No. 396 at 96:21-98:5; Dkt. No. 445 at 14:7-18, 147:10-148:6, 78:17-79:15. That information is what ████████████████████████ (Ex. 14 at TCS00020218), Epic requested in discovery (Dkt. Nos. 64-1, 64-2, 66-3), and the Court ordered to be produced on October 28, 2015 (Dkt. No. 151; Dkt. No. 155 at 15-10-14).  TCS also

admits that ███████████████████████████████████████████████████████

███████████████████████ *See* Dkt. No. 412 at 168.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*See* Dkt. No. 396 at 96:21-98:5; Dkt. No. 412 at 274:22-276:8; Dkt. No. 498-1; Dkt. No. 437-3 at

262:12-23. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ (Dkt. No. 235) ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████. Dkt. No. 412 at 48:11-16, 96:5-8, 102:22-25; Dkt. No. 437 at 48:12-50:8; *see*

*also* Declaration of Samuel S. Rubin ("Rubin Decl.") ¶ 43.[4]

    Worse, █████████████████████████████████████████████████████

████████████████████████████████████ Dkt. No. 412 at 141:1-15, 194:6-23; Dkt. No. 437

at 35:19-36:3; 40:14-23; 41:11-13; Dkt. No. 445 at 18:14-19:9. █████████████████████

█████████████████████████████████████████████████████ Dkt. No. 412

at 45:24-46:1; Dkt. No. 437 at 35:6-14; 40:14-23, 41:11-42:25. ██████████████████████

███████████████████████████████████ *See, e.g.*, Dkt. No. 437 at 35:19-23; 167:17-

169:12.  In other words, ████████████████████████████████████████ *See id.*;

Rubin Decl. ¶¶ 46-47.  This highlights the need to suspend normal retention schedules and

routine deletion — █████████████████████ Ex. 14. ██████████████████████████

████████████████████████████████████████████████████████████████

---

[4]  The Declaration of Samuel S. Rubin, filed concurrently herewith, describes the findings of the ongoing Stroz Friedberg forensic investigation.



█████████████████████████████████████████████ Dkt. No. 412
at 194:18-195:8; 196:15-197:5, 216:20-217:1; Dkt. No. 445 at 18:14-19:9; Dkt. No. 498-1.  But
████████████████████████████

Indeed, █████████████████████████████████████████
███████████████████████.  Dkt. No. 437 at 41:11-24, 42:21-43:3.  ███████████
████████████████████████████ (*id.*), █████████████████
█████████████████████ Rubin Decl. ¶¶ 44-45.  As a result, neither Epic nor the

Court can even begin to know the full extent of the TCS employees who had access to Epic's

confidential and trade secret information.  █████████████████████████

██████████████████████████████████████████████

███████████████████████.  Rubin Decl. ¶¶ 46-47.

**b.**   ████████████████████████████
████████████

In November 2014, ███████████████████████████████

█████████████████████████████████████████████

█████████████████████████████.  Dkt. No. 437-1 at 67:13-19.  █████

█████████████████████████████████████████████

██████████████████████████████████████.  *Id.* at
58:10-25, 61:19-62:2.[5] ████████████████████████

██████████████████████████.  *Id.* at 59:1-8, 67:2-12.[6]

---

[5] ████████████████████████████████████████████████
███████████.  Rubin Decl. ¶¶ 5, 33, 37.
[6] ███████████████████████████.

But TCS did not ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

        ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ Rubin Decl. ¶ 34. ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ *Id.* ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at ¶ 35.  As Stroz

concluded: ██████████████████████████████████████████████████████

██████████████████████ *Id.* at ¶ 50.  Thus, ███████████████████████

████████████

    In  addition, █████████████████████████████████████████████████

████████████████████████████████████████████████ Mr. Menon, TCS's

corporate  representative,  admitted  that ████████████████████████

██████████████████ Dkt. No. 437-1 at 65:22-66:3.  He also conceded that ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 66:4-10. ████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████. Rubin Decl. ¶¶ 31-32.

Information about deleted files is critical here.  TCS downloaded Epic documents thousands of times but has produced only a few in discovery.  ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ *Id.* at ¶¶ 10-11.  The ability to analyze deleted files is also critical because it is possible that UserWeb documents downloaded or used by members of the Med Mantra team may have been deleted either after use or upon discovery of Mr. Guionnet's allegations or Epic's lawsuit.  *See* Dkt. No. 68 at 37:2-25 (Magistrate Judge Crocker recognizing TCS is too smart to leave "smoking gun" documents on Med Mantra team computers).  Yet ████████████████████████████████████████████████

████████████████████. Rubin Decl. ¶¶ 41-42.

In addition, ████████████████████████████████████████

███████████████████████████████████████████████████████████. *See* Dkt. No. 412 at 157:15-159:4.  ███████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Dkt. No. 437-1 at 69:2-72:6.  Sadly, if TCS had just ██████████████████████████████████, it would have been able to determine precisely who accessed Epic's UserWeb, and whose computers to preserve.  Instead, ██████████████████████████████████, which was problematic for at least two significant reasons.

20

First, TCS's decision to ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████. Mr. Menon admitted ████████████

███████████████████████████████████████████████████████████████████

██████████████ Dkt. No. 437-1 at 70:13-71:13.  Mr. Menon further acknowledged that █████

███████████████████████████████████████████████████████████████████

███████████████████████████. *Id.*

Nevertheless, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████. *Id.* at 72:2-6.  *In other*

*words, TCS sought to preserve only the evidence it believed would support its own theory of the*

*case, i.e.,* ████████████████████████████████████████████.  Meanwhile, TCS

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ *See* Rubin Decl. ¶¶ 39-40 (██████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████

Second, TCS ignored evidence that ████████████████████████████████████

████████████████████████. For example, Ms. Gunasekaran, ████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████. Dkt. No. 410 at 13:1-10, 56:1-7, 57:2-59:19, 62:6-63:12; 95:13-96:1, 136:13-137:18; Dkt. No. 128 at 18:18-22.

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████ Dkt. No. 410 at 95:13-96:15; Dkt. No. 129 at 29:2-30:7. ████████████████████████████████

████████████████████████████████████████████

Dkt. No. 410 at 102:10-103:2. █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. Dkt. No. 410 at 103:24-104:19,127:21-129:1; Dkt. No. 183 at 7:13-16; Dkt. No. 130 at 17:7-18.  In short, TCS knew that ████████ ████████████████████████████████, yet failed to preserve the evidence.

**c.** █████████████████████████████████████
██████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Dkt. No. 273 at 9. ██████████████████████████████████████. This methodology is particularly suspect because TCS has admitted it did not expect its employees to be truthful about accessing UserWeb because sharing passwords is against TCS policy. *See* Dkt. No. 281 at 20 n. 24 ("The activity at issue – sharing a password – is prohibited by TCS policy and not conduct employees would readily concede engaging in themselves or implicate others in.").

It was perhaps not surprising, therefore, that ██████████████████████████
████████████████████████████████████████████.  Dkt. No. 412 at
168:8-20.  Mr. Amalraj acknowledged that ██████████████████████████████
██████████████████████████████.  Dkt. No. 412 at 10:5-17, 168:8-20.  But
TCS chose not to do so.

It is also notable that ████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████.  *See* Dkt. No. 273 at 9.  Worse, ████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████  *Compare* Dkt. No. 416-1 at TCS00034853 ████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████  *with id.* at TCS00034855 (████████████████
██████████████████████████████).  TCS's failures in this regard are
unexplainable.

### d.   TCS Failed to Conduct a Reasonable Search of the Electronic Data.

Not only did TCS fail to preserve relevant electronic evidence, but TCS's attempts to
search electronic data at that time were limited to ████████████████████.  In December
2014, ██████████████████████████████████████████████████████████████
██████████████████████.  Dkt. No. 412 at 280:18-284:4. ████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████.  *Id.* at
286:1-287:8; Dkt. No. 273 at 17; Rubin Decl. ¶¶ 24-27.

23

But TCS has admitted that  Dkt. No. 412 at 283:20-284:4.   TCS also admitted that Dkt. No. 437 at 185:11-22.  Further, . *See, e.g.,* Dkt. No. 397 at 52:15-53:7; Dkt. No. 408 at 52:24-53:11; Dkt. No. 501 at 92:11-18.  Accordingly, TCS's could not reasonably be expected to uncover evidence that TCS's employees accessed Epic's UserWeb.

### B.   TCS Knew it Had a Duty to Preserve Relevant Evidence at Least in April 2014.

Once a party has "knowledge of the potential for litigation," it has a "duty to preserve all existing relevant documents in its possession or under its control." *Bryden v. Boys & Girls Club*, No. 09-50290, 2011 WL 843907, at *3 (N.D. Ill. Mar. 8, 2011).  The fact that a party conducted an internal investigation into an incident is evidence that it had knowledge of potential litigation. *Zbylski v. Douglas Cty. Sch. Dist.*, No. 14-01676, 2015 WL 9583380, at *11 (D. Colo. Dec. 31, 2015) (citing *Marcum v. Scioto Cnty.*, No. 10-790, 2013 WL 9557844, *7 (S.D. Ohio Nov. 21, 2013)).[7]  In other words, the party need not "understand[] the precise nature of the specific litigation at issue" in order for its "obligation to preserve data [to] arise[]." *Id.* at *10.

Here, TCS had reason to anticipate litigation as soon as Mr. Guionnet notified TCS executives of

---

[7] *See also Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 289 (S.D.N.Y. 2011) ("litigation was reasonably anticipated from the very beginning of the investigation and remediation process").

2411754



████████████████████████████████████████. *See, e.g.*, Dkt. Nos. 236-19, 247-14, 487-5. ██████████████████████████████████████████

███████████████████████ Dkt. No. 294 at 7:2-10:2, 16:5-21.  Thus, at the very latest, TCS's duty to preserve attached in April of 2014.[8]  And by August 2014, █████████████████████

████████████████████████████████████ (Dkt. No. 416-1), ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Ex. 14 at TCS00020218-20219; Dkt. No. 416-1; Dkt. No. 498-1.  In short, █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

## C.  TCS Breached Its Duty To Preserve Evidence.

Once a party has notice of potential litigation, it must suspend its routine document retention policy to ensure the preservation of relevant evidence.  *Wiginton v. Ellis*, No. 02-6832, 2003 WL 22439865, at *7 (N.D. Ill. Oct. 27, 2003); *Krumwiede v. Brighton Assocs., LLC*, No. 05-3003, 2006 WL 1308629, at *8-10 (N.D. Ill. May 8, 2006); *Marten Tranps. Ltd. v. Platform Advert., Inc.*, No. 14-2464, 2016 WL 492743, at *5 (D. Kan. Feb. 8, 2016).  And a litigant's preservation "may not be 'selective,' saving only the evidence supporting a theory of

---

[8] TCS is no stranger to litigation in the United States such that it might not understand its obligation to preserve documents and data once litigation was reasonably anticipated.  TCS has been involved in many significant U.S. litigation matters.  *See, e.g.*, *In re County of Orange*, 784 F.3d 520 (9th Cir. 2015) (breach of contract lawsuit filed against TCS by Orange County, California); *Heldt v. Tata Consultancy Servs., Ltd.*, No. 15-1696, 2015 WL 5542302 (N.D. Cal. Sept. 18, 2015) (employment discrimination class action against TCS); *Vedachalam v. Tata Consultancy Servs., Ltd.*, No. 06-963, 2013 WL 3929119 (N.D. Cal. July 18, 2013) (employment and breach of contract class action against TCS).  Moreover, ███████

*See* Dkt. No. 294 at 9, 11, 14-15 ████████████████████████
████████████████.

liability and impeding the examination of another theory." *Marten Trans.*, 2016 WL 492743, at *5.

TCS, a large, sophisticated IT company surely was technologically capable of properly preserving documents.[9]  To satisfy its preservation duty, TCS was required, at a minimum, to implement an active plan to find, preserve, and retain relevant evidence and tell its employees about the plan. *See Chandler v. Buncich*, No. 12-175, 2012 WL 4343314, at *1 (N.D. Ind. Sept. 24, 2012); *Danis v. USN Commc'ns, Inc.*, No. 98-7482, 2000 WL 1694325, at *37-38 (N.D. Ill. Oct. 20, 2000) (duty to preserve requires "comprehensive document retention policy").

TCS failed to preserve  Dkt. No. 412 at 93:22-94:19; Dkt. No. 445 at 14:7-18, 147:10-148:6, 78:17-79:15.  TCS *knew* this information was relevant to the litigation it anticipated.  All of

. Dkt. No. 412 at 194:18-195:8; 196:15-197:5, 216:20-217:1; Dkt. No. 445 at 18:14-19:9; Dkt. No. 498-1.

---

[9] TCS has emphasized its size and sophistication as a global IT company in this case and elsewhere. *See, e.g.*, Dkt. No. 19 at 1 (describing TCS as "a leading international software provider"); Dkt. No. 214 at 5 (TCS, which "has more than 318,000 employees worldwide," "provides information technology services, consulting and business solutions on a global scale, and offers a wide portfolio of infrastructure, engineering and assurance services"); *id.* at 4-5 (explaining that TCS is part of the Tata Group, which includes Land Rover, Jaguar, Tetley Tea, and Eight O'Clock Coffee); Ex. 20 at 3 (TCS is "among the top 10 technology firms in the world"); Ex. 21 (TCS has been "recognized as a Leader in Digital Services" because it is "at the forefront of rapid innovation in digital technologies"); Ex. 22 (touting TCS's "leading-edge technologies" and "best of talent globally"); Ex. 20 at 17 (TCS "is an IT services, consulting and business services organization that delivers real results to global business, ensuring a level of certainty no other firm can match"); Ex. 23 (explaining TCS customers "experience certainty" because of TCS's "uncompromising devotion to rigorous, world-class processes and standards"); Ex. 24 ("TCS has over 344,000 of the world's best trained consultants in 46 countries").

2411754

Even after a Court order directing TCS to "employ any and all means" to obtain and produce it (Dkt. No. 151), TCS still failed to do it.  Indeed, ████████████████████ ████████████████████████████████████████████████—which was too late.  Dkt. No. 437 at 41:11-24, 42:21-43:3.  Because TCS ██████████████████ ████████████████████████████████████ most of the data was irretrievably lost.  There is simply no excuse for TCS's behavior:  it *knew* the evidence was relevant, indeed critical; it *knew* it should preserve the evidence; it *knew* how to preserve the evidence; it *knew* ██████ and Epic wanted the evidence; and yet it did not preserve the evidence.

Instead, TCS *only preserved the evidence that would assist in its defense.* ██████ ████████████████████████████████████████████████████████ ██████  *See* Dkt. No. 412 at 157:15-159:4.  Yet TCS selectively ████████████████ ████████████ allowing the evidence contained on the unimaged computers to be overwritten. TCS chose to ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████.  In other words, TCS preserved the evidence it believed most likely to support *its own* theory of the case, while permitting the evidence likely to support Epic's allegations (*e.g.*, evidence showing employees with no use for information on the UserWeb were accessing the portal and potentially sharing the information outside of the ODC) to be destroyed.

The end result is that Epic was hamstrung from the start of this case.  Without knowledge of *who* downloaded Epic documents, which was easily retrievable by TCS but never produced and ultimately destroyed, Epic could not even begin a complete investigation.  It had no means to determine *what* was done with those documents, or *where* the documents were sent.  And the

27

computers used by those additional employees that would have been discovered by the proxy logs were not maintained, their email boxes not searched, and the evidence of what they did with Epic's highly confidential information was destroyed.

### D.   TCS's Spoliation Warrants Sanctions.

Spoliation sanctions may be imposed upon a finding of willfulness, bad faith, or fault. *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992); *Jones v. Bremen High Sch. Dist. 228*, No. 08-3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010); *see Oleksy v. Gen. Elec. Co.*, No. 06-1245, 2013 WL 3944174, at *9 (N.D. Ill. July 31, 2013) ("[T]he Seventh Circuit has held that finding 'bad faith' is not necessary for a Court to sanction a litigant for the spoliation of evidence.").  Although some opinions suggest a split regarding whether bad faith is required for any spoliation sanctions, *see Trask-Morton*, 534 F.3d at 681, the Western District of Wisconsin recently explained that spoliation sanctions are appropriate even in the absence of bad faith where, as here, a defendant destroyed evidence the plaintiff needed to prove its claim. *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-99, 2014 WL 6982330, at *2 (W.D. Wis. Dec. 10, 2014) (collecting cases).  Even if required here, the bad faith and willfulness standards are easily satisfied in this case.

The failure to modify normal document retention policies with the knowledge that relevant documents would be destroyed is evidence of bad faith.  *Wiginton*, 2003 WL 22439865, at *7.  As one court explained:

> [F]ailure to prevent the destruction of relevant documents crosses the line between negligence and bad faith, even where the documents are destroyed according to a routine document retention policy. Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents.

*Krumwiede*, 2006 WL 1308629, at *8.  TCS was surely aware of this obligation when 
Ex. 14.  Indeed,
Dkt. No. 412 at 194:18-195:8; 196:15-197:5, 216:20-217:1; Dkt. No. 445 at 18:14-19:9; Dkt. No. 498-1.
.  Dkt. No. 437 at 65:1-67:1; Dkt. No. 412 at 153:20-154:5, 159:17-161:15.

In determining bad faith, this Court may consider "whether the destroyed evidence was material, whether there was a duty to preserve that evidence, and when that duty arose." *Am. Family Mut. Ins., Co. v. Roth*, No. 05-3839, 2009 WL 982788, at *4 (N.D. Ill. Feb. 20, 2009) (finding lack of specific explanation weighed in favor of spoliation); *Wiginton,* 2003 WL 22439865 at *1-2, 7 (finding willful blindness rose to level of bad faith where defendant, knowing that relevant documents would be destroyed if it did not act to preserve them, continued to follow its normal document retention and destruction policies).  The sheer "volume and timing" of spoliation may also be sufficient to find willfulness or bad faith.  *Krumwiede*, 2006 WL 1308629, at *10.

Here, substantial evidence of bad faith exists.  That TCS knew litigation was looming, but refused to preserve evidence that was relevant to
and this proceeding, is alone sufficient to show bad faith.  TCS consciously
, and now evidence crucial to Epic's claims is gone forever.

TCS's actions also show willfulness and fault.  TCS is a sophisticated business in data and technology.  TCS is "among the top 10 technology firms in the world" and is "at the forefront of rapid innovation in digital technologies," with "uncompromising devotion to rigorous, world-class processes and standards."  Ex. 20 at 3, 6; Ex. 21.  Mr. Menon testified that

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████.  Dkt. No. 437 at 12:8-11; 21:6-16, 21:20-22:4; 26:18-28:6; Dkt. No. 396 at 9:19-23, 91:8-93:10; Dkt. No. 412 5:5-15, 20:11-21:14.  That TCS knew it had an obligation to preserve relevant data, yet simply chose not to, clearly evidences willfulness and fault.  *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) (fault is "objectively unreasonable behavior" that goes beyond "a mere mistake or slight error in judgment"); *State Farm Fire & Cas. Co. v. Broan Mfg. Co.*, 523 F. Supp. 2d 992, 996 (D. Ariz. 2007) ("A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the evidence was potentially relevant to the litigation before it was destroyed.").[10]

### E.  At a Minimum, TCS's Spoliation Warrants an Adverse Inference or Adverse Jury Instruction.

A district court has "wide latitude in fashioning appropriate sanctions."  *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) (quoting *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999)).  Accordingly, the Seventh Circuit will affirm "any sanctions that were reasonable under the circumstances."  *Id.*[11]  While sanctions can be employed for a wide array of

---

[10] *See also, e.g.*, *Christou v. Beatport, LLC*, No. 10-2912, 2013 WL 248058, at *14 (D. Colo. Jan. 23, 2013) ("A commercial party represented by experienced and highly sophisticated counsel cannot disregard the duty to preserve potentially relevant documents when a case like this is filed."); *Neverson-Young v. BlackRock, Inc.*, No. 09-6716, 2011 WL 3585961, at *3 (S.D.N.Y. Aug. 11, 2011) (corporate actors have been found to be grossly negligent in failing to preserve evidence).

[11] Thus, a district court need not "select the 'least drastic' or 'most reasonable' sanction."  *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996) (citing *Marrocco*, 966 F.2d at 225); *Newman v.*

purposes, they cannot replace lost evidence.  *Marrocco*, 966 F.2d at 225.  Thus, it is appropriate to draw a judicial notice of an inference against TCS or, alternatively, to instruct the jury that it may draw an inference against TCS.

### 1.   This Court Should Draw Its Own Inference Against TCS

"The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established.  When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him."  *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217 (1st Cir. 1982) (describing the purposes of judicially-drawn adverse inferences).

A court may draw an inference that the missing documents contained negative information when the party seeking the inference has shown that the documents were destroyed in bad faith.  *Smithfield Foods, Inc. v. United States*, No. 13-651, 2015 WL 6965213, at *2 (E.D. Wis. Nov. 10, 2015) (citing *Everett v. Cook Cnty.*, 655 F.3d 723, 727 (7th Cir. 2011).  As the Seventh Circuit has explained:  "it should be enough that there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped his opponent."   *Niehus v. Liberio*, 973 F.2d 526, 530, 531 (7th Cir. 1992) (explaining that an inference is especially applicable where "discovery was thwarted by the stonewalling tactics of the opposing party").  "[I]f, being sensitive to the possibility of a suit, a company then destroys the very files that would be expected to contain the evidence most

---

*Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591 (7th Cir. 1992)); *accord In re Golant*, 239 F.3d 931, 937 (7th Cir. 2001) (affirming sanction of default judgment for failure to make a complete production of documents pursuant to a court order).

31

relevant to such a suit, the inference arises that it has purged incriminating evidence." *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 272 (7th Cir. 1993).

TCS's efforts to obstruct Epic's attempts to obtain evidence in this case – not to mention TCS's selective preservation efforts and management-led stratagem to ███████████ – leave little room to question whether TCS acted in bad faith.  In light of TCS's disregard for its duty to preserve evidence it knew was crucial to Epic's claim, Epic requests that the Court draw its own adverse inference against TCS.  Accordingly, this Court should find that TCS had a duty to preserve evidence, that ███████████████████ TCS failed to preserve contained evidence highly relevant to Epic's claims, and that this Court infers from TCS's destruction that ██████████████ contained information helpful to Epic and harmful to TCS.

### 2.   Alternatively, the Court Should Provide an Adverse Inference Jury Instruction

Alternatively, the Court may instruct the jury that the unpreserved evidence, had it not been deleted, "would have been adverse" to TCS.  *See Domanus*, 742 F.3d at 296; *Ovebade v. Boston Sci. Corp.*, No. 11-968, 2012 WL 4020971, at *15 (S.D. Ind. Sept. 12, 2012) (instructing jury that spoliating party destroyed or failed to maintain evidence under circumstances suggesting the contents would not be helpful in proving his claims in the litigation); *Turner v. Rataczak*, No. 13-48, 2014 WL 5023095, at *3 (W.D. Wis. Oct. 8, 2014) (discussing Seventh Circuit Pattern Jury Instruction § 1.20); *Rodgers v. Lowe's Home Centers, Inc.*, No. 05-502, 2007 WL 257714, at *5 (N.D. Ill. Jan. 30, 2007) (noting "jury is allowed to draw a negative

inference" where there is fault beyond "mere negligence"). Epic is submitting proposed jury instructions with its pre-trial filings.[12]

## II. TCS Made Misrepresentations and Delayed Production of Key Evidence Related to its Investigations.

This Court previously recognized that TCS's conduct in response to Epic's attempt to obtain information about TCS's investigations into its employees' improper UserWeb access has been "inexplicable," "disingenuous," and "obstruct[ive]." Dkt. No. 291 at 2, 7, 8, 9. TCS's behavior did not improve after the Court's hearing on this matter. TCS has continued to engage in evasive discovery behavior that was clearly designed to impede Epic's ability to discover the truth.

### A. Relevant Factual Background.

The very first page of the very first document TCS filed in this case asserted: "According to TCS' investigation to date, the claims in this action have no merit . . . ." Dkt. No. 19 at 1. TCS subsequently reiterated that ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████    Dkt. No. 247-9 (July 25, 2015 letter) at 1-2; *see also id.* ████████

████████████████████████████████████████████████████

████████████████████[13]



---

[12] Such a jury instruction is considered "lenient" where, as here, there is strong evidence of bad faith. In *Domanus*, the Seventh Circuit held that the magistrate judge's recommendation of an adverse inference jury instruction was "unreasonably lenient" in light of the defendant's repeated discovery violations, and affirmed the district judge's decision to impose a default judgment instead. 742 F.3d at 296.

[13] ████████

████████" Accordingly, Epic does not rely on anything in the letter to prove TCS's liability, but instead offers certain excerpts for another purpose. *See* Fed. R. Evid. 408 (explaining that while evidence of an attempt to compromise a claim is not admissible to prove liability, the evidence may nevertheless be "offered for another purpose"). That other purpose is to show that ████████████████████

████████████████████████████████████████████

*See, e.g., Breuer Elec. Mfg.*

We now know that TCS's bold averments of innocence to the Court and Epic were knowingly untrue.  TCS had in its hands (i) ███████████████████████████, (ii) an ███████████████████████████████████, (iii) ███████████████, (iv) the ████████████████████████████ and (v) ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Dkt. No. 167-1 at TCS00017924-26; Dkt. No. 416-1 at TCS00034847-49, 53-54.  ████████████████████████████████████████████ ████████████████████ Ex. 44 at TCS00368313-14.[14]  TCS therefore knew its statements to the Court were untrue when made.

Moreover, █████████████████████████████████████ ██████, were indisputably not privileged.  *See* Dkt. No. 293 at 35:25-37:6, 42:4-43:18 (holding ████████████████████████████████████████████); Dkt. No. 294 at 23:5-24:9, 28:11-23.  The other documents contained, at a minimum, substantial non-privileged factual information that should have been disclosed in discovery.  *See, e.g.*, Dkt. No. 416-1.

Yet TCS withheld the documents from production, and stated in discovery responses that ████████████████████████████████████████████

---

*Co. v. Toronado Sys. of Am.*, 687 F.2d 182, 185 (7th Cir. 1982) (describing as "ridiculous" a party's argument that consideration of settlement negotiations violated Rule 408 when settlement evidence was "properly presented" to rebut that party's assertion that it was unaware of the actual facts); *see also Eisenberg v. Univ. of New Mexico*, 936 F.2d 1131, 1134 (10th Cir. 1991) (when reviewing a motion for sanctions, evidence of settlement may be properly considered pursuant to Rule 408); *CNA Fin. Corp. v. Brown*, 162 F.3d 1334, 1338 (11th Cir. 1998) (court properly considered settlement offers pursuant to Rule 408 when evaluating motion for sanctions).

[14] Despite being provided to TCS on December 9, *2014* (Ex. 44 at TCS00368308), TCS did not produce ████████████████████████████ until January 6, *2016*.

34

███████ Dkt. No. 169-8 at 11-12; Dkt. No. 169-9 at 11-12; Dkt. No. 254-4 at 2 (asserting TCS "has long maintained that documents relating to TCS's internal investigation are privileged"). Thus, while Epic should have had these investigative reports in hand, it instead had to expend extraordinary efforts to try to get to the bottom of TCS's misdeeds—expense and time dramatically increased due to TCS's unsupportable positions and mistruths.

On September 4, 2015, Kaiser produced a PowerPoint deck found on a Kaiser laptop used by TCS employee Anmol Gupta. *See* Dkt. No. 108 at 1-2; Dkt. No. 109-1. That document included discussion of ████████████████████████████████████ ████████████████████████████████. *Id.* It was only after Epic pointed to references in other documents to ████████████████████████ (*see* Dkt. No. 109-2 at 2; Dkt. No. 109-8 at TCS00007936), which Epic believed this document to be, that TCS produced ████████████████████████████ (Dkt. No. 167-1). That September 12, *2014* report was first produced to Epic on September 16, *2015*, one year after its creation and five months after Epic had first requested documents related to any TCS investigations into its employees' UserWeb access. *See* Dkt. No. 237-3.[15]

TCS tried to justify its failure to produce the report by arguing it was not "responsive to Request No. 34 on its face," and that TCS "has long maintained that documents relating to TCS's internal investigation are privileged." Dkt. No. 254-4 at 2. A brief review of the September 12,

---

[15] The information in this document should have been provided to Epic even before this lawsuit was filed. The contract between TCS and Epic required TCS ████████████████████████████ ████████████████████████ Dkt. No. 7-8 ¶ 3(c)(vi); *see also id.* ¶ 1 ████████████████████████ ██████ Dkt. No. 167-1 at TCS00017924-26.

2014 report ███████████████████████████ confirms that there is no reasonable

basis for either argument.  Dkt. No. 167-1; *see also* Dkt. No. 293 at 42:4-43:18.  TCS's third

argument, "that none of the TCS employees that appear on TCS00017919 [the transmittal email

to Kaiser] were among the parties' agreed upon custodians," was equally baseless.  *See* Dkt. No.

254-4 at 2.  TCS has an independent obligation to produce relevant and responsive materials that

it is aware of, regardless of where they are found.  Dkt. No. 103 at 27:4-28:2, 51:18-52:3; Dkt.

No. 338 at 4:3-11; Dkt. No. 293 at 43:4-18.  As the Court put it, Epic "doesn't know what [it]

doesn't know."  Dkt. No 103 at 45:15-46:6.  That is why it was *TCS's* obligation to engage in a

reasonable search for materials responsive to Epic's discovery requests.

Faced with conflicting evidence regarding the number and privileged nature of TCS's

investigations (*e.g.*, Ex. 6 at TCS00020129), Epic served a Rule 30(b)(6) deposition notice and

accompanying document requests seeking information about all of TCS's investigations.  Dkt.

No. 248-6.  The following day, TCS's attorneys continued to insist that only one investigation

had taken place, in spite of evidence to the contrary  Dkt. No. 254 at ¶ 7; Dkt. No. 248-8 at 1.

Meanwhile, on November 9, TCS's Rule 30(b)(6) witness, Suresh Muthuswami, indicated his

belief that ████████████████████████████████ Dkt. No. 188 at

247:2-15.  Epic was, once again, forced to file a motion to compel.  Dkt. No. 246.

In response to Epic's motion to compel, TCS again asserted that ████████████



███████████████████████████████████████████████████████

█████████████████████ Dkt. No. 273 at 1; *see also id.* at 2 ██████████████

███████████████████████████████████████████████████████

████████████████████████ ).  TCS claimed ██████████████████

████████████████████████ (*id.* at 7), and maintained that ████████████

2411754

███████████████████████████████. *Id.* at 10.  TCS also claimed the "sword and shield doctrine" was inapplicable because "Epic has not been deprived of information TCS will later reveal." *Id.* at 21.  But, as will soon become clear, that is precisely what happened.

At the December 4, 2015 hearing on Epic's motion, the Court found that TCS had employed "a cat and mouse game as Epic has attempted to try to get to the bottom of the information that they are entitled to," and ordered TCS to stop "hiding the ball" and provide "straightforward answer[s]" about the scope and number of its investigations.  Dkt. No. 293 at 8:5-8, 9:25-11:5.  TCS's counsel was unable to do so.  He claimed ███████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████." *Id.* at 12:9-18, 32:18-21.  As it turns out, all of these statements were completely wrong.

On December 7, 2015, during a continued hearing, Loeb & Loeb attorneys Ms. La Mar and Mr. Bajak confirmed that (1) ████████████████████████████████ █████████████████████████████████████; (2) ████████████████████ █████████████████████████████████████████████████ █████████████████████; (3) ████████████; and (4) █████████████████████████. Dkt. No. 294 at 9:22-10:14, 11:12-13, 20:16-24:9, 28:11-23, 31:2-34:1; Dkt. No. 291 at 5-7.

TCS's inconsistent positions regarding its investigations did not stop after the Court's December 2015 hearings and order.  On January 14, 2016, it was revealed for the very first time that, despite repeated assertions in this case to the contrary (*see supra* n. 3), ████████████ ████████████████████████████████████████████████████████

███████████    Dkt. No. 437-3 at 249:21-252:4.[16]   TCS reiterated this point in recent briefing,

claiming ████████████████████████████████████████████████████

████████████████████████████   Dkt. No. 430 at 5, 11.

In response to this new revelation, Epic served deposition notices on TCS (Ex. 27), which were rebuffed. Ex. 28 at 2-3. Then Epic proposed that TCS respond to requests for admission that memorialized the assertions in TCS's recent briefing and by its witnesses, which were also refused. Exs. 28-30. Instead, TCS proposed responding to an interrogatory it had drafted. Ex. 29. While Epic objected to the situation TCS had created, it accepted TCS's interrogatory response under protest. Ex. 30 at 1; Ex. 31.

TCS's February 10, 2016 interrogatory response addresses information Epic requested *ten months* earlier. Dkt. No. 169-8 at 11-12; Dkt. No. 169-9 at 11-12; Ex. 31. Yet TCS was only willing to provide information about its investigations *after* the discovery cut-off, when Epic would be unable to test its assertions (which conflict with prior discovery in several regards). There is no legitimate reason for TCS's delay; TCS knew all of this information in April 2015.

The newly formulated interrogatory response is a classic demonstration of the "sword-and-shield" approach that this Court has warned against. *See* Dkt. No. 143 at 11:16-21 ("we're not going to let TCS use this privilege as a shield and a sword"). TCS makes representations that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████   Ex. 31 at 3-5. Yet, TCS's May 2015 response to Epic's interrogatory seeking

---

[16] Other recent evidence indicates ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Dkt. No. 508 at 136:18-138:19, 224:1-227:2; Ex. 32 at TCS0038845-46; Ex. 33 at TCS00388424-25.

information about TCS's investigations refused to disclose any of those  things, claiming instead that ██████████████████████████████████████████████████
██████████████████████████████████████████████ Dkt. No. 169-8 at 11-12;
Dkt. No. 169-9 at 11-12.  Similarly, during Mr. Bajak's deposition, TCS's counsel made very
clear TCS's position that ██████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████  Dkt. No. 472 at 29:22-30:2.  And Mr. Bajak was ██████████████████████████
██████████████████████████  *E.g.*, *id.* at 27:2-5, 30:11-20, 49:6-23.

TCS  also  produced  a  document  shortly  before  the  recent  deposition  of  Narasimhan
Srinivasan, TCS's Head of HR for North America, that further confuses everything TCS has said
on the subject of its investigations.  *See* Ex. 36.  TCS has both said ████████████████████
██████████████████████████████████████████████  *Compare* Dkt. No. 472
(Bajak Tr.) at 38:1-3, 39:16-18, 46:9-15, 62:7-25, 125:12-24 *and* Dkt. No. 403 (Mohanty Tr.) at
87:9-89:20 *with* Dkt. No. 437-3 (Menon Tr.) at 249:21-252:4.  In addition, Mr. Chandrasekaran,
the CEO of TCS, submitted a declaration in an effort to avoid a deposition, claiming:  ████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████  Dkt. No. 434 at ¶ 19.[17]  But we know now that
Mr.  Srinivasan  ██████████████████████████████████████  (Exs. 34-36),  including
informing him that ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████  Ex. 36 at TCS00388407.



---

[17] On January 22, 2016, the Court ordered TCS to make Mr. Chandrasekaran available for a brief
deposition at a time and place convenient to the witness.  Dkt. No. 446 at 43.  That deposition is currently
scheduled for March 2, 2016.  Ex. 37 at 1.

The clear implication is that 

This process violates the very reason Audit Committees exist and are populated with independent directors.  They are supposed to conduct independent, non-privileged investigations into serious allegations, without company directors interfering to protect themselves or others from scrutiny and possible adverse repercussions.[18]

**B.  At a Minimum, TCS's Misrepresentations and Delayed Discovery Warrant Sanctions in the Form of an Adverse Jury Instruction.**

In an attempt to avoid producing discovery about its investigations, TCS made numerous misrepresentations to Epic and the Court.  TCS repeatedly asserted , which was false, and that which was basless.  *E.g.*, Dkt. No. 169-8 at 11-12; Dkt. No. 169-9 at 11-12; Dkt. No. 294 at 20:16-24:9.

TCS also told the Court that . Dkt. No. 293 at 12:9-18, 32:18-21; Dkt. No. 294 at 24:10-24.

Both of these statements were also untrue.  *See, e.g.*, Ex. 7 at TCS00302584-87 .

Underscoring that TCS's May 2015 interrogatory response was false, TCS unilaterally drafted and responded to a new interrogatory *after* the close of discovery, revealing information it had previously refused to disclose.  Ex. 31.  TCS's belated revelation of information that was in its possession at the time of the initial interrogatory response "provide[s] powerful evidence

---

[18] *See, e.g.*, Audit Committees Reg. & Prac. Special Note & § 2.1 (2011).

that [TCS] was not engaging in the discovery process in good faith." *e360 Insights*, 658 F.3d at 643. As the Seventh Circuit put it under in similar circumstances, "[t]here is no way that [TCS] could have believed in good faith that its last-minute disclosure of so [much new information] and a radically [different story than it had initially told] was even remotely appropriate." *See id.* (finding it unbelievable that the responding party could have "first learned of all this information" between the initial interrogatory responses and the subsequent ones); *see also Melendez*, 79 F.3d at 671 (sanctioning party for failure to timely disclose information it "knew or should have known" was "covered by plaintiff's straightforward discovery requests"); *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003) ("We have held that incomplete or evasive responses to interrogatories can support in part dismissal of the entire action under Rule 37(b).").

TCS's misconduct also violated several Court orders, including the Court's June 8, 2015 order that the parties "respond[] fully and fairly to . . . interrogatories," (Dkt. No. 59 at 1-2), and that failure to do so would "result in Rule 37(b) sanctions." *Id.*; *see also id.* at 1 ("All cards had better be put on the table face up in the near future or there will be consequences."); Dkt. No. 291 at 11 (ordering TCS to "immediately produce all relevant documents about its investigation"); Dkt. No. 39 at 31:22-32:24 (ordering the parties to avoid "games playing" or risk "extraordinarily severe" "consequences"). In *Aktipis v. Loyola University of Chicago*, the Seventh Circuit reiterated that Rule 37 sanctions are warranted when a party engages in "unreasonable," "uncooperative," and "dilatory tactics" that violate a court order and the party was previously warned that such behavior may result in sanctions. 175 F.3d 1019, at *2 (7th Cir. 1999) (unpublished) (affirming dismissal of plaintiff's case as a Rule 37 sanction and emphasizing that the inquiry is one of "reasonableness," not the "non-complying party's subjective motivation").

41

In addition to violating the Court's orders, TCS's conduct was also highly prejudicial to Epic. The entire course of discovery would have played out differently if TCS had disclosed in May 2015 that ███████████████████████████████████████████████████████ ███████████████████████████████████. Epic would have had a significant start in understanding ████████████████████████████████████████████ ██████████████████████████████████. *See* Dkt. No. 167-1. Epic would have known that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

Instead, Epic was forced to grope in the dark, guessing at the relevant witnesses, fighting TCS for the opportunity to depose them, and then questioning the witnesses without the benefit of facts that it was entitled to receive. Worse, ██████████████████████████████ ██████████████████████████████████████. Had Epic known ████████████████████████████████, it would have deposed Mr. Menon and Mr. Amalraj earlier, obtained █████████████████████████████████ earlier, learned that ████████████████████████████ earlier, and would have sought to get Stroz Friedberg involved in the process far earlier, which may have resulted in Epic being able to obtain additional evidence that has since been destroyed.

Epic would have also learned far earlier (rather than at the close of discovery) that the ████████████████████████████████████████████████████████████ ██████████████████████. Lacking this knowledge, Epic was forced to accept TCS's position that ██████████████████████████████████████ ████████████████████████████. Finally, ██████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████   Without the report, Epic had only TCS's assertions that Mr. Pandian had "no responsive information" and that it could not "locate" him.  It goes without saying that obtaining Mr. Pandian's confession about ████████████████████████████ ██████████████████████████ during the discovery period would have significantly altered the course of discovery (and certainly would have led to additional helpful evidence).

A district court enjoys wide discretion in fashioning an appropriate sanction because it is "in the best position to select a fitting sanction."  *Melendez*, 79 F.3d at 670-71.  For example, in *Melendez*, where the defendant failed to timely disclose critical evidence that it "knew or should have known" was called for by the "plaintiff's straightforward discovery requests," the Seventh Circuit affirmed a sanction barring the defendant from presenting expert testimony.  *Id.* at 670-72.  The district court selected this sanction (and the Seventh Circuit approved it) because the subject matter of the expert's testimony was related to the information the defendant failed to timely disclose and because this sanction was sufficiently "severe"  to compensate for the "great[] prejudice[]" caused by the defendant's belated production.  *See id.*

Here, Epic submits that an appropriate sanction for TCS's misconduct in connection with discovery related to its investigations would be an instruction to the jury that it is to presume that Epic's confidential information was used by TCS for improper purposes or, alternatively, an instruction allowing the jury to draw its own inference that the evidence TCS failed to preserve contained information that would have been harmful to TCS's case.  This sanction is both proportionate to and directly related to TCS's misconduct in improperly delaying, obfuscating, and withholding plainly relevant and non-privileged information about its investigations in the face of clear requests for that information.  *See Aktipis*, 175 F.3d at *2-3 (explaining that a court

43

"will presume proportionality" in the face of "willful or bad faith violations of discovery orders" or "a pattern of contumacious conduct or dilatory tactics") (quoting *Crown Life v. Craig*, 995 F.2d 1376, 1383 (7th Cir. 1993)).

### III.   TCS Violated the Court's Order to Identify the TCS Employees Who Accessed UserWeb.

This Court previously ordered TCS to provide Epic with an amended interrogatory response identifying all TCS employees who accessed the UserWeb, directing TCS to: "Do it all. Do it quickly. Or there will be trouble." Dkt. No. 155 at 15:23-17:2; *see also* Dkt. No. 151. TCS never did so, warranting sanctions under Rule 37.

#### A.   Relevant Factual Background.

The very first question in this case – Interrogatory No. 1 – asked TCS to identify each TCS employee who downloaded documents from UserWeb. Dkt. No. 169-8 at 4-5; Dkt. No. 169-9 at 5. Interrogatory No. 2 asked TCS to identify each TCS employee who received, reviewed, or accessed any Epic document downloaded from the UserWeb. Dkt. No. 169-8 at 6; Dkt. No. 169-9 at 6. In response to these two interrogatories, ███████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████). Dkt. No. 169-8 at 4-7; Dkt. No. 169-9 at 5-7. TCS's sworn interrogatory responses, which were verified by General Manager Pushpa Hegde, purported to be based on a "review of pertinent files and discussions with appropriate personnel." Dkt. No. 169-8 at 19; Dkt. No. 169-9 at 19.

Throughout this case, Epic has repeatedly discovered additional individuals who downloaded or accessed UserWeb materials. ███████████████████████. *See, e.g.*, Dkt. No. 132 at 27:13-15, 42:12-14; Dkt. No. 410 at 13:1-10, 16:10-12, 69:3-70:2. ██

██████████████████████████████████ – *before* TCS responded to

Epic's interrogatory, but which TCS refused to produce until forced to do so in September 2015

– . Dkt. No. 167-1 at TCS00017925.

Likewise, on September 30, 2015, TCS employee Aswin Anandhan

Dkt. No. 132 at 42:5-22, 44:2-45:1.

Dkt. No. 412 at 101:23-102:21, 104:14-105:24, 134:5-

137:12.

*Id.*

TCS did not include this

information in its sworn response – instead falsely stating

. *Id.* at 134:5-137:12.

Faced with TCS's failure to adequately investigate and disclose the identities of all TCS

employees with access to UserWeb, Epic was forced to file a motion to compel.  Dkt. No. 136.

The Court granted Epic's motion "in all respects," emphasizing:  "this is now a court order and

TCS defies it at its peril."  Dkt. No. 155 at 15:12-14.  It continued:

> [T]he Court now has enough information to know that there really was some sort
> of a serious and intentional security breach here by TCS's employees.  So now
> from the Court's perspective for discovery purposes, TCS is deeply in the hole. . .
> .  TCS is now responsible for ferreting it all out and turning it all over to Epic. . . .
> Do it all.  Do it quickly.  Or there will be trouble.

2411754

*Id.* at 15:23-17:2; *see also id.* at 18:8-10 ("Epic is entitled to have TCS turn over every stone in the field to make sure that TCS has not missed something that is discoverable").  The Court also explained that "to the extent there is any thread that has not been followed or any technique for learning who used these credentials that has not been employed, TCS has got to do it now."  *Id.* at 17:18-21, 18:4-6.  The Court's written order confirmed that TCS was obligated to "proactively and without qualification . . . employ all means and methods at its disposal to ensure that it actually has uncovered and disclosed all information responsive to" Epic's request for the identity of UserWeb users.  Dkt. No. at 151; Dkt. No. 136.

In addition to directing TCS to "make sure [it] does everything it has to do to comply with this order," (Dkt. No. 155 at 18:19-21), the Court warned TCS that if "it turns out later this information was not provided, there will be serious consequences to TCS's case."  *Id.* at 16:16-25 (emphasizing that "the consequences will be notoriously bad for [whichever] side [the Court] finds to be in defiance of the Court's order").[19]

Despite Epic raising this issue several times (*e.g.*, Dkt. No. 414 at 29; Ex. 38 at 5-6), TCS *never* provided a full and complete interrogatory response as ordered.  Nor did TCS "employ all means and methods at its disposal" and "turn over every stone in the field," as it was directed to do.  Dkt. No. 151; Dkt. No. 155 at 18:4-10.  Far from it.  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[19] This was not the first time the Court warned TCS about shirking its discovery obligations.  At the beginning of the case, the Court cautioned the parties against "document dumps" and "games playing," "assur[ing]" them that "if that were to happen here . . ., the consequences would be extraordinarily severe."  Dkt. No. 39 (Jan. 22, 2105 Hrg. Tr.) at 31:22-32:23. On June 8, 2015, the Court again warned the parties:  "we are well past the point of preciosity in responding fully and fairly to interrogatories posed by the other side.  All cards had better be put on the table face up in the near future or there will be consequences.  Both sides shall fully and fairly respond to its opponent's interrogatories–and other discovery demands . . . .  Failure to do so shall result in Rule 37(b) sanctions . . . ."  Dkt. No. 59 at 1-2.

███████████████████████████████████████████████████ Dkt. No. 445 at
85:3-89:13; Dkt. No. 258 ¶¶ 6-9; Dkt. No. 258-5; Dkt. No. 273 at 16-17.   Mr. Menon
acknowledged that, at best, ██████████████████████████████████████████
██████████████████████████████████ *Id.* at 88:5-19.  He also admitted
that ████████████████████████████████████████████████████
██████████████████████████████████ *Id.* at 88:20-89:3.   TCS  has
acknowledged that it did not expect its employees to voluntarily disclose that they had accessed
UserWeb using shared passwords.  Dkt. No. 273 at 16 (TCS asserting that accessing UserWeb
using a shared password is "not conduct employees would readily concede engaging in
themselves or implicate others in"); *see also* Dkt. No. 445 at 89:4-13 (acknowledging █████
██████████████████████████████████████████████████████ ").

███████████████████████████████████████████████████████

████████████████████████████████ Dkt. No. 188 at 50:20-51:7; Dkt. No. 247-8.  An
unsworn document is not akin to an interrogatory response, which is what Magistrate Judge
Crocker ordered TCS to serve.  *See* Dkt. No. 155 at 15:1-17:2, 18:12-21.  Perhaps more
importantly, the unsworn document prepared by counsel was neither accurate nor complete. █
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████ *Compare* Dkt. No. 247-8 at 1 *with* Dkt. No. 132 at 44:5-18, 74:1-76:5, 95:12-96:5,
103:22-23, 189:3-6. ██████████████████████████████████████████
████████████████████████ *Compare* Dkt. No. 247-8 at 1 *with* Dkt. No. 167-1 at
TCS00017925; *see also* Dkt. No. 188 at 72:23-75:3. ██████████████████████████
██████████████████████████████████████████ . *See, e.g.,* Dkt. No.

47

2411754

408 at 64:18-25.  Deposition testimony has also confirmed ███████████████████

██████████████████████████████████████████████████████████████████████████

██████████  *E.g.*, Dkt. No. 128 at 146:15-147:8; Dkt. No. 410 at 57:2-22.

In short, despite Epic first requesting this information in an interrogatory served in April

2015 ████████████████████████████████████████████████  and despite the

Court ordering TCS to "turn over every stone" to provide this information to Epic in October

2015, TCS *still* has not identified all of the TCS employees who accessed the Epic UserWeb.  As

a result, Epic still does not know who downloaded the thousands of documents that were

obtained from UserWeb with Mr. Gajaram's credentials, or whether these documents were

downloaded by employees on the Kaiser team, the Med Mantra team, the DaVita team, or by

individuals on some combination of these teams.[20]

Epic learned after the close of discovery that TCS had 32 of Epic's confidential and trade

secret documents that TCS had downloaded from UserWeb in its possession all along, but TCS

never produced them in discovery.  Richmond Decl. ¶ 78-82.  While this is a small fraction of

the thousands of Epic documents TCS downloaded, it is very significant.  TCS has only

produced a slightly larger fraction in discovery, leaving many thousands of the Epic documents

downloaded by TCS unaccounted for.  Epic only received these 32 Epic documents in February

2016, and only as a result of Stroz's forensic analysis.  *Id.*  TCS's failure to produce these Epic

documents, along with the electronic records associated with them, at the commencement of

discovery prevented Epic from questioning any TCS witnessed about how they obtained and

used these documents, and who they were shared with.  It also foreclosed Epic from obtaining

---

[20] On Febuary 25, 2016, close to 10 months after Epic propounded its interrogatory asking TCS who downloaded Epic's documents from the UserWeb and four months after the Court's order mandating that TCS leave no stone unturned to answer that question, TCS provided a supplemental response.  The response remains incomplete.  Moreover, its service a month after the close of discovery does not alter the conclusion that TCS violated this Court's October 28 order.

and analyzing the electronic record, including emails, of all of the TCS employees who were in possession of these Epic documents.

This is but one illustration of TCS's failure to produce the "paper trail" the Court ordered it to produce, and which would have helped Epic determine who its downloaded documents were shared with, where they ended up, and which of the downloaded documents were unaccounted for. *See* Dkt. No. 155 at 6:12-7:2, 13:2-8, 15:12-16:5 (ordering production of the "paper trail"). That Stroz Friendberg's forensic analysis unearthed 32 Epic documents downloaded from UserWeb by someone at TCS undermines any claim by TCS that it made any attempt to gather and produce the "paper trail" it was ordered to turn over to Epic.

**B. TCS's Conduct Violated the Court's Order, Precluded Epic from Uncovering the Truth, and Warrants Sanctions.**

A party's failure to comply with a court order is "a sufficient basis to impose sanctions under Rule 37(b)(2)(A)." *e360 Insights*, 658 F.3d at 642. This Court ordered TCS to fully respond to Epic's request for the identity of UserWeb users. Dkt. No. at 151; *see also* Dkt. No. 155 at 15:12-18:10. And the Court made abundantly clear that, if TCS failed to do so, "the consequences will be notoriously bad." *See* Dkt. No. 155 at 15:23-17:2 ("turn it all over to Epic," or "there will be trouble").

Notwithstanding the Court's orders, its repeated warnings of sanctions, and several follow-up requests from Epic, TCS *never* produced this information. That is not in dispute. But, worse, TCS did not even try. TCS has admitted that ██████████████████████████████

████████████████████████████████████████████████████████████████████

██████ Dkt. No. 445 at 85:3-89:13; Dkt. No. 258 at ¶¶ 6-9; Dkt. No. 258-5; Dkt. No. 273 at 16-17. We now know why: ████████████████████████████████████

████████████████████████████████████████████. Dkt. No. 510 at 108:4-110:21,

49

112:1-11, 112:18-114:21, 136:23-138:2. ██████████████████ TCS's failure ██████

████████████████████████████████████████████████████████████████

████████████████████ is unexplainable and inexcusable.

To avoid sanctions for non-compliance, TCS "bear[s] the burden of showing that compliance [with the Court's order] was impossible." *Domanus*, 742 F.3d at 301.  But, like the defendants in *Domanus*, TCS's "efforts to comply with the [Court's order] were minimal, at best." *Id.* at 296. The *Domanus* plaintiff served discovery intended to acquire the defendants' bank account records. *Id.* at 295.  The defendants disclosed only certain accounts and failed to make a complete production of records. *Id.*  When the magistrate judge ordered the defendants to make a full production, they made only "a few halfhearted efforts to obtain the records." *Id.* at 296.  Concluding the defendants had not "demonstrate[d] a diligent effort at compliance," the district judge held the defendants in contempt and, ultimately, entered a default judgment against them. *Id.* at 297.  On appeal, the defendants argued they should not have been sanctioned because "compliance was impossible." *Id.* at 301.  The Seventh Circuit affirmed the default judgment, explaining that the district court had reasonably found "the defendants' efforts were neither extensive nor in good faith." *Id.* at 301-02; *see also Crown Life*, 995 F.2d at 1383 (holding that inacessiblity of data does not relieve a party from its duty to produce relevant data in discovery).  As in *Domanus*, TCS's email survey was, "at most, [a] token effort[]" to comply with the Court's order.  742 F.2d at 302.  TCS's efforts were certainly not "extensive," and they do not appear to have been taken in good faith. *See id.* at 295, 301-02.

### C.   At a Minimum, TCS's Violation of the Court's Orders Warrants the Preclusion of TCS's Argument that it Only Used UserWeb Materials for Testing Purposes.

TCS's refusal to comply with the Court's order to identify the employees accessing UserWeb had significant ramifications for Epic's case.  As the Court previously recognized,

50

identifying the downloaders was only the first step in Epic's quest to learn how its confidential UserWeb materials were used. Without knowing *who* downloaded the materials, Epic has been at a severe disadvantage in determining how the materials were used.

TCS's refusal to identify the downloaders is particularly concerning in this case, where TCS steadfastly refused to search for documents by any means other than through an electronic search of specified custodians' electronic files only *after* (1) Epic identified the custodian as relevant, and (2) Epic justified the custodian's relevance to the case. *See, e.g.*, Ex. 26 at 1; Dkt. No. 96-13 at 3; Dkt. No. 254-4 at 2. But unless an individual was identified as a UserWeb user or downloader through documents or testimony, Epic could not know which individuals were relevant. Because of TCS's scheme to ██████████████ we now know that much of the testimony in this case was either false or incomplete. It was therefore imperative for TCS – who has unfettered access to its own employees and their files (including the files in which Stroz recently found the 32 confidential Epic documents that TCS failed to produce during discovery) – to determine *who* downloaded the documents, so that Epic could engage in discovery to determine *how* those documents were used. Because TCS failed to do so – even in the face of a Court order – we will never fully know how the thousands of UserWeb documents were used.

Accordingly, Epic requests that, at a minimum, the Court bar TCS from arguing at trial that its employees only used Epic's confidential information for the purpose of performing testing for Kaiser. *See Kraemer v. Hoffman*, No. 13-860, 2014 WL 4978225, at *2 (W.D. Wis. Sept. 6, 2014) (finding Rule 37 permits order "prohibiting the disobedient party from supporting or opposing designated claims or defenses," but ultimately granting default judgment as sanction); *Motown Record Co. v. DePietro*, No. CIV. 04-CV-2246, 2007 WL 1725604, at *1 (E.D. Pa. June 11, 2007) ("Defendant is precluded from offering any testimony-whether lay or

51

expert-or making any argument that Plaintiffs would be able to sufficiently rebut only if they had the opportunity to examine the spoliated" evidence.).   TCS should not be able to make this blanket assertion when Epic was barred from properly testing the accuracy of the assertion during discovery.  *See Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (affirming order barring party from presenting evidence at trial after it failed to allow opposing party to take evidence on the issue during discovery); *Melendez*, 79 F.3d at 672 (barring defendant from presenting expert testimony where critical evidence was withheld from plaintiff during discovery); *Rodgers*, 2007 WL 257714, at *12 (barring defendant's testimony on evidence it spoliated).

## IV.   TCS Hid Key Fact Witnesses.

In April 2015, after TCS had made clear that Epic would be required to travel to India to depose witnesses located there, Epic asked TCS to provide information regarding the location of 34 potential deponents so that Epic could begin scheduling depositions.  Dkt. No. 61-15; Dkt. No. 372-1 at 2.  While the information should have been easily shared, it instead required several meet and confer discussions, attempts by Epic to obtain information regarding the whereabouts of these witnesses, and even a motion to compel (*e.g.*, Dkt. No. 61-17; Dkt. No. 372-1 at 2; Dkt No. 60; Dkt. No. 61-19; Dkt. No. 61 at ¶¶ 18-23), until TCS finally provided this basic information on June 26, 2015 — *two months* later.

For several key witnesses, TCS provided either false information or none at all.  And TCS succeeded in dragging out the deposition process for so long that Epic was required to take several depositions *after* the discovery cut-off, ensuring Epic would be prevented from using that testimony in dispositive motions or conducting any follow-up discovery, and predjudicing Epic's ability to pursue appropriate discovery.

52

### A.   Factual Background.

#### 1.   Mahendra Pandian.

At the start of the case in January 2015, Epic informed TCS it wanted to take discovery of Mr. Pandian.  Ex. 26 at 3.  We now know that ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████  *Dkt.* No. 412 at 97:6-98:22; *see also* Dkt. No. 416-1 at TCS00034853-55.  But TCS responded that it would not "agree to search" Mr. Pandian's files because it did not believe Mr. Pandian was "likely to have responsive documents."  Ex. 26 at 1.  This turned out to be wrong.  *See, e.g.*, Exs. 67-69.  In April 2015, Epic again requested that TCS search Mr. Pandian's files for responsive documents, and asked for his deposition.  Dkt. No. 61-15; Dkt. No. 96-10.  TCS continued to refuse to search Mr. Pandian's documents and insisted that Epic must "provide some basis for its belief that [Mr. Pandian] would have responsive information."  Dkt. No. 96-13 at 3.  On June 4 and 5, 2015, Epic reiterated its request for information regarding Mr. Pandian's whereabouts and asked whether TCS would produce him for deposition.  Dkt. No. 114-7 at 1, 5.  On June 25, TCS finally responded that "no information regarding a person of that name was found within TCS's records."  Ex. 39.

But then a few months later TCS employee Aswin Anandhan ████████████████████ ████████████████████████████.  Dkt. No. 132 at 20:24-21:7, 73:24-74:20.  On October 19, 2015, ████████████████████████████████████████████████.  Dkt. No. 230-7 at 8.  And then ████████████████████████████████████████ ████████████████████████████████  Dkt. No. 184 at 118:20-119:3.  It appeared that Mr. Pandian had finally been "located."

Epic served a deposition notice for Mr. Pandian.  Ex. 40.  TCS agreed to make Mr. Pandian available during Epic's upcoming trip to India and later set a date of January 14, 2016,

53

which it abruptly cancelled two days before the deposition with no explanation, and even though all counsel was present in India.  Exs. 41-43.

TCS finally produced Mr. Pandian for deposition in the United States after the close of discovery.  Ex. 43.  Once again, TCS's discovery tactics had prevented Epic from using deposition testimony to generate additional leads for discovery.  But the full implications of TCS's delay would not be understood until Mr. Pandian's actually testified.

Once under oath, Mr. Pandian explained ██████████████████████ ████████████████████████████████████████████████████████ ████████████████ Dkt. No. 510 at 107:24-110:21.  Mr. Pandian testified that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* ████████████ ████████████████████████████████████████████████████ *Id.* at 113:21-114:2.  Mr. Pandian's testimony was corroborated by Ms. Pandurangan, who testified that ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Dkt. No. 397 at 88:3-16.

██████████████████████████████████████████████████ ████████████████████████████████████████████ Dkt. No. 510 at 111:21-112:11. What's worse, ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ *Id.* at 112:18-114:21.

Mr. Pandian testified that ████████████████████████████████████ ████████████████████. *Id.* at 107:24-110:21.

54

███████████████████████████████████████████████████████████

(*id.* at 132:5-134:18), ██████████████████████████████████████

██████████████████████████████████████████████████████████ *Id.*

at 132:5-136:11.  In short, as Mr. Pandian testified:



*Id.* at 136:23-137:16.

Mr. Pandian's confession has now called into question virtually all of the testimony provided by TCS in this case.  If TCS believed that, of all people, Mr. Pandian had "no responsive information," what other documents and information were withheld as non-responsive?  If TCS could not "locate" Mr. Pandian, what other documents and information has it not been able to locate for production?  How can Epic, the Court, and the jury be expected to believe anything TCS has said now that it has been revealed that TCS ███████████████████

██████████████████████████████████

### 2. DV Prasad.

Epic requested information about the location of DV Prasad in April 2015 for the purpose of scheduling his deposition.  Dkt. No. 61-15.  When TCS responded two months later, it claimed there were "multiple people with this name," and failed to disclose anything about these individuals or their locations.  Ex. 39.  TCS's witnesses repeatedly testified about Mr. Prasad, and clearly knew who he was.  *See*, *e.g.*, Dkt. No. 176 at 291:14-295:13; Dkt. No. 179 at 897:21-25, 951:12-953:12; Dkt. No. 162 at 1291:15-1293:11; Dkt. No. 159 at 53:9-58:12; Dkt. No. 131 at 60:16-67:16.  After Epic pointed TCS to this testimony, TCS agreed to look for Mr. Prasad –

who, it turns out, was located in California. *See* Ex. 65. However, TCS refused to make Mr. Prasad available for deposition until December 16, 2015, after the parties had filed dispositive motions and as the discovery cut-off was nearing. Ex. 66. That deposition exposed why TCS had hidden Mr. Prasad from Epic for so long.



. *See* Dkt. No. 349 at 74:5-19; Dkt. No. 176 at 291:4-293:24.

(Dkt. No. 159 at 27:15-19; Dkt. No. 380-1),

Dkt. No. 349 at 74:5-19, 92:18-93:3; Dkt. No. 176 at 291:4-293:24.

Dkt. No. 176 at 291:4-293:24. As it turns out, Mr. Guionnet's concern was well-founded.

On December 16, 2015, mere hours before Epic was set to depose Mr. Prasad, TCS produced a smoking gun email in which Mr. Prasad revealed that

Dkt. No. 372-2.

Mr. Prasad confirmed that the contents of this email meant what they so plainly say:

██████████████████████████████████████████████ Dkt. No. 349 at

185:17-186:17. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *Id.* at 189:21-190:15. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████. *Id.* at 191:4-192:12.

████████████████████████████████████████████████

███████████████ *Id.* at 193:9-194:23.   Yet, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Dkt. No.

159 at 208:1-20; Dkt. No. 161 at 218:11-14.  In fact, ████████████████████

████████████████████████████████████████████████████████

██████████████████ Dkt. No. 159 at 53:9-54:6, 56:11-14.[21]   Having successfully

delayed in producing Mr. Prasad, Epic was without his seriously concerning admissions when it

deposed Mr. Reddy and Mr. Medikonda — who otherwise denied ████████████████████

████████████████

---

[21] Perhaps even more suspicious was TCS's production of a strange email mere hours before Mr. Prasad's deposition. ████



Ex. 70.

*Id.*

*Id.*
*Id.*  TCS produced the email mere hours
after it was sent in the middle of the night.

**3.** ████████████████████████████████████████████████

TCS  produced ██████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

Dkt. No. 258-1.

Not surprisingly, Epic spent significant time and effort attempting to determine ██████████

████████████████████████████████████████████████████████ The

logical conclusion was that this person had UserWeb access, and was sharing documents or

access with other TCS employees, and that management was fully aware.  The answer should

have been easily provided by TCS.  It was not.  Epic attempted to get to the bottom of the issue

through several depositions, but continually faced roadblocks:

- Mr. Muthuswami ██████████████████████████████████████. Dkt. No. 158 at 98:20-99:14, 99:25-108:23.

- Two months later, testifying as TCS's Rule 30(b)(6) designee, Mr. Muthuswami still ████████████████████████████████. Dkt. No. 188 at 89:21-91:16.

- Mr. Anmol Gupta ████████████████████████ Dkt. No. 129 at 227:19-230:11.   Long after Mr. Gupta's deposition, TCS produced an email revealing that ████████████████████████████████████████████ Dkt. No. 450-9.

- Mr. Agarwal also ██████████████████████████████████████ Dkt. No. 444 at 33:19-36:18, 37:8-22, 38:24-41:12.  He further indicated that ████████████████████████████████████████████████████ *Id.* at 42:20-56:5.

- Mr. Menon admitted ████████████████████████████ Dkt. No. 445 at 106:8-108:21.

- Mr. Menon also testified about ███████████████████████████████ ███████████████████████████████ Dkt. No. 445 at 109:13-111:12. ██████████████████████████ *Id.* at 111:9-18.

With attempts to obtain answers though depositions and prior written discovery having

failed, Epic served an interrogatory specifically targeted to capture the identity of the ███████

██████████████████████ Dkt. No. 450-1 at 8.[22]

On January 14, 2016, TCS responded that ████████████████████████████████

███████████████████████████████████████████████████ Dkt. No.

450-2 at 15-16.  Epic filed a motion to compel on January 25, 2016, pointing out that, rather than

"reasonable," TCS's investigation had been perfunctory, and was not started until December

2015 even though Epic has been seeking this information for months.  Dkt. No. 449 at 1, 5.  Epic

pointed out the simple steps that TCS should have taken, and explained that it ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ *Id.*

*Three days* later, on the day before the close of discovery, TCS suddenly identified the

████████████████████████████████████ Ex. 71.  Epic rushed to locate Mr. Behera

and subpoena him for deposition the following day, but because the deposition could not take

place until after the close of discovery, TCS had again succeeded in ensuring Epic would be

unable to conduct any follow-up discovery on this issue.

---

[22] Epic served this interrogatory on December 2, 2015.  However, the requested information should also have been disclosed in response to earlier written discovery, including Epic's April 3, 2015 request that TCS "[i]dentify by full name and professional designation any [TCS] employee, agent, representative, or any other person purporting to act on [TCS's] behalf, who accessed the UserWeb . . ."  Dkt. No. 64-1 at 4-5; Dkt. No. 64-2 at 4-5.

### 4.  Syama Sundar and Suresh Muthuswami.

Epic requested information about Mr. Sundar's and Mr. Muthuswami's location on April 23, 2015.  Dkt. No. 61-15.  Two months later, TCS responded that both men were located in Chennai, India.  Ex. 39.  On July 20, 2015, after negotiating deposition schedules for months, TCS announced that it would bring these two witnesses, both of whom Epic thought were in India, to New York and agreed that the depositions would occur in August 2015.  Ex. 64; *see also* Ex. 73 at 1; Dkt. No. 372-1; Ex. 74.

When Mr. Sundar appeared for deposition, Epic learned that he has lived and worked in Connecticut for at least *10 years*.  Dkt. No. 125 at 9:19-25, 53:19-54:12.  Likewise, when Mr. Muthuswami was deposed, it was revealed that he has lived in New Jersey for at least *15 years.* Dkt. No. 158 at 8:4-24.  There is no legitimate excuse for TCS's representation in June 2015 that these men were living in India.  They are TCS's two key witnssses.  It is inconceivable that their physical locations were such a mystery.

### B.  TCS's Efforts to Hide Witnesses and Evidence Warrant Sanctions Under Rule 37 and the Court's Inherent Authority.

Here, in addition to trampling upon the integrity of the judicial process, TCS's conduct violated the Court's repeated orders for the parties to be cooperative and forthcoming during discovery.  The Court also warned that evasive or dilatory tactics would not be tolerated.  Dkt. No. 39 at 31:22-32:24; Dkt. No. 59 at 1-2.  Unfortunately, TCS did not heed the Court's warnings.

The Court should not condone TCS's repeated discovery abuses, particularly as it relates to hiding and lying about its own witnesses.  When Epic attempted to begin the scheduling process in a cooperative way, TCS repeatedly misrepresented the whereabouts of its employees or claimed they "could not be located."  At the same time it was claiming Mr. Muthuswami and

Mr. Sundar lived on the other side of the world, it claimed Mr. Pandian could not be "located" and had no "responsive information."  Ex. 39; Ex. 26; Dkt. No. 53-4.  But TCS must have known how to reach Mr. Pandian (a current TCS employee), and that he had potentially responsive information, ██████████████████████████████████████████████████████ ███████████.  *See* Ex. 75 at TCS00034854, TCS00034855.  Indeed, ███████████████████ ██████████████████████████████████████ *Id.* at TCS00034853-55.

The same is true with respect to DV Prasad.  TCS's employees repeatedly testified that they knew who Mr. Prasad was, yet TCS insisted it had no idea who this critical witness was. *See* Ex. 39; *see also, e.g.*, Dkt. No. 176 at 291:14-295:13; Dkt. No. 179 at 897:21-25, 951:12-953:12; Dkt. No. 162 at 1291:15-1293:11; Dkt. No. 159 at 53:9-58:12; Dkt. No. 131 at 60:16-67:16.  Even after Mr. Prasad was identified and located, TCS refused to produce him for several months, waiting until after dispositive motions had been filed.  *See* Ex. 66.  Then, TCS produced smoking-gun documents mere hours before Mr. Prasad's deposition.  Those documents, and Mr. Prasad's testimony, called into question Mr. Reddy's ██████████████████████████████ ██████████████████████████████████.  *See* Dkt. No. 372-2; Dkt. No. 349 at 185:17-186:17, 189:21-192:12.

The Seventh Circuit has held that sanctions are appropriate where a party undermines the integrity of the judicial process.  For example, the Court of Appeals in *Salmeron v. Enterprise Recovery Systems* affirmed the sanction of dismissal where a party disclosed documents the parties had agreed to treat as "attorneys' eyes only" on three occasions.  579 F.3d 787, 793-95 (7th Cir. 2009) (rejecting disclosing party's "shifting stories" and attempts to claim the disclosure was "merely negligent").  The Court emphasized that "integrity is fundamental to the judicial process" and that a party must be able to trust the representations of its adversary.  *Id.* at

61

2411754

796 ("The attorneys for USA Funds were entitled to take Sanchez at his word."); *see also Domanus*, 742 F.3d at 300-02 (discussing delays and improper excuses in connection with deposition scheduling that "smacked of discovery-dodging").

The *Salmeron* court also explained that there need be no showing of prejudice to the opposing party in order for the court to impose sanctions for abuse of the judicial process, although there certainly was prejudice to Epic here.  For instance, because of TCS's delay in producing Mr. Prasad and Mr. Reddy's intervening departure from TCS, Epic is unable to reopen Mr. Reddy's deposition.[23]  The misrepresentations and delay in producing Mr. Pandian are even worse.  Mr. Pandian's belated confession that ███████████████████████████ ██████████████ calls into question virtually all of the testimony provided by TCS in this case.

### C.   At a Minimum, TCS's Scheme to Hide Witnesses Warrants a Presumption that Epic's Stolen Information Was Used for Improper Purposes.

Mr. Pandian's testimony has confirmed  If TCS was not using Epic's confidential information to improve its Med Mantra product, TCS would not have improperly insisted on hiding Mr. Prasad and Mr. Pandian. Due to TCS's ploys to hide these key witnesses, Epic was severely prejudiced to take the discovery it was owed, and to challenge TCS witnesses with the information learned from Mr. Pandian and Mr. Prasad.

---

[23] TCS also waited to produce several documents from Mr. Reddy's files until after he had been deposed and after he had left the company, claiming the belated production was "inadvertent."  Ex. 76.  Stroz Friedberg is now in the process of attempting to obtain Mr. Reddy's computer and electronic files so that it can investigate whether additional information was withheld.  *See* Ex. 77.

In light of TCS's discovery abuses, which amount to a fraud on Epic and the Court, default is warranted. *See Jones v. Goodyear Tire & Rubber Co.*, 137 F.R.D. 657, 664 (C.D. Ill. 1991) (granting directed verdict as sanction instead of lesser sanction of rebuttable presumption offered by defendants), *aff'd sub nom. Marrocco*, 966 F.2d 220. Short of that, the only reasonable solution to address this conduct is for the Court to impose a rebuttable presumption that the thousands of stolen UserWeb documents were taken for the purpose of using Epic's confidential information to improve Med Mantra. *See, e.g.*, *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (holding that a finding of intentional destruction indicating a "desire to suppress the truth" warrants the sanction of an adverse inference instruction for a party's destruction of evidence).

## V.  TCS Misrepresented and Hid its U.S. Med Mantra Products, Refused to Allow Court-Ordered Inspections, and Failed to Produce Documents it Was Ordered to Turn Over.

Epic alleges that TCS wrongfully obtained confidential Epic information, which it used to improve its Med Mantra products. Accordingly, Epic requested documents and information showing Med Mantra as it existed in 2011 before TCS's confirmed downloads from UserWeb, as well as the changes TCS made to its Med Mantra products during the relevant time period, for the purpose of showing that TCS incorporated Epic information into its product development. As with every other facet of this case, TCS was less than forthcoming. Complicating Epic's quest to obtain relevant technical materials for the Med Mantra products was TCS's refusal to even *disclose* all of its Med Mantra products. Worse, TCS expressly disclaimed being involved in the U.S. market for EHR products, repeatedly asserting Med Mantra was India-specific, and TCS had no plans to market Med Mantra in the U.S. As it turns out, ████████████

████████████████████████████████████████████████████████████

2411754

██████████████████████████████████████████████████████

████████████████████████████████████████████

Finally, although the Court ordered TCS to permit Epic to conduct inspections of its Med Mantra products, TCS has violated the Court's order, refusing to allow such inspections to take place. Epic was never permitted to inspect the version of Med Mantra in use in the British-American Hospital in Mauritius ████████████████████████████████ or the version of Med Mantra deployed at DaVita. Having been unable to inspect the "base" software or the DaVita software, it is impossible for Epic to determine whether its Beaker (and other stolen documents) were used to help TCS create its Med Mantra-based laboratory product for DaVita. TCS also refused to permit the Court-ordered inspection of many of TCS's other products

**A. Relevant Factual Background.**

**1. TCS Refused to Identify and Provide Discovery about its Med Mantra Products.**

On April 3, 2015, Epic served an interrogatory asking TCS to "[i]dentify each and every software developed, marketed, or sold by [TCS] related to healthcare or electronic health record management." Dkt. Nos. 64-1 at 8, 64-2 at 8. TCS objected to providing the requested information and instead ███████████████████████████████████████ ████████████████████████████████ Dkt. No. 62 at 16. During a meet and confer on June 4, 2015, TCS agreed to supplement its response with a list of currently available software products, but refused to provide any information regarding TCS products under development. Dkt. 101-7 at 1-3. TCS did not provide an amended response until December 29, 2015. Ex. 45; Ex. 46 (TCS India); Ex. 47 (TCS America). In other words, it took TCS almost *nine months* to simply provide a list of its electronic health records products. There was less than one month of discovery left by the time TCS finally produced this information.

64

███████████████████████████████████████████████████
████████████████████████████████████████. *Compare* Ex. 46 *and*
Ex. 47 (see above TCS Amended Rog responses) *with* Dkt. No. 508 at 157:15-23 ███████
███████████████████.

    Neither TCS's May 2015 interrogatory response nor the website referenced in that response mentioned TCS Hospital Information Systems (TCS-HIS).  *See* Dkt. No. 62 at 16; Dkt. No. 263-15.  The possible existence of the TCS-HIS product was only discovered through review of TCS's "Med Mantra" documents production made towards the end of August 2015, which was woefully incomplete.  *See* Dkt. 136 at 4-5; Dkt. No. 131 at 20:12-20.  Whereas ████████
███████████████████████████████████████████████████
████████████████████████████████████████.  Dkt. No. 131 at 20:12-20, 71:13-72:7.  According to Vijaya Badipatla, head of the Med Mantra development team, ████████████████████████████████████████████████
████████████████████.  *Id.* at 70:9-18.

    TCS's conduct with respect to DaVita and Quest was worse.  TCS denied for many months that it *could* or *would* market its Med Mantra software within the United States.  TCS claimed in this case, for example:

- "Med Mantra software so far has not focused on the U.S. market" and "currently is not in competition with Epic's software in the U.S. or any other market."  Dkt. No. 19 at 4; *see also id.* at 13.

- Mr. Sundar testified that ████████████████████████████████████████
  ████████████████████████  Dkt. No. 125 at 186:3-190:3.

- ████████████████████████████████████████████████████
  ████████████████████████  Dkt. No. 454 at 11.



But contrary to its assertions in this case, discovery revealed that ███████████████ ████████████████████████████████ Dkt. No. 168-9 at PG0023781.   Epic  also  learned  through  discovery  that ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████   *E.g.*, Dkt. No. 131 at 145:14-24; Dkt. No. 125 at 159:13-21, 228:11-14.   Epic discovered  that ████████████████████████████████████ ████████████████████████████████████(Dkt. No. 168-6), even though ███████████████████. Dkt. No. 126 at 351:25-352:14.  And it became apparent that ████████████████████████ ████████████████████████████████████████ ████    Dkt. No. 169-1 at TCS00007964-7965; Dkt. No. 169-2 at TCS00008079; Dkt. No. 125 at 257:1-4; Dkt. No. 131 at 151:4-6.[24]

On September 24, 2015, Epic served on TCS a Rule 30(b)(6) deposition notice seeking testimony  regarding  the  laboratory  product  TCS  is  developing  for  DaVita,  along  with corresponding document requests.  Dkt. No. 165-27.[25]  On October 10, 2015, TCS stated it would not produce a corporate witness pursuant to Epic's Rule 30(b)(6) notice on the DaVita lab product.  Dkt. No. 165-28.  TCS also refused to produce documents about its lab product for DaVita, claiming  Epic's  requests  for  DaVita-related  documents  were  "overbroad  and  not

---

[24] This was subsequently confirmed by witnesses from both TCS and DaVita.  *See, e.g.*, Dkt. No. 426 at 116:15-117:13 ██████████████████████████████████████████████ ████████████████

[25] TCS should have already produced DaVita documents in its purportedly complete August 21, 2015 "Med Mantra" production, since it had acknowledged that the product it supplied to DaVita was based on the MedMantra lab module.  But that production did not include any documents related to the DaVita lab product, prompting Epic to serve requests targeted specifically at the DaVita product.  *See* Dkt. No. 167 at ¶ 31.

2411754

reasonably calculated to lead to the discovery of admissible evidence because Plaintiff's allegations in this action concern the development of Med mantra and no other software."  Dkt. No. 169-7.  Once again, TCS ignored that ████████████████████████████████████ ████████████████████████████  Exs. 169-8, 169-9 (Exs. 32 and 33 to Dkt. 166).

Epic was, yet again, required to file a motion to compel indisputably relevant documents and testimony.  Dkt. No. 166.  At the hearing on Epic's motion on November 20, 2015, the Court confirmed that there was "no basis" for TCS to object to the requested discovery and rejected TCS's argument that the discovery was "duplicative [a]s absurd."  Dkt. No. 255 at 3-4.  The Court ordered TCS to complete its production of DaVita-related documents by December 14, 2015, with the Rule 30(b)(6) deposition to occur the following week.  *Id.* at 7.

The Rule 30(b)(6) deposition regarding the DaVita lab product was scheduled for December 23, 2015.  Ex. 48; Ex. 49.  On December 9, 2015, TCS indicated it would be producing "a handful" of DaVita-related documents the following day.  Ex. 50.  TCS then produced 192 DaVita documents.  Richmond Decl. ¶ 51; Ex. 51; Ex. 52; Ex. 54.  On December 15 and 16, 2015, TCS confirmed that its December 10, 2015, DaVita production had been only a partial production of the documents Epic had requested, in violation of the Court's November 20, 2015, order.  Ex. 53.  On December 17, 2015, after the deadline ordered by the Court, TCS produced 25 additional DaVita documents.  Richmond Decl. ¶ 52; Ex. 51; Ex. 54.  On December 21, 2015, a full week after the Court-ordered deadline and two days before the scheduled deposition of TCS's corporate designee on the DaVita product, TCS produced over *2,400* additional documents.  Richmond Decl. ¶ 53; Ex. 54.[26]

---

[26] At the same time, TCS produced over *29,000* technical Med Mantra documents that should have been produced many months earlier, despite the Court's prior order that neither party engage in "no document dumps" in this case and warning that "if that were to happen here by any lawyer or either side, the consequences would be extraordinarily severe."  Dkt. No. 39 at 31:22-32:24 (taking care to make clear

2411754

What was not included in TCS's production (or any of its discovery responses to date), was ███████████████████████████████████████, which Epic only learned about *after* the close of discovery. On January 20, 2016, during the continued deposition of TCS's Rule 30(b)(6) designee, Mohankrishna Jasti admitted that ███████████████████████████████████████████████████████ Dkt. No. 463 at 366:14-367:8, 393:22-394:15. But Mr. Jasti omitted that ███████████████████████████████████████████. *See* Dkt. No. 508. at 154:3-157:20; Ex. 34. Epic did not learn about ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ *Id.*

## 2. TCS Violated the Court's Order to Produce Technical Med Mantra Documents.

On April 3, 2015, the same date it asked for a list of products, Epic requested documents related to Med Mantra's marketing, development, and business plans, along with brochures and other consumer-facing Med Mantra marketing documents and communications. Dkt. Nos. 64-3, 64-4. TCS initially claimed that these materials were irrelevant unless they specifically referred or related to "Epic." Dkt. No. 64-8; *see also* Dkt. No. 65 at 11 ("There is no reason to compel a further response to these Requests, because TCS has already determined that no such documents exist that refer or relate to Epic.").

After a motion to compel, TCS finally produced some Med Mantra-related documents on August 21, 2015.[27] As TCS well knew, Epic wanted and needed documents regarding TCS's

---

that this admonition was "an order of the court"). Even though it was voluminous, the production was incomplete, as key release notes that the Court had ordered TCS to produce were (and still are) missing. *See infra* pp. 68-70.

[27] ██████████████████████████████████████████████████████████ On July 8, 2015, Epic

EHR products to investigate the changes made by TCS to Med Mantra and/or TCS-HIS to determine if those changes coincided with the improper downloading of Epic's documents, or if the changes reflect incorporation of Epic's trade secrets or confidential information into TCS's competing products.   But the documents produced by TCS in August 2015 (███████████ ███████████████████) failed to provide any information on the changes to Med Mantra, or TCS-HIS.  Those documents do not discern between the multiple software versions, when each version was released, or what changed in each version.  Dkt. No. 131 at 96:11-97:9, 98:19-99:7, 100:7-12.   The head of development for the Med Mantra team, Mr. Badipatla, admitted ████████████████████████████████████████████████████ ████████████████████████████████████████████.  *Id.* at 74:25-78:10, 79:14-80:4, 83:20-23, 89:18-92:2, 93:11-15, 94:8-23, 98:19-99:7, 100:7-12, 101:7-10.

Mr. Badipatla also admitted that ███████████████████████████ █████████████████████████████████████████ Dkt. No. 131 at 50:6-22, 54:5-21, 54:22-55:7.  Mr. Badipatla testified that █████████████████ █████████████████████████████████████████ Dkt. No. 131 at 79:14-80:4, 83:20-23, 91:22-92:2, 94:8-23, 100:7-12, 100:17-101:10; *see id.* at 121:19-122:4 (Mr. Badipatla admitting the █████████████████████████████████████ ████.  In other words, TCS knew all along that its release notes were the critical documents that would adequately describe the changes made to the TCS software.

Nonetheless, obtaining just a portion of these documents required Epic to take a trip to India to depose Mr. Badipatla and to file a motion to compel.  On October 28, 2015, the Court narrowed its requests pertaining to Med Mantra and other TCS EHR software pursuant to the Court's direction. Dkt. No. 165-29.

2411754

granted "in all respects" Epic's motion to compel TCS to "produce documents showing changes made to the Med Mantra and TCS-HIS EHR products from 2011 to the present . . ., including Release Notes and Systems Requirement Specifications."  Dkt. No. 136; Dkt. No. 155 at 15:10-14.  The Court granted the motion in full with a stern warning to TCS.  Dkt. No. at 151; Dkt. No. 155 at 15:23-17:2.

On December 21 and 23, 2015, TCS produced over 30,000 technical documents totaling in excess of 250,000 pages.  Dkt. No. 418 at ¶ 4; Exs. 51, 54.  Yet, despite the volume of TCS's document dump, it appears Epic *still* does not have a full set of the relevant release notes.  TCS's production remains incomplete with respect to the versions of Med Mantra and their development or change history.  Dkt. No. 418 ¶¶ 5-9.  As Epic's expert witness explained, ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████     *Id.* ¶ 10.  Despite Epic pointing out the gaps in TCS's production in January 2016 (*see* Dkt. No. 414 at 32; Dkt. No. 418), TCS has **never** produced the missing documents or explained the gaps in its production, in violation of the Court's October 28, 2015, order.

### 3.   TCS Violated the Court's Order to Permit Med Mantra Inspections.

Epic alleges that TCS used confidential information and trade secrets it wrongfully obtained from Epic to improve its competing Med Mantra products.  In addition to obtaining evidence that shows that TCS planned to – and indeed did – use confidential information gained by its employees working on Epic software in the TCoE for the purpose of improving its own Med Mantra product, Epic sought to inspect the various installations of TCS's Med Mantra

product to determine whether any of its confidential information or trade secrets had been incorporated.

Specifically, on September 11, 2015, Epic served on TCS a Request for Inspection of "any and all versions of Med Mantra and any other EMR Products implemented by TCS at (1) medical facilities in the Apollo Hospital Group, (2) the Adyar Cancer Institute, (3) the Tata Medical Center in Kolkata, (4) the British American Hospital Enterprise Limited, and (5) DaVita Labs." Ex. 56 at 3-6. Epic also requested inspection of "any and all demonstration versions of Med Mantra and any other EMR products" and inspections of "any and all Med Mantra and any other EMR products" in testing environments. *Id.* at 6-8. Epic noticed the inspections to take place on or before October 12, 2015. *Id.* at 1.

On September 23, 2015, hearing nothing from TCS about the impending inspections, Epic requested that the parties begin working together to make arrangements. Ex. 57. As TCS's production of its development documents up to that time was missing broad swaths of relevant documents, Epic also asked TCS to produce, at a minimum, the release notes Epic had requested months earlier, and which Mr. Badipatla, the head of development for Med Mantra, had testified

█████████████████████████████████████████████████████████████████████████████

██████. *Id.*

On October 13, 2015, TCS objected to several of Epic's inspection requests, admitting that ███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████ *See* Dkt. No. 263-4 at 4. As to others, TCS claimed they

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████ *Id.*

While TCS indicated it would allow certain inspections to go forward, it also placed limitations on those inspections. *Id.*

While Epic objected to the limitations TCS placed on its ability to inspect TCS's various Med Mantra and EMR products (*see, e.g.*, Exs. 58, 63) and was significantly hampered by TCS's failure to make a complete production of the relevant documents, Epic agreed to proceed in the manner authorized by TCS in order to ensure that it would have an opportunity to inspect at least some of TCS's Med Mantra products. Epic therefore proceeded to attempt to work with TCS to schedule the limited inspections. *See id.*; Ex. 62.

As discussed above, on October 28, 2015, the Court ordered TCS to produce the release notes and system requirement specifications documents that Epic had made clear to TCS it needed before it could properly inspect TCS's EHR software. Dkt. No. 155 at 6:17-20, 15:12-14, 17:1-2; Dkt. No. 151. The Court emphasized that "TCS is deeply in the hole" and needed to provide relevant and responsive discovery that would allow Epic to "actually get[] to the bottom of this and root[] it all out," and warned that "if it turns out later this information was not provided, there will be serious consequences to TCS's case." Dkt. No. 155 at 16:1-25.

On November 3, 2015, Epic sent a letter reiterating its concerns about TCS's Med Mantra name game. Dkt. No. 263-9. With respect to its requested inspections, Epic pointed out the impropriety of TCS's refusal to permit inspections of EMR products in which it clearly could have used Epic's confidential and trade secret information. *Id.* at 2. Indeed, TCS had taken the position that even certain Med Mantra-based products, such as the DaVita lab product and the product implemented in Adyar, were off-limits because, although "based on Med Mantra" they had since been modified in some respect. *Id.* at 2-3. Epic insisted that TCS stop its games

playing and immediately permit discovery being refused on the ground that certain EMR products were not "Med Mantra" or had been modified over time.  *Id.*

TCS continued to play the Med Mantra name game.  Epic therefore filed a motion to compel on November 23, 2015.  Dkt. Nos. 261, 262.  During the hearing on Epic's motion, the Court admonished TCS for continuing to play "a cat and mouse game as Epic has attempted to try to get to the bottom of information they are entitled to," and indicated it would "bring that to a head today."  Dkt. No 293. at 8:5-8.  The Court then emphasized that it had *already* overruled TCS's objections as to Epic's DaVita-related discovery and ordered TCS to produce the requested discovery relating the DaVita lab product, and that this earlier ruling would apply equally to any product that was developed using Med Mantra.  *Id.* at 64:13-17, 65:5-10, 66:17-21, 67:6-19.  Indeed, the Court questioned how the issue could even continue to be "in dispute by TCS . . . after the last ruling by the court."  *Id.* at 67:6-19.

In light of the Court's ruling, TCS agreed during the December 4, 2015, hearing to allow Epic to inspect "all of the TCS EHR products that refer to Med Mantra" or used "the Med Mantra approach or software," including (1) the British American Hospital in Mauritius, (2) the cancer institute in Chennai, and (3) the Kolkata cancer hospital.  *Id.* at 67:17-68:3, 68:25-69:15, 70:8-71:7, 87:4-11.  The Court then ordered it to do so.  Dkt. No. 288.  The Court also ordered TCS to produce the release notes and development documentation for each of these products a reasonable time in advance of the inspections (and directed the parties to meet and confer regarding the precise production date).  *Id.*; Dkt. No. 293 at 74:4-76:16.

On December 9, 2015, Epic asked TCS to identify "the dates that we can conduct an inspection of the Mauritius system, the cancer hospital in Chennai, and the Kolkata cancer hospital as discussed during the [December 4] hearing."  Ex. 59.  Epic also requested that TCS

73

produce "the documents required in advance of the inspections" by December 22, 2014 and requested a meet and confer on this issue.  *Id.*  TCS did not respond.

On December 29, 2015, Epic followed up again.  Ex. 60.  When TCS continued to ignore Epic's repeated requests, Epic sent yet another letter on January 10, 2016, explaining that "[a]s a result of [the Court's] rulings, TCS must allow our experts' inspections of TCS's various EMR products," but TCS continued to refuse to provide "dates for the outstanding inspections."  Ex. 61.  Epic insisted that TCS respond to its requests to schedule the inspections ordered by the Court.  *Id.*  It never did so.  Richmond Decl. ¶ 67.  Even five months after Epic requested the inspections, three months after the Court rejected TCS's Med Mantra name game and ordered it to produce discovery of other EMR products, and two months after the Court *ordered* TCS to permit the inspections, Epic was never permitted to inspect these software products to determine whether any of them contain Epic's confidential and trade secret information.  Richmond Decl. ¶ 67.

> **B.    At a Minimum, TCS's Violation of the Court's Orders to Produce Product Development Information and Allow Inspections Warrant a Presumption that Epic's Confidential Information was Used to Help TCS Develop its EHR Products.**

TCS's repeated violations of the Court orders have significantly impeded Epic's ability to show that its confidential information was used by TCS to develop or improve its competing software.  It is no secret that Epic needed this information to present its case at trial.  The Court has already recognized the critical role of information regarding changes made to TCS's Med Mantra (and Med Mantra-based) software during the period in which TCS employees were improperly accessing Epic's confidential and trade secret information.  *See* Dkt. No. 293 at 64:13-17, 65:5-10, 66:17-21, 67:6-19; 69:7-11.  Indeed, that is precisely why TCS was ordered

to produce this information in discovery, and why the Court warned TCS there would be consequences if it did not. *See* Dkt. No. 155.

Despite their indisputable relevance, TCS failed to timely or completely produce the development documents for its EHR products, including the changes to those products during the relevant time period. And, for the limited inspections that TCS allowed of Med Mantra and TCS-HIS, Epic had to take these inspection without the benefit of TCS's technical development documents. Over 30,000 documents were produced after these inspections in a document dump by TCS on December 24, 2015 — five weeks before the close of discovery and on the eve of weeks of multi-track depositions to be taken in India. Even then, TCS's production omitted critical release notes for TCS-HIS.[28] Further, even though TCS produced some level of development information for the British American Hospital, DaVita, and other installations of Med Mantra, TCS has refused to permit the Court-ordered inspections of these products.

The unreasonableness of TCS's refusal to produce this information is all the more stark in light of TCS's record of hiding the laboratory software it was developing for U.S.-based companies during the very same period it was stealing Epic's information (including documents relating to Epic's laboratory product even though Kaiser does not use that product). *Cf. Domanus*, 742 F.3d at 297 (court was entitled to disregard defendant's excuses for his incomplete production in light of his "pattern of discovery violations and recalcitrance," including initially asserting the requested information was "irrelevant to the dispute"); *Melendez*, 79 F.3d at 671-72 (affirming imposition of "severe" sanctions where party failed to disclose

---

[28] TCS's failures to preserve evidence should foreclose any argument that TCS attempts make based on ███████████████████████████████████████████████████████████████████████ *See* Section I.A.3.d; Rubin Decl. ¶¶ 24-26. Moreover, ███████████████████████████████████████████████████████ *See* Rubin Decl. ¶¶ 41-42.

information it "knew or should have known . . . was required by the court's discovery orders" until the eve of trial, coupled with its "earlier evasive discovery tactics"); *Crown Life*, 995 F.2d at 1380-81 (affirming significant sanctions where defendant withheld data that was critical to the plaintiff's case and "offered no reasonable excuse" for its failure to produce the data); *Aktipis*, 175 F.3d at *3 (affirming Rule 37 sanctions where non-disclosing party was "at fault for being uncooperative and for engaging in dilatory tactics").

Faced with TCS's discovery abuses, the Court should, at a minimum, order an instruction that the jury may presume that TCS used Epic's confidential information to help TCS develop its EHR products. *See Supra*, Sections I.E.1., II.B, and IV.C; *cf. Crown Life*, 995 F.2d at 1382 (affirming sanction that was "proportionate to [defendant's] willful failure to comply with discovery orders and [its] failure of contumacious conduct").

## VI.   Together, TCS's Misconduct Warrants Default Judgment

Epic has attempted to shine a spotlight on some of the most obvious aspects of TCS's discovery abuse above, and to identify specific sanctions for each category.  The Court should also conclude that, taken together, TCS's "drumbeat of discovery abuse," permeated every aspect of this case and warrants an even greater sanction, *i.e.*, entry of a default judgment. *See Domanus*, 742 F.3d at 300 (entering $413 million default judgment in similar circumstances). Such an approach would be in keeping with the Seventh Circuit's guidance that it is appropriate to fashion a sanction "not in isolation but in light of 'the entire procedural history of the case.'" *e360 Insight*, 658 F.3d at 643 (quoting *Long*, 213 F.3d at 986); *see United States v. Approximately $7,400 in U.S. Currency*, 276 F.R.D. 596, 598-99 (E.D. Wis. 2011) (granting default judgment in light of "entire procedural history" after defendant failed to comply with two discovery orders).

76

Because a court considering the sanction of default judgment must "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit," we remind the Court below of some of the additional discovery misconduct that has previously been raised in this case, but for which the Court reserved on sanctions. *See Domanus*, 742 F.3d at 301 (quoting *e360 Insight*, 658 F.3d at 643). Each individual straw piled on by TCS may not be sufficient alone to warrant the "strong medicine" of default judgment but, together, they have ensured that Epic cannot obtain a fair trial. *See id.*

### A. TCS Engaged in Additional Misconduct that Delayed Discovery and Prejudiced Epic.

#### 1. TCS Opposed Discovery and Moved to Dismiss on the Ground that Epic's Allegations were Implausible.

On November 26, 2014, TCS opposed Epic's request for expedited discovery by claiming that, "*according to TCS' investigation to date,* the claims in this action have no merit and appear premised on unreliable statements by a disgruntled TCS employee." Dkt. No. 19 at 1 (emphasis added). Contrary to its representation to the Court, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Dkt. No. 416-1. In other words, TCS itself had already concluded that at least some of Epic's claims had merit.[29]

On January 5, 2015, after resisting expedited discovery, TCS moved to dismiss Epic's complaint on the ground that Epic's allegations of improper access to UserWeb were "implausible." Dkt No. 27 at 17. TCS asserted, for example, that "Epic ha[d] not plausibly alleged that TCS, or any of its employees, accessed any specific information that it was not

---

[29] That ██████████████████████████████████████████████████████████ also undermined TCS's argument that it should not have been required to respond to discovery on an expedited basis because it had not had sufficient time to "perform diligence" regarding Epic's allegations. *See* Dkt. No. 19 at 3; *see also id.* at 20.

authorized to access." Dkt. No. 27 at 20; *see also id.* at 2, 22 (asserting that "Epic's allegations that TCS accessed documents 'without authorization'" were implausible).

On February 9, 2015, in response to Epic's amended complaint, TCS again moved to dismiss on the ground that Epic's claims "are implausible on their face." Dkt. No. 44 at 4. Among other things, TCS asserted that Epic failed to "allege that TCS accessed information either 'without authorization' or in a manner that 'exceed[ed] authorized access." *Id.* at 20. TCS also claimed it was "allow[ed] to give its employees access to Epic's Confidential Information, with[out] needing a UserWeb Access Agreement [and thus individual log-in credentials] for each employee." *Id.* at 31. TCS reiterated its assertions in a reply brief filed on March 26, 2015. *See* Dkt. No. 50 at 2 (claiming "Epic's allegations against TCS in this case are a house of cards, with no factual allegations sufficient to state a claim for relief against TCS under any theory"); *id.* at 3 (arguing "this is not a case where . . . TCS hacked into a computer off-limits to outsiders and took sensitive data"); *id.* at 10 (arguing its employees were "authorized to access" the UserWeb).

Yet, unbeknownst to Epic and the Court at the time, TCS had already determined months before filing these motions that ███████████████████████████████████████ ██████████████████████████████. *See* Dkt. No. 416-1 at TCS00034847-48 (concluding ██████ ████████████████████████████████████████████████████████████████████ ██████████████████████). TCS's Chief Security Officer Mr. Menon and the head of all intellectual property for TCS, Dr. Santosh Mohanty, ███████████████████████████ ████████████. *See id.* at TCS00034846. TCS's in-house lawyers ████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████. *See* Dkt. No. 167-1 at TCS00017919; Ex. 7 at TCS00302576. They also knew from ████████████████████████████████████████████

████████████████████████████████████████████████.  *See* Ex. 7 at TCS00302585.

TCS's outside lawyers k████████████████████████████████████████████████████

████  *See* Dkt. No. 117 at 5; Dkt. No. 119 at ¶¶ 9-12; Dkt. No. 248-5.  And TCS's management

knew. ██████████████████████████████████████████████████████████

█████████████████████████████████████  Dkt. No. 188 at 35:15-25, 36:1-8; Dkt. No. 403

at 121:20-122:8 ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  Dkt. No. 508 at

149:20-151:17.

Despite all of this knowledge, TCS persisted in asking the Court to dismiss Epic's case

on the ground that it was "implausible" that TCS employees accessed the UserWeb "without

authorization."  *See, e.g.*, Dkt. No. 44 at 23 (arguing for dismissal on the ground that Epic "does

not plead facts to plausibly allege that TCS's alleged access was 'without authorization'").

### 2. TCS Delayed Rule 30(b)(6) Depositions and Produced Unprepared Witnesses.

TCS repeatedly delayed scheduling Rule 30(b)(6) depositions by many months, only to

present unprepared witnesses who could not speak to the noticed topics.  TCS's behavior appears

to have been intended to delay Epic's discovery of how inadequate its investigation,

preservation, and collection efforts have been in this case.  On April 10, 2015, Epic served Rule

30(b)(6) notices designed to obtain discovery on what this Court has described as "three critical

topics" in this case.  Dkt. No. 143 at 12:16-18; Dkt. Nos. 64-5, 64-6, 64-7.[30]  Epic noticed the

---

[30] Those three topics were:  (1) efforts by TCS to ensure protection of Epic's confidential information; (2) information about the accessing and use of information from Epic's UserWeb by TCS employees; and (3) preparation by TCS of comparative analyses between Epic and Med Mantra, including the purpose(s) and use(s) of such analyses and the individuals involved.  Dkt. Nos. 64-5, 64-6, 64-7.

depositions for May 25-27, 2015, and designated them to take place in New York, the location of TCS America's headquarters and TCS's attorneys.  Dkt. Nos. 64-5, 64-6, 64-7.

On April 30, 2015, TCS claimed it was not available on the dates for which the Rule 30(b)(6) depositions were noticed, and wanted to postpone depositions until later in the case. Richmond Decl. ¶ 70; Dkt. No. 53-4.  TCS then formally objected to the noticed location of the depositions "for those Defendants and/or their corporate representatives who are located in India."  Dkt. Nos. 64-9, 64-10, 64-11.  On June 4, 2015, TCS alleged it did not know who its corporate representatives would be, or whether it would agree to produce them in New York, but said it would endeavor to provide that information by June 11, 2015.  Dkt. Nos. 64-14, 372-1.  It did not do so, requiring Epic to file a motion to compel.  Dkt. No. 64 at ¶ 18; Dkt. No. 60.  On June 24, 2015, TCS indicated it was still "in the process of identifying who the witnesses will be."  Dkt. No. 65 at 1.  On July 20, 2015, TCS finally identified Mr. Sundar as its Rule 30(b)(6) witness and agreed that the deposition would occur in August 2015.  Ex. 64 at 1.

On August 28, 2015, three months after Epic had noticed the Rule 30(b)(6) depositions, TCS finally produced Mr. Sundar for testimony in New York.  Dkt. No. 92.  Mr. Sundar represented that ██████████████████████████████████████████████

████████████████  *Id.* at 24:22-25:26, 26:4-20, 27:10-28:2.  However, it was evident that Mr. Sundar had not prepared at all.  For example, one of the matters identified was "[t]he use or intended use of any comparative analysis between Med Mantra and Epic."  Dkt. No. 64-6 at 4. Accordingly, Epic's counsel asked Mr. Sundar: ████████████████████████████████

████████████████████████████████████████  Dkt. No. 92 at 517:15-17.  Mr. Sundar

██████████████████████████████████████████████████████  *Id.* at

517:20-22.  But, as TCS's Rule 30(b)(6) designee, Mr. Sundar was required to be *the* "person to

answer that."  Rather than re-hash all of the details of Mr. Sundar's deficient testimony here, Epic refers the Court to its prior motion to dismiss on this topic (Dkt. No. 113).  Put simply, Mr. Sundar's Rule 30(b)(6) deposition testimony was "tantamount to a complete failure of [TCS] to appear."  *See Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993).

Nonetheless, TCS refused to allow any further Rule 30(b)(6) questioning (Dkt. Nos. 114-9, 114-10), necessitating yet another motion to compel.  Dkt. No. 113.  The Court agreed that Epic's "exasperation [wa]s merited" and initially ordered TCS to produce another corporate designee to testify about the topics on Epic's April 2014 notices "in a week," or "waive the ability to put in evidence and the chips will fall where they may."  Dkt. No. 143 at 18:11-19:22. When TCS suggested its replacement witness may "have to come from India," the Court agreed that "if you're going to bring in someone from India . . . we can do it by the end of October."  *Id.* at 20:16-21:10.  But TCS did not bring a witness from India; it designated Mr. Muthuswami, who lives in New Jersey.  Dkt. No. 165-7.  And TCS did not produce Mr. Muthuswami until November 9, 2015.  *Id.*; Dkt. No. 188.

Mr. Muthuswami was no better prepared than Mr. Sundar had been.



Dkt. No. 188 at 11:14-12:18, 17:3-18:17, 65:20-66:2.

. *Id.* at 45:4-21, 65:20-66:2.

███████████████████████████████████████. *Id.* at 41:15-44:18,

44:15-18, 51:1-11, 181:19-182:8, 211:19-212:3, 248:21-249:17. ███████████

███████████████████████████████████████████████████████████

█████████████████████████████ *Id.* at 51:6-11, 234:17-235:7.

Mr. Muthuswami's ill-prepared testimony necessitated a further motion to compel.  Dkt.

No. 257.  The Court found that "what TCS did in choosing a 30(b)(6) representative who had no

involvement in these matters, was not involved in the investigation of these matters and was

going to simply be testifying from what an attorney told them, is simply poor form and perhaps

even approaches obstruction."  Dkt. No. 293 at 55:8-56:16.  As the Court summarized:

> [Y]ou chose someone with no information because it was easier and frankly safer
> because you, counsel, can control what information is disclosed, since the only
> information the person has is what you give them.

*Id.* at 57:8-58:3.  The Court found this to be a "cynical approach" that violated the "spirit" of the

law, and emphasized that TCS was "facing sanctions" for its conduct.  *Id.* at 57:8-60:25.  But the

Court "reserve[d] as to sanctions" at that time, indicating it would consider sanctions once TCS's

conduct was "put . . . in context."  *Id.* at 64:6-11.

As the Court recognized during the December 4, 2015, hearing, Mr. Menon was the clear

choice for TCS's Rule 30(b)(6) witness, at least with respect to the topics involving security

measures and TCS's UserWeb access.  *Id.* at 57:14-24.  As ██████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████  Yet TCS inexplicably selected two individuals with no first-

hand knowledge (and little second-hand knowledge) of the noticed topics.  TCS's decision not to

produce Mr. Menon appears to have been made for the purpose of keeping critical information

from Epic about ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████.  If

TCS had not played these games, Epic would have been able to depose Mr. Menon, and obtain

his documents (which TCS held until the end of December 2015), much earlier.  This would

have led to Epic obtaining the important information described above earlier, and would have

potentially enabled earlier engagement by Stroz Friedberg to attempt to preserve some of the

evidence TCS allowed to be destroyed.

### B. Default Judgment is Appropriate Where, as Here, Discovery Misconduct is Rampant.

It is now apparent that TCS has been attempting to ███████████████ of its employees'

UserWeb access for years.  That behavior carried over into this case, beginning with TCS's first

filing in November 2014, when TCS sought to avoid producing discovery on the ground that its

"investigation" had concluded Epic's claims had "no merit."  Dkt. No. 19 at 1.  It infected every

part of the discovery process, with the Court repeatedly finding that TCS had been dilatory,

"disingenuous," and even "obstructive."  *See, e.g.*, Dkt. No. 291 at 2, 7, 8; Dkt. No. 293 at 55:11-

16.  But it was not until Mr. Pandian's testimony on February 12, 2016 that there was evidence

to show that all of this conduct was ██████████████████████████████

███████  *See* Dkt. No. 510 at 108:4-12, 110:11-21, 112:1-11, 114:7-6.  For the reasons

discussed below, Epic believes default judgment is an appropriate sanction to address TCS's

behavior.

TCS may be tempted to point to the Court's dissatisfaction about the initial telephone

interviews with Mr. Menon as a reason why all of its discovery abuse should be swept under the

carpet.  However, the facts and circumstances related to those calls provides no excuse for what

TCS has been doing for over a year.  In particular, whatever happened during those calls did not

affect how TCS was responding to Epic's discovery requests or the Court's discovery orders, or

excuse TCS's failure to preserve critical electronic data in the face of a clear duty to preserve that information.  Nor was the Court aware at that time of the subsequent deposition testimony of Mr. Pandian that ████████████████████████████████████████████ ████████████████████  And, to the extent TCS continues to be concerned about those initial calls, the Court has certainly contained any perceived harm and has required Epic's lawyers and Stroz Friedberg to provide discovery and answers for TCS's benefit.

The Court has already found that TCS established "a clear record of delay or contumacious conduct" in this case, requiring motions to compel and court orders before Epic was permitted to obtain even the most relevant and basic discovery.  *See Domanus*, 742 F.3d at 301 (quoting *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003)); *see, e.g.*, Dkt. No. 155 at 15:23-17:2, Dkt. No. 293 at 55:11-16, Dkt. No. 291 at 2, 7, 8.  The Seventh Circuit has held that this is sufficient to warrant a default judgment.[31]  The sanction of default judgment also requires "a finding of willfulness, bad faith, or fault."  *Melendez*, 79 F.3d at 671; *e360 Insight*, 658 F.3d at 642; *see Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005).  As discussed above, this standard is also satisfied here.[32]

---

[31] *See, e.g.*, *Williams v. Chicago Bd. of Educ.*, 155 F.3d 853, 857-59 (7th Cir. 1998); *Govas v. Chalmers*, 965 F.2d 298, 303 (7th Cir. 1992); *Newman v. Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591-92 (7th Cir. 1992); *Profile Gear Corp. v. Foundry Allied Indus., Inc.*, 937 F.2d 351, 353-54 (7th Cir. 1991); *Powers v. Chicago Transit Auth.*, 890 F.2d 1355, 1361-62 (7th Cir. 1989); *Patterson v. Coca-Cola Bottling Co.*, 852 F.2d 280, 284-85 (7th Cir. 1988); *Hal Commodity Cycles Mgmt. v. Kirsh*, 825 F.2d 1136, 1138-39 (7th Cir. 1987).  As the Seventh Circuit has explained, "Rule 37 dismissals and default judgments" are "treat[ed] . . . the same" for purposes of analyzing whether a party's conduct warrants these most severe of sanctions.  *Crown Life*, 995 F.2d at 1381 n. 4.

[32] Bad faith is satisfied where a party "knew or should have known" that disclosure was required, and may be inferred where a party has engaged in other "evasive discovery tactics."  *Melendez*, 79 F.3d at 671 (finding bad faith where it was "difficult to conceive that [the defendant] reasonably and in good faith believed [responsive information] was not covered by plaintiff's straightforward discovery requests").  Willfulness is "associated with conduct that is intentional or reckless."  *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000).  And "fault" is "objectively unreasonable behavior" that goes beyond "a mere mistake or slight error in judgment."  *Id.*

84

When assessing the severity of a party's abuse of the judicial process, "[a]n award of sanctions must be proportionate to the circumstances surrounding the failure to comply." *Crown Life*, 995 F.2d at 1382. But it "is axiomatic that the appropriateness of lesser sanctions need not be explored if the circumstances justify imposition of the ultimate penalty." *Dotson*, 321 F.3d at 667; *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 165 (7th Cir. 1994) (collecting cases). The Seventh Circuit and the Supreme Court have also made clear that dismissal or default judgment sanctions "must be available not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Dotson*, 321 F.3d at 667 (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976).

The Seventh Circuit has long held that a default judgment sanction is appropriate under Rule 37 at the discretion of the trial court, particularly "where willful failure to comply with court-ordered discovery" has "seriously hampered" trial preparation. *Hindmon v. Nat'l-Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 621-22 (7th Cir. 1982) (collecting cases); *see also Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1178-80 (7th Cir. 1987) (holding that incomplete or evasive responses to interrogatories can support, in part, dismissal of the entire action under Rule 37(b)); *Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992) (affirming default judgment as sanction for defendant's bad faith failure to comply with discovery order and deception of court); *see also Kraemer*, 2014 WL 4978225, at *2 (granting default judgment after defendant "(1) failed to respond timely to interrogatories, requests to admit and requests for the production of documents; (2) failed to attend a noticed deposition; and (3) failed to cure these defects"). The Court may also enter default judgment under its inherent authority, a power "essential to a court's ability to preserve the integrity of its proceedings."

*Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015); *Quela v. Payco–Gen. Am. Creditas, Inc.*, No. 99-1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000) (relying on inherent power of court, entering default judgment against defendant who coerced employee to lie in deposition on central issue in case).  Further, while a finding of prejudice is not required for a court to enter default judgment, a court should consider what effect "the challenged conduct has had on the course of the litigation."  *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993).

As discussed in great detail above, TCS's repeated abuses of judicial process were in bad faith and were willful, placing TCS at fault. TCS allowed the only proof available as to who actually accessed and disseminated Epic's information to be destroyed.  *See Marrocco*, 966 F.2d at 225 (affirming directed verdict after defendant's destruction prevented plaintiffs from establishing prima facie case of negligent manufacturing).   Further, TCS propounded false discovery responses and made misrepresentations during the discovery process, leading Epic on a wild goose chase to locate witnesses and evidence.  Worse yet, it recently came to light that TCS ███████████████████████████████████████████████████████. A significant sanction is warranted here for the important purposes of "both punishing [TCS's] dishonesty and deterring others who might consider similar misconduct." *See Secrease*, 800 F.3d at 402.  Under both Rule 37 and its inherent authority, the Court has ample basis to "conclude that lesser sanctions [are] not likely to be either sufficient or effective. They would not [be] sufficient because the wrongdoing was so egregious and repeated." *See id.*   And they would not be effective because it is impossible for Epic to obtain a fair trial faced with TCS's record of

misrepresentations and destruction of evidence.  Epic respectfully requests that the court grant default judgment as a sanction for TCS's widespread and persistent abuse of judicial process.

In addition, Epic requests as a sanction the fees and costs it incurred in briging this motion, as well as reimbursement for the costs and fees associated with the significant efforts required to obtain relevant and responsive evidence in the face of TCS's refusal to comply with the rules of discovery.  *Sentry Ins. A Mut. Co. v. B & H Health Care Servs., Inc.*, No. 13-386, 2014 WL 348182, at *3 (W.D. Wis. Jan. 31, 2014); *Oyebade v. Boston Sci. Corp.*, No. 11-968, 2012 WL 4020971, at *14-15 (S.D. Ind. Sept. 12, 2012) (allowing monetary recovery under Rule 37 and inherent authority for party's supplemental and third-party discovery in an attempt to gather information that sanctioned party would not provide).  The majority of the fees and costs incurred in this litigation have been associated with Epic's attempts to simply obtain the relevant, responsive, and non-privilege evidence to which it is entitled under the federal rules.

## <u>CONCLUSION</u>

For the foregoing reasons, Epic respectfully requests that the Court enter the six proposed sanctions described in Sections I through V above.  In addition to these evidentiary sanctions, in light of TCS's pervasive misconduct, which permeated every aspect of discovery, Epic requests that the Court enter default judgment with respect to liability on all counts in its Second Amended Complaint, leaving damages to be decided by the jury and injunctive relief to be decided by the Court.  Finally, Epic requests that the Court order TCS to pay Epic its fees and costs incurred in connection with Epic's attempts to obtain discovery and to seek remedies for TCS's failure to produce the discovery to which Epic was entitled.  Those costs and fees were substantially increased due to TCS's failures to preserve evidence, and to be forthcoming with information, documents, and witnesses, which caused prejudicial delay and obstructed Epic's ability to fairly conduct discovery.

2411754

Dated:  February 26, 2016

                                               *&#47;s&#47; Rick Richmond*

                                               Rick Richmond
rrichmond@jenner.com
Nick G. Saros
nsaros@jenner.com
Julie A. Shepard
jshepard@jenner.com
Kelly M. Morrison
kmorrison@jenner.com
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Tel:  213-239-5100
Fax:  213-239-5199

Anthony A. Tomaselli
anthony.tomaselli@quarles.com
Kristin G. Noel
kristin.noel@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: 608.251.5000
Fax: 608.251.9166

*Attorneys for Plaintiff Epic Systems Corporation*

88

2411754