IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

                        Plaintiff,                          OPINION AND ORDER

        v.                                                  14-cv-748-wmc

TATA CONSULTANCY SERVICES
LIMITED and TATA AMERICA
INTERNATIONAL CORPORATION d/b/a
TCA America,

                        Defendants.

This case is set for a jury trial commencing, April 4, 2016.  In advance of the final

pretrial conference scheduled March 24, 2016, the court issues the following opinion on

the parties' respective motions *in limine* (dkt. ##540, 543, 556, 561, 564, 567, 571, 573,

577, 579, 581, 590), as well as on plaintiff's recently-filed motion for partial summary

judgment on defendants' unclean hands affirmative defense (dkt. #532).


OPINION

## I. Plaintiff's Motion for Partial Summary Judgment on Unclean Hands Defense (dkt. #532)

With respect to defendants' unclean hands defense, plaintiff seeks summary

judgment on the grounds that the alleged misconduct by plaintiff is no defense as a

matter of law to the alleged conduct by defendants set forth in plaintiff's claims.  The

court incorporates by reference the undisputed facts set forth in its prior opinion and

order on the parties' cross-motions for summary judgment.  (3/2/16 Op. & Order (dkt.

#538) 63.)   Material to this motion, defendant alleges in answer to the amended

complaint and counterclaims that Epic:  (1) violated antitrust provisions; (2) tortuously

interfered with TCS's contract with Kaiser; and (3) misappropriated trade secrets. (Dkt. #295.) In moving for summary judgment on the unclean hands affirmative defense, plaintiff assumes that defendant's unclean hands defense primarily concerns allegations of spying and specifically defendants' allegations on information and belief that plaintiff misappropriated trade secrets as a result. In its response to plaintiff's motion for summary judgment, TCS contends that its defense is based on two actions: (1) "Epic refused to share necessary information about its EHR systems with TCS so that TCS could implement the systems for Kaiser Permanent, in violation of antitrust and business tort laws;" and (2) "Epic sent spies to Indian hospitals under false pretenses to inspect confidential displays of TCS's EHR systems, misappropriating TCS's trade secrets for its own commercial advantage." (Defs.' Opp'n (dkt. #652) 7.)[1]

Under Wisconsin common law, a plaintiff is not entitled to equitable relief unless she has "clean hands." *S & M Rotogravure Service, Inc. v. Baer*, 77 Wis.2d 454, 466, 252 N.W.2d 913, 918-19 (1977) (citing *Martinson v. Brooks Equipment Leasing, Inc.*, 36 Wis.2d 209, 223, 152 N.W.2d 849 (1967)). For this defense to have merit, however, defendant must demonstrate that "the things from which the plaintiff seeks relief are the fruit of *its own* wrongful or unlawful course of conduct." *Id.* (emphasis added) (citing *David Adler & Sons Co. v. Maglio*, 200 Wis. 153, 160-61, 228 N.W. 123 (1929)); *see also Security Pac. Nat'l Bank v. Ginkowski*, 140 Wis. 2d 332, 339, 410 N.W.2d 589, 593 (Ct. App.1987)

---

[1] Defendants also contend that the court should deny plaintiff's motion as untimely, arguing that plaintiff could have filed its motion at the same time it filed its answer to defendants' counterclaims. Perhaps plaintiff could have filed its motion sooner, but defendants share in any fault by choosing not to assert its possible affirmative defenses and counterclaims until compelled to do so by rejection of its motion to dismiss. Regardless, the court will not deny plaintiff's motion based on its timing, especially given its clear merit.

("For relief to be denied a plaintiff in equity under the 'clean hands' doctrine, it must be shown that the alleged conduct constituting 'unclean hands' caused the harm from which the plaintiff seeks relief . . . [and] 'it must clearly appear that the things from which the plaintiff seeks relief are the fruit of its own wrongful or unlawful course of conduct.'" Stated another way, the unclean hands defense "only applies when there is a *direct nexus* between the bad conduct and the activities sought to be enjoined." *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir. 1985) (quoting *Int'l Union, Allied Industrial Workers v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir. 1982)).

Attempting to avoid this straightforward doctrine, defendants observe that "[t]he Seventh Circuit Court of Appeals takes a broader and less doctrinaire view of the unclean hands defense, holding that it 'nowadays just means that equitable relief will be refused if it would give the plaintiff a wrongful gain." (Defs.' Opp'n (dkt. #652) 5 (quoting *Scheiber v. Dolby Labs.*, 293 F.3d 1014, 1021 (7th Cir. 2002)).) The discussion in *Scheiber* concerned whether this defense could apply in the context of a claim for damages. The exact impact of that case here is far from clear given that the court opted *not* to apply the doctrine, not to mention that the case involved a patent infringement claim governed by federal law. Regardless, the *Scheiber* court did *not* hold that the defense could be untethered from the harm alleged in plaintiff's claims, much less that it could be untethered from controlling Wisconsin common law.

Defendants also cite to *Packers Trading v. Commodity Futures Trading Commission*, 972 F.2d 144, 148 (7th Cir. 1992), for the proposition that at least "in connection with transactions that occurred in [the] futures market, the unclean hands defense did not

3

even have to be alleged with respect to the same transactions that formed the basis of the challenge." (Defs.' Opp'n (dkt. #652) 5.) Aside from the fact that this again concerns federal law, what defendants fail to mention is that *all* of the transactions at issue in *Packers Trading* occurred within a matter of a few hours, during which the court found that the plaintiff took advantage of a mistake. *Packers Trading*, 972 F.2d at 147-48. Accordingly, that court simply found the Commission's view of the relevant timeframe was too rigid, "focusing only on a small portion of the whole transaction, taking it out of context and isolating it from the gross wrongdoing." *Id.* at 148. Moreover, that court reiterated the principal requirement of an unclean hands defense: the plaintiff's alleged wrongdoing must be tied to the "controversy in issue." *Id.*

Accordingly, plaintiff's characterization of the legal requirements of this defense under either Wisconsin law or the Seventh Circuit's articulation of federal law is accurate. Plaintiff's motion for summary judgment on the unclean hands defense, therefore, turns on whether there is a nexus between defendants' allegations of misconduct on plaintiff's part and plaintiff's claims against defendants. In other words, did plaintiff's alleged bad acts give rise to the harm plaintiff suffered by defendants' accessing and using plaintiff's proprietary information? The court will address this question with respect to each of the alleged actions underlying defendants' defense.

*First*, defendants assert their unclean hands defense based on plaintiff's refusal to give defendants access to the UserWeb, thus allegedly "forc[ing] TCS to seek out the information by accessing Epic's UserWeb, which created Epic's alleged right to sue for misappropriation of trade secrets." (Defs.' Opp'n (dkt. #652) 7.) As defendants' frame

4

it, the problem with this alleged conduct is not a lack of "nexus," but rather a lack of merit.  Whatever the reach of the unclean hands defense, it does *not* extend to defendants being allowed to blame the plaintiff for their decision to misappropriate protected information because plaintiff refused to give it to the defendant in the first instance. Such an argument is different from defendants asserting that it believed they were justified in accessing the information for purely legitimate reasons or from seeking a legal means for doing so (whether by renegotiations, appeal to a regulatory agency or suing in court).  Even if it is a viable defense, it would only excuse defendants' unauthorized access, not its admitted failure to give notice of that access or justify the alleged improper use of that information once accessed.  Regardless, plaintiff's alleged conduct does not fit within the contours of the defense, and the court will grant plaintiff's motion as to this first alleged "bad act."

*Second*, TCS rests its unclean hands defense on plaintiff's alleged spying and misappropriation of *defendants'* trade secrets based solely on the content of an internal Epic email exchange issued in February 2015.  As an initial matter, the internal email itself requests nothing more than an effort by Epic's President to elicit assistance from individuals in India by examining the computer *screens* of its health care clients using Med Mantra or other TCS software for telltale signs of copying of Epic software.  Particularly given defendants refusal to authorize such access during much of the present litigation, the court finds the request, at least as written, not only understandable, but appropriate. Regardless, whatever the imputed misconduct defendants would ascribe, it fails to amount to an unclean hands defense because the alleged bad acts are *unrelated* to

plaintiff's claims, as best illustrated by the timing of plaintiff's alleged conduct. How could actions taken by Epic in February *2015* relate to or have a nexus with, much less establish, Epic's right to sue for defendants' misappropriation of trade secrets that occurred a year before? Epic *filed* its lawsuit asserting its claims against defendants over six months before its alleged spying. Manifestly, Epic's alleged spying and misappropriation of trade secrets months, even years, *after* TCS's alleged improper use of Epic's confidential information at issue in this case was not the cause of defendants' improper access and alleged use of Epic's confidential information.

Accordingly, plaintiff's motion for partial summary judgment on defendants' affirmative defense of unclean hands is GRANTED.

## II. Plaintiff's Motions *in Limine*

### A. No. 1: preclude evidence and argument that TCS could have created comparative analysis from publicly available information (dkt. #567)

Plaintiff's first motion *in limine* seeks an order precluding TCS from introducing evidence or arguing that TCS could have created the comparative analysis from publicly-available information. Consistent with its earlier motion to compel, including compelling interrogatories requesting the source of information relied on in TCS's comparative analysis, plaintiff asserts that TCS failed to produce any evidence in support of its contention that the analysis could have been completed from public sources, making such contention pure speculation. While denying plaintiff's motion, the court ruled at that time that "defendant will be *barred* from further supplementing their responses, and plaintiff may point out defendants' failure to come forward with specific examples in

support of its theory that Yallapragada or others relied or could have relief on publicly-available information to develop his comparative analysis, unless previously, specifically designated or disclosed in answer to interrogatories."  (3/2/16 Op. & Order (dkt. #538) 63.)

In response, defendants contend that if the comparative analysis is going to be introduced at trial -- defendants have their own motion seeking to exclude it (*see infra* Opinion § III.F) -- then "TCS should be able to point to the significant evidence in the record that can be used to show that the Comparative Analysis could have been created using publicly available information, or from common knowledge of TCS employees." (Defs.' Opp'n (dkt. #661) 2.)  The problem with defendants' position is that their brief fails to direct the court to *any* evidence that the comparative analysis was created from such sources, much less to evidence disclosed in response to plaintiff's interrogatories, whether in the form of public documents or independent knowledge of its employees. Instead, defendants' argument entirely consists of poking holes in plaintiff's evidence that Kaiser team members supplied information from the Epic UserWeb for the comparative analysis.

Defendants, of course, are free to challenge plaintiff's evidence and argue that the evidence does not prove that the analysis *was* derived from the Kaiser team and their access to Epic's documents on the UserWeb, but the court will not allow TCS attorneys to argue that the comparative analysis was created from publicly-available sources absent evidence to support that argument.  Moreover, defendants remain bound by the court's above-referenced ruling on plaintiff's motion to compel interrogatory responses.

Accordingly, this motion is GRANTED IN PART AND DENIED IN PART.  Defendants may challenge plaintiff's evidence and argue from that, but may not assert that the comparative analysis was created from publicly-available sources absent evidence to support this assertion previously disclosed in response to plaintiff's interrogatories.

### B. No. 2: preclude evidence and argument that only a limited number of individuals or testing teams accessed the UserWeb (dkt. #571)

In this motion, plaintiff seeks an order pursuant to Federal Rule of Evidence 403, precluding defendants from offering any evidence or argument that "only certain individuals, or only individuals from two testing teams, accessed Epic's UserWeb."  (Pl.'s Br. (dkt. #572) 1.)   Plaintiff's motion is tied to its motion for sanctions based on defendants' purported failure to:  (1) preserve electronic evidence, including proxy logs, that would identify which individuals accessed the UserWeb; and (2) create images of the relevant computers, which would have shown whether documents were downloaded, saved or shared.

In their opposition, defendants argue that this motion is simply an attempt to distract the court from the real issue of whether plaintiff has evidence to support its claims of improper use.  No doubt, that is a principal, if not the central, issue for trial. Still, plaintiff's assertion that defendants' investigatory efforts were neither timely nor sufficient to determine which TCS employees improperly accessed the UserWeb or improperly shared the information obtained is also material to the question of improper use.  Said another way, to understand *how* the documents were used, one must first

determine who accessed them and plaintiff may argue that defendant did not investigate quickly enough or thoroughly enough to answer that question with any confidence.

Still, plaintiff's motion goes too far in seeking to bar defendants from putting forth any evidence as to who accessed the UserWeb on the basis that their investigation was inadequate. The court will not exclude evidence offered by defendants that a limited number of employees accessed the UserWeb for legitimate or at least innocuous purposes, nor argument that this shows no misuse of information. Plaintiff, of course, is free to challenge the adequacy of defendants' investigation, in particular whether TCS's decision to focus the investigation on a specific Kaiser team or teams was reasonable, just as defendants remain free to describe the results of their investigations, whether initial or subsequent efforts, and the relatively limited number of employees they maintain accessed the UserWeb. If anything, plaintiff's evidence that significantly more employees accessed the UserWeb than TCS discovered would cast doubt on whether TCS took these allegations seriously, and whether TCS made reasonable efforts to discover the scope of the unauthorized access and, in turn, any improper use. Ultimately, however, the jury will have to make that assessment as a matter of fact. Accordingly, this motion is DENIED.

### C. No. 3: preclude evidence and argument that TCS used Epic's confidential information only for testing services (dkt. #573)

Plaintiff's next motion is closely related, as it seeks an order precluding any evidence and argument that defendants used Epic's confidential information solely for testing work for Kaiser. Plaintiff contends that defendants lack the required foundation

to make this argument, again because they failed to conduct an adequate investigation or preserve evidence to allow plaintiff to do so.   Moreover, plaintiff argues that the investigation defendant conducted was designed to uncover access of documents by the Kaiser team only, rather than investigate whether Med Mantra development teams accessed and used Epic's confidential information.

In response, TCS points to its employees' testimony that they *only* accessed the UserWeb for the legitimate purpose of aiding their work for Kaiser.  The court will not preclude TCS from presenting this evidence and arguing from it.  On the other hand, as explained in the court's ruling on plaintiff's motion no. 3, plaintiff is free to challenge the adequacy of defendants' investigation and argue accordingly.   For the same reasons, therefore, this motion is also DENIED.

### D. No. 4: preclude evidence and argument regarding Epic's alleged contractual obligation to provide TCS access to the UserWeb (dkt. #575)

Plaintiff seeks an order precluding any evidence or argument that Epic had a contractual obligation to provide TCS access to the UserWeb.  Plaintiff contends that the only basis for such an argument is Epic's license agreement with Kaiser, but the language in that agreement simply provides that Kaiser *may* furnish Epic documents to third-parties, like TCS, not that Kaiser is required to do so.  Plaintiff further argues that this theory is not relevant to any of the claims Epic asserts in this case.   Instead, plaintiff asserts its only arguable relevance would be in support of:  (1) TCS's counterclaim for tortious interference with a contract, which is not part of this trial; or (2) an equitable

10

affirmative defense, which is a matter for the court, not the jury, and for which the court has granted judgment to plaintiff.

In response, defendants direct the court to Kaiser's 2003 contract with Epic, which provides in pertinent part:

> Third party Assistance.  If you receive assistance from a third party related to the use or implementation of the Program Property.  You will not permit such third party to have access to the Program Property unless such third party (i) has been informed that You are obligated to keep Epic Confidential Information and Program Property (or generically any vendor's confidential information and software) confidential and that it is Your policy to keep all such information confidential, and (ii) has entered into a confidentiality agreement with you.

(Defs.' Opp'n (dkt. #644) 3.)   Consistent with this language, defendants essentially concede that the contract simply authorizes *Kaiser* to disclose Epic information to consultants like TCS provided certain assurances are met, but the contract does *not* require Epic to provide direct access to the UserWeb.  Indeed, the undisputed record at summary judgment established that Epic refused to provide TCS access to the UserWeb in 2011 and 2012 and that TCS was aware it lacked direct access.  (3/2/16 Op. & Order (dkt. #538) Facts § B.iv.)  While defendants assert tortious interference counterclaims based on this lack of access, defendants fail to explain -- and the court sees no basis -- why this evidence and argument is relevant to plaintiff's claims at issue in this trial. Accordingly, this motion is GRANTED.

E.  **No. 5: preclude evidence and argument that TCS's Med Mantra-based software was not improved using Epic's confidential information in any EHR products Epic was not allowed to inspect (dkt. #577)**

In this motion, plaintiff continues to press for specific findings of fact based on alleged discovery abuse, here seeking an order precluding defendants from arguing that certain of its EHR products, which plaintiff represents it has not been permitted to inspect, were not improved using Epic's confidential information.  As context, the court previously ordered defendants to permit Epic to inspect TCS's products for certain Indian hospitals, but plaintiff represents that defendants blocked the inspections for three hospitals by failing to respond to plaintiff's multiple requests for inspections dates.

In response, defendants assert they offered inspection of the software used at the three hospitals, but that "plaintiff responded to TCS's offer not with acceptable dates but rather with requests for further clarification."  (Defs.' Opp'n (dkt. #663) 3.)  The record belies defendants' assertion.  During a December, 4, 2015, hearing on discovery disputes, the court expressly ordered inspection of the software *at the three hospitals* at issue in that motion.  (12/4/15 Hearing Tr. (dkt. #293) 67-70, 87.)  Defendants do not dispute this.  In a December 9, 2015, email, plaintiff promptly inquired with defendants about available dates.  (Richmond Decl., Ex. 59 (dkt. #529-8).)  Having heard no response, plaintiff emailed again on December 28, 2015 (*id.*, Ex. 60 (dkt. #529-9)), and after again receiving no response, plaintiff emailed on January 10, 2016, requesting dates by January 12, 2016 (*id.*, Ex. 61 (dkt. #530).  Defendants utterly fail to offer *any* evidence that they responded to these multiple requests, despite the court's straightforward order AND despite already being behind a very large eight ball for multiple, earlier discovery failings.

Instead, defendants simply cite October email exchanges about this overarching inspection dispute, which pre-date the court's December 4th order to compel.  If anything, that exchange simply supports defendants' reluctance to allow inspection before being ordered to allow it.  (Defs.' Opp'n (dkt. #663) 2 (citing Richmond Decl., Exs. 62, 63 (dkt. ##530-1, 530-2)).)   Finally, faced with a motion for sanctions, defendants responded on March 3, 2016 -- six months after plaintiff's first request and nearly three months after being ordered by the court to comply -- with a classic cover your bases email, now requesting plaintiff propose dates for the three inspections. (Richmond Decl., Ex. 4 (dkt. #585-4).)

Under all the circumstances here, this late response cannot unwind defendants' repeated past failures to comply with its discovery obligations and multiple sanctions, much less this court's unambiguous order.  With trial now less than two weeks away, it is too late to arrange inspections.  Accordingly, the motion is GRANTED.  As a sanction for their failure to comply with this court's order requiring inspection of the software at these three hospitals, defendants may not rely on these software products to argue that Med Mantra was not improved by Epic's confidential information.  As for plaintiff, the court assumes that it is simply too late for inspections to occur, but if plaintiff feels otherwise, the court will order defendants to allow the inspections on the dates and time requested by plaintiff.[2]

---

[2] The court will also consider providing the proposed adverse inference instructions specific to the software at these three hospitals.

13

### F. No. 6: preclude evidence and argument regarding Guionnet's allegations on unrelated topics (dkt. #579)

In addition to complaining about improper access of Epic's UserWeb and improper use of Epic's proprietary information -- claims central to this lawsuit -- TCS whistleblower Phillippe Guionnet made additional allegations against defendants regarding "fraudulent billing, immigration issues, and racial discrimination."   (Pl.'s Br. (dkt. #580) 2.)  Plaintiff contends that these allegations are irrelevant, and that TCS has admitted as much.   Concerned that defendants intend to introduce these other allegations in an effort to discredit Guionnet, plaintiff seeks an order excluding any evidence or argument about these other allegations.

Defendants concede that these "unrelated allegations are not relevant to Epic's claims in this case," but contend that "the *fact* that the allegations were made, as well as the *timing* of those allegations, is relevant to the context in which Mr. Guionnet made his claims regarding Epic and Med Mantra."  (Defs.' Opp'n (dkt. #665) 2.)  Whether to challenge Guionnet's credibility or point out that Guionnet's allegations about improper access occurred up to one year after he first learned of this access, the court agrees with defendants that the evidence of Guionnet's other allegations is relevant, although the court will limit the introduction of evidence regarding these assertions so as to avoid a side-show on homeland security, fraudulent billing, retaliation, discrimination, or other tangentially related subjects.  While this motion is, therefore, DENIED, the court will hear arguments from the parties at the final pre-trial conference as to appropriate limitations on this evidence.

14

### G. No. 7: preclude evidence and argument on the matters raised in TCS's unclean hands defense (dkt. #581)

The court's order granting summary judgment to plaintiff on defendants' affirmative defense of unclean hands (*see supra* Opinion § I) moots this motion. Even if not mooted, the court would grant it in light of the fact that under Wisconsin law, the defense only applies to equitable remedies. *See State v. Sawicky*, 2014 WI App 1, ¶ 19, 352 Wis. 2d 248, 841 N.W.2d 581.

### H. Motion *in Limine* to exclude certain opinions of TCS's expert Erik Laykin (dkt. #590)

Finally, plaintiff brought a *Daubert* challenge to exclude certain opinions of TCS's expert Erik Laykin. The admissibility of expert testimony in federal courts is governed principally by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court functions as a "gatekeeper" regarding expert testimony. The court must determine whether a party's proffered expert testimony is relevant and reliable.

15

*Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable").  Although expert testimony is "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), it must satisfy the following three-part test:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and
>
> (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.

*Ervin v. Johnson* & *Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

*First*, while acknowledging Laykin's expertise with respect to electronic discovery, computer forensics and cybercrime, plaintiff contends that Laykin lacks the requisite "knowledge, skill, experience training or education" in "architecting, designing, developing, analyzing, testing or marketing electronic healthcare record ('EHR') software or systems" required by Federal Rule of Evidence 702 to testify on EHR-related issues. (Pl.'s Br. (dkt. #591) 6.)   In particular, Epic seeks to exclude Laykin's testimony regarding:  (1)  how the "TCS's Med Mantra product was developed," "the regulations that shaped it," and how "Med Mantra differs from Epic's software"; (2) why Med

Mantra would not be an appropriate solution for the U.S. market; (3) why Epic's software is not appropriate for the Indian market; (4) why TCS needed access to the UserWeb in order to fully and properly test the Epic software for Kaiser; and (5) the nature and value of the software architecture of Epic and Med Mantra.

In response, defendants point in detail to Laykin's role as President of Online Labs, Inc., between 1997 and 2004, during which he worked with three healthcare related applications, as well as his CIO position with HealthAddress.com., during which he developed an internet-based healthcare platform.   These experiences, defendants assert, provide Laykin with a sufficient basis to testify about the U.S. EHR market and the value of Epic's system in that market.  Laykin's role in developing healthcare related application, defendants further assert, inform his view of the need for TCS to access the UserWeb to properly test Epic software for Kaiser.   This background is enough foundation to allow Laykin to assist the jury in understanding this technical filed. Accordingly, Epic's motion as to this first challenged area is DENIED.

*Second*, plaintiff seeks to exclude Laykin's contract interpretation opinions as improper.   Specifically, plaintiff takes issue with Laykin's opinion that "TCS was 'obligated' to 'evaluate, optimize, and assist in the enhancement of Epic's system to fulfill its contractual obligations," and that "[u]nderstanding the foundation of Epic software was precisely what TCS was hired to do, as Epic, Kaiser, and TCS agreed upon."  (Pl.'s Br. (dkt. #591) 12-13.)

In response, defendants argue that Laykin is not reinventing contractual obligations, but rather is limited to explaining that:  (1) the 2005 Agreement permitted

17

TCS access to Epic's confidential information; (2) TCS was "obligated" under its contract with Kaiser to "evaluate, optimize, and assist in the enhancement of Epic's software"; and (3) "Understanding the foundation of Epic software was precisely what TCS was hired to do, as Epic, Kaiser and TCS agreed upon."  (Defs.' Opp'n (dkt. #656) 11-12 & 12 n.2).)

The sticking point in this opinion is the source of Laykin's opinion that Epic agreed on TCS's role and whether that role required access to the UserWeb.  As explained above in the court's ruling to plaintiff's motion in limine no. 4, defendants cannot argue that Epic was contractually obligated to provide access to the UserWeb. (*See supra* Opinion § II.D.)  Instead, Epic's contract with Kaiser simply contemplated that Kaiser *may* provide TCS with confidential information, and then Epic's 2005 agreement with TCS set forth TCs's requirements in maintaining the confidentiality of this information.  Based on this ruling, the court agrees with Epic that Laykin may not testify that Epic was contractually obligated to provide TCS with access to the UserWeb.  To that extent, this portion of the motion is GRANTED, but in all other respects it is DENIED.

*Third*, plaintiff challenges the basis of Laykin's testimony that TCS's performance of its testing obligations to Kaiser was impeded by its lack of access to the UserWeb.  Plaintiff contends that (1) this testimony is not relevant to plaintiff's claims, and (2) even if it were, Laykin has no basis to offer an opinion about what TCS required or preferred with respect to testing EHR software.

In response, defendants argue that Laykin's testimony that such access was required is based on TCS employees' testimony that their efforts were impeded by not

having access to the UserWeb.  As such, defendants contend that this is simply a fact issue for the jury to determine.  (Defs.' Opp'n (dkt. #656) 10-11.)  While the court agrees with defendants that Laykin has an adequate basis to offer this testimony, the question is whether this evidence, and Laykin's expert opinion based on this evidence, is relevant.  Perhaps it supports defendants' position that Epic's confidential information was only used in TCS's work with Kaiser.  Accordingly, this portion of the motion is RESERVED and the court will take up this challenge at the final pretrial conference itself.

*Fourth*, and finally, plaintiff seeks to exclude Laykin's opinion that Epic lacked a legitimate basis for denying TCS access to the UserWeb.  Plaintiff contends that (1) Laykin lacks the requisite expertise to offer this opinion, (2) it is not relevant, and (3) even if relevant, it should be excluded as unduly prejudicial under Rule 403.

In light of Laykin's experience in creating healthcare related applications, Laykin arguably has a sufficient basis to opine on whether the denial of access to the UserWeb was necessary to protect Epic's confidential information.  That said, similar to the third challenge, it is not clear whether this opinion is relevant.  Whether Epic had a legitimate basis to deny access may be relevant to defendants' counterclaim theories, but the court is hard-pressed to understand how this opinion is relevant to the claims to be tried to the jury.  Accordingly, this portion of the motion is RESERVED pending argument at the final pretrial conference.

## III.  Defendants' Motions *in Limine*

### A.  MIL to exclude evidence that Epic information was used to develop or enhance Med Mantra or other TCS products (dkt. #511)

In its first motion, defendants seek an order excluding evidence of a central issue in this trial -- whether Epic information was used to develop or enhance Med Mantra or other TCS products.  For the reasons provided in this court's summary judgment opinion and order, the court has already determined that there is sufficient evidence from which a reasonable jury could infer improper use.  (3/2/16 Op. & Order (dkt. #538) 40-42, 59.)  As also explained in that opinion, as well as in other parts of this opinion, defendants are free to point out plaintiff's lack of direct evidence of misuse from their investigation, just as plaintiff is free to argue that any failure to produce direct evidence is more probably than not due to the defendants' failure to investigate timely or adequately evidence of misuse, to preserve evidence found during their own inadequate investigation or to preserve other computers or files that might contain evidence.  This motion is, therefore, DENIED.

### B.  MIL to exclude cumulative testimony regarding access to UserWeb (dkt. #540)

Defendants next seek an order excluding "cumulative testimony from TCS's employees whereby those employees admit that they accessed UserWeb during their work for the parties' mutual client Kaiser."  (Defs.' Br. (dkt. #541) 2.)  Defendants contend that the order is warranted because plaintiff intends to use this testimony in the hope that the jury will speculate that TCS misused Epic's information based on the number of people at TCS who accessed UserWeb.  More to the point for purposes of the

motion, defendants contend in their brief that "TCS testers' access to UserWeb" is an "undisputed fact." (*Id.* at 7.)

Were defendants correct in contending that access is an undisputed fact, the defendants would have a point. Unfortunately, defendants have yet to offer a stipulation as to the number of employees who accessed the UserWeb, much less who, how often, and for what purpose. The court would still welcome such a stipulation, and encourages both sides to take advance of such a mechanism to summarize other, potentially cumulative testimony, just as they are hopefully utilizing Federal Rule of Civil Procedure 1006 to avoid needlessly voluminous exhibits.

Otherwise, plaintiff's so-called "parading" of TCS employees who acknowledge their unauthorized access of the UserWeb *is* material to prove the scope of defendants' access, as well as their failure to recognize and respond adequately to Epic's allegations of unauthorized access, which in turn could be relevant to the jury inferring (not speculating about) improper use. Accordingly, this motion is DENIED, absent submission of an acceptable stipulation or summary as to the identity, number and/or purpose of employees who accessed the UserWeb.

### C. MIL to exclude Guionnet's testimony about development of Med Mantra (dkt. #543)

In this motion, defendants seek an order excluding Guionnet's testimony about the development of Med Mantra, offering two independent bases: (1) Guionnet "obstructed TCS's ability to cross-examine him"; and (2) his testimony is inadmissible because it is either based on hearsay or lacks personal knowledge.

21

As for the first basis, defendants contend that during his multi-day deposition, Guionnet "behaved differently depending on whether Epic's attorney or TCS's attorney was asking questions." (Def.'s Br. (dkt. #544) 5.)  While "Guionnet had no problem responding at length to Epic's questions, . . . [w]hen TCS's attorney began asking questions, Mr. Guionnet adopted a strategy of obstruction that turned the deposition into a fruitless exercise for TCS." (*Id.*)  For experienced lawyers to point this out as somehow out of the ordinary is frankly surprising.  Indeed, that much could be said of virtually *every* adverse witness examination.  Accordingly, the court expected something extraordinary in the transcript, but that was missing as well.

Even if it were outrageous, defendants' remedy was, as plaintiff points out, to come to this court with examples of such conduct (not comparisons of answers) and obtain relief -- whether by motion to compel answers or conduct a follow up deposition before the court -- not to wait until the eve of trial and move to exclude the witness's testimony altogether.

Putting aside this basic concern as to timing, plaintiff also contends that Guionnet's responses were justified in light of the overbroad nature of defendants' questions.  In particular, plaintiff points out that defendants repeatedly asked Guionnet to tell them "every fact," "every instance," "everything you know," "every location," "everything you did," "every pieces of information you have," and other similar types of questions.  (Pl.'s Opp'n (dkt. #628) 3.)  From the court's review of the transcript, Guionnet's responses may have been frustrating, but it fell within the range of typical responses from an adverse witness, particularly where counsel fails to pose well-crafted

22

questions.   In fairness, when defendants' counsel posed more exacting questions, Guionnet did resort on a number of occasions to inexcusable diversions (*e.g.*, Defts. Br. (dkt. #544) 7-8), but this behavior simply does not rise to the level of the witnesses in cases cited by defendants, where a court struck deposition testimony or otherwise sanctioned obstructionist behavior.  (*See* Defts.' Mot. (dkt. #544) 17 (citing cases).)

Certainly, Guionnet is a hostile witness when it comes to defendants.  At trial, defendants are free to lead him and properly impeach him from the deposition transcripts if he changes his answers.  Indeed, if his demeanor is as extreme as represented, that should come out through proper use of impeachment by video transcript, not by excluding his testimony altogether.  Finally, the court can direct Guionnet to answer if he proves truly uncooperative.[3]

As for the exclusion of *specific* testimony, defendants contend that Guionnet's testimony should be excluded because he testified at his deposition that:  (1) his knowledge of Med Mantra's functionalities at the time he joined TCS in 2012 were based on what he was told by TCS's employee, Venu Medikonda; and (2) he had not focused on Med Mantra, because he did not think it would work in the United States market generally or for Kaiser specifically.  From this, defendants reason that Guionnet's opinion in February 2014, based on his visit to the Apollo Hospital in Chennai, that the Med Mantra product had experienced "phenomenal development" in a short period of time is not based on personal knowledge, but rather based on hearsay.  Defendants also argue that Guionnet's testimony that his only other involvement with Med Mantra was

---

[3] If Guionnet is not present at trial, then defendants' designated video excerpts should serve to undermine his credibility.

limited to a weekly call with Syama Sundar, and a monthly meeting with Venugopal Reddy, further demonstrates his lack of personal knowledge about Med Mantra. Finally, defendants question whether the timing of Guionnet's visit to a hospital in Kolkata undermines his claim that he compared the Med Mantra product at the Chennai hospital with that previously reviewed at the hospital in Kolkata.

In response, plaintiff argues that Guionnet's role at TCS included responsibilities relating to Med Mantra. Specifically, plaintiff points to Guionnet's testimony that he was involved in an integration module, and that given his role at Kaiser, he was also interested in attempting to market Med Mantra to Kaiser. (Pl.'s Opp'n (dkt. #628) 8-9).) Moreover, Guionnet's testimony about his February 2014 visit to an Apollo hospital and his impression of the Med Mantra product on that date certainly is based on personal knowledge. Defendants, of course, are free to challenge his experience with Med Mantra, but the court does not find that his testimony lacks sufficient foundation for him to testify about his contemporaneous impressions of Med Mantra, particularly as relayed to others within TCS and to Kaiser.

The more interesting question is whether Guionnet can testify as to statements made by other TCS employees about Med Mantra toward the beginning of his employment, which informed his view of the product and his assumption that the software had developed significantly in a very short period of time. Specifically, at his deposition, Guionnet testified as to what his fellow employee, Venu Medikonda, had told him about the product. Plaintiff contends that these statements are not hearsay under Federal Rule of Evidence 802(d)(2)(C), as statements made by defendants' employee

24

within the scope of his employment.  The court will take up argument on this at the final pretrial conference.  Accordingly, the motion is DENIED with respect to excluding Guionnet's testimony generally, as well as to Med Mantra specifically if based on his personal knowledge, including that involving his February 2014 visit to the Apollo hospital in Kolkata.  The court will RESERVE as to the admissibility of Guionnet's testimony as to what other TCS employees told him about Med Mantra pending a proffer at the final pretrial conference.

### D. MIL to exclude evidence relating to plaintiff's claim of damages (dkt. #556)

In this motion, defendants challenge plaintiff's claims for damages, apparently based on:  (1) its purported failure to provide a computation as part of its initial disclosures; or (2) its failure to make available for inspection the evidentiary material from which later computations were based under Federal Rule of Civil Procedure 26.

In response, plaintiff contends that the during the preliminary pretrial conference, Judge Crocker stated that the parties need not submit Rule 26(a)(1) disclosures, which resulted in *neither* party serving disclosures.  (Pl.'s Opp'n (dkt. #637) 4.)  As plaintiff explains, the conference was not recorded.  (Pl.'s Opp'n (dkt. #637 4 & 4 n.1.)  To the extent defendants disagree with this assertion -- and such a denial would appear untenable if defendants made no Rule 26(a)(1) disclosures, as plaintiff represents -- then defendants are free to renew this motion at the final pretrial conference.

Taking plaintiff at its word until then, the court will assume that Judge Crocker relieved the parties of this obligation, meaning there is no basis to strike damages

25

calculations from the record on that basis.  Regardless, as plaintiff explains, Epic disclosed potential damages calculations in the preliminary report of Thomas Britven, and supplemented that report on March 14, 2016, a date agreed upon by the parties.  (Pl.'s Opp'n (dkt. #637) 5-7.)  As such, it is difficult for the court to discern any prejudice to defendants by plaintiff's failure to disclose its damages computations.  Even if it were prejudicial, defendants' repeated failure to cooperate in discovery would excuse the failure to produce much of this information sooner.[4]

Defendants also challenge Epic's Chief Security Officer Stirling Martin's declaration as "self-serving and unsupported."  (Defs.' Br. (dkt. #557) 6.)   In the declaration, Martin stated that Epic personnel spent approximately 108 hours investigating TCS's unauthorized downloading of documents from the UserWeb, amounting to losses of approximately $9,000.  (*Id.* at 6-7 (citing Martin Decl. (dkt. #226-1) ¶ 14).)  When asked at a 30(b)(6) deposition how Epic arrived at these figures, Martin testified that he did not specifically know.  (*Id.* at 9 (citing Martin Depo. (dkt. #186) 171).)

In response, plaintiff challenges defendants' characterization of Martin's testimony, instead directing the court to portions of his deposition in which he stated that he was not sure whether the 108-hour calculation was based on time logs or collected through interviews.  Regardless, Epic represents that he had a basis for generating that number.  (Pl.'s Opp'n (dkt. #637) 10.)  Moreover, he further testified that the $9,000 calculation was likely done by multiplying the hourly rate by the number

---

[4] The court would nevertheless consider possible steps that defendants might offer to ameliorate any actual prejudice to defendants by late disclosure.

26

of hours.  (*Id.*)   From this, coupled with additional discovery plaintiff produced to support the cost of the investigation, the court finds that there is an adequate foundation for Martin's testimony, though defendants remain free to cross-examine him about any inconsistencies in his past testimony, the rigor of his analysis and the reasonableness of his ultimate calculation.  Further, Martin may not now embellish his testimony, even if he now has a *better* answer to this question.  Accordingly, this motion is DENIED.

### E.  MIL to exclude any references to TCS's participation in outsourcing, its use of H1B visas, or it being a "foreign" company (dkt. #561)

Defendants further seek an order to exclude "any references to TCS's participation in outsourcing, its use of H1B visas, or it being a 'foreign' [or 'alien'] company.'"  (Defs.' Br. (dkt. #562) 1.)  Defendants also seek an instruction that TCS's citizenship should not be taken into account.  (*Id.* at 7.)  Defendants reasonably argue that issues surrounding outsourcing jobs are particularly contentious in the United States right now, especially with the presidential election, and therefore any references to these issues would be unduly prejudicial.  Defendants also contend that this information is not relevant to the issues to be tried.

In response, plaintiff address each of defendants' requests specifically.  *First*, as to any reference of TCS being a "foreign" or "alien" company, plaintiff justifiably points out that TCS's status as an Indian company will be known to the jury -- both parties proposed a number of voir dire questions based on this fact.  All of that said, the court agrees with defendants -- and plaintiff appears to not challenge -- that references to TCS being a "foreign" or "alien" company are improper, as are gratuitous or unnecessary

27

references to it being an "Indian" company.  Accordingly, this portion of the motion is GRANTED as unopposed.  Failure to abide by this ruling will result in admonition of counsel by the court, in the jury's presence if necessary.  To the extent the parties need further guidance on this ruling, they should ask the court at the final pretrial conference.[5]

*Second*, as to defendants' request to exclude any references to "outsourcing," the court agrees with plaintiff that evidence of TCS America's "back-to-back agreement" with TCS India, which allowed for off-shore services to be provided to Kaiser, is relevant to the issues presented to the jury.  In particular, the jury will need to be informed of the use of Offshore Development Centers, and TCS employees' use of kiosks at the ODCs to access Epic's UserWeb.  Still, there is no reason to refer to this arrangement as "outsourcing," particularly given that it has become a loaded term.  Accordingly, this motion is GRANTED IN PART AND DENIED IN PART.  Plaintiff is free to introduce evidence of TCS providing off-shore services to Kaiser, including the use of ODCs, but plaintiff and its witnesses should not refer to this arrangement as "outsourcing." Plaintiff's counsel will be responsible for insuring that its witnesses are so admonished.

*Third*, defendants seek to exclude references to TCS's use of H1B visas.  On its face, this request seems entirely appropriate, but as plaintiff points out, it is inconsistent with TCS's plan to admit Guionnet's allegations about TCS's use of visas.  To the extent TCS opens the door by introducing this evidence, then plaintiff, of course, may also address Guionnet's assertions.  Moreover, TCS's motion appears inconsistent with its

---

[5] Should they wish, the court also invites defendants to submit a proposed jury instruction informing the jury that it may not consider TCS's status as a foreign or Indian corporation in rendering its decision.

28

recently-filed additional voir dire questions focused on H1B visas.  As such, this portion of the motion is RESERVED, pending a discussion at the final pretrial conference.

### F.  MIL to exclude comparative analysis document (dkt. #564)

Finally, defendants seek an order excluding the comparative analysis document between Epic's software product and Med Mantra.  Defendant contends that such an order is warranted because:  (1) there is no direct evidence to support Guionnet's claim of improper use of Epic's proprietary information form the UserWeb; and (2) the timing of the document's creation in March 2014 does not jive with Guionnet's own testimony that he noticed dramatic improvements in the Med Mantra product a month earlier in February 2014.  Defendant also argues that there is no evidence that the UserWeb documents were used to create the analysis, and even if they were, there is no evidence that the analysis was shared with the Med Mantra team.

The court already addressed this argument in its opinion and order on the parties' summary judgment motions.  (3/2/16 Op. & Order (dkt. #538) 40-42, 59.)  For the reasons explained in that opinion, the comparative analysis document is circumstantial evidence of defendants' improper use of the Epic's proprietary information.  Of course, there are a number of factual issues surrounding this evidence for the jury to consider. Just to name a few, why was it produced, who commissioned it, what data was used to produce it, and how was it used?  But the fact that there are factual issues surrounding the analysis and inferences the jury may draw from it does not render it inadmissible.  In this motion, defendants raise a number of arguments that poke holes in plaintiff's theory

29

of improper use based on this evidence -- the timing theory in particular. Defendants are, of course, free to raise these same arguments with the jury, but the court is not going to exclude the evidence. Accordingly, this motion is DENIED.

ORDER

IT IS ORDERED that:

1) Plaintiff Epic Systems Corporation's motion for partial summary judgment on defendants' unclean hands affirmative defense (dkt. #532) is GRANTED.

2) Defendants Tata Consultancy Services Limited and Tata America International Corporation's motion in limine to exclude evidence that Epic information was used to develop or enhance Med Mantra or other TCS products (dkt. #511) is DENIED.

3) Defendants' motion in limine to exclude cumulative testimony regarding access to the UserWeb (dkt. #540) is DENIED.

4) Defendants' motion in limine to exclude Guionnet's testimony about the development of Med Mantra (dkt. #543) is DENIED IN PART AND RESERVED IN PART.

5) Defendants' motion in limine to exclude evidence relating to plaintiff's claim of damages (dkt. #556) is DENIED.

6) Defendants' motion in limine to exclude any references to TCS's participation in outsourcing, its use of H1B visas, or it being a 'foreign' company (dkt. #561) is GRANTED IN PART, DENIED IN PART AND RESERVED IN PART.

7) Defendants' motion in limine to exclude the comparative analysis document (dkt. #564) is DENIED.

8) Plaintiff's motion in limine no. 1 (dkt. #567) is GRANTED IN PART AND DENIED IN PART.

9) Plaintiff's motion in limine no. 2 (dkt. #571) is DENIED.

10) Plaintiff's motion in limine no. 3 (dkt. #573) is DENIED.

11) Plaintiff's motion in limine no. 4 (dkt. #575) is GRANTED.

12)    Plaintiff's motion in limine no. 5 (dkt. #577) is GRANTED.

13)    Plaintiff's motion in limine no. 6 (dkt. #579) is DENIED.

14)    Plaintiff's motion in limine no. 7 (dkt. #581) is DENIED AS MOOT.

15)    Plaintiff's motion in limine to exclude certain opinion of defendants' expert Erik Laykin (dkt. #590) is GRANTED IN PART, DENIED IN PART AND RESERVED IN PART.

Entered this 23rd day of March, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

31