UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation;

                       Plaintiff,

       v.

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation;
and TATA AMERICA INTERNATIONAL
CORPORATION (dba TCS America), a
New York Corporation;

                       Defendants.

Case No. 14-cv-748-wmc

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendants Tata America International ("Tata America") and Tata Consultancy Services Limited ("TCS India") (collectively, "TCS") move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on the grounds that Plaintiff Epic Systems Corporation ("Epic") has failed to present any evidence at trial to support each element of each of its claims against TCS. Accordingly, this Court should grant TCS judgment as a matter of law because a reasonable jury would not have a legally sufficient evidentiary basis to find for Epic on any of its claims against TCS.

**ARGUMENT**

**I.    LEGAL STANDARD**

The Federal Rules of Civil Procedure provide:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a

>claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). Under this Rule, "a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 745-46 (7th Cir. 2007) (affirming the grant of a defendant's Rule 50(a) motion at the close of the plaintiff's case in chief); *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001). "To avoid a directed verdict, the plaintiff must do more than argue that the jury might have disbelieved all of the defendant's witnesses. Rather, the plaintiff must offer substantial affirmative evidence to support her argument." *Heft v. Moore*, 351 F.3d 278, 284 (7th Cir. 2003). Further, "the party opposing the motion must have put forward more than a 'mere scintilla' of evidence to support [a] jury verdict." *Honaker*, at 484.

Epic failed to meet this burden. The Court, therefore, should enter judgment in TCS's favor.

## II. NO REASONABLE JURY COULD FIND THAT TCS MISAPPROPRIATED EPIC'S ALLEGED TRADE SECRETS

As the sole basis for its Wisconsin Uniform Trade Secrets Act ("WUTSA") claim, Epic contends that TCS violated the WUTSA by downloading without authorization thirty-six (36) files containing trade secrets (the "Alleged Trade Secrets"). At trial, however, Epic has failed to prove by a preponderance of the evidence (1) that TCS "disclosed" or "used" the Alleged Trade Secrets and (2) that the Alleged Trade Secrets are in fact trade secrets as defined by the WUTSA. As a result, TCS is entitled to judgment as a matter of law on Epic's WUTSA claim.

2

**A.     There Is No Evidence that TCS Disclosed or Used Epic's Alleged Trade Secrets**

The critical failure in Epic's case is its inability to produce any actual proof of "use" or "disclos[ure]" of Epic's Alleged Trade Secrets by TCS under the WUTSA. Under the WUTSA, misappropriation occurs, in relevant part, where one *discloses* or *uses* without express or implied consent a trade secret of another if the person did any of the following:

> (1) Used improper means to acquire knowledge of the trade secret.
> (2) At the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:
>> (a) Deriving it from or through a person who utilized improper means to acquire it.
>> (b) Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.
>> (c) Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.
>> (d) Acquiring it by accident or mistake.

Though Epic has presented testimony from 44 witnesses, not one witness testified that Epic's Alleged Trade Secrets were *actually used* in Med Mantra, DaVita, or any other TCS product. In fact, Epic's star witness, Phillipe Guionnet, conceded at trial that he had no actual proof that Epic's information was used in Med Mantra or DaVita and that his statements were just suspicions. (Rough Trial Tr., 4/5/16 at 380:1 – 381:12.) This lack of evidence of use was further supported by the admissions of Epic's CEO (Judy Faulkner), President (Carl Dvorak), and Senior Vice President (Stirling Martin) that they had no personal knowledge that Epic's information was used in Med Mantra or DaVita. (Rough Trial Tr., 4/4/16 at 392:20 – 393:3; Rough Trial Tr., 4/5/16 at 55:5-9, 55:25 – 56:12; 156:8-23.) At most, all Epic has done is blow smoke with regard to the downloading of its information by TCS employees. That is not enough to prove mere possession or potential for misuse. *See Sentry Pool v. Wave Tec Pools, Inc*., No. 07-4082, 2008 WL 3200837 (C.D. Ill. Aug. 6, 2008). An evaluation of the totality of the evidence presented at trial by Epic

3

fails to show any disclosure or use by TCS in connection with Med Mantra or any other aspect of TCS's business unrelated to its work for Kaiser.

### 1. The Evidence Is Clear That The Downloaded Information Was Used In Connection With TCS's Work For Kaiser

Though Epic has gone to great lengths in its attempt to string together tidbits of circumstantial evidence to show that TCS downloaded Epic's information for an improper purpose, the trial record clearly demonstrates that all of the TCS employees who accessed UserWeb did so with relation to their work for Kaiser. Specifically, Ramesh Gajaram testified that he only used the documents he downloaded from UserWeb for purposes of his work for Kaiser. (Rough Trial Tr., 4/6/16 at 91:19-11). Likewise, Aswin Anandhan stated that the downloaded information from UserWeb was used to assist with test case design and test case execution and was not used for anything other than his work for Kaiser. (Rough Trial Tr., 4/6/16 at 129:10-13). This is corroborated by the testimony of several of the testers doing work for Kaiser that accessed UserWeb for their Kaiser work. (*See* Dkt. 809, pp. 3, 5, 7-10; Dkt. 815, pp. 1, 4.) Moreover, Epic has adduced no evidence that any of the information contained in the comparative analysis was taken from Epic's Alleged Trade Secrets or that any of the Med Mantra developers ever saw the comparative analysis. Not one witness testified that Epic's Alleged Trade Secrets were used to create the comparative analysis.

Epic simply has not established that its Alleged Trade Secrets were used for any other reason other than in TCS's work for Kaiser. As such, its WUTSA claim against TCS fails and judgment should be entered in TCS's favor.

4

### 2. There is No Evidence That TCS "Used" Epic's Alleged Trade Secrets In Connection With Med Mantra Or Any Other TCS Product

Likewise, the record is void of evidence that TCS disclosed or used Epic's alleged trade secrets in connection with Med Mantra or any other TCS product. There is absolutely no evidence that any of the downloaded information, including the Alleged Trade Secrets, was used in connection with the development of any TCS product. In fact, several of the witnesses testified specifically that they either had no knowledge of Med Mantra or DaVita at all or only heard of them during or after TCS's investigation. (*See* Rough Trial Tr., 4/6/16 at 90:25 – 91:10, 129:1-9; Dkt. 809, pp. 2, 4, 8-10; Dkt. 815, pp. 2, 4.) As a result, TCS is entitled to judgment as a matter of law on this claim.

### B. Epic's Own Evidence Shows That It Failed to Maintain the Secrecy of the Alleged Trade Secrets

A claim for trade secret misappropriation requires the clear identification of a trade secret and evidence of misappropriation by the defendants. *See* Wis. Stat. §134.90. Moreover, in order to qualify as a trade secret, a plaintiff must, among other things, prove that the alleged trade secret is "the subject of efforts to maintain its secrecy that are reasonable under the circumstances. Wis. Stat. §134.90(1)(c). *See also Servicios Technologicos De Guat. v. Woccu Servs. Group*, 2014 U.S. Dist. LEXIS 107092, at *9-10 (W.D. Wis. Aug. 5, 2014); *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 852 (Wis. 1989). The evidence presented at trial is clear that Epic exerted minimal effort to maintain the secrecy of the Alleged Trade Secrets. Therefore, such information does not meet the definition of a trade secret under the WUTSA.

At trial, Epic's Senior Vice President and Acting Chief Security Officer, Stirling Martin, testified that Epic attempted to maintain the secrecy of the Alleged Trade Secrets by the use of "lengthy legal agreements" with consultants and customers, copyright labels on some, but not all,

5

of the information contained on UserWeb, and a simple two-step process for determining who will be granted access to UserWeb. Even considered together, these efforts are not sufficient to warranted trade secret protection under the WUTSA

First, confidentiality agreements in and of themselves are not sufficient to establish that reasonable efforts were made to maintain the secrecy of the Alleged Trade Secrets. *See Fleetwood Packaging v. Hein*, 2014 U.S. Dist. LEXIS 172540, at *13 (N.D. Ill. Dec. 15, 2014) ("a confidentiality agreement itself is… insufficient to imbue [information] with secrecy"); *Coyne's & Co. v. Enesco, LLS*, 2010 U.S. Dist. LEXIS 83630, at *43-44 (D. Minn. Aug. 16, 2010) (noting that plaintiff submitted no evidence of the steps it took to maintain confidentiality, beyond the fact that defendant filed a non-disclosure agreement); *Aubin Indus. v. Smith*, 2007 U.S. Dist. LEXIS 65950, at *39 (S.D. Ohio Sept. 6, 2007) ("A confidentiality agreement between two private parties is not enough, standing alone, to establish trade secret protection"); *RogersCasey, Inc. v. Nankof*, 2003 U.S. Dist. LEXIS 6960, at *15 (S.D.N.Y. Apr. 24, 2003) ("The mere fact that defendants signed confidentiality agreements is insufficient to demonstrate that the identified client information was kept secret"). Significantly, Mr. Martin testified that only *customers* sign confidentiality agreements with Epic and that Epic does not require customer *employees* to sign confidentiality agreements or fill out something additional. (*See* Rough Trial Tr. 4/4/16 at 443:14-24.) Instead, Epic relies on its customers to ensure the confidentiality of its Alleged Trade Secrets. (Rough Trial Tr., 4/4/16 at 443:20-24.)

Second, the use of copyright labels on some documents on UserWeb shows no real effort to maintain secrecy. Mr. Martin testified that some, but not all documents on UserWeb, had a label on them that stated that some of the information contained confidential material that must be kept confidential, but did not identify which material was confidential. (*See* Rough Trial Tr.,

4/5/16 at 85-86). Significantly, Mr. Martin did not testify that any of the Alleged Trade Secrets were among those documents that contain a copyright label.

Third, Epic's vetting process used before granting permission to access UserWeb is nothing more than pro forma, accomplishing little. Mr. Martin testified at trial that all an individual has to do to get access to UserWeb is to provide his name and affiliation which Epic "verifies" by checking a list of known domains that belong to their customers to ensure that the individual is using a customer email address. (*See* Rough Trial Tr., 4/4/16 at 435:13 – 437:12.) This, Mr. Martin claims, somehow helps Epic determines if the applicant is a customer employee. (*Id.*) In terms of monitoring continuing eligibility to access UserWeb, Epic's efforts to limit access are equally anemic. All it supposedly does is to verify the email address of individuals with UserWeb access each quarter to ensure that such an individual is still an employee of an Epic customer authorized to have access. (*Id.*, pp. 455:22 – 456:24). These efforts are obviously insufficient. It is undisputed that TCS employee, Ramesh Gajaram used the UserWeb credentials he obtained while a CSC employee to access UserWeb for *15 months* before Epic terminated his access. Astonishingly, Epic repeatedly reinstated Mr. Gajaram's UserWeb credentials, even after Mr. Gajaram informed Epic that he was associated with TCS starting in 2011 and every three months thereafter as part of Epic's password renewal process. (Rough Trial Tr., 4/6/16 at 89:2-10). Epic clearly did not make much effort to guard its top secret "secrets."

Lastly, Epic does not limit access to UserWeb to only those employees of its customers who need access to do their jobs. Epic specifically conceded at trial that, at any given time, between 1,000,000 and 2,000,000 people could have access to the information contained on UserWeb, including the Alleged Trade Secrets if they merely provide their name and affiliation – even if they did not need access to do their jobs. (*See* Rough Trial Tr., 4/4/15 at 435:13 – 437:12.)

7

Epic's vetting system did not include verifying with customers that an employee applicant needed access to do his/her job but instead relied entirely on the efforts of their customers to guard Epic's Alleged Trade Secrets. Opening up one's "crown jewels" to that many people, many of whom would not need to access UserWeb for their job, and relying on their customers to police its "top secret" information is not evidence of an effort to maintain secrecy but is, to the contrary, clear evidence that Epic was reckless with its Alleged Trade Secrets and did not sufficiently preserve the secrecy of the information. How Epic can now claim that it maintains the secrecy and confidentiality of this information when it allows millions of people access to its "crown jewels" is incomprehensible.

In sum, the evidence regarding "secrecy" efforts shows that Epic's practices were, at best, reckless. They certainly are not sufficient to show that the Alleged Trade Secrets were the subject of reasonable efforts to maintain their secrecy. Epic failed to establish this element of its claim and TCS is entitled to judgment as a matter of law on Epic's WUTSA claim.

## II.     THERE IS NO EVIDENCE OF UNFAIR COMPETITION OR UNJUST ENRICHMENT

A key element of Epic's unjust enrichment and unfair competition claims is proof of use of something belonging to Epic that is used to benefit TCS at Epic's expense. Epic failed to present sufficient evidence to establish these elements.

### A.     Any Accessed Epic Information Did Not Benefit TCS Because TCS Never Used It for Med Mantra, DaVita, or Any Other Product

In order to establish a claim for unjust enrichment under Wisconsin law, Epic is required to establish "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the

8

benefit without payment of its value." *Gebhardt Bros. Inc. v. Brimmel*, 31 Wis.2d 581, 584 (Wis. 1966). In this case, Epic believes that the benefit conferred on TCS is the key to its software supposedly contained within the downloaded information that would let TCS develop competing software at a much lower cost. Such a "key," however, is only a benefit if it has been used. In the absence of evidence of use for Med Mantra, DaVita, or any other TCS product, there can be no benefit conferred. *Edgenet, Inc. v. GS1, AISBL*, 742 F. Supp. 2d 997, 1032 (E.D. Wis. 2010) ("The only way in which information obtained can support the existence of a benefit to defendants is if such information is put to use in a way that destroys plaintiff's competitive advantage.") That is, the value of the information is its use, not simply in its retention. As discussed above, Epic presented no viable evidence of use of its information for the development or enhancement of Med Mantra, DaVita, or any other TCS product and, therefore, its unjust enrichment claim must be dismissed.

Moreover, to the extent Epic attempts to base its unjust enrichment claim on any potential benefit TCS may receive in the future, courts consistently hold that future benefits cannot be the basis of an unjust enrichment claim. *See e.g.*, *PMX Jewels Ltd. V. Ruvanni Inc.*, 2014 U.S. Dist. LEXIS 60420, *6-7 (E.D. Pa. Apr. 30, 2014) ("It is clear that a potential future benefit is insufficient to satisfy the first element of an unjust enrichment claim"); *Thomas v. Lehighton Emergency Med. Assocs., P.C.*, 2012 U.S. Dist. LEXIS 114812, *11-12 (M.D. Pa. Aug. 15, 2012) ("the alleged benefit that [Defendants] could receive in the future is irrelevant because to establish an unjust enrichment claim, it must be shown that the benefit has already been conferred"); *Froom-Lipman Group, L.L.C. v. Forest City Enter*s., 747 F. Supp. 2d 891, 901, 2010 U.S. Dist. LEXIS 101521, *26 (N.D. Ohio 2010) ("a mere expectation of compensation alone does not and cannot entitle plaintiff to unjust enrichment damages, much less damages on

9

unsupported and hypothetical future benefits"); *Trianco, LLC v. Int'l Bus. Machines Corp.,* 583 F.Supp.2d 649, 655 (E.D.Pa.2008) aff'd, 347 F. App'x 808 (3d Cir.2009) ("[O]ne cannot allow a party to recover under unjust enrichment for the performance promised in order to secure the 'hoped-for' contract and future negotiations."); *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 3006831, at *12 (W.D.Pa. Nov.9, 2005) (rejecting an argument based on the potential future benefit that a party may receive because "to establish an unjust enrichment claim, it must be shown that [a] benefit has already been conferred"); *Scaramuzza v. Sciolla*, No. Civ. A. 04-CV-1270, 2004 U.S. Dist. LEXIS 18709 (E.D. Pa. Sept. 14, 2004) (characterizing unjust enrichment as "a retroactive equitable remedy," and noting that "[i]t is well established that an unjust enrichment action will fail based on the allegations of future benefits"); *Mina Inv. Holdings Ltd. v. Lefkowitz,* 51 F. Supp. 2d 486, 490 (S.D.N.Y. 1999) (finding that plaintiff's allegation that defendant "may" become unjustly enriched in the future is insufficient to state an unjust enrichment claim); *Axel Johnson, Inc. v. Arthur Anderson & Co.,* 830 F.Supp. 204, 211–12 (S.D.N.Y.1993) ("No cause of action for unjust enrichment lies in hypothetical future liabilities."); *Gov't Guaran* tee *Fund of Republic of Finland v. Hyatt Corp.,* 955 F.Supp. 441, 460 (D.Vi. 1997) ("[N]o claim of unjust enrichment lies for 'hypothetical future liabilities.' ") (quoting *Axel,* 830 F.Supp. at 212).

TCS is entitled to judgment as a matter of law on Epic's unjust enrichment claim.

**B. Any Accessed Epic Information Cannot Form the Basis of an Unfair Competition Claim Because The Evidence Shows That TCS Never Used It In Competition With Epic**

"[T]he essence of [an unfair competition cause of action] is the *defendant's use* of the plaintiff's product, into which the plaintiff has put time, skill, and money; and the *defendant's use* of the plaintiff's product or a copy of it in competition with the plaintiff and gaining an advantage

10

in that competition because the plaintiff, and not the defendant, has expended the energy to produce it." *Mercury Record Prods. v. Econ. Consultants, Inc*., 64 Wis. 2d 163, 175 (Wis. 1974) (emphasis added).

Again, Epic has presented no evidence that TCS used any of the downloaded information to compete with Epic. As such, the Court should order a directed verdict in TCS's favor on this claim.

### III. EPIC HAS NOT PRESENTED EVIDENCE OF INJURY TO BUSINESS

Although Epic has asserted a claim for injury to business, it appears to have abandoned this claim at trial. There is no evidence in the record establishing key elements of this claim. TCS is entitled to judgment as a matter of law.

Section 134.01 provides:

> **Injury to business; restraint of will**. Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $ 500.

Wis. Stat. § 134.01. "Both categories of section 134.01 require malice. *Maleki v. Fine-Lando Clinic Chartered, S.C*., 162 Wis. 2d 73, 86 (Wis. 1991) "Thus, malice is an integral element [of an injury to business claim] that must be proved in respect to either portion of the statute and must be proved in respect to both parties to the conspiracy. There can be no conspiracy if malice is not found in respect to both conspirators. *Id.*

As an initial matter, Epic has presented absolutely no evidence of an alleged conspiracy between Tata America and TCS India. Nor has it presented evidence that either party acted maliciously in carrying out such conspiracy. For conduct to be malicious under

11

§ 134.01, "it must be conduct intended to cause harm for harm's sake." *Id.* Wisconsin courts interpret "maliciously injuring to import doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a mean to some further end legitimately desired such as hurting someone's business by competition" *Id.* at 87-88.

There can be no recovery on Epic's injury to business claim if it has not even attempted to present evidence that both Tata America and TCS India acted together, both with a malicious intent to harm Epic for harm's sake. TCS is entitled to judgment as a matter of law.

## IV. TCS DID NOT DEPRIVE EPIC OF ITS PROPERTY

Epic has asserted a deprivation of property claim under Wis. Stat. § 895.446. That statute provides a civil remedy for, as relevant here, theft of movable property in violation of Wis. Stat. § 943.20. Under the plain meaning of that statute, the property at issue here – data, codes, information in general that have no physical presence and cannot be touched—is not movable property and cannot be the basis of a sec. 895.446 claim as a matter of law.

To understand what moveable property is for the purpose of determining whether sec. 943.20 applies, one must first look to the definition of property set forth in that statute. This must be the starting point because a basic canon of statutory construction assumes that identical words used in different parts of the same statute are intended to have the same meaning. *Sorenson v. Sec'y of Treasury,* 475 U.S. 851, 860 (1986); *Dore v. City of Milwaukee,* 42 Wis. 108, 112-113 (1877). Thus, in understanding the definition of "movable property," one must understand the definition of "property." The statute defines it as follows:

> (2)(b) "Property" means all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights.

"Tangible" is not defined in the statute. Therefore, despite Epic's argument to the contrary, resort to a dictionary definition is in fact appropriate. *Carmichael v. Payment Cntr, Inc.,* 336 F.3d 636, 640 (7th Cir. 2003); *State v. Steffes,* 2013 WI 53, ¶ 26, 347 Wis.2d 683, 832 N.W.2d 101 (2013) (interpreting statute based on "[a] straightforward reading of this statute combined with the use of dictionaries"). Dictionary.com defines "tangible" as something that is capable of being touched or is discernible by touch. Dictionary.com, http://www.dictionary.com/browse/tangible?s=t (last accessed April 10, 2016).

Putting together the definitions of property, tangible and moveable property, as properly taken from the statute and from the dictionary, the definition of movable property is as follows:

> Property that may be touched whose physical location can be changed, without limitation including electricity and gas, documents which represent or embody intangible rights, and things growing on, affixed to or found in land.

There is no question that Epic's information does not fall within this definition. The information in and of itself cannot be touched and is not discernible by touch and is not covered by the statute.

In opposing TCS's efforts to have this claim dismissed, Epic has complained that TCS's position would read the provision that provides protection to documents containing intangible property out of the statute. Epic is wrong on this as well. This provision makes it clear that intellectual property—intangible rights—is not covered by the statute. If it was covered, there would be no need to have a provision specifically stating that it was. The purpose of this provision is merely to make it clear that documents—tangible property—do not lose the protection of the statute merely because they contain intangible information, nothing more, nothing less.

The bottom line is that Epic's electronic records and the information in those records are not movable property. Epic has no claim under sec. 943.20 as a matter of law.

Epic's deprivation of property claim also fails because Epic has failed to produce any evidence to support two elements of the claim: deprivation of property in the first instances and intent to deprive of property permanently.

First, it is undisputed that Epic still has access to all of its alleged trade secrets and confidential information. There is no evidence to the contrary. Indeed, Epic actually paraded around the courtroom with "bankers boxes" full of documents (tangible) which contain the information (intangible). Possession of information is not a zero sum game. Two people, indeed millions of people, can access the same information at the same time. Contrast this with electricity, a type of property that is expressly covered by 943.20. If I take your electricity, you no longer have it. You cannot share it without losing some of it yourself.[1] Nothing has interfered with its possession of the information. Again, the statute simply does not apply.

Second, Epic did not present any evidence from which an intent to deprive Epic permanently can be inferred. The people who accessed this information did so to do their work for Kaiser, not because they wanted to take information permanently from Epic so that Epic could no longer use it. Indeed, it would be illogical to set about trying to do so because, as discussed, accessing Epic's information does not deprive them of the information by any stretch of the imagination.

---

[1] That is why it makes sense to include electricity as tangible property covered by the statute—one can be denied permanent possession of it—but not Epic's information.

14

In sum, sec. 895.446 does not apply as a matter of law and Epic has failed to put forth evidence on at least two elements of this claim. For these reasons, TCS is entitled to judgment as a matter of law against Epic.

## V. THERE IS NO EVIDENCE IN THE RECORD THAT TCS ACTED WITH INTENT TO INDUCE EPIC TO RELY ON ANY REPRESENTATION OF FACT TO ITS PECUNIARY DAMAGE

As set forth in the Court's jury instructions for the fraudulent misrepresentation claim, Epic must prove, among other things, that TCS intended to induce Epic to rely on any alleged misrepresentation of fact to its pecuniary damage and that Epic justifiably relied on any such misrepresentation. (Closing Instructions at p. 6.) Epic has failed to meet its burden.

Epic presented no evidence of an intent on the part of anyone to induce Epic to do something that would cause it economic harm. The only evidence of intent was supplied by the testers that testified that their only intent was to get the information they needed to do their job for the parties' mutual customer, Kaiser. That's it. There simply is no evidence to support this element of Epic's fraudulent misrepresentation claim.

## VI. EPIC PRESENTED NO EVIDENCE THAT TCS ENGAGED IN ANY OF THE CONDUCT IT ALLEGES BREACHED THE STANDARD CONSULTING AGREEMENT OR BREACHED ANY DUTY OF GOOD FAITH AND FAIR DEALING

Epic maintained at the outset of trial that TCS breached four different provisions of the Standard Consulting Agreement and breached its duty of good faith and fair dealing by the same conduct. No reasonable jury could find for Epic, however, because Epic failed to submit evidence that alleged conduct forming the basis of the alleged breaches occurred.

At trial, Epic was required to establish by a preponderance of the evidence that TCS breached the Standard Consultant Agreement by failing to (1) limit access or solely use UserWeb

15

documents for Kaiser's behalf or (2) maintain the confidentiality of Epic's confidential information. Epic has failed to present evidence proving breach of either provision.

As stated more fully above, the trial record is clear that all of the TCS employees who accessed UserWeb did so with relation to their work for Kaiser. Moreover, not one witness testified that information from Epic's UserWeb was used to create the comparative analysis. Nor is there any evidence that the Med Mantra developers ever saw the comparative analysis. Epic simply has not established that its information was used for any other reason other than in TCS's work for Kaiser. As such, its breach of contract claim against TCS fails and judgment should be entered in TCS's favor.

Moreover, this Court has already held on summary judgment that TCS breached the Standard Consultant Agreement by (1) failing to provide written notice of repeated unauthorized access as required under the contract and (2) failing to maintain in confidence information and store copies in a secure place. As Epic has presented no evidence that TCS has committed a breach independent of the Standard Consultant Agreement, such claim is duplicative of its breach of contract claim, which this Court has ruled on. As such, TCS is entitled to a directed verdict on this cause of action.

## VII. EPIC FAILED TO PRESENT EVIDENCE THAT TCS ACTED WITH INTENT TO DEFRAUD

To prove its federal Computer Fraud and Access Act password trafficking claim, Epic was obligated to present evidence that TCS employees who shared passwords acted with an intent to defraud Epic. (Closing Instructions at p. 6) It failed to do so. The only evidence regarding the motive of the individuals who shared passwords is that they were doing so to enable them to do their jobs for Kaiser. That's it. But that is not sufficient. TCS is entitled to judgment as a matter of law on this claim as well.

**CONCLUSION**

For all of the reasons set forth above, TCS respectfully requests that the Court grant its Rule 50 motion and issue a ruling that, on the basis of the evidence presented by Epic at trial, Epic's claims against TCS fail as a matter of law. TCS further requests that the Court grant TCS such other and further relief as the Court deems just and proper.

Dated: April 11, 2016

                                      By: s/Philip D. Robben
                                          Paul F. Doyle
                                          Philip D. Robben
                                          Alison L. MacGregor
                                          Melissa E. Byroade
                                          KELLEY DRYE & WARREN LLP
                                          101 Park Avenue
                                          New York, New York 10178
                                          Email: pdoyle@kelleydrye.com
                                          Email: probben@kelleydrye.com
                                          Email: amacgregor@kelleydrye.com
                                          Email: mbyroade@kelleydrye.com
                                          Phone: (212) 808-7800
                                          Fax: (212) 808-7897

                                          and

                                          s/Barbara A. Neider
                                          Barbara A. Neider
                                          Meg Vergeront
                                          STAFFORD ROSENBAUM LLP
                                          222 West Washington Avenue, Suite 900
                                          P.O. Box 1784
                                          Madison, Wisconsin 53701-1784
                                          Email: bneider@staffordlaw.com
                                          Email: mvergeront@staffordlaw.com
                                          Phone: (608) 256-0226
                                          Fax: (608) 259-2600

                                          *Attorneys for Defendants Tata Consultancy Services Limited and Tata America International Corporation*