IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION,

                Plaintiff,                          OPINION AND ORDER

    v.                                                  14-cv-748-wmc

TATA CONSULTANCY SERVICES
LIMITED and TATA AMERICA
INTERNATIONAL CORPORATION d/b/a
TCA America,

                Defendants.

---

With respect to plaintiff Epic's proffer on evidence of compensatory damages in advance of the possible, next phase of trial, the court rules as follows:

## I. Components of Epic's Claim to Compensatory Damages

During yesterday's proffer on damages, Epic indicated that it has two components to its claim of damages, both of which are based on a measurement of benefits unfairly obtained by TCS. The first is based on the claimed value of a service contract that TCS renewed with Kaiser for three years (though terminated after one), a component of damages which it appears Epic should have expressly disclosed by separate amount and description in response to an interrogatory in December of 2015, but did not. (Def.'s Notice (dkt. #846-1) at 4-6.) Moreover, it appears Epic had still not disclosed *any* amount, or even its method for arriving at an amount, for this component of its damage claim until well after the start of the actual trial of this case. (Pl.'s Resp. (dkt. #851).) If this is so, that component of damages would appear appropriately excluded.

In a proffer offered last night, Epic essentially concedes these facts of record, but asserts that since both sides took substantial discovery on the advantages gained by testers who had unrestricted and unlawful UserWeb access, as well as Epic's experts repeated references to that advantage, a last-minute separate claim to damages in a specific amount should be no surprise and, in any event, TCS is not prejudiced from having to reply. The court will hear from TCS on both points, but as to the latter, accepts TCS's representation that it has already sent some of the relevant witnesses home to India, and of course the most relevant witness would be Kaiser itself, since the claim is that the testers performance was a driver for Kaiser's decision to renew its contract with TCS. Even if TCS were allowed to call some of its witnesses by video conferencing from India, Epic offers no indication that Kaiser was even asked about its reasons for renewal, and it would seem unlikely that someone from Kaiser would be available at the last minute to testify, even by video conferencing. If Epic could somehow clear these hurdles, however, the court would consider allowing it to claim damages for the value of the one year life of that contact in the next phase of trial.

The second component of the value is for Epic's confidential information, including trade secrets.[1] Apparently because of an absence of other proof, Epic's theory of recovery here does not distinguish between its claims in the context of breach of

---

[1] Actually, Epic would breaks this component into two parts: (1) the value of the comparative analysis (Ex. 39) and (2) the value of what it called during yesterday's hearing the acquisition and possession of its trade secrets and, in its brief early this morning, "improv[ing] the data model, flow, and architecture of its competing electronic medical records software." Since Epic's principal damages expert does not differentiate between the benefits conferred (or unjust enrichment) attributable to each, but rather assigns a total sum for both, the court will treat them together as well.

contract and the misappropriation of trade secrets (or its other common law tort claims, besides unjust enrichment), for which it might have made claim to the value of the product from Epic's perspective, and in the context of unjust enrichment, for which it must claim the value of the product from TCS's perspective.

The Wisconsin Supreme Court underscored the distinction between the damages available in a contract implied-in-fact or quantum merit claim and a contract-implied-on-law or unjust enrichment claim in *Ramsey v. Ellis*, 168 Wis. 2d 779, 484 N.W.2d 331 (1992). *See generally* II Michael B. Apfeld *et al.*, *Contract Law in Wisconsin* Ch. 14(C)(3)(a) (4th ed. 2014). Whereas a quantum merit claim assesses damages from the perspective of the market value of the plaintiff's goods or services, an unjust enrichment claim focuses on value of the benefit obtained by the defendant. *Id.* Epic's choice to limit its damages claim to the value of the benefit to TCS is understandable. Indeed, given that a quantum meruit or contract implied-in-fact theory is premised on proof "that the defendant requested the [plaintiff's] services," *Ramsey*, 484 N.W.2d at 333, a claim that TCS stole (or at least wrongfully took) confidential information or trade secrets proves an ill fit, since Epic must show injury in order to seek the value to Epic of the confidential information, including trade secrets, TCS obtained by accessing and downloading documents from the UserWeb. *See Sokol Crystal Products, Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1433 (7th Cir. 1994) (explaining that any damages for misappropriation of trade secrets must be limited to plaintiff's injury).

Absent evidence that Epic was somehow precluded from using the same confidential information -- which is obviously not the case -- or that TCS used the information in a way that placed it on equal footing with Epic -- something also not in evidence at least to this point -- Epic cannot prove injury. Stated another way, regardless of whether Epic pursued a damages claim based on the value of the benefit conferred on TCS or the value of the information from Epic's perspective, Epic would need to show use.[2]

## II. Proffer of Value to TCS

Unfortunately for Epic, there is also insufficient proof to permit an award of damages on the basis of unjust enrichment as well, leaving injunctive relief, and perhaps further discovery, as its remedy for any liability finding by the jury, unless Epic's experts could propose a *credible* reduction in its cost "proxy" to reflect very limited evidence of any *actual* benefit to TCS. Absent use, the mere threat of use is better addressed through an injunction. *See 3M v. Pribyl*, 259 F.3d 587, 605 (7th Cir. 2001) ("[E]ven assuming that the defendants knew 3M's customized resin formulations, 3M is sufficiently protected against the threat of disclosure by the district court's injunction."); *see also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010) (holding that hypothetical future profits is an inappropriate measure of unjust enrichment damages).

---

[2] Perhaps Epic could demonstrate some other injury based on discrete breaches for failing to give notice or failing to maintain confidential information in a safe place, but Epic does not proffer *any* evidence of more discrete injuries or resulting damages. Instead, it opted to pursue an over-arching damages theory premised on the claimed value of the benefit obtained by TCS.

Under the theory Epic opted to pursue, its principal damages expert, Thomas Britven, purports to derive the value of *TCS's* unjust enrichment or unfair taking by using *Epic's* cost of researching and developing the confidential information, including trade secrets, as a "proxy" for TCS's avoided research and development costs. (Britven Suppl. Rept. (dkt. #673-4) ¶¶ 36-47.) As a starting point, Wisconsin courts typically reject plaintiff's costs as a basis for awarding unjust enrichment damages. *See Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009), *as amended* (Mar. 18, 2009) ("The measure of damages under unjust enrichment is limited to the value of the benefit conferred on the defendant; any costs the plaintiff may have incurred are generally irrelevant.") (citing *Mgmt. Computer Servs., Inc. v. Hawkins*, 206 Wis.2d 158, 557 N.W.2d 67, 79–80 (1996)). Still, the court credits Epic's argument that a misappropriation of trade secrets and related tort claims call for a flexible approach to damages, particularly when the defendants are to blame for much of its inability to provide concrete evidence. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) (describing various approaches under flexible approach). Still, the complete lack of evidence tying the costs of Epic's research and development efforts to any commensurate benefit to TCS dooms its methodology.

In conducting his analysis, Britven began with the total "man hours" expended by Epic in research and development ("R&D") of its EHR solution from 2005 through 2014, and then converted that number into a dollar amount based on hourly rates. (*Id.* at ¶¶ 36-37.) Britven divided those research and development costs into approximately 50 of Epic's software modules. (*Id.* at ¶ 38.) Then, relying solely on input from Epic's

5

Senior Vice President, Stirling Martin, Britven accepts all but two of the software modules as implicated by TCS's downloading of documents and adopts Martin's approximation of the percentage of each module's total confidential information not appropriated by TCS, for which he removes 4.8 million man hours (the so-called "X" Analysis). (*Id.* at ¶¶ 38-42; *see also id.*, Suppl. Attachment 5.0 (dkt. #673-4) 98.) From all of this, Britven then determines the cost of research and development for the misappropriated confidential information, including trade secrets. (*Id.* at ¶ 43.)

In his preliminary report, Britven indicated that he also would need to discount this number further after another of Epic's experts, Wes Rishel, a software developer, determines the "corresponding technical areas of TCS EHR product enhanced by Epic's trade secrets and confidential information." (Britven Prelim. Rept. (dkt. #380-7) ¶ 119.) However, because Rishel proved unable to do that for various reasons -- including TCS's failure both to preserve certain evidence and to produce other evidence timely -- Britven ultimately concluded that the benefit conferred on TCS need not be limited to TCS's use of Epic's confidential information in a "technical fashion in Med Mantra and related [HIS] products." (Britven Suppl. Rept. (dkt. #673-4) ¶ 50.) Rather, he opines that since the information taken includes the value of "what *not* to do," and the value of what to do now permeates all parts of TCS, the benefits "surpass the finite values associated with what was technically incorporated into its product." (*Id.*) Britven also points to TCS's possession of confidential knowledge of most of Epic's modules, as evidenced by the existence of a comparative analysis (Trial Ex. 39) and apparent discussions between TCS's Kaiser "tester" team and members of its Med Mantra team (Tr. Ex. 423), as well

6

as allowing the wholly unexplained access to Epic's UserWeb to at least one member of that latter team, allows the jury to infer TCS's use of this information in preparing to compete in the United States market for EHR software to grow their business for such software internationally.  (*Id.* at ¶ 51.)

Britven then claims to have somehow accounted for the complete lack of proof of any specific use of Epic's confidential information in the development or improvement of TCS's software (even with respect to *one* of the 50 modules involved), as well as recognizing that whatever it is that TCS did get, it got *zero* source code (and uses an entirely different software language than Epic in any event), by reducing his costs calculation by 4.2 million additional man hours, with Rishel's input.  Finally, Britven purports to discount his cost figure by approximately 50% to reflect a four-year "half-life" of the downloaded information in recognition that as technology advances, the cost of similar R&D would have declined.   (Britven Suppl. Rept. (dkt. #674-3) ¶¶ 44-47.)

[redacted chart]

(Britven Proffer Slides (dkt. #849-1) 3.)

Any reasonable consideration of Britven's damage opinion begins and ends with the fundamentally flawed assumption that TCS actually used Epic's confidential information for competitive advantage, something repeated during his proffer:

> I do know from a general business perspective that these -- and from what I have heard, okay? -- that these trade secrets and confidential information have been disseminated through the enterprise and they're embedded within TCS, okay?
>
> And now I look to my business experience, okay? And I ask the question: how would that information be used in the

7

>normal course of business? Well, this information will not [have] been used just like other information.
>
>. . .
>
>What I heard is the information is spread throughout the enterprise.
>
>. . .
>
>And then from a business perspective, if this information is within the enterprise, okay, it will be treated like other information within the enterprise to run the business, whether it be from a sales or marketing, okay, from a product planning, product development, pricing, competitive analysis. It would just be used like everything else in the business.

(4/13/16 Unofficial Rough Draft Tr. at 8-P-12 to 8-P-13.) Britven purports to reach this conclusion on his own, pointing to documents suggesting that TCS would like to develop a competitive software product to Epic's and his understanding that the information taken would facilitate its doing so at a substantially faster pace.

Mainly, however, the assumption is based on a series of "facts" he was directed to accept as true, but for various reasons (again, in substantial part due to defendants' failures to live up to its discovery obligations), Epic was not able to prove. Indeed, the only evidence that defendants actually used any of the confidential information downloaded from its UserWeb is an already fairly dated general comparison of modules available in Epic's software and a more rudimentary software product sold by TCS in India called "Med Mantra," as well as a related discussion. The remainder is based on Epic's speculation that the confidential information is sitting on a shelf somewhere to be used immediately after this trial ends.

8

Not only has Epic been unable to proffer any evidence that this comparison was in fact used in some way to improve the Med Mantra product (or, for that matter, other TCS HIS products now being marketed in India, Africa and apparently the Middle East), but there is *no* evidence of any kind that the bulk of the other confidential information downloaded by TCS and principally used to support a service contract for *Epic's* software use by a mutual client, Kaiser Permanente, found its way to *anyone* on the Med Mantra or other TCS HIS team member actually engaged in the development of that software. As such, Britven offers a nearly [redacted] dollar benefit estimate for pieces of software for various modules developed for Epic's use without a single, concrete example as to how it was used in the research and development of a single feature offered (or for that matter not offered) in a competing TCS product.

Moreover, there is substantial evidence in this record that would lead a reasonable trier of fact to conclude the cost of development of this software is only a good approximation of its value to *Epic*, who after all continues to use it, benefit from it and improve it, including through on-site teams at each of its individual customers, with whom it has unique, ongoing relationships built over many years and, in some cases, decades. Not so for TCS. First, it is readily conceded by Epic that the information taken was incomplete as to every module and included none of the software code, albeit for a number of modules (in Mr. Martin's estimation), the confidential information that was obtained amounts to as much as 90% of what would be needed to develop the module, at least through 2014. Second, Britven concedes that much of the attributed value for this

9

software is not based on any current product, marketing strategy or sales by TCS, but rather on how it *might* be used in the future.

Not only are assumptions about future use barred in an unjust enrichment calculation, but they are much better addressed by injunctive relief than by a speculative damage award. *See 3M,* 259 F.3d at 605-607 ("While vacating the jury award for misappropriation, the district court left intact the permanent injunction . . . [leaving 3M] sufficiently protected against the threat of a disclosure."); *Fail-Safe,* 744 F. Supp. at 898 ("awarding a share of hypothetical future profits as damages award for unjust enrichment is inappropriate"). Finally, there was substantial evidence establishing that the sophisticated software used by Epic is primarily designed to address the requirements of hospitals and other health care providers within the United States, a software product market TCS has yet to penetrate at all, other than its failed attempt to provide ongoing services to Kaiser and recent efforts to develop software with DaVita. If anything, after the entry of an appropriate injunction here, the likelihood of TCS succeeding in penetrating that market is even lower, and certainly lower absent an appropriate compensation to Epic for any inappropriate information that might actually be used in developing a product for the U.S. market. Accordingly, the tremendous additional time and effort required to take advantage of any confidential information that TCS may actually have retained (which is purportedly accounted for in Britven's expert report, with the benefit of Rishel's questionable estimates) would more likely make doing so

prohibitively expensive, or at least arguably require a substantially greater discount to arrive at its actual value to TCS.[3]

Even those few cases Epic's counsel was able to find that allowed a plaintiff to recover savings in research, development and marketing by looking to the plaintiff's original costs, did so based on proof that the savings were actually enjoyed by the defendant, *see, e.g., Salisbury Laboratories, Inc. v. Merieu X. Laboratories, Inc.*, 908 F.2d 706, 714-15 (11th Cir. 1990), and were already realized rather than "based on future gains." *Sonoco Products Co. v. Johnson*, 23 P.3d 1287, 1290 (Col. Ct. App. 2001).

The problem with Epic's approach is perhaps best illustrated in *3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001), a case cited by Epic in support of its unjust enrichment damages theory.

In *3M*, the court considered the district court's treatment of two trade secret claims (among other claims). As for the first trade secret, operating procedures and manuals, the Seventh Circuit affirmed the jury's finding of misappropriation and the damages award. In so holding, the court explained that there was significant evidence to support a finding that the defendant had obtained a "head start in their operation by using the trade secret knowledge." *Id.* at 596. "While it took 3M six years and countless resources in order to make its carrier tape operation efficient and profitable, Accu-tech was able to almost immediately operate its resin sheeting line effectively." *Id.* Moreover, there was further evidence of "significant similarities between 3M's carrier tape line and Accu-Tech's resin sheeting line, including the use of the same or similar equipment and

---

[3] Were this the principal flaw in Epic's proffer, the court might defer to the jury on this question, but for reasons already described, it is simply an additional concern.

11

materials." *Id.* From this, the district court "resolved that the jury had assessed damages based on what it would have cost the defendant to independently develop the trade secrets at issue." *Id.* at 607. While plaintiff, here, sets forth a similar approach to damages, what is missing is the *evidence of use* (or benefit) the expressly drove the *3M* decision at both the district and appellate court levels.

Indeed, in the same opinion, with respect to a different trade secret, one for a customized resin formula, the Seventh Circuit affirmed the district court's grant of judgment as a matter of law and order *vacating* the jury's damages award, because there was no evidence permitting a reasonable inference that the defendant used 3M's formula; to the contrary, "the evidence at trial specifically established that Accu-Tech was *not* using 3M's polystyrene resin." *Id.* at 605. The Seventh Circuit further reasoned that any threat of future use or disclosure was best remedied by the permanent injunction entered by the district court, which the Seventh Circuit left intact. *Id.*

Here, while there is no evidence of *non*-use -- the record is uncertain as to the extent TCS used the comparative analysis or other confidential information more generally to develop a competitive product -- nor is there evidence of the permeating use on which Britven relies in setting forth Epic's damages theory. In other words, while the court is open to a "use" theory which is broader than specific evidence that Epic's "confidential and trade secret information was incorporated into TCS's Med Mantra product" (Pl.'s Damages Br. (dkt. #852) 4), plaintiff must tie its damages theory to that use. Otherwise, all the jury has is Britven's assessment of the total value to TCS of Epic' confidential information without any way to discount that total value to reflect TCS's

12

*actual* benefit. *See 3M*, 259 F.3d at 605 (finding evidence of knowledge of trade secrets inadequate to show use for purposes of maintaining jury finding of misappropriation and damages award).

The court does not take lightly the decision to deny Epic an opportunity to present its unjust enrichment theory to the jury in this case. Indeed, were there any meaningful facts to support its claim that TCS had actually benefitted from the downloading of its trade secrets and other confidential information beyond testing Epic software for the parties' mutual client, Kaiser Permanente, the court would err in allowing the jury to hear this evidence. But there is no such evidence, at least beyond a single comparative document that looks more like a marketing piece than a serious effort at software development, subsequent follow up by marketers and the conclusory statements of a disgruntled TCS employee, whose observations could be, but were not, tested in any meaningful way. In particular, Epic appears to have proffered no evidence as to the value of the use of its confidential information by TCS's testers (at least on a timely basis), nor a reasonable measure of the possible value of any marketing comparisons done to date. Indeed, even if the court were to emphasize the need for the jury to only award damages arising out of actual, present injuries (not future, speculative injuries), (1) there is nothing in the expert's methodology that allows for a reasoned reduction from his bulk number (though he might have opined on how the jury could *meaningfully* do so), and (2) what proof of a concrete, existing competitive injury could there be when TCS has nothing but an experimental product in the U.S. and no proof of one in Europe, while Epic has no proven presence in Asia, Africa or the Middle East (if

the jury can even consider damages outside the U.S.). Instead, Epic swung for the fences by asking its damages expert to *assume* far broader use of its confidential information than the facts now support. At this point, that swing has not even cleared the infield.

The court will take up where that leaves us after receipt of the jury's verdict.

ORDER

IT IS ORDERED that Epic's present damages proffer is REJECTED without prejudice to further order of this court.

Entered this 14th day of April, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge