UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION, a
Wisconsin Corporation,

        Plaintiff,

     v.

TATA CONSULTANCY SERVICES
LIMITED, an Indian Corporation; and TATA
AMERICA INTERNATIONAL
CORPORATION (dba TCS AMERICA), a
New York Corporation,

        Defendants.

Case No. 14-CV-748

---

**EPIC'S OPPOSITION TO TCS'S MOTIONS
FOR JUDGMENT AS A MATTER OF LAW AS TO DAMAGES
AND TO STRIKE THE DAMAGES PHASE TESTIMONY
OF THOMAS BRITVEN AND STIRLING MARTIN**

---

2437265

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

EXECUTIVE SUMMARY ...........................................................................................2

ARGUMENT ................................................................................................................5

I.   The Court Properly Permitted the Damages Testimony of Mr. Martin and Mr. Britven. ...........................................................................................................5

    A.   The Court Has Broad Discretion in Managing Trial and Admitting Evidence. ...........5

    B.   Epic's Revised Damages Methodology Was Not Untimely or Prejudicial. .................6

II.   The Jury Was Entitled to Award Epic Damages Equivalent to the Value of the Trade Secrets and Confidential Information TCS Stole.......................................9

    A.   The Jury Was Entitled to Award Damages to Compensate Epic for TCS's Unjust Enrichment. ...........................................................................................9

    B.   The Jury Was Entitled to Award Epic the Value of the Benefit Conferred on TCS. ....................................................................................................................10

    C.   The "Avoided R&D" Methodology Was a Permissible Way to Calculate the Value of the Trade Secrets and Confidential Information TCS Stole, and the Jury Was Entitled to Employ that Method in Calculating Unjust Enrichment Damages.............................................................................................10

        1.   Under Wisconsin Law, a Plaintiff Need Not Show Use Where the Defendant Obtained the Property Through Tortious Conduct.............................11

        2.   The Value of Stolen Trade Secrets Does Not Depend on Whether the Defendant Used them Successfully or Profitably. .................................14

        3.   Avoided R&D Costs is an Appropriate Measure of the Value of Misappropriated Trade Secrets and Confidential Information. ............................18

III.   The Jury Properly Found that TCS Used Epic's Trade Secrets and Confidential Information, and Awarded Epic Damages for the Value of the Stolen Information..........20

    A.   TCS Faces a Heavy Burden in Setting Aside the Jury's Damages Verdict.................21

    B.   The Jury Was Clearly Instructed that it Must Find Use To Award Damages. ............24

    C.   Epic Presented Substantial Evidence of Use. .........................................................25

        1.   TCS Used Epic's Information to Develop its U.S. Entry Strategy.......................25

       2.  TCS Used Epic's Information to Prepare a Comparative Analysis. .......................29

          a.  The Jury Was Entitled to Find that TCS Used Epic's Confidential Information to Prepare the Comparative Analysis. ...........................................31

          b.  The Jury Was Entitled to Find that TCS Used Epic's Trade Secrets in Preparing the Comparative Analysis. ..............................................36

              1)  TCS Forfeited its Ability to Challenge Epic's Trade Secret Claim for Lack of Specificity. ..............................................................36

              2)  Epic Presented Sufficient Evidence that TCS Used its Trade Secrets to Prepare the Comparative Analysis. ...........................................37

          c.  TCS's "Use" Argument Fails as a Matter of Law and, in Any Event, There Was Sufficient Evidence for Jurors to Infer that TCS "Used" the Comparative Analysis. ....................................................................41

       3.  TCS Used Epic's Information to Improve Its Medical Software Products. ..........45

       4.  The Adverse Inference Instruction Permitted the Jury to "Assume" Epic's Information was Used for an Improper Purpose. ....................................49

    D.  The Jury's Role Was To Weigh the Competing Evidence, and It Was Entitled to Find it More Likely than Not that TCS Used Epic's Trade Secrets and Confidential Information. ......................................................54

IV.   The Jury's Award of $240 Million for the Value of the Property TCS Obtained was Reasonable and Supported by the Evidence. ..............................................56

    A.  The Jury Had a Reasonable Basis for the $140 Million It Awarded for the Benefit TCS Obtained From the Information It Took and Used to Prepare the Comparative Analysis. ..............................................................57

    B.  The Jury Had a Reasonable Basis for the $100 Million It Awarded for the Benefit TCS Obtained From the Rest of the Information It Took and Used to Formulate a US Entry Strategy and Improve Its Competing Software Products. ....................................................................................60

V.    TCS Is Not Entitled to Judgment as Matter of Law as to Damages for the Remaining Claims on Which Epic Prevailed. ....................................................63

VI.   The Jury Properly Awarded Epic Punitive Damages. ........................................65

    A.  Because the Jury Properly Awarded Epic Compensatory Damages, It Was Permitted to Consider an Award of Punitive Damages. ..............................65

2437265

B.   TCS Forfeited Any Challenge to the Jury's Punitive Damages Award on the Basis of Insufficient Evidence. ....................................................................65

C.   By Failing to Raise a Contemporaneous Objection, TCS Forfeited Any Challenge to the Standard Applied by the Jury. ........................................66

D.   The Jury's Punitive Damages Award Was Supported by the Evidence. ....................67

1.   TCS Acted in an Intentional Disregard of Epic's Rights.......................................68

2.   TCS's Conduct Was Willful and Malicious. ...........................................................72

VII.   The Punitive Damages Award Should, at Most, Be Reduced to the Statutory Cap – Two Times Compensatory Damages. ....................................................................74

A.   A Punitive Damages Award of Two Times the Jury's Chosen Compensatory Damage Award Is Not Excessive Under Wisconsin Law. ...........................................75

1.   The Excessiveness Inquiry Is Integrally Tied to the Twin Purposes of Punitive Damages. ..................................................................................................76

a.   The Punitive Damages Award Is Not So Clearly Excessive As To Indicate Passion and Prejudice..........................................................................76

b.   TCS Mischaracterizes Epic's Level of Care in Protecting Its Trade Secrets and Such Level of Care Is Irrelevant to the Excessiveness Inquiry In Any Event. ...................................................................................85

B.   The Punitive Damages Award Is Not Grossly Excessive Under The Federal Due Process Clause...............................................................................................86

1.   TCS's Assertions of Foreign Bias Are Unfounded and Contradict the Jury Instructions........................................................................................................87

2.   The Punitive Damages Award Is Not Grossly Excessive Under The *Gore* Guideposts...........................................................................................................88

VIII.   The Court Should Reject TCS's Waiver Argument.........................................................91

CONCLUSION.................................................................................................................93

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M v. Pribyl*,
   259 F.3d 587 (7th Cir. 2001) ....................................................................... passim

*Aaron v. Kroger Ltd. P'ship I*,
   No. 10-606, 2012 WL 78392 (E.D. Va. Jan. 6, 2012) ........................................53

*Adams v. City of Chicago*,
   798 F.3d 539 (7th Cir. 2015) ............................................................................79

*Am. Laser Prods., Inc. v. Nat'l Imaging Supplies Grp., Inc.*,
   No. 94-7624, 1996 WL 705243 (N.D. Ill. Dec. 4, 1996)......................................8

*Am. Nat'l Bank & Tr. Co. of Chi. v. Reg'l Transp. Auth.*,
   125 F.3d 420 (7th Cir. 1997) .....................................................................56, 59

*Arizona v. ASARCO LLC*,
   773 F.3d 1050 (9th Cir. 2014) ...................................................................75, 86

*Aspen Tech., Inc. v. M3 Tech., Inc.*,
   569 F. App'x 259 (5th Cir. 2014) ................................................................. passim

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
   45 F. App'x 479 (6th Cir. 2002) ...................................................15, 17, 18, 83

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946)........................................................................................92

*Blinzler v. Marriott Int'l, Inc.*,
   81 F.3d 1148 (1st Cir. 1996)...........................................................................51

*BMW of N. Am., Inc v. Gore*,
   517 U.S. 559 (1996)................................................................................. passim

*BNSF Ry. Co. v. U.S. Dep't of Labor*,
   816 F.3d 628 (10th Cir. 2016) ...................................................................75, 86

*Bob Willow Motors, Inc. v. Gen. Motors Corp.*,
   872 F.2d 788 (7th Cir. 1989) .....................................................................67, 91

*Bourns, Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003) ...........................................................................19

iv

*BP Amoco Chem. Co. v. Flint Hills Res., LLC,*
   697 F. Supp. 2d 1001 (N.D. Ill. 2010) ...............................................................24

*Bridgetree, Inc. v. Red F Mktg. LLC,*
   No. 10-228, 2013 WL 443698 (W.D.N.C. Feb. 5, 2013) .......................................51

*Brown & Williamson Tobacco Corp. v. Jacobson,*
   827 F.2d 1119 (7th Cir. 1987) ...........................................................................79

*Byrnie v. Town of Cromwell Bd. of Educ.,*
   243 F.3d 93 (2d Cir. 2001) ....................................................................51, 52, 53

*Carroll v. Otis Elevator Co.,*
   896 F.2d 210 (7th Cir. 1990) ...............................................................................6

*Centrifugal Acquisition Corp. v. Moon,*
   849 F. Supp. 2d 814 (E.D. Wis. 2012) ................................................................72

*Chapes v. Pro-Pac, Inc.,*
   473 B.R. 295 (E.D. Wis. 2012) ...........................................................................80

*Chemetall GmbH v. ZR Energy, Inc.,*
   No. 99-4334, 2001 WL 1104604 (N.D. Ill. Sept. 18, 2001) ......................36, 38, 39

*Chi. Title Ins. Corp. v Magnuson,*
   487 F.3d 985 (6th Cir. 2007) .............................................................................89

*Clark v. State,*
   214 N.W.2d 450 (Wis. 1974) ..............................................................................73

*ConFold Pac., Inc. v. Polaris Indus., Inc.,*
   433 F.3d 952 (7th Cir. 2006) .............................................................................10

*Cosgrove v. Bartolotta,*
   150 F.3d 729 (7th Cir. 1998) .......................................................................12, 18

*CSX Transp., Inc. v. Hensley,*
   556 U.S. 838 (2009) ..........................................................................24, 85, 88

*D.L. Anderson's Lakeside Leisure Co. v. Anderson,*
   757 N.W.2d 803 (Wis. 2008) ..............................................................................80

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) ..........................................................................................59

*David v. Caterpillar, Inc.,*
   324 F.3d 851 (7th Cir. 2003) ...............................................................................8

v

*Davis v. Consol. Rail Corp.*,
    788 F.2d 1260 (7th Cir. 1986) ...........................................................................67

*DeRance, Inc. v. PaineWebber, Inc.*,
    872 F.2d 1312 (7th Cir. 1989) .....................................................................81, 86

*Deters v. Equifax Credit Info. Servs., Inc.*,
    202 F.3d 1262 (10th Cir. 2000) ........................................................................86

*Dow Chem. Co. v. St. Vincent Hosp. & Health Care Ctr., Inc.*,
    553 N.E.2d 144 (Ind. Ct. App. 1990)................................................................83

*Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*,
    965 F.2d 1442 (7th Cir. 1992) .............................................................56, 60, 63

*DSMC, Inc. v. Convera Corp.*,
    479 F. Supp. 2d 68 (D.D.C. 2007) ....................................................................37

*E.E.O.C. v. AIC Sec. Investigations, Ltd.*,
    55 F.3d 1276 (7th Cir. 1995) .....................................................................66, 80

*E.E.O.C. v. AutoZone, Inc.*,
    707 F.3d 824 (7th Cir. 2013) .....................................................................21, 89

*E.E.O.C. v. CEC Entm't, Inc.*,
    No. 98-698, 2000 WL 1339288 (W.D. Wis. 2000) ..........................................82

*E.E.O.C. v. Fed. Express Corp.*,
    513 F.3d 360 (4th Cir. 2008) ............................................................................75

*E.E.O.C. v. G-K-G, Inc.*,
    39 F.3d 740 (7th Cir. 1994) ..............................................................................22

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
    No. 12-2937, 2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) ........................7, 19

*Emmel v. Coca-Cola Bottling Co. of Chi.*,
    95 F.3d 627 (7th Cir. 1996) .............................................................21, 30, 37, 47

*Eng'g Res. v. CRS Seam*,
    No. 94-6970, 1997 WL 232778 (N.D. Ill. May 1, 1997)....................................83

*Estate of Moreland v. Dieter*,
    395 F.3d 747 (7th Cir. 2005) ....................................................................5, 20, 89

*Exxon Shipping Co. v. Baker*,
    128 S. Ct. 2605 (2008)......................................................................................91

vi

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)............................................................................81

*Fahrenberg v. Tengel*,
    291 N.W.2d 516 (Wis. 1980)..........................................................79

*Fail-Safe LLC v. A.O. Smith Corp.*,
    744 F. Supp. 2d 831 (E.D. Wis. 2010)......................................14, 17

*Frazier v. Boyle*,
    206 F.R.D. 480 (E.D. Wis. 2002) ...................................................66

*Greer v. Miller*,
    483 U.S. 756 (1987)........................................................................88

*Griffin v. Foley*,
    542 F.3d 209 (7th Cir. 2008) ........................................................5, 6

*Haley v. Gross*,
    86 F.3d 630 (7th Cir. 1996) .............................................................21

*Halverson v. River Falls Youth Hockey Ass'n*,
    593 N.W.2d 895 (Wis. 1999)..........................................................13

*Heft v. Moore*,
    351 F.3d 278 (7th Cir. 2003) ..........................................................22

*Heitmann v. City of Chicago*,
    560 F.3d 642 (7th Cir. 2009) ..........................................................10

*Hutelmyer v. Cox*,
    514 S.E.2d 554 (N.C. Ct. App. 1999) .............................................75

*Hydrite Chem. Co. v. Calumet Lubricants Co.*,
    47 F.3d 887 (7th Cir. 1995) .............................................................64

*IDX Sys. Corp. v. Epic Sys. Corp.*,
    285 F.3d 581 (7th Cir. 2002) .....................................................37, 38

*In re Cawood Patent*,
    94 U.S. 695 (1877)..........................................................................15

*In re Cross Media Mktg. Corp.*,
    No. 06-4228, 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006).......15, 43

*In re Hoskins*,
    405 B.R. 576 (Bankr. N.D. W. Va. 2009).......................................12

vii

*Jacque v. Steenberg Homes, Inc.*,
  563 N.W.2d 154 (Wis. 1997)............................................................76, 77, 79, 80

*Jay Edwards, Inc. v. New England Toyota Distrib., Inc.*,
  708 F.2d 814 (1st Cir. 1983).............................................................................59

*Johnson v. H.K. Webster, Inc.*,
  775 F.2d 1 (1st Cir. 1985)...................................................................................8

*Jonasson v. Lutheran Child & Family Servs.*,
  115 F.3d 436 (7th Cir. 1997) ............................................................................79

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974)..........................................................................................15

*Kimble v. Land Concepts, Inc.*,
  845 N.W.2d 395 (Wis. 2014)..................................................................... passim

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998).................................................................51, 52, 53

*Kunz v. DeFelice*,
  538 F.3d 667 (7th Cir. 2008) ............................................................................81

*Lampley v. Onyx Acceptance Corp.*,
  340 F.3d 478 (7th Cir. 2003) ............................................................................75

*Lapsley v. Xtek, Inc.*,
  689 F.3d 802 (7th Cir. 2012) ............................................................................59

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
  342 F.3d 714 (7th Cir. 2003) ............................................................................21

*Lindquist Ford, Inc. v. Middleton Motors, Inc.*,
  557 F.3d 469 (7th Cir. 2009) ............................................................................14

*Lucini Italia Co. v. Grappolini*,
  No. 01-6405, 2003 WL 1989605 (N.D. Ill. Apr. 28, 2003)................................83

*Ludyjan v. Cont'l Cas. Co.*,
  747 N.W.2d 745 (Wis. Ct. App. 2008) ...............................................12, 13, 14, 41

*Lust v. Sealy, Inc.*,
  383 F.3d 580 (7th Cir. 2004) ...............................................................21, 33, 54

*MacDermid Printing Sols., LLC v. Cortron Corp.*,
  No. 08-1649, 2015 WL 251527 (D. Conn. Jan. 20, 2015)................................83

viii

*Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*,
    557 N.W.2d 67 (Wis. 1996) ................................................................................ 14

*Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*,
    87 F.3d 937 (7th Cir. 1996) ......................................................................... 82, 83

*Massey v. Blue Cross-Blue Shield of Ill.*,
    226 F.3d 922 (7th Cir. 2000) ............................................................................. 52

*Mattel Inc. v. MGA Entertainment, Inc.*,
    801 F. Supp. 2d 950 (C.D. Cal. 2011) ............................................................. 83

*Mayer v. Gary Partners & Co.*,
    29 F.3d 330 (7th Cir. 1994) ............................................................................... 52

*McCarty v. Pheasant Run, Inc.*,
    826 F.2d 1554 (7th Cir. 1987) ........................................................................... 36

*McHugh v. Olympia Entm't, Inc.*,
    37 F. App'x 730 (6th Cir. 2002) ......................................................................... 7

*McLean v. Badger Equip. Co.*,
    868 F. Supp. 258 (E.D. Wis. 1994) .............................................................. 22, 54

*Merten v. Nathan*,
    321 N.W.2d 173 (Wis. 1982) ............................................................................ 10

*Midland Mgmt. Corp. v. Comput. Consoles Inc.*,
    No. 87-971, 1993 WL 69624 (N.D. Ill. Mar. 1, 1993) ...................................... 66

*Milton v. Washburn Cnty.*,
    797 N.W.2d 924 (Wis. Ct. App. 2011) ............................................................. 73

*Minuteman, Inc. v. Alexander*,
    434 N.W.2d 773 (Wis. 1989) ............................................................................ 16

*MMG Fin. Corp. v. Midwest Amusements Park, LLC*,
    630 F.3d 651 (7th Cir. 2011) ............................................................................. 41

*Modis, Inc. v. Bardelli*,
    531 F. Supp. 2d 314 (D. Conn. 2008) .............................................................. 64

*N. Air. Servs., Inc. v. Link*,
    809 N.W.2d 900 (Wis. Ct. App. Jan. 18, 2012) ............................................... 10

*Nation-Wide Check Corp. v. Forest Hill Distribs., Inc.*,
    692 F.2d 214 (1st Cir. 1982) ............................................................................. 51

ix

*Northern Air Servs., Inc. v. Link*,
    778 N.W.2d 172 (Wis. Ct. App. 2009) ............................................................67

*Official Airlines Schedule Info. Serv., Inc. v. E. Air Lines, Inc.*,
    333 F.2d 672 (5th Cir. 1964) ............................................................16

*Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*,
    908 F.2d 1363 (7th Cir. 1990) ............................................................64

*Patriot Rail Corp. v. Sierra R.R. Co.*,
    No. 09-9, 2014 WL 5426446 (E.D. Cal. Oct. 23, 2014) ............................................................83

*Phil Crowley Steel Corp. v. Macomber, Inc.*,
    601 F.2d 342 (8th Cir. 1979) ............................................................9

*Pro-Pac, Inc. v. WOW Logistics Co.*,
    721 F.3d 781 (7th Cir. 2013) ............................................................9, 10, 65

*Prod. Specialties Grp., Inc. v. Minsor Sys., Inc.*,
    513 F.3d 695 (7th Cir. 2008) ............................................................66

*Quad/Graphics, Inc. v. One2One Commc'ns, LLC*,
    529 F. App'x 784 (7th Cir. 2013) ............................................................67, 68

*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
    No. 99-1174, 2004 WL 1613563 (N.D. Ill. July 19, 2004) ............................................................36

*Ramsey v. Ellis*,
    484 N.W.2d 331 (Wis. 1992) ............................................................10

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ............................................................21

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    345 F.3d 1366 (Fed. Cir. 2003) ............................................................83

*RKI, Inc. v. Grimes*,
    177 F. Supp. 2d 859 (N.D. Ill. 2001) ............................................................23, 27, 51

*Robison v. Lescrenier*,
    721 F.2d 1101 (7th Cir. 1983) ............................................................83, 84

*Rodriguez v. Crown Equip. Corp.*,
    923 F.2d 416 (5th Cir. 1991) ............................................................7

*Romano v. U-Haul Int'l*,
    233 F.3d 655 (1st Cir. 2000) ............................................................75

x

*Rose v. Clark*,
    478 U.S. 570 (1986)................................................................................73

*RRK Holding Co. v. Sears, Roebuck & Co.*,
    563 F. Supp. 2d 832 (N.D. Ill. 2008) ..............................................82, 83

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)................................................................................84

*Russo v. Ballard Med. Prods.*,
    550 F.3d 1004 (10th Cir. 2008) .......................................................15, 17

*Salsbury Labs., Inc. v. Merieux Labs., Inc.*,
    908 F.2d 706 (11th Cir. 1990) ................................................................19

*Savino v. C.P. Hall Co.*,
    199 F.3d 925 (7th Cir. 1999) ..................................................................66

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ..................................................................59

*Schwigel v. Kohlmann*,
    694 N.W.2d 467 (Wis. Ct. App. 2005) ..................................................80

*Shulse v. City of Mayville*,
    271 N.W. 643 (Wis. 1937)......................................................................14

*SI Handling Sys., Inc. v. Heisley*,
    753 F.2d 1244 (3d Cir. 1985)..............................................22, 23, 27, 39

*SKF USA Inc. v. BJerkness*,
    No. 08-4709, 2010 WL 3155981 (N.D. Ill. Aug 9, 2010) ...............82, 83

*Smith v. Rowe*,
    761 F.2d 360 (7th Cir. 1985) ..................................................................56

*Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*,
    15 F.3d 1427 (7th Cir. 1994) ........................................................ passim

*Sonoco Prods. Co. v. Johnson*,
    23 P.3d 1287 (Colo. Ct. App. 2001) ................................................18, 19

*Spesco, Inc. v. Gen. Elec. Co.*,
    719 F.2d 233 (7th Cir. 1983) ..................................................................56

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
    538 U.S. 408 (2003)..................................................................... passim

*State v. Williams*,
    644 N.W.2d 919 (Wis. 2002) ........................................................................73

*Strenke v. Hogner*,
    694 N.W.2d 296 (Wis. 2005) .................................................................68, 73

*Structural Polymer Grp., Ltd. v. Zoltek Corp.*,
    543 F.3d 987 (8th Cir. 2008) ......................................................................8

*Sys. Dev. Integration, LLC v. Comput. Sci. Corp.*,
    886 F. Supp. 2d 873 (N.D. Ill. 2012) .......................................................20

*Tart v. Ill. Power Co.*,
    366 F.3d 461 (7th Cir. 2004) ....................................................................21

*Tech Sys., Inc. v. Pyles*,
    No. 12-374, 2013 WL 4033650 (E.D. Va. Aug. 6, 2013) ........................51

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*,
    No. 02-3293, 2004 WL 2367740 (N.D. Ill. Oct. 15, 2004) ......................7

*Thomas v. Cook Cnty. Sheriff's Dep't*,
    588 F.3d 445 (7th Cir. 2009) ....................................................................24

*Thomas v. Cook Cnty. Sheriff's Dep't*,
    604 F.3d 293 (7th Cir. 2010) ....................................................................33

*Time Warner Entm't v. Six Flags Over Georgia*,
    563 S.E.2d 178 (Ga. Ct. App. 2002) ........................................................83

*TracFone Wireless, Inc. v. Adams*,
    98 F. Supp. 3d 1243, 1262-63 (S.D. Fla. 2015) .......................................64

*Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*,
    661 N.W.2d 789 (Wis. 2003) ............................................................ passim

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ............................................................ passim

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
    725 F. Supp. 2d 378 (S.D.N.Y. 2010).......................................................51

*Upthegrove Hardware, Inc. v. Penn. Lumbermans Mut. Ins. Co.*,
    431 N.W.2d 689 (Wis. Ct. App. 1988) .....................................................78

*Weiss v. United Fire & Cas. Co.*,
    541 N.W.2d 753 (Wis. 1995).....................................................................78

*Wellogix, Inc. v. Accenture L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) ..............................................................18

*Wischer v. Mitsubishi Heavy Indus. Am., Inc.*,
    694 N.W.2d 320 (Wis. 2005) .............................................................68

*Zelinski v. Columbia 300, Inc.*,
    335 F.3d 633 (7th Cir. 2003) ..............................................................36

STATUTES

Computer Fraud and Abuse Act ...........................................................4, 63, 64

Uniform Trade Secrets Act ...................................................................15, 16

Wis. Stat. § 134.90 ..............................................................................16, 75

Wis. Stat. § 895.043 ......................................................................68, 75, 82

Wis. Stat. § 895.446 .................................................................................63

Wisconsin Uniform Trade Secrets Act ........................................................9, 16

OTHER AUTHORITIES

66 Am. Jur. 2d Restitution and Implied Contracts § 2 (2011) .........................11

9A Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. § 2529 (2d ed. 1995)...................21

Dobbs Law of Remedies § 9.3(4) (2d ed. 1993) ..........................................12

Fed. R. Civ. P. 26 ..................................................................................7, 8

Fed. R. Civ. P. 50 ..............................................................................passim

Fed. R. Civ. P. 51 ..................................................................................67

Fed. R. Civ. P. 54 ..................................................................................10

Fed. R. Civ. P. 56 ..................................................................................52

Fed. R. Evid. 103(a)(1) .............................................................................9

Restatement of Restitution § 151 ..............................................................12

Restatement (Second) of Torts § 903 ....................................................10, 65

Restatement (Third) of Unfair Competition § 40 ...................................... passim

2437265

Restatement (Third) of Restitution § 49(3)................................................................11, 12

Restatement (Third) of Restitution § 51 ...........................................................12, 14, 18

2437265

## INTRODUCTION

The jury's verdict should stand.  Nothing TCS says suggests otherwise.

TCS's attack on the jury's verdict is an "all-or-nothing" gambit.  The Court offered TCS the opportunity to "file a challenge to the compensatory and punitive damages verdicts at any time."  Dkt. No. 875.  But rather than avail itself of this opportunity to seek some sort of reasonably considered reduction in the amount of the verdict, TCS has asked for a complete rejection of the jury's work in this case, with a resulting judgment in TCS's favor.

TCS's damages motion is long on rhetoric but short on facts and the relevant law.  TCS ignores its heavy burden under Rule 50 and acts as if the trial never happened.  With respect to compensatory damages, for example, TCS claims that "Epic did not show the jury a single shred of evidence to suggest that TCS used its information."  Dkt. No. 914 at 1.  TCS further claims that none of the TCS employees working in the ODC, who shared Epic's confidential information with Naresh Yallapragada, "ever saw any of Epic's alleged trade secrets or confidential information, let alone used that information for the comparative analysis."  *Id*. at 26.  And, despite admitting it can no longer determine how many people accessed Epic's UserWeb, who they were, or where Epic's trade secret and confidential information was sent, TCS argues that "what is clear from the trial record is that all of the TCS employees who accessed UserWeb did so in connection with their work for Kaiser."  *Id*. at 20.  In short, TCS relies solely on select testimony of its own witnesses, ignoring that Rule 50 requires a consideration of all of the evidence in the record in the light most favorable to Epic.

TCS makes similar arguments with respect to punitive damages.  For example, TCS claims "there is no evidence to suggest that the harm to Epic (if any) resulted from malice, trickery, or deceit," *id*. at 62, "there is no evidence in the record from which the jury could have concluded that TCS acted with an intentional disregard of Epic's rights," *id*. at 51, and "Epic

2437265

presented absolutely no evidence establishing that TCS's conduct was willful and malicious," *id.* at 48.

TCS is wrong on all of these critical points.  As set forth below, Epic put forth ample evidence to support the jury's verdict, including evidence that TCS used Epic's confidential information, and that it did so with intentional disregard for Epic's rights.

## EXECUTIVE SUMMARY

This executive summary previews the eight parts of Epic's opposition.

Part I (pp. 5 to 9) defends the Court's decision to permit Epic's senior vice president, Stirling Martin, and Epic's damages expert, Thomas Britven, to provide testimony about Epic's damages.  Before the damages phase of the trial began, the Court expressed concerns about the damages evidence that would be provided to the jury.  Epic appropriately adjusted the anticipated testimony of Mr. Martin and Mr. Britven to meet the Court's concerns.

TCS pretends that those adjustments were unwarranted and dramatic.  But the truth is, as TCS has admitted, Epic's adjustments resulted in what TCS describes as "essentially a 'lite' version of Mr. Britven's original" damages opinion that required only "a few cosmetic and superficial changes to his damages model, complimented by some additional testimony by Epic employee Stirling Martin."  Dkt. No. 914 at 4.  In those circumstances, the Court was well within its discretion to permit the adjusted damages testimony to go to the jury.

Part II (pp. 9 to 20) then explains why the jury was entitled to award compensatory damages to Epic under an unjust enrichment theory.  Under that theory, if TCS was unjustly enriched, then Epic was entitled to compensation for the amount by which TCS benefited from its bad acts, such as misappropriation of trade secrets, fraud, and unfair competition.  There is no requirement that Epic show "use" by TCS of trade secrets under Wisconsin law, as TCS

2

contends. Instead, all that a plaintiff must show, as here, is that the defendant wrongfully obtained the trade secrets, regardless of whether it successfully used the secrets thereafter.

In any event, even though not required, Mr. Britven assumed "use" of Epic's trade secrets and confidential information for purposes of his damages analysis. As a proxy for measuring how much TCS was enriched, Mr. Britven properly employed an "avoided R&D cost" analysis that measured (in part) the investment Epic made to develop its trade secrets and confidential information before they were stolen by TCS. Mr. Britven's "avoided R&D cost" analysis was a sound and accepted methodology for measuring the unjust enrichment to TCS.

Part III (pp. 20 to 56) next reviews the evidence about how TCS "used" Epic's trade secrets and other confidential information. In reviewing the evidence in this context, TCS ignores the stringent standard that applies to its attempt to throw out the jury's verdict under Federal Rule of Civil Procedure 50. That standard requires TCS to prove that no rational jury could have found in Epic's favor, based on a record review demanding that all evidence and inferences be viewed in the light most favorable to Epic, not TCS. That is an extremely heavy burden that TCS fails to acknowledge, let alone carry. As a proper review of the trial record shows, there was substantial evidence of TCS's "use" of Epic's trade secrets and confidential information.

Part IV (pp. 56 to 63) explains how the jury's $240 million compensatory damages verdict is reasonable and supported by the evidence. Specifically, the $140 million ascribed to the comparative analysis was more than reasonably justified. The starting point for this $140 million number was the $200 million recommended by Epic's expert with respect to the comparative analysis. TCS's expert suggested a 30-40% reduction to account for reduced labor rates in India. Although no one can know with certainty how the jury arrived at its $140 million

3

number, a simple mathematical calculation shows that $200 million reduced by 30% is $140 million.

With respect to the additional $100 million awarded by the jury as compensatory damages, there was ample evidence that the trade secrets and other confidential information not used for the comparative analysis, such as the data model, were used in other ways. For instance, Philippe Guionnet testified that information he saw during the Med Mantra "deep dive" meeting included the Epic data model. Mr. Guionnet was convinced to a "near certitude," based on his own "before" and "after" observations, that Epic's data model had been used to improve Med Mantra. Again, although no one knows for sure how the jury calculated the $100 million, the value of Epic's data model can be derived by subtracting its proportional worth from the other trade secrets reflected in the "X analysis" developed by Stirling Martin, which roughly approximates $100 million.

Part V (pp. 63 to 64) briefly discusses additional claim-specific reasons why Epic is entitled to damages with respect to its claims for breach of contract, fraudulent misrepresentation, unfair competition, violations of the Computer Fraud and Abuse Act, and deprivation of property. These are discrete reasons in addition to all of the reasons why the $240 million in compensatory damages is justified for the trade secret misappropriation, common-law unjust enrichment, and tort claims.

Part VI (pp. 65 to 74) explains why the jury was entitled to award punitive damages in view of the evidence clearly showing TCS's malice and intentional disregard of Epic's rights.

Part VII (pp. 75 to 91) discusses why the punitive damages award should be $480 million, which is the amount permitted under Wisconsin law. This reduction from the $700 million awarded by the jury as punitive damages is due to the "two-times" Wisconsin cap

4

applicable to a compensatory damages award of $240 million.  In addition to imposing a "two-times" cap, Wisconsin law provides a six-factor analysis for punitive damages, which is similar to the U.S. Supreme Court's punitive damages case-law guidance under the federal Due Process Clause.  The evidence favors Epic on all of the relevant state and federal factors, thus justifying a punitive damages award of $480 million.

Part VIII (pp. 91 to 93) explains why Epic is not precluded from arguing that it lacked the evidence it needed simply because it opted to continue with trial as scheduled rather than postponing trial to attempt to force TCS to produce additional evidence that TCS should have produced long before.

The opposition ends with Epic's request that the Court deny TCS's motion to strike the damages testimony of Stirling Martin and Thomas Britven and TCS's motion for judgment as a matter of law.  The jury appropriately considered the evidence presented and rationally drew inferences in Epic's favor.  Nothing TCS has said can or should change that result.  Epic is entitled to judgment on the jury's verdict, in the reduced amount of $720 million, representing $240 million in compensatory damages and $480 million in punitive damages.

## ARGUMENT

### I.    The Court Properly Permitted the Damages Testimony of Mr. Martin and Mr. Britven.

#### A.    The Court Has Broad Discretion in Managing Trial and Admitting Evidence.

"Because the trial court is in the best position to make decisions regarding jury guidance and evidentiary matters," *Estate of Moreland v. Dieter*, 395 F.3d 747, 753-54 (7th Cir. 2005), the decision to admit testimony is entrusted to the sound discretion of the trial judge.  *Griffin v. Foley*, 542 F.3d 209, 217-18 (7th Cir. 2008) (on appeal, "the district court's decision is to be overturned only if no reasonable person would agree with the trial court's ruling"); *see also*

2437265

*Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("The decision to admit expert testimony is committed to the broad discretion of the trial court and its determination will be affirmed unless it is 'manifestly erroneous.'").  Likewise, "[m]atters of trial management are for the district judge," and will be disturbed "only when it is apparent that the judge has acted unreasonably."  *Griffin*, 542 F.3d at 217.

### B.      Epic's Revised Damages Methodology Was Not Untimely or Prejudicial.

To prevail on its motion to strike, TCS bears the burden of proving that the Court "acted unreasonably" in permitting Mr. Martin and Mr. Britven to testify during the damages phase of trial.  As explained below, however, the Court was well within its discretion in permitting the jury to hear the damages-related testimony of these witnesses.  Indeed, TCS has failed to identify any prejudice whatsoever and concedes that the damages methodology was essentially the same as that disclosed prior to trial, with merely "a few cosmetic and superficial changes" to tie the methodology to evidence presented at trial.

TCS asserts that Epic's unjust enrichment damages theory should have been excluded as untimely, but its argument is undermined by TCS's own admissions.  At the same time that it complains Epic disclosed a new damages theory "minutes before it was presented to the jury," Dkt. No. 914 at 9, TCS characterizes the "new" damages model as "essentially a 'lite' version of Mr. Britven's original [model]," with just "a few cosmetic and superficial changes."  *Id.* at 4; *see also id.* at 5 (asserting that the "purportedly new model was just as flawed and disconnected from the evidence as the prior one").  TCS's counsel contemporaneously confirmed that view on the record: "*I really don't feel like I'm hearing anything new here.*"  Dkt. No. 907 at 8:25-9:2 (emphasis added); *see also id.* at 10:19-21 (TCS Counsel:  "there's really nothing new here apart from . . . it's more targeted to where Mr. Martin thinks he saw downloads").

6

Indeed, as the Court recognized, "[t]he only thing new [wa]s ratcheting back" on Epic's damages model to focus more directly on the comparative analysis, a subset of the original calculation that the Court rejected as overbroad.  Dkt. No. 907 at 9:3-7; *cf. E.J. Brooks Co. v. Cambridge Sec. Seals*, No. 12-2937, 2015 WL 9704079, at *6 (S.D.N.Y. Dec. 23, 2015) *and id.*, Dkt. No. 343 at 4 (Def's Mem. in Supp. of its Motion to Vacate or Modify Judgment) (court rejecting defendant's contention that damages methodology was sprung upon it "[o]n the eve of trial" where expert's report "laid out the avoided costs theory of damages").  The comparative analysis was prepared in 2014 and produced early in this case as TCS acknowledges.  Dkt. No. 914 at 13 n.2.  It was also the subject of extensive discovery and briefing, including motions *in limine*, so it could not have come as a surprise to TCS that Epic intended to rely on it at trial. *See, e.g.*, Dkt. No. 633.

In other words, Epic did not come up with the comparative analysis as a new source for damages at trial, but rather tailored its calculations to the evidence and the Court's rulings. Courts have acknowledged that parties in the midst of trial require the flexibility to modify damages calculations to meet the evidence presented.  *See, e.g.*, *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02-3293, 2004 WL 2367740, at *9 (N.D. Ill. Oct. 15, 2004) (denying motion to exclude new damages theories to the extent that the plaintiff "must modify its damages calculations in light of the evidence presented or rulings made at trial"); *see also Rodriguez v. Crown Equip. Corp.*, 923 F.2d 416, 418 (5th Cir. 1991) (explaining that "[t]rial lawyers, and witnesses alike, must react to shifting fact patterns, developing arguments, and refined lines of inquiry" and that modification of an opinion based on the evidence presented at trial is "not a new theory"); *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 735 (6th Cir. 2002) (recognizing that "[n]othing in Rule 26 . . . precludes an expert from revising or further

clarifying opinions, particularly in response to points raised in the presentation of a case" and emphasizing the need to consider "the realities of adversarial litigation").

TCS fails to identify any prejudice from Epic's purported failure to disclose a "new" damages theory.  In exercising its discretion to exclude evidence because of a party's failure to strictly comply with Rule 26(a), a district court should consider, among other things, "the prejudice or surprise to the party against whom the evidence is offered" and "the bad faith or willfulness involved in not disclosing the evidence at an earlier date."  *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).  TCS has not identified any prejudice that it suffered as a result of Epic's *ratcheting back* its damages theory to a subset of the theory that Epic originally advanced, nor did it request additional time to respond to the revised calculation.  *Cf. Am. Laser Prods., Inc. v. Nat'l Imaging Supplies Grp., Inc.*, No. 94-7624, 1996 WL 705243, at *1 (N.D. Ill. Dec. 4, 1996) (rejecting claim of prejudice where, "[i]f anything, the introduction of this evidence contributed to a lower damage award"); *see generally* Dkt. No. 907; *see also Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 8 (1st Cir. 1985) ("Courts have looked with disfavor upon parties who claim surprise and prejudice but who do not ask for a recess so they may attempt to counter the opponent's testimony.").  TCS also fails to explain how it would have benefited from additional time, given that its expert declined to provide an alternative damages calculation and instead opined that Epic was entitled to no damages at all.

Accordingly, there was no basis to exclude Epic's damages theory as untimely, and the Court acted well within its discretion in permitting the jury to hear testimony from Mr. Martin and Mr. Britven.  *See Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 999 (8th Cir. 2008) (district court did not abuse its discretion in permitting plaintiff to offer modified damages calculation at trial where "[t]he underlying information was available to [defendant] throughout"

8

and the modified calculation merely reflected a "changed . . . assumption"); *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344-45 (8th Cir. 1979) (no abuse of discretion in denying motion to strike expert testimony on the ground that plaintiff's modified damages calculation was untimely where "the documents upon which [plaintiff's] damages were calculated were made available to [defendant] well in advance of trial" and "[n]o continuance was sought" by defendant).[1]

## II.   The Jury Was Entitled to Award Epic Damages Equivalent to the Value of the Trade Secrets and Confidential Information TCS Stole.

### A.   The Jury Was Entitled to Award Damages to Compensate Epic for TCS's Unjust Enrichment.

TCS does not dispute that Epic's claims for unjust enrichment and violations of the Wisconsin Uniform Trade Secrets Act permitted the jury to award Epic damages in an amount that would compensate Epic for "TCS's unjust enrichment."  Dkt. No. 914 at 22 n.3.  The jury also was entitled to award Epic unjust enrichment damages for TCS's fraudulent misrepresentations and unfair competition.  "Wisconsin law does not limit restitution to merely unjust enrichment claims, but also allows plaintiffs to receive restitution as compensation for tort claims."  *Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 786 (7th Cir. 2013).  Specifically:

> In cases in which a tortfeasor has received from the commission of a tort against another person a benefit that constitutes unjust enrichment at the expense of the other, he is ordinarily liable to the other, at the latter's election, either for the damage done to the other's interests or for the value of the benefit received through the commission of the tort.

---

[1] Even if Epic's damages methodology contained anything new, TCS forfeited any objection by failing to raise it during trial.  *See* Fed. R. Evid. 103(a)(1).  TCS did not object to Epic's "new" damages theory based upon the comparative analysis during trial as untimely, objecting only to Epic's alternative theory based on TCS's renewal of the Kaiser contract.  *See* Dkt. No. 896 at 120-21 (objecting to a damages methodology based on the Kaiser contract as "a new theory being introduced at this stage").  TCS acknowledges this by devoting a portion of its brief to its objections to the Kaiser contract, even though that theory was excluded and no damages were awarded on that basis.  *See* Dkt. No. 914 at 9-10.  Nor can TCS complain that it was afforded insufficient time to prepare to rebut the modified damages theory, since TCS never requested additional time from the Court.

*Id.* (quoting *N. Air. Servs., Inc. v. Link*, 809 N.W.2d 900, at *4 (Wis. Ct. App. Jan. 18, 2012));

*see also* Restatement (Second) of Torts § 903 cmt. b (1979).  "[T]he 'prophylactic' purpose" of

tort law, *i.e.*, "preventing future harm," requires a broad view of the categories of damages

available to tort victims.  *Merten v. Nathan*, 321 N.W.2d 173, 177 (Wis. 1982).  Put simply,

"payment of damages provides a strong incentive to prevent the occurrence of harm."  *Id.*[2]

**B.** **The Jury Was Entitled to Award Epic the Value of the Benefit Conferred on TCS.**

"[R]ecovery for unjust enrichment is based upon the inequity of allowing the defendant

to retain a benefit without paying for it."  *Ramsey v. Ellis*, 484 N.W.2d 331, 333 (Wis. 1992).

Accordingly, damages for unjust enrichment "are measured by the benefit conferred upon the

defendant."  *Id.*; *see, e.g.*, *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957-58 (7th

Cir. 2006) (analyzing Wisconsin law and explaining that, where a party takes "something that of

rights belongs to the plaintiff," the plaintiff is entitled to "restitution of the value of the benefit

received" by the defendant).

Based on this law, the jury was properly instructed as follows:

> You may . . . award Epic the value of the benefits obtained by TCS because of
> TCS's wrongful conduct.  Regardless of whether you find that Epic itself suffered
> losses, if you find that TCS obtained a benefit from Epic's trade secrets or
> confidential information, then you may award the monetary value that you
> attribute to those benefits as the measure of plaintiff's damages.

Dkt. No. 872 at 3.

**C.** **The "Avoided R&D" Methodology Was a Permissible Way to Calculate the Value of the Trade Secrets and Confidential Information TCS Stole, and the**

---

[2] To the extent TCS contends that Epic never sought unjust enrichment damages in connection with its
claims for fraud and unfair competition, TCS is incorrect.  *See* Dkt. No. 673-4 ¶¶ 33, 61, 62; Dkt. No.
380-7 ¶¶ 90, 96-98.  In any event, as the Seventh Circuit emphasized in *Pro-Pac*, "a trial court 'should
grant the relief to which each party is entitled, even if the party has not demanded that relief in its
pleadings.'"  721 F.3d at 785 (quoting Fed. R. Civ. P. 54(c)); *see also Heitmann v. City of Chicago*, 560
F.3d 642, 645 (7th Cir. 2009) ("Prevailing parties get the relief to which they are entitled, no matter what
they ask for.").

**Jury Was Entitled to Employ that Method in Calculating Unjust Enrichment Damages.**

Although TCS does not dispute that the jury was permitted to award Epic damages equivalent to the value of the "benefit" TCS obtained by stealing Epic's trade secrets and confidential information, TCS nevertheless appears to take issue with the manner in which the jury calculated that value.  Specifically, TCS contends that damages based on "avoided R&D costs" are permissible only if the plaintiff proves that the defendant used its trade secrets and confidential information to develop a competing product.  *See* Dkt. No. 914 at 40.[3]

Contrary to TCS's assertions, there is no requirement that TCS have "used" Epic's trade secrets and confidential information in a particular way.  Indeed, the Wisconsin Court of Appeals has explained that where, as here, a defendant engaged in "consciously tortious conduct" to obtain the plaintiff's property at issue, the plaintiff need not show that the defendant "used" the stolen material at all.  Courts have also recognized in the trade secrets context that the defendant should "pay for what it wrongfully obtained."

      1.    <u>Under Wisconsin Law, a Plaintiff Need Not Show Use Where the Defendant Obtained the Property Through Tortious Conduct.</u>

Damages for unjust enrichment may be measured in several different ways, including "the value of the benefit in advancing the purposes of the defendant," "the cost to the claimant of conferring the benefit," "the market value of the benefit," and "a price the defendant has expressed a willingness to pay."  Restatement (Third) of Restitution § 49(3) (2011); *see also, e.g.*, 66 Am. Jur. 2d Restitution and Implied Contracts § 2 (2011) (unjust enrichment is "a broad and flexible remedy").  The choice among these various measures of recompense "is dictated by

---

[3] As explained in Part III below, the evidence presented at trial was sufficient for the jury to find that TCS used Epic's trade secrets and confidential information to develop or improve its medical software products.  Accordingly, the Court need not consider TCS's argument.  Nonetheless, even assuming the evidence was insufficient to show that TCS used Epic's information to develop or improve a competing product, TCS's argument fails as a matter of law.

11

general principles of unjust enrichment, turning chiefly on the innocence or blameworthiness of the defendant." Restatement (Third) of Restitution § 49(3), cmt. a. In all cases, "[t]he value for restitution purposes of benefits obtained by the misconduct of the defendant . . . is *not less than* their market value." *Id.* § 51(2) (emphasis added).

As the Wisconsin Court of Appeals has explained, "use value" may be the proper measure of damages where the defendant has engaged in "no tortious conduct." *Ludyjan v. Cont'l Cas. Co.*, 747 N.W.2d 745, 749 (Wis. Ct. App. 2008). But "[t]his is not to say that a defendant's failure to make use of property will always defeat unjust enrichment." *Id.* Instead, where, as here, "a defendant . . . is unjustly enriched *through consciously tortious conduct*," he "must pay the value of the property obtained, and '*[t]he fact that the subject matter was of little or no worth to [him] is not material*.'" *Id.* (quoting Restatement of Restitution § 151, cmt. b (1937) (emphases added)).[4]

In other words, where the defendant acts wrongfully, the proper measure of damages is the "value" of the benefits wrongfully obtained, without any "discount[] to reflect some lesser value actually realized in advancing the purposes of the defendant." Restatement (Third) of Restitution § 51, cmt. d; *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 734 (7th Cir. 1998) (applying Wisconsin law and holding that, where the defendant obtains a benefit from the plaintiff that "is not rendered gratuitously, as by an officious intermeddler, or donatively, as by

---

[4] *See also In re Hoskins*, 405 B.R. 576, 584-85 (Bankr. N.D. W. Va. 2009) (holding that, where debtors tortiously interfered with plaintiff's license to use their property, on which plaintiff had built a cabin with the debtors' consent, the proper measure of damages was "the extent to which the construction of the new cabin increased the overall value of the Debtor's real property — not the value of the new cabin to the Debtors, personally"); *cf*. Dobbs Law of Remedies § 9.3(4) (2d ed. 1993) (with respect to rental value, "the plaintiff would always be entitled to the greater [of rental value or rents collected] when the defendant is guilty of intentional fraud, but would be entitled only to the actual use-value to the defendant if the defendant is innocent").

2437265

an altruist or friend or relative," then the plaintiff "is entitled to demand the restitution of the market value of the benefit").

This rule makes good sense. Where a defendant obtains a plaintiff's property through no fault of the defendant's — for example, because the plaintiff "thrust property upon" him — the plaintiff cannot demand to be paid for the property, unless the defendant actually put it to good use. *Ludyjan*, 747 N.W.2d at 746. A contrary rule would encourage "officious intermeddling:" would-be plaintiffs could roam the streets conferring "benefits" in the form of painted houses, erected structures, replaced tires, and the like, and then sue the "beneficiaries" for compensation, regardless of whether those individuals wanted or used the plaintiff's "property" or "services." *See, e.g.*, *id.* at 750 (explaining policy behind "officious intermeddler" rule). But where a defendant obtains a plaintiff's property through his own wrongdoing, it may be assumed that he wanted that property, even if its precise use cannot be proven. In that situation, there is no concern that a lesser threshold for awarding damages will encourage "officious intermeddling," because the defendant wrongfully took property that was not thrust upon him.

The cases TCS cites do not state otherwise. For example, *Halverson v. River Falls Youth Hockey Ass'n*, 593 N.W.2d 895, 899-900 (Wis. 1999), is a classic "officious intermeddler" case. There, the plaintiff leased a building from the defendant and improved it for the plaintiff's own use. After the parties' relationship soured, the plaintiff sought to recover the amount he had spent on those improvements. The Wisconsin Court of Appeals affirmed the trial court's holding that the plaintiff could not do so, explaining that "[m]aking improvements alone d[id] not prove the" defendant landlord — who had done nothing wrong — "received any benefit from them." *Id.* at 900.

13

2437265

*Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67 (Wis. 1996), is also consistent with the rule that where the defendant has engaged in conscious wrongdoing, the plaintiff need not prove use.  There, the court held that the plaintiff failed to sufficiently establish the net profits the defendant had received from its wrongful act.  But that is merely an example of a plaintiff selecting one method of proving unjust enrichment damages; it is not the only method available to plaintiffs.  Indeed, the Restatement provides that "net profit" damages shall be the measure of damages awarded to a plaintiff against a "conscious wrongdoer" "[u]*nless*" the "market value" of the benefits obtained by the wrongdoer "imposes a greater liability."  Restatement (Third) of Restitution § 51(2), (4) (emphasis added).  Thus, *Management Computer Services* merely reflects the way that one plaintiff chose, unsuccessfully, to try to prove damages on the specific facts of that case.[5]

2.      The Value of Stolen Trade Secrets Does Not Depend on Whether the Defendant Used them Successfully or Profitably.

The principle discussed by the Wisconsin Court of Appeals in *Ludyjan* has also been recognized in the trade secrets context.  Relying on a Supreme Court opinion in a patent case, the Fifth Circuit explained that a "lack of actual profits [obtained through use of a misappropriated

---

[5] The other cases on which TCS relies are equally off-point.  In *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009), the Seventh Circuit held that the district court had erred in considering the elements of an unjust enrichment claim, and reversed on liability; it did not "fully address" the issue of damages.  *Id.* at 483.  *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831, 867 (E.D. Wis. 2010), is a summary judgment decision on liability, but does not review an award of damages.  In any event, the plaintiff's theory in *Fail-Safe* was that the defendant used the plaintiff's information; *Fail-Safe* does not hold that the *only* proper theory of damages is based on "use."  *See id.* at 866.  And *Shulse v. City of Mayville*, 271 N.W. 643 (Wis. 1937), distinguished the damages available under an unjust enrichment theory from those awarded for breach of contract.  *Id.* at 647.  The Wisconsin Supreme Court explained that in "ordinary cases, particularly those involving money and service, the amount of the plaintiff's recovery [under an unjust enrichment theory] is the amount of money advanced or the reasonable value of the services rendered."  *Id.*  It then identified the exception that applies to an officious intermeddler, *i.e.*, where a party voluntarily provides a "service" that "is of no value or benefit to the city or the city only partially benefits," in which case "the city is liable only to the extent of the benefits received."  *Id.*  The Court's discussion, which was cabined to services (which are necessarily conferred knowingly), said nothing about the damages available when property is taken through "consciously tortious conduct."

14

trade secret] does not insulate the defendants from being obliged to *pay for what they have wrongfully obtained* in the mistaken belief their theft would benefit them." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974) (emphasis added) (citing *In re Cawood Patent*, 94 U.S. 695 (1877)); *see also, e.g.*, *In re Cross Media Mktg. Corp.*, No. 06-4228, 2006 WL 2337177, at *6 (S.D.N.Y. Aug. 11, 2006) (holding misappropriating party was "responsible to pay Cross Media the cost of developing the customer lists she wrongfully obtained" even though she did not financially benefit from the misappropriation); *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002) (the "value of the secret to the defendant at the time that it was misappropriated" is not dependent on "the commercial success of the enterprise").

As with common law unjust enrichment, "[t]he rationale for this seems clearly to be that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves." *Univ. Computing*, 504 F.2d at 536; *accord Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1021 (10th Cir. 2008) (explaining the "deterrent function" served by unjust enrichment awards and finding it immaterial that "the unjust enrichment award put [plaintiff] in a much better position than if he had entered a licensing agreement with [defendant]" because the defendant, "as the party that acted wrongfully, must assume the risk it took by misappropriating" the trade secrets).[6]

---

[6] This notion that the recovery of an innocent victim should not be premised on its ability to prove that the defendant successfully or profitably used the secrets that it stole — property that is necessarily valuable in light of its trade secret status and that the defendant must have deemed valuable enough to take through "wrongful means" — comports with the fact that "[o]ne of the broadly stated policies behind trade secret law is 'the maintenance of standards of commercial ethics.'" Unif. Trade Secrets Act § 1 cmt. (1984) (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974)). Likewise, the Restatement recognizes that a "defendant's willingness to resort to improper means in order to acquire a trade secret *is itself evidence* of a substantial risk of subsequent use or disclosure." Restatement (Third) of Unfair Competition § 40 cmt. b (emphasis added); *see also Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 266 (5th Cir. 2014) (permitting jury to infer use from the defendant's "calculated attempt to

In *University Computing*, the Fifth Circuit explained that in calculating unjust enrichment damages, "the law looks to the time at which the misappropriation occurred to determine *what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage*, provided he does in fact put the idea to a commercial use." 504 F.2d at 536 (emphasis added).[7]   Although written before the Uniform Trade Secrets Act, and when the Restatement still required "use" as an element of a trade secrets claim, *University Computing* remains one of the most comprehensive authorities on damages available for trade secret misappropriation.

The Restatement now follows the Uniform Trade Secrets Act "in also recognizing liability for the acquisition of a trade secret by improper means." Restatement (Third) of Unfair Competition § 40. Likewise, "an improper acquisition is enough to constitute a misappropriation of a trade secret" under the Wisconsin Uniform Trade Secrets Act. *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 774 (Wis. 1989); *see* Wis. Stat. § 134.90(2)(a); *accord* Dkt. No. 538 at 57-58 (explaining that a plaintiff may show misappropriation through either improper acquisition *or* use or disclosure). And there is no required showing of "use" to award damages. Wis. Stat. § 134.90(4)(a) (providing that a court "may award damages," including "unjust enrichment caused by" a violation of sub. (2), which includes misappropriation through improper acquisition).

---

acquire [the plaintiff's] confidential information"). To be a trade secret under WUTSA, information must "derive independent economic value . . . from not being known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Wis. Stat. § 134.90(1)(c)(1). The jury found that the stolen information included trade secrets (Dkt. No. 855 at 2) and TCS has not challenged this finding.

[7] The final clause ("provided he does in fact put the idea to a commercial use") appears to be premised on an earlier case holding that liability for trade secrets misappropriation required that "the idea must be adopted and made use of by the defendant." *Id.* at 536 n.30 (citing *Official Airlines Schedule Info. Serv., Inc. v. E. Air Lines, Inc.*, 333 F.2d 672, 674 (5th Cir. 1964)). Moreover, at the time *University Computing* and *Official Airlines* were issued, the Restatement "limited liability for the appropriation of trade secrets to instances of wrongful use or disclosure." Restatement (Third) of Unfair Competition § 40 note (1995).

To the extent *University Computing* can be read as requiring a showing of "commercial use" to award damages for trade secret misappropriation — even where, as here, use is not required to establish liability — the Fifth Circuit employed a far lower standard of "use" than that proposed by TCS. The *University Computing* court recognized that "[a]lmost without exception prior trade secret cases involved a device or process which was used by the defendant to" either "improve his manufacturing process" or "improve[] a larger manufactured product." 504 F.2d at 540. However, the court rejected the notion that this was the only type of "use" that would support an award of damages for misappropriation. *See id.* at 540-41.[8] Instead, the court held that "any misappropriation, followed by an exercise of control and dominion . . . must constitute a commercial use for which damages can be awarded." *Univ. Computing*, 504 F.2d at 542. The court affirmed the jury's damages verdict even though the evidence failed to prove that the defendant obtained any financial benefit as a result of the stolen trade secret. *See id.* at 541-42 (concluding that, even in the absence of financial gain, the jury "could, indeed, find that [defendant] and, through it, the other two defendants, used the [trade secret] as if it had been theirs to do with as they pleased").[9]

---

[8] *See also Russo*, 550 F.3d at 1021 (rejecting argument that "unjust enrichment damages are appropriate only when the defendant has used a misappropriated trade secret to compete with the plaintiff" as contrary to the trade secrets act and the Restatement); *Avery Dennison*, 45 F. App'x at 487 (rejecting defendant's "definition of commercial use [a]s unduly restrictive").

[9] The standard of "commercial use" employed by the court in *University Computing* comports with the definition in the Restatement, which has been endorsed by the Eastern District of Wisconsin: "As a general matter, *any* exploitation of the trade secret that is *likely* to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section." Restatement (Third) of Unfair Competition § 40, cmt. c (1995) (emphases added); *see Fail-Safe*, 744 F. Supp. 2d at 852 (quoting the Restatement and explaining that "'misusing' a trade secret is quite a broad concept"). Notably, neither the Restatement nor *Fail-Safe* discusses "use" as a requirement for an award of *damages*. Rather, the Restatement discusses "use" in terms of *liability* for misuse of trade secrets, and *Fail-Safe* considers the definition in determining whether the plaintiff's claim alleging improper use was time-barred. *See* Restatement (Third) of Unfair Competition § 40, cmt. c (discussing "improper use or disclosure"); 744 F. Supp. 2d at 851 (noting that the plaintiff "only alleges that [defendant] 'used' [its] trade secrets without its consent and does not claim that [defendant] acquired [its] trade secrets through unlawful means").

*3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001), does not advance TCS's argument.   TCS suggests that the Seventh Circuit affirmed the district court's decision to vacate the jury's award "because there was no evidence . . . that the defendants had used" a resin formula at issue in that case.   Dkt. No. 914 at 40.   But TCS fails to mention that there was *also* "no evidence" that the "primary developer of [the defendant's] resin sheeting manufacturing process" even "had knowledge" of 3M's proprietary formula.   *3M*, 259 F.3d at 593, 604-05.   In other words, there could be no liability for trade secret misappropriation because there was no evidence of appropriation in the first instance.   *See id.* at 604-05.   *3M* says nothing about whether, to obtain damages on an unjust enrichment theory, a plaintiff must demonstrate that the defendant "used" the wrongfully obtained information, or used it in a particular way.   As the Restatement makes clear, the answer to that question is no.

       3.       <u>Avoided R&D Costs is an Appropriate Measure of the Value of Misappropriated Trade Secrets and Confidential Information.</u>

As the authorities discussed above make clear, once a party is found to have obtained property through improper means, the jury is entitled to award damages equivalent to the value of the stolen property.   One way of ascertaining that value is by determining what the defendant would have had to pay to obtain the property in a lawful manner.   *See, e.g.*, Restatement (Third) of Restitution § 51, cmt. d (2011).   While often this is the "market value" of the property (*id.*; *Cosgrove*, 150 F.3d at 734), the calculation is more difficult where the stolen property constitutes trade secrets and confidential information, which, by their very nature, are not available for purchase in the marketplace.   *See Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1289 (Colo. Ct. App. 2001).   Courts therefore have held that the value of misappropriated trade secrets can be calculated in a variety of ways.   *E.g.*, *Wellogix, Inc. v. Accenture L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013); *Avery Dennison*, 45 F. App'x at 485-86; *see generally Univ. Computing*, 504 F.2d at

18

538 (concluding, based on a "review of the caselaw," that cases involving trade secret misappropriation "require[] a flexible and imaginative approach to the problem of damages").

One method used to determine the "value" of stolen information is to consider what it would have cost the defendant to "develop[] the trade secret on his own, using the actual development costs of the plaintiffs as the complete method of damages."  *Univ. Computing*, 504 F.2d at 538; *see, e.g.*, *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 709-10 (9th Cir. 2003) (affirming damages award based on expert testimony valuing misappropriated trade secrets on the basis of development time); *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 714 (11th Cir. 1990) (affirming award of avoided R&D costs on the ground that, to obtain the trade secrets legally, the defendant "would have been required to expend approximately the same amount as [the plaintiff] on the research, development, and marketing" of the product); *E.J. Brooks Co. v. Cambridge Sec. Seals*, No. 12-2937, 2015 WL 9704079, at *4-6 (S.D.N.Y. Dec. 23, 2015) (surveying cases and confirming avoided development costs are an appropriate method of measuring a defendant's unjust gains); *Sonoco Prods.*, 23 P.3d at 1288 (affirming award based on "the amount it would have cost [the defendant] to finance the development of the misappropriated information").[10]

---

[10] While the *University Computing* court explained that this method is "frequently inadequate" to fully compensate the plaintiff, it suggested that this "limited measure" of damages may be appropriate "where the trade secret was used by the defendant in a limited number of situations, where the plaintiff was not in direct competition with the defendant, where the development of the secret did not require substantial improvements in existing trade practices . . . , and where the defendant's use of the plaintiff's trade secret has ceased."  *Univ. Computing*, 504 F.2d at 538 (employing "reasonable royalty" approach that would more completely compensate the plaintiff in that case).  The evidence permitted the jury to conclude that: (1) TCS used Epic's trade secrets and confidential information in a number of ways, including to improve its competing Med Mantra software and market that software to one of Epic's largest customers; (2) Epic and TCS are competitors in the electronic health records market, including in the United States; and (3) Epic's development of the stolen trade secrets and confidential information required substantial investment by Epic.  But it is worth noting that the circumstances identified by the *University Computing* court as weighing in favor of an award of avoided R&D costs are those that TCS has argued exist in this case.

In short, as this Court recognized, Mr. Britven's "approach for arriving at" a calculation of the value of the trade secrets and confidential information stolen by TCS, by using Epic's R&D costs as a proxy for what it would have cost TCS to obtain the trade secrets and confidential information in a lawful manner, "is perfectly justified."   Dkt. No. 898 at 6 (recognizing there is "not a problem with the expert's methodology").[11]

## III.   The Jury Properly Found that TCS Used Epic's Trade Secrets and Confidential Information, and Awarded Epic Damages for the Value of the Stolen Information.

Although not required by the law, the jury was instructed that it could "only award damages for the development costs saved by misappropriation of Epic's trade secrets or confidential information if the trade secrets or confidential information were in fact *actually* used by TCS."   Dkt. No. 873.   On the basis of that instruction, TCS argues there was not even "a single shred of evidence to suggest that TCS used" Epic's information.   Dkt. No. 914 at 1.

---

[11] To the extent TCS now challenges Mr. Britven's methodology, that "issue was forfeited" by its failure to make a *Daubert* challenge.  *See Estate of Moreland*, 395 F.3d at 756; *see also* Dkt. No. 896 at 135-36 (TCS's counsel acknowledging that Mr. Britven's "analysis" is not "wrong" and explaining TCS did not bring a *Daubert* motion because its concern was with whether the "facts" show use, not a concern with Mr. Britven's methodology).

With respect to facts, TCS complains that Mr. Britven purportedly "relied on an assumption not borne out by the evidence," Dkt. No. 914 at 37, which was his supposed assumption that Epic's trade secrets and confidential information were used in developing Med Mantra.  But the law does not require that stolen trade secrets and confidential information be put to any particular "use" to require the thief to compensate the rightful owner for the value of the property it took.  *Supra* pp. 11-18.  In other words, contrary to TCS's assertion, for purposes of calculating the value of stolen property, "use *is* use."  *See* Dkt. No. 914 at 41 (emphasis added).  Put simply, that Epic believed at the outset of the case that TCS had used the stolen information in one way, but the evidence at trial showed that TCS also used it in other ways, does not alter the critical damages inquiry:  what is the value of the property TCS took from Epic?

The fact that Mr. Britven assumed "use" also does not undermine his methodology.  It is common practice for damages experts to assume the existence of predicate facts, as TCS's own expert did in making the contrary assumption that TCS did not "use" Epic's trade secrets and confidential information.  *See* Dkt. No. 898 at 51, 53; *see also, e.g., Sys. Dev. Integration, LLC v. Comput. Sci. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) (explaining that it "is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion" and that to "hold otherwise would be illogical").

20

### A.      TCS Faces a Heavy Burden in Setting Aside the Jury's Damages Verdict.

As a starting point, TCS ignores the "stringent standard" that TCS faces in seeking to set aside the jury's damages verdict:  The Court may grant TCS's motion for judgment as a matter of law only if it determines that "no rational jury could have found for [Epic]" after reviewing all evidence "in the light most favorable to [Epic]."  *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 629-30 (7th Cir. 1996); *see also Tart v. Ill. Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004).

Accordingly, the Court must "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to [Epic]."  *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834-35 (7th Cir. 2013); *see also Haley v. Gross*, 86 F.3d 630, 632 (7th Cir. 1996).  This exercise requires the Court to "disregard all evidence favorable to [TCS] that the jury is not *required* to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (emphasis added) (quoting 9A Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. § 2529, at 299 (2d ed. 1995)).  Further, when conducting this analysis, a court "shall not second-guess the jury's view of the contested evidence," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003), and must refrain from "mak[ing] credibility determinations or weigh[ing] the evidence."  *Reeves*, 530 U.S. at 150-51 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Indeed, the jury was entitled to disbelieve the evidence TCS put forth in support of its theory, *i.e.*, that the stolen trade secrets and confidential information were used only for testing, in favor of Epic's competing evidence.  *See Lust v. Sealy, Inc.*, 383 F.3d 580, 582 (7th Cir. 2004) (rejecting defendant's attempt to seek judgment as a matter of law by "treating as gospel self-

21

serving testimony of [its employees] . . . that the jury was free to disbelieve"). After all, "[i]ssues of credibility and the weight to be given to the evidence are completely within the province of the jury," *McLean v. Badger Equip. Co.*, 868 F. Supp. 258, 263 (E.D. Wis. 1994), and there was substantial evidence at trial that TCS's witnesses lied, allowed the destruction of material evidence, and engaged in a campaign to "suppress the truth." *E.g., infra* pp. 54-56.

Relying on *Heft v. Moore*, TCS argues that a "plaintiff must do more than argue that the jury might have disbelieved all of the defendant's witnesses. Rather, the plaintiff must offer substantial affirmative evidence to support her argument." Dkt. No. 914 at 8-9 (citing 351 F.3d 278, 284 (7th Cir. 2003)). But the plaintiff in *Heft* "offered *no* affirmative evidence" in support of her case and, indeed, her "testimony contradict[ed] her own theory." 351 F.3d at 284 (emphasis added). In other words, *Heft* was "a no-evidence case, and such a case a plaintiff must lose, because he has the burden of proof." *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 746-47 (7th Cir. 1994). Here, however, both parties offered evidence supporting their theories of the case, as this Court found in denying TCS's motion for summary judgment. *See* Dkt. No. 538 at 2, 62 (recognizing Epic had sufficient evidence of "use" to go to a jury); *see also* Dkt. No. 703 at 20 (same).

TCS also ignores the "preponderance of the evidence" standard on which the jury was instructed, as well as the jury's ability to rely on circumstantial evidence and draw reasonable inferences from the evidence presented. *See, e.g.*, Dkt. No. 857 at 8 (instructing the jury on "drawing of inferences"); Dkt. No. 858 at 1-2 (instructing the jury on burdens of proof); *id.* at 3 (reiterating that reasonable inferences may be drawn from direct or circumstantial evidence). Courts have recognized the importance that these factors play in trade secret cases, since "[m]isappropriation and misuse can rarely be proved by convincing direct evidence." *SI*

22

*Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985); *see also, e.g.*, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876-77 (N.D. Ill. 2001) (same).

Presented with "defendants' witnesses who directly deny everything," trade secret plaintiffs often must "construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *SI Handling*, 753 F.2d at 1261 (holding fact-finder was permitted to "surmise that . . . trade secrets were being used" even in the absence of direct evidence of use); *RKI, Inc.*, 177 F. Supp. 2d at 876-77 ("Because direct evidence of theft and use of trade secrets is often not available, the plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence."); *accord Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (holding it was "entirely reasonable for [the jury] to infer" that the defendant used the plaintiff's trade secret "from the circumstantial evidence presented" at trial and denying motion for judgment as a matter of law).

As demonstrated below, the evidence at trial provided a more than sufficient basis for the jury to conclude that TCS not only took Epic's trade secrets and confidential information, but also used the stolen information in a variety of ways. In addition, the jury received an adverse inference instruction permitting it to "assume" that the missing evidence it learned about at trial "contained information helpful to Epic and harmful to TCS." Dkt. No. 858 at 3. Indeed, one of the non-exclusive examples in the instruction authorized the jury to assume that the now-destroyed evidence "would have shown that [Epic's] information was used for improper purposes." *Id.* at 4.

23

**B.     The Jury Was Clearly Instructed that it Must Find Use To Award Damages.**

Before the jury began its damages deliberations, after having already been instructed that

it must find some "use," the Court provided additional direction on the meaning of "use:"

> During the course of testimony, it became clear that there are varying views on
> what constitutes "use."  Here, "use" requires more than simple knowledge of the
> trade secrets.  Instead, Epic must prove by a preponderance of the evidence that
> TCS exploited this information, for example, by developing a marketing strategy,
> informing its competitive position within the EHR market, or refining TCS's
> software products.  Although the focus of damages is on the *benefit* to TCS, "use"
> does not necessarily require a showing that TCS relied on Epic's confidential
> information to successfully develop, market and sell a competitive product.

Dkt. No. 873; *see also* Dkt. No 872 at 3; Dkt. No. 907 at 110:2-10, 118:20-23.

"[J]uries are presumed to follow the court's instructions."  *CSX Transp., Inc. v. Hensley*,

556 U.S. 838, 841 (2009) (recognizing that our "jury system is premised on the idea that

rationality and careful regard for the court's instructions will confine and exclude jurors' raw

emotions"); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 588 F.3d 445, 461-62 (7th Cir. 2009)

(holding "we presume that juries follow the court's instructions" and therefore concluding the

jury followed the instructions respecting compensatory damages); *Sokol*, 15 F.3d at 1433

(presuming jurors understood and followed instructions on trade secret damages).

TCS has not established that the jury disregarded the Court's clear instructions requiring

jurors to find that TCS "used" Epic's trade secrets and confidential information to award

compensatory damages.  *See 3M*, 259 F.3d at 600; *BP Amoco Chem. Co. v. Flint Hills Res., LLC*,

697 F. Supp. 2d 1001, 1024 (N.D. Ill. 2010) (finding no "basis for a judgment as a matter of law"

where moving party "failed to establish that the jury did not follow the [court's] instruction").

Accordingly, the Court must presume that the jury followed these instructions and found "use."

*See* Dkt. No. 873.

### C.     Epic Presented Substantial Evidence of Use.

As detailed below, Epic presented evidence at trial that TCS used Epic's trade secrets and confidential information in several ways, including to (1) formulate a U.S. entry strategy for its medical software product, (2) prepare an analysis comparing Epic's software to TCS's Med Mantra software product, and (3) improve one or more of its own medical software products. This evidence was buttressed by the adverse inference instruction, which allowed the jury to "assume" that additional evidence not shown at trial would have "contained information helpful to Epic and harmful to TCS."  Dkt. No. 858 at 3.  Indeed, the Court previously held that there was sufficient evidence of use to allow the case to go to the jury.  *See* Dkt. No. 538 at 2 ("a reasonable jury *could* find improper use based on circumstantial evidence in this record"); *id.* at 62 (holding Epic "put forth sufficient evidence [at the summary judgment stage] to support . . . a jury finding in its favor on improper use"); Dkt. No. 703 at 20 (reiterating that the Court "already determined that there is sufficient evidence from which a reasonable jury could infer improper use" of Epic's information to "develop or enhance Med Mantra or other TCS products").

### 1.     TCS Used Epic's Information to Develop its U.S. Entry Strategy.

The evidence showed that TCS employees had access to Epic's UserWeb before May 2012.  Tr. Ex. 163; Tr. Ex. 285 at 8.   TCS management, including President Suresh Muthuswami, knew that TCS had been enjoying access to Epic's information, and that TCS's loss in May 2012 of the "one guy in our team who had access" left the company in a "[d]ire state."  *Id.*  Shortly thereafter, TCS employees began using Mr. Gajaram's credentials to access and download information from the UserWeb.  Tr. Ex. 2751; Dkt. No. 891 (Gajaram) at 56:4-7, 58:23-60:15; *see also, e.g.*, Dkt. No. 922-8 (Gunasekaran Clip Report) at 55:2-56:4, 57:2-7, 62:6-8, 63:10-12, 66:15-21.  Indeed, as the Court recognized in its summary judgment order,

there was sufficient evidence for the jury to infer that TCS hired Mr. Gajaram *because of* his access to UserWeb.[12]

TCS admitted that it does not know who all accessed Epic's UserWeb using Mr. Gajaram's credentials, or who received or reviewed materials others obtained from the UserWeb.[13]  The evidence also showed that it is impossible to determine the full spectrum of information that TCS employees accessed or reviewed.  In addition to downloading documents using Mr. Gajaram's account (for which there are some remaining records), TCS employees accessed an unknown quantity of other information, which they either reviewed on the computer screen or cut-and-pasted into emails or Microsoft Word documents (neither of which would appear in Epic's download logs).[14]

Several months after Mr. Gajaram joined TCS and TCS employees began using his account to access the UserWeb, President Muthuswami and his direct report, Syama Sundar, prepared a presentation for TCS's CEO, Natarajan Chandrasekaran, regarding TCS's HealthCare strategy.  Tr. Exs. 159, 159A; Dkt. No. 901 at 81-82.  A key portion of the presentation focused on TCS's "US Entry Strategy" for its Med Mantra product.  Tr. Ex. 159-A at 2.  The presentation recognized that there were "key gaps in functional areas" that "need[ed] to be built into" Med

---

[12] Dkt. No. 538 at 16 n.10; *see* Dkt. No. 891 at 80:2-10, 18-19 (Gajaram testifying he used UserWeb at CSC, where his primary job was to test the Epic application); *id.* at 79:11-23 (Gajaram testifying he was likely recommended to work for TCS based on his past experience testing Epic's software); *id.* at 78:10-18, 79:3-4 (Gajaram testifying that TCS offered him a "far better" pay package than he had at CSC); *id.* at 58:23-60:15 (Gajaram testifying he told Mukesh Kumar about his UserWeb access "around the time [he] started at TCS" and began sharing his password with others); Dkt. No. 922-8 (Gunasekaran Clip Report) at 55:2-56:4, 57:2-7, 62:6-8, 63:10-12, 66:15-21, 69:25-70:15.

[13] Tr. Ex. 2078 at 4, 9; Dkt. No. 902 (Menon) at 59:2-13, 59:17-60:12; 61:25-62:14; Dkt. No. 891 (Gajaram) at 60:25-61:25; Dkt. No. 895 (Laykin) at 49:5-50:4, 53:5-8, 53:17-21; Dkt. No. 891 (Muthuswami) at 32:7-22; Dkt. No. 901 (Sundar) at 113:25-114:11.

[14] Dkt. No. 891 (Gajaram) at 58:15-18; Dkt. No. 815 at 3 (Kartha Stip.) ¶ 9; Dkt. No. 809 at 7 (Ponnambalam Stip.) ¶ 9; Dkt. No. 922-8 (Gunasekaran Clip Report) at 72:24-73:8; Dkt. No. 895 (Laykin) at 54:23-55:4; Dkt. No. 895 (Martin) at 164:17-165:4.

2437265

Mantra and concluded that this would require an "[i]nvestment of 1800 person months of development effort." *Id.*

In other words, after having unfettered access to Epic's UserWeb through Mr. Gajaram's credentials for 12 months, TCS determined that it would take "1800 person months of development effort" for TCS to make its Med Mantra product ready for the U.S. market. *Id.* A rational jury could infer that this understanding came from TCS's knowledge of Epic's software based on its access to Epic's trade secrets and confidential information. *Cf. Aspen Tech.*, 569 F. App'x at 266 (holding jury could infer use based on "possession," the defendant's "calculated attempt to acquire [the plaintiff's] confidential information," and testimony on "specific ways" the defendant "could have used" the trade secrets to its advantage).[15]

In light of the substantial investment required to make the Med Mantra product U.S.-ready, Mr. Muthuswami and Mr. Sundar recommended that TCS "leverage" the "modular architecture of Med Mantra to create and promote Departmental/Functional Solutions" and "us[e] DaVita as a reference site to promote Lab Management solution to Hospitals and Independent Laboratories." Tr. Ex. 159-A at 2. According to testimony from TCS and DaVita employees, this strategy recommendation was adopted: TCS proceeded to develop a lab module with DaVita, and both companies understood that TCS's goal was to use the DaVita product as a

---

[15] As explained above, "direct evidence" that TCS used Epic's confidential information and trade secrets to devise its "1800 person months" estimate is unnecessary and, in any event, its absence is "not surprising, since any plaintiff would be hard pressed to present direct proof of the flow of information inside the defendant's company." *Sokol*, 15 F.3d at 1432 (holding a reasonable jury could infer that the defendant's President "had access" to the stolen trade secrets in light of evidence that a company engineer had access to them); *see also SI Handling*, 753 F.2d at 1261 (trade secret plaintiffs are permitted to "construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place"); *RKI, Inc.*, 177 F. Supp. 2d at 876 ("plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence").

springboard to launch TCS's laboratory solution into the U.S. market.[16]  TCS's strategy appears
to have worked.  In 2013, TCS entered into an agreement with another U.S.-based company,
Quest Diagnostics, to license TCS's laboratory solution.   Tr. Ex. 557; Dkt. No. 922-23
(Srinivasan Clip Report – Rebuttal) at 156:10-157:7, 157:11-13, 157:15-20.

Using Epic's trade secrets and confidential information to inform its "US Entry
Strategy" — including what to do (*i.e.*, develop a laboratory module for DaVita and use it as a
"reference site" to sell the lab module to other hospitals and labs) and, equally importantly, what
not to do (*i.e.*, invest 1800 person months to make the improvements necessary to market the full
Med Mantra solution in the U.S.) — certainly qualifies as "use," requiring TCS to compensate
Epic for the value of the stolen information.  *See* Dkt. No. 873; *see also Aspen Tech.*, 569 F.
App'x at 267-68 (use of trade secrets to "avoid making . . . mistakes" or determine "where [the
defendant] need not waste its time and resources" "constitute[s] 'use' under the *Restatement*");
*Univ. Computing*, 504 F.2d at 542 (use of stolen trade secret to "serve[] the commercial
interests" of the defendant constitutes "use"); *accord* Dkt. No. 898 at 87-88 (using Epic's
confidential information to "draw some conclusions about how they need to get it into market . . .
would be evidence of a benefit" for which Epic would be entitled to compensation).  The jury
was entitled to award damages to compensate Epic for the benefit TCS received by using Epic's
trade secrets and confidential information in connection with developing a U.S. entry strategy.
*See* Dkt. No. 871 at 1(b) (awarding damages to compensate Epic for TCS's use of Epic's
confidential information in ways other than the comparative analysis).

---

[16] Tr. Exs. 156, 159, 159A; Dkt. No. 890 (Guionnet) at 8:2-9:12; Dkt. No. at 901 (Sundar) at 78:22-25,
80:4-25; Dkt. No. 922-21 (Reddy Clip Report) at 138:21-139:22; Dkt. No. 922-12 (Krishnaswamy Clip
Report) at 101:17-102:9, 102:11-14; Dkt. No. 922-6 (Cline Clip Report) at 114:18-115:2, 116:20-117:2,
117:5-13.

2437265

2.   <u>TCS Used Epic's Information to Prepare a Comparative Analysis.</u>

Mr. Muthuswami's and Mr. Sundar's September 2012 "US Entry Strategy" presentation to TCS's CEO reflected their belief that there were "key gaps" in Med Mantra that would "need to be built into the platform" before TCS could sell the product to U.S. customers.  Tr. Ex. 159; Tr. Ex. 159-A at 2.  And although they evidently thought the best short-term option for TCS's "US Entry Strategy" was to focus on a laboratory product, the company apparently was not ready to abandon a broader long-term strategy.  To that end, Venugopal Reddy approached DV Prasad, a former Med Mantra team member then working on the Kaiser team, a few months later and asked him to "prepare a presentation comparing functionality between MedMantra Vs Epic . . . and share it with him such that we can assess Me[d]Mantra and see if we [can] directly sell Me[d]Mantra to Kaiser or make necessary changes and then go to Kaiser."  Tr. Ex. 423; Dkt. No. 922-20 (Prasad Dudduruku ("Prasad") Clip Report) at 14:22-25, 15:22-16:1, 16:4-19, 163:3-170:6, 172:21-173:21.  Mr. Prasad testified that he declined to prepare the requested presentation because he "kn[e]w it [wa]s not right" to use "confidential" customer information for such an analysis and "didn't want to get into any trouble."  Dkt. No. 922-20 (Prasad Clip Report) at 174:9-175:13; *see also* Dkt. No. 922-14 (M. Kumar Clip Report) at 98:9-14, 98:16-21 (testifying that he would not have sent documents to Naresh Yallapragada if he had known the purpose was to prepare a comparative analysis).

TCS eventually found a willing participant in Naresh Yallapragada, a functional consultant from the Med Mantra team.  *See* Tr. Exs. 14, 39.[17]  The jury heard that, over a one-

---

[17] TCS continues to dispute that Naresh Yallapragada was "working on Med Mantra at the time he created the comparative analysis."  Dkt. No. 914 at 17.  The Court need not wade into this dispute.  First, it was up to the jury to weigh the competing evidence offered by the parties and determine whether Mr. Yallapragada was a member of the Med Mantra team.  *See* Dkt. No. 538 at 25 n.18.  For example, the jury was entitled to accept TCS's admission in the organizational chart it prepared for this case that "Naresh [Yallapragada] was part of this team [Med Mantra]."  Tr. Ex. 14; *see also* Dkt. No. 901 (Sundar) at 50:6-

29

month period in the spring of 2014, Mr. Yallapragada worked with "subject matter experts" from the Testing Center of Excellence ("TCoE") to prepare a comparative analysis between Epic's software and its own Med Mantra software.[18]  The jury was presented with evidence that the purpose of this comparative analysis, which was ultimately shared with Venugopal Reddy and the two client partners for the Kaiser account, was to assess Med Mantra and determine whether TCS could market Med Mantra, or some component of it, to Kaiser.[19]  The jury found that TCS obtained a benefit by "using" Epic's trade secrets and confidential information to prepare this comparative analysis, and explicitly awarded damages on that basis.  Dkt. No. 871 at 1(a).  The jury's conclusion was not "irrational," and was supported by legally sufficient evidence.  *See Emmel*, 95 F.3d at 629-30.

TCS does not dispute that Naresh Yallapragada prepared a comparative analysis between Epic's software and Med Mantra based on information he received about Epic's software from TCS employees testing Epic's software in the TCoE.  Instead, TCS claims Epic failed to prove that the comparative analysis was prepared using Epic's trade secrets and confidential

20.  Second, and perhaps more importantly, it is immaterial whether Mr. Yallapragada was technically "on" the Med Mantra team when he prepared the comparative analysis.  It is undisputed that Mr. Yallapragada was never entitled to this information as a member of the Kaiser team, and was a functional consultant for the Med Mantra team until at least November 2013, shortly before he was assigned to prepare the comparative analysis.  *See, e.g.*, Dkt. No. 891 (Muthuswami) at 16:3-8, 40:11-24; Dkt. No. 922-21 (Reddy Clip Report) at 210:2-13.  He therefore had both the institutional knowledge to compare Epic to Med Mantra (there is no evidence, for example, that WebExes, phone calls, or document-sharing was necessary to teach Mr. Yallapragada about the functionalities of Med Mantra) and the contacts to share helpful information gained from his analysis with his Med Mantra colleagues easily.  *Cf. Sokol*, 15 F.3d at 1432 (discussing permissible inference regarding information-sharing within company).

[18] Tr. Exs. 39, 196, 197, 199, 199A, 204, 209-213; Dkt. No. 922-14 (M. Kumar Clip Report) at 49:17-54:17, 64:11-65:13, 67:23-70:10, 71:9-72:5, 96:5-97:5, 98:4-99:21, 101:4-21, 102:3-104:4, 107:20-109:14; Dkt. No. 922-24 (Telkapalli Clip Report) at 27:8-28:17, 30:7-32:20, 34:12-37:2, 42:9-64:23, 71:21-72:6; Dkt. No. 809 at 1 (Khader Stip.) ¶¶ 10-11; Dkt. No. 922-25 (Vadamalai Clip Report) at 54:3-64:25, 83:22-84:11.

[19] Tr. Exs. 39, 169, 199, 199A, 423; Dkt. No. 922-21 (Reddy Clip Report) at 209:3-210:1; Dkt. No. 922-20 (Prasad Clip Report) at 169:24-170:6; Dkt. No. 895 (Laykin) at 85:4-8, 85:13-18; Dkt. No. 902 (Menon) at 34:7-17, 43:19-44:1 (testifying that Reddy was involved in both Kaiser and Med Mantra and Mukherji is a TCS executive in charge of the Kaiser account).

2437265

information (as opposed to some "general" knowledge of Epic's software). TCS then takes its "use" argument one step further, arguing that even if TCS used Epic's confidential information to make the comparative analysis, Epic is entitled to compensation only if it proved TCS used the comparative analysis to either improve Med Mantra or market it to Kaiser. But this specific form of "use" envisioned by TCS was not required by the law, as explained above. Nor was this specific form of use required by the jury instructions, instructions to which TCS raised no contemporaneous objection. In short, TCS is wrong on all counts.

> a. **The Jury Was Entitled to Find that TCS Used Epic's Confidential Information to Prepare the Comparative Analysis.**

TCS once again contends that Epic failed to prove that the comparative analysis was prepared using Epic's trade secrets and confidential information because the comparative analysis supposedly "could have" been prepared with "general" knowledge of Epic software. As a preliminary matter, TCS was barred from making this argument to the jury because it failed to present any evidence during discovery that the comparative analysis *was* prepared with "generic" publicly-available information. Dkt. No. 703 at 7-8. Regardless, as the Court previously found, there was "sufficient circumstantial evidence for a reasonable jury to make th[e] inference" that the comparative analysis was prepared with Epic's trade secrets and confidential information. Dkt. No. 538 at 41.

The evidence presented at trial showed widespread sharing of Mr. Gajaram's UserWeb credentials, extending to at least dozens of TCS employees.[20]  From June 2012 through June 2014, Mr. Gajaram's credentials were used to download over 6,000 documents, and to view and

---

[20] Dkt. No. 891 (Gajaram) at 59:15-60:15; Dkt. No. 891 (Anandhan) at 109:20-15, 109:22-25, 112:16-25; Dkt. No. 922-8 (Gunasekaran Clip Report) at 69:25-70:24, 95:13-97:1; Dkt. No. 809 at 3 (Narasimhan Stip.) ¶ 7; Dkt. No. 809 at 7 (Ponnambalan Stip.) ¶ 5; Dkt. No. 809 at 9 (Susmita Stip.) ¶¶ 5, 6, 8; Dkt. No. 815 at 1 (Kartha Stip.) ¶¶ 7, 8; Dkt. No. 815 at 3 (Kaspar Stip.) ¶ 2; Dkt. No. 895 (Laykin) at 53:5-8, 53:17-21.

copy-and-paste a substantial quantity of other confidential information from the UserWeb.[21] Because of the broad dissemination of Mr. Gajaram's credentials, TCS admits that it *does not know* how many of its employees had access to the UserWeb, *which* employees had access, *what* those employees did with the information they obtained, or with *whom* they shared the information. *Supra* n.13; *see also* Dkt. No. 922-4 (Bandarapu Clip Report) at 111:15-115:2.

At the very least, it is undisputed that dozens of employees in the TCoE accessed Epic's UserWeb. *Supra* n.20. The evidence also showed that information was shared freely among employees in the TCoE, including across teams.[22] These TCoE employees then shared their knowledge about Epic's software with Naresh Yallapragada who, in turn, used that information to prepare a comparison between Epic and Med Mantra. *Supra* n.18. A reasonable jury could certainly conclude from this evidence — as this jury did — that information from the UserWeb made its way into the comparative analysis through the dozens of conversations and WebExes that were arranged to allow TCS employees testing Epic's software to share "all the knowledge that [they] ha[d]" with Naresh Yallapragada. *Id.*; Tr. Exs. 196, 197; *see also* Dkt. No. 895 (Laykin) at 86:4-87:3; *Sokol*, 15 F.3d at 1432 (holding that a reasonable jury could infer trade secrets were shared internally and recognizing that "any plaintiff would be hard pressed to present direct proof of the flow of information inside the defendant's company"). The jury's conclusion was particularly reasonable in this case, in light of TCS's spoliation of information that would have assisted Epic in tracing the flow of its information, and the resulting adverse inference instruction (*see infra* n. 28).

---

[21] Tr. Ex. 2099; Dkt. No. 889 (Martin) at 149:5-159:19; Dkt. No. 895 (Laykin) at 44:21-45:20; Dkt. No. 895 (Martin) at 164:17-165:4; Dkt. No. 891 (Gajaram) at 58:15-18; Dkt. No. 815 at 3 (Kartha Stip.) ¶ 9; Dkt. No. 809 at 7 (Ponnambalam Stip.) ¶ 9; Dkt. No. 922-8 (Gunasekaran Clip Report) at 72:24-73:8

[22] Dkt. No. 809 at 3 (Narasimhan Stip.) ¶¶ 8, 9; Dkt. No. 809 at 5 (Pandurangan Stip.) ¶ 10; Dkt. No. 815 at 1 (Kartha Stip.) ¶¶ 1, 7, 8, 11; Dkt. No. 809 at 9 (Susmita Stip.) ¶¶ 1, 5, 8; Dkt. No. 922-8 (Gunasekaran Clip Report) at 95:13-97:1.

2437265

TCS asks the Court to disregard all of this evidence and instead credit statements by four employees involved in making the comparative analysis that they never used the UserWeb.  *See* Dkt. No. 914 at 27-28.  But the jury was not required to accept the self-serving testimony of TCS's witnesses, particularly when jurors heard evidence that these same employees participated in a campaign to suppress the truth and lied about their access to UserWeb.  *Lust*, 383 F.3d at 582-83; *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 302 (7th Cir. 2010) ("When faced with conflicting, or even inconsistent testimony, the jury is free to believe one side over the other.").  For example, the jury was entitled to discredit Mukesh Kumar's claims that he had "never seen" UserWeb and had never "seen anybody else log in" to UserWeb (*see* Dkt. No. 922-14, M. Kumar Clip Report at 30:13-31:9) in light of Ramesh Gajaram's testimony that, shortly after joining TCS, he told Mr. Kumar he had access to Epic's UserWeb and "logged on and showed [Mr. Kumar] the portal."   Dkt. No. 891 at 58:23-60:4 (estimating that he had "approximately 10 or so conversations with Mr. Kumar over time about Epic UserWeb and [his] access" and testifying that Mr. Kumar knew he was sharing his UserWeb password with others); *see also* Dkt. No. 809 at 7 (Ponnambalan Stip.) ¶ 8 (Mr. Kumar knew about her team's access).

Likewise, the jury was entitled to disbelieve Nazia Khader's statement that she "never logged in to UserWeb" (*see* Dkt. No. 809 at 1, ¶ 4) when jurors knew she sent a message to Mr. Gajaram stating, "Your UserWeb ID in Epic community library was not working" (*id.* ¶ 7; Tr. Ex. 116), and contrary testimony that everyone on the Northwest team, including Ms. Khader, had access to the UserWeb through Mr. Gajaram's credentials.  Dkt. No. 815 at 3 (Kaspar Stip.) ¶ 2; *see also, e.g.*, Dkt. No. 922-8 (Gunasekaran Clip Report) at 84:16-21, 85:12-86:2, 86:10-19 (testimony contradicting Ms. Khader's statements that Ms. Gunasekaran had told her to message Mr. Gajaram about his UserWeb password); Tr. Ex. 2078.

33

And jurors were permitted to disregard as untruthful Mr. Telkapalli's testimony that he didn't even know what the UserWeb *is* (*see* Dkt. No. 922-24, Telkapalli Clip Report at 22:8-17), given testimony that dozens of his fellow testers had access to UserWeb and that testers on his team (N. Cal.) were directed to stop accessing UserWeb.  *See* Dkt. No. 809 at 9 (Susmita Stip.) ¶¶ 1, 5, 8.  Finally, the jury was well within its right to disbelieve Mr. Vadamalai's testimony that he had never seen UserWeb or any information from UserWeb (*see* Dkt. No. 922-25, Vadamalai Clip Report at 43:4-18), given Mahendra Pandian's testimony that Mr. Vadamalai was one of the leaders of the "suppress the truth" campaign intended to hide evidence of TCS's access to the UserWeb.  Dkt. No. 922-19 (Pandian Clip Report) at 112:18-113:16; *see also* Dkt. No. 809 at 5 (Pandurangan Stip.) ¶ 10 (testifying Vadamalai directed her to provide UserWeb materials to a member of the S. Cal. team).  In short, it is anything but "clear that the TCS employees who assisted Mr. Yallapragada in creating the comparative analysis did not use Epic information from UserWeb to do so," Dkt. No. 914 at 27, as TCS now insists.[23]

---

[23] TCS also misstates the evidence in claiming that it shows the comparative analysis was prepared with "general knowledge of the testing team members."  Dkt. No. 914 at 27-28.  For example, Ms. Khader did not "testif[y] that any information [she] gave to Mr. Yallapragada was based on [her] general understanding of Epic's software, not any confidential information, and not from UserWeb."  *Id.* at 27.  Rather, she "testified that the presentation shown to Mr. Yallapragada contained information about Epic's emergency department functionalities, screen shots of Epic's emergency department module, showed the work flow of the module, and described 'how to work with it and how to test it.'"  Dkt. No. 809 at 1 (Khader Stip.) ¶ 11.  Ms. Khader's stipulation said nothing about where the information came from, whether from the UserWeb or otherwise.  *See generally id.*

Nor would the fact that the comparative analysis was derived from "general knowledge of the testing team members," even if true, insulate TCS.  The evidence presented at trial demonstrated that the "general knowledge of the testing team members" was greatly informed by information they obtained from the UserWeb, either directly, from other TCS team members, or from Kaiser or Epic.  Dkt. No. 895 (Laykin) at 86:4-87:3; *see, e.g.,* Dkt. No. 809 at 3 (Narasimhan Stip.) ¶¶ 7-9; Dkt. No. 809 at 7 (Ponnambalan Stip.) ¶¶ 3, 5, 9, 10; Dkt. No. 809 at 9 (Susmita Stip.) ¶¶ 5, 6; Dkt. No. 815 at 1 (Kartha Stip.) ¶¶ 3, 7-9, 11, 12; Dkt. No. 815 at 3 (Kaspar Stip.) ¶¶ 2, 5; Dkt. No. 922-8 (Gunasekaran Clip Report) at 55:24-56:7, 57:2-7, 69:25-70:24; Dkt. No. 891 (Anandhan) at 110: 8-15; 136:14-137:5; Dkt. No. 891 (Gajaram) at 85:24-86:11, 90:6-8, 92:5-14.  Regardless of how TCS employees obtained Epic's confidential information from the UserWeb or otherwise, they were barred from using that information to prepare a comparative analysis.  *See* Tr. Ex. 3 ¶ 3(c)(ii), (vii).

TCS's argument that Epic's clients have knowledge of "the type of information in the comparative analysis," Dkt. No. 914 at 28-29, also does nothing to undermine the confidentiality of that information.  After all, unlike TCS, Epic's clients *are* authorized to access the UserWeb.  *See* Dkt. No. 889 (Martin) at 117:2-5, 118:16-119:14; Dkt. No. 900 (Martin) at 41:4-7.  The fact that Epic's clients also have access to information available on the UserWeb says nothing about whether *TCS* was permitted to access or use this information to prepare a comparative analysis.  As the jury found, it was not.

Finally, the jury could conclude that TCS used Epic's confidential information to prepare the comparative analysis *even if* jurors found that information from the UserWeb was not incorporated into the comparative analysis.  The jury heard evidence and argument that the scope of Epic's confidential information was not limited to information on the UserWeb but, rather, extended to "any information" TCS or its employees "obtain[ed] from Epic or [Kaiser] as to the [Epic software], Epic or Epic's plans or customers, including without limitation information concerning the functioning, operation or Code of the [Epic software], Epic's training or implementation methodologies or procedures, or Epic's planned products or services."  Tr. Ex. 3 ¶ 1(b); Dkt. No. 889 (Martin) at 114:5-9, 114:14-115:15; Dkt. No. 901 (Muthuswami) at 134:24-135:24.  Based on the definition of "confidential information" to which TCS agreed (*see* Tr. Ex. 3 ¶ 1(b)), the jury easily could conclude that the comparative analysis incorporated Epic's confidential information even if it found insufficient evidence that information from the UserWeb was included.  Indeed, the jury heard both Iyappan Rathina and DV Prasad admit that the comparative analysis contained Epic's confidential information.  Dkt. No. 821 at 3 (Rathina Stip.) ¶ 12; Dkt. No. 922-20 (Prasad Clip Report) at 174:9-175:4; *see also* Dkt. No. 893 (Rishel) at 71:16-19.

**b.** **The Jury Was Entitled to Find that TCS Used Epic's Trade Secrets in Preparing the Comparative Analysis.**

1) TCS Forfeited its Ability to Challenge Epic's Trade Secret Claim for Lack of Specificity.

TCS's argument that Epic failed to identify its trade secrets with specificity comes far too late in the case to warrant this Court's consideration.  TCS never argued — either before or during trial — that Epic had failed to identify the stolen trade secrets with sufficient particularity. Nor did TCS move for judgment as a matter of law on this basis at either the close of Epic's case or the close of all the evidence.  *See* Dkt. Nos. 830, 843.

Rule 50(a)(2) permits a party to move for judgment as a matter of law before a case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).  The purpose of the rule "is that the opposing party should have a chance to rectify (or at least seek the court's leave to rectify) deficiencies in his evidence before it is too late, that is, before the case goes to the jury."  *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1556 (7th Cir. 1987); *see also R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99-1174, 2004 WL 1613563, at *4 (N.D. Ill. July 19, 2004).  Thus, "the ability to make a 'renewed' motion must be predicated on the filing of an initial motion in which each legal and factual ground for relief must be specifically laid out."  *R.J. Reynolds*, 2004 WL 1613563, at *4 (citing Fed. R. Civ. P. 50(a)(2)).  This rule makes sense:  a party should not be permitted to lie in wait in the hope that its opponent omits a critical piece of evidence, only to raise the purported omission *after* the jury reaches a verdict.  TCS's late assertion of problems it now claims to perceive with Epic's identification of the stolen trade secrets "completely defeats this purpose" and is therefore forfeited.  *Id.*; *see also Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003); *Chemetall GmbH v. ZR Energy, Inc.*, No. 99-4334, 2001 WL 1104604, at *4 (N.D. Ill. Sept. 18, 2001) (holding defendant's argument that plaintiff failed to show the

36

2437265

misappropriated information constituted a trade secret was waived for failure to make a pre-verdict motion on the issue).

               2)    <u>Epic Presented Sufficient Evidence that TCS Used its Trade Secrets to Prepare the Comparative Analysis.</u>

In addition to being raised too late, TCS's argument fails on the merits. TCS claims that there "was no credible evidence from which the jury could conclude that Epic's trade secrets were used to create the comparative analysis," (Dkt. No. 914 at 29), but its argument is belied by the evidence. Mr. Martin identified trade secrets as among the information used by TCS to prepare the comparative analysis. As TCS acknowledges, Mr. Martin identified Foundations documents as trade secrets. Dkt. No. 900 at 14:20-15:11, 26:3-27:16. Yet TCS now complains that Mr. Martin failed to identify which portion of the Foundations line item related to trade secrets incorporated in the comparative analysis.

<u>First</u>, TCS significantly overstates Epic's burden. The jury's verdict is subject to attack only if TCS can show that no rational juror could have found that TCS used Epic's trade secrets in preparing the comparative analysis. *See Emmel*, 95 F.3d at 629-30. TCS attempts to confuse the issue by relying on *IDX*, where summary judgment was entered for the defendant because the plaintiff failed to show that the allegedly misappropriated information qualified as a "trade secret" under WUTSA. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002). The Seventh Circuit agreed that, by "effectively asserting that all information in or about its software [wa]s a trade secret," the plaintiff had been "both too vague and too inclusive." *Id.* at 583. This is not the case here, where Epic identified 35 specific documents (out of over 1700 unique documents downloaded by TCS) as containing trade secrets. *See* Dkt. No. 889 (Martin) at 156:12-24; Tr. Ex. 1247; *cf. DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 78 (D.D.C.

2007) (distinguishing *IDX* where, rather than identifying an "entire software product," plaintiff "identified nine different features" as purported trade secrets).

TCS now attempts to argue that Epic had to show precisely *which* of the information contained in the 35 trade secret documents qualified as "trade secrets," and to prove that this specific information was incorporated into the comparative analysis.   TCS's argument was rejected in *Chemetall*, where the defendant claimed that the plaintiff failed to identify the specific aspects of its manufacturing process that constituted trade secrets.   As the court explained:

> [A]lthough the general verdict reached by the jury did not specify which element or elements in the plaintiff's ZMP process it found to be a trade secret, the verdict represents the jury's unanimous judgment that at least one element in this process was entitled to protection.  The instructions told the jury it could find for plaintiff on the trade secret claim only if the jury found that plaintiff possessed a trade secret, and gave the jury ample guidance on how to make that determination . . . . The Court finds that under these instructions (which are unchallenged here), there was sufficient evidence to allow a reasonable jury to find that Chemetall's ZMP process contained trade secret information–and that the defendants misappropriated it.

2001 WL 1104604, at *7.[24]

As in *Chemetall*, TCS's assertion that "some" of the information in the 35 documents "is not a trade secret," Dkt. No. 914 at 31, is a "non-starter," because "some" is not "all."  2001 WL 1104604, at *6.  The jury was instructed on the statutory requirements for a trade secret, Dkt. No. 858 at 9, and found that TCS misappropriated Epic's trade secrets.  Dkt. No. 855 at 2.  The jury was also directed that it could award damages for trade secret misappropriation only if it found that TCS "used" Epic's trade secrets.   Dkt. No. 872 at 3; Dkt. No. 873.   TCS has never

---

[24] The Seventh Circuit reached a similar conclusion in *3M*, rejecting the defendants' argument that the plaintiff had to "divulge what specific information contained within the more than 500 pages of materials could be considered secret."  259 F.3d at 595.  The Court found it irrelevant that a "host" of information contained in the misappropriated documents was in the public domain (and therefore not protected) because there was "sufficient evidence to support the jury's finding" that the documents also contained trade secrets, and that the defendants "used" those "operating procedures and manuals."  *Id.*

challenged these instructions, and it provides no basis to disturb the jury's finding that TCS used Epic's trade secrets in preparing the comparative analysis.  *See* Dkt. No. 871 at 1; *see also Chemetall*, 2001 WL 1104604, at *7; *SI Handling*, 753 F.2d at 1261 (in light of challenges in proving trade secret misappropriation, jury "may draw inferences which convince [it] that it is more probable than not that what plaintiffs allege happened did in fact take place," and may "surmise that . . . trade secrets were being used").

<u>Second</u>, even assuming some level of specificity was necessary to sustain the jury's verdict, TCS's argument fails on the record.  Mr. Martin testified about the value and importance of the Foundations documents, explaining that Foundations "is the heart and soul of how [Epic] store[s] information in the system and it's a unique thing for health care" that "differentiates Epic's software" from that of its competitors.  Dkt. No. 900 at 14:20-15:5; *see also id.* at 27:8-28:9 (Martin testifying that Foundations qualifies as a trade secret and "is really at the core of what we make and the products that we make").  As Exhibit 2527-B shows, the Foundations documents incorporate two categories of trade secret information:  data model/data architecture and configuration options.  Tr. Ex. 2527-B; *see* Dkt. No. 889 (Martin) at 155:3-156:11 (discussing trade secret status of information about configuration).  TCS points out that the data model column was disregarded in calculating damages attributable to the comparative analysis (*see* Dkt. No. 914 at 33), but TCS ignores the configuration component of Foundations, which Mr. Martin testified *was* incorporated into the comparative analysis.  Specifically, during the damages phase, Mr. Martin testified:  "My conclusion in reviewing the functional comparison was that there was sufficient detail included to include the *End User Screens* and *Workflow* column and the *Configuration Options* column and the *Integration* column." Dkt. No. 907 at 70:14-71:4.

Mr. Martin further explained the significance of the configuration information contained in the misappropriated trade secret documents, testifying that the configuration column contained information that "reflected the degree of configurability in the system and provided that blueprint of all of the configuration choices that are available in the software product that helped make the software behave for a small organization like GHC Madison here in town, scaling off all the way to a larger organization like Kaiser, or make it work internationally like in the Middle East." Dkt. No. 907 at 76:9-77:7; *see also* Dkt. No. 889 at 140:2-16 (Martin testifying that information about configuration choices would "tell[]" a competitor "the full set of information that's needed" to develop a competing product).

Finally, TCS apparently misapprehends the nature of the unjust enrichment damages calculation offered by Mr. Britven, as well as the jury's subsequent award. TCS's argument regarding a parsing of trade secrets compared to confidential information might be relevant if the jury found liability only as to trade secret misappropriation, but that is not what happened. *See* Dkt. No. 855; *see also* Dkt. No. 858 at 10-11 (directing that unjust enrichment, unfair competition, and deprivation of property claims "involve[d] Epic's information that is not trade secrets"). Mr. Britven opined on the value of that which was taken by TCS, and ultimately used in various ways, without regard to which portion of the stolen information qualified as trade secrets and which portion constituted confidential information that did not meet the trade secret statutory definition. Had TCS desired to present an alternative damages theory that drew a distinction between the two, *e.g.*, asserting that one category of information should be valued greater than the other, it could have done so and asked for a jury verdict form that would draw a distinction between damages related to trade secrets and damages related to confidential information. But TCS did not do so, and it forfeited any challenge to the verdict form by failing

40

to raise a contemporaneous objection.  *See* Dkt. No. 871; Dkt. No. 841; Dkt. No. 898 at 93:8-95:6 (no request that award be divided among trade secrets and confidential information); *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 658-59 (7th Cir. 2011).

### c. TCS's "Use" Argument Fails as a Matter of Law and, in Any Event, There Was Sufficient Evidence for Jurors to Infer that TCS "Used" the Comparative Analysis.

Recognizing the jury found that TCS "used" Epic's trade secrets and confidential information to prepare the comparative analysis, TCS takes its "use" argument a step further, arguing that Epic had to prove that TCS then "used" the comparative analysis either to improve or market its medical software products.  But that is not the standard required under the law, and it is not the standard on which the jury was instructed.

Because the jury found that TCS obtained Epic's trade secrets and confidential information "through consciously tortious conduct," it *could* have been instructed to compensate Epic for "the value of the property obtained," even if the stolen property was ultimately "of little or no worth" to TCS.  *See Ludyjan*, 747 N.W.2d at 749; *supra* pp. 11-18.  But the jury was not provided this instruction.  *See* Dkt. No. 873; *see also* Dkt. No. 896 at 83-84, 87 (Court denying Epic's request for instruction permitting unjust enrichment damages for the benefits obtained by TCS because of its "acquisition or use" of Epic's trade secrets and confidential information).

Instead, the jury was instructed that it "may only award damages for the development costs saved by the misappropriation of Epic's trade secrets or confidential information if the trade secrets or confidential information were in fact *actually* used by TCS."  Dkt. No. 873.  The Court elaborated:

> Here, "use" requires more than simple knowledge of the trade secrets.  Instead, Epic must prove by a preponderance of the evidence that TCS exploited this information, for example, by developing a marketing strategy, informing its competitive position with the EHR market, or refining TCS's software products. Although the focus of damages is on the *benefit* to TCS, "use" does not

41

necessarily require a showing that TCS relied on Epic's confidential information to successfully develop, market and sell a competitive product. Finally, as the court stated in its introductory instructions on damages, the value or threat of *future* use, including future sales, does not serve as a basis for an award of compensatory damages, but is rather addressed by the court's injunction.

*Id.* TCS did not object to the Court's instruction regarding "use," including its definition of that term. *See* Dkt. No. 896 at 86-89; Dkt. No. 907 at 16-18.

TCS's failure to object to the Court's instruction is not surprising, given that it is as strict as TCS could hope for (and, as noted above, stricter than the law requires). Again, under the Restatement, "*any exploitation* of the trade secret that is *likely to result in* injury to the trade secret owner or *enrichment to the defendant* is a 'use'" of the trade secret. Restatement (Third) of Unfair Competition § 40, cmt. c (emphases added); *see also Univ. Computing*, 504 F.2d at 542 ("any misappropriation, followed by an exercise of control and dominion . . . must constitute a commercial use for which damages can be awarded"). As explained above, there was substantial evidence presented at trial from which the jury could conclude that TCS used Epic's confidential information and trade secrets to prepare a comparative analysis, use that is more than "likely to result in injury to" Epic or "enrichment" to TCS. *Supra* pp. 29-41; Dkt. No. 871; *see also* Dkt. No. 905 at 116:14-19 (Court explaining there was "room for a reasonable inference that [the comparative analysis] was used by [TCS] to think about how to improve Med Mantra"); Dkt. No. 893 at 70:12-71:15 (Rishel testifying about how the comparative analysis could be used by TCS to compete with Epic). Accordingly, TCS cannot show that no rational juror would find "use" as the Court defined that term for jurors.

Indeed, TCS makes no effort to even argue that point. Rather, TCS now asks the Court to apply an even stricter definition of "use," one that would require TCS to "use" the comparative analysis that it prepared "using" Epic's confidential information. Dkt. No. 914 at 23. But this is a challenge to the jury charge on "use," and again TCS forfeited that challenge by not objecting

42

to the instruction.  *Supra* p. 42.  Even under TCS's overly stringent standard, however, there was sufficient evidence in the record from which a reasonable jury could infer that TCS "used" the comparative analysis.

The evidence showed that TCS wanted a comparative analysis between Epic and Med Mantra so that it could "assess Med Mantra" and determine whether it could "sell Me[d]Mantra to Kaiser," one of Epic's largest customers.  Tr. Ex. 423; Dkt. No. 922-20 (Prasad Clip Report) at 163:3-170:6, 172:21-173:21; *see also* Dkt. No. 895 (Laykin) at 85:4-18.  It is undisputed that a comparative analysis was subsequently prepared and shared with Venugopal Reddy, who was involved with both Kaiser and Med Mantra, as well as the two TCS client partners for the Kaiser relationship.  *Supra* nn. 18, 19.  The evidence also showed that TCS arranged for Kaiser employees to attend a Med Mantra presentation at the Apollo Hospital.  Dkt. No. 922-4 (Bandarapu Clip Report) at 46:10-50:8; Dkt. No. 890 (Guionnet) at 33:1-25.  From this evidence the jury could infer that TCS wanted to sell Med Mantra to Kaiser, and that the comparative analysis was part of its marketing effort.  *See, e.g.*, Dkt. No. 907 at 10:4-10 (Court rejecting TCS's argument that there was "no evidence" that the comparative analysis was "used for anything" in light of evidence that "[t]hey met and talked about it and disseminated it within a group of marketers within that side of the business, which shouldn't have occurred").  As both this Court and others have recognized, TCS need not have been successful in that effort for the jury to conclude that TCS "used" the comparative analysis as part of an overall effort to sell Med Mantra to Kaiser.  *See* Dkt. No. 873; *Univ. Computing*, 504 F.2d at 536, 542 (lack of profits does not insulate defendant and an attempted sale is "use"); *In re Cross Media*, 2006 WL 2337177, at *6; Restatement (Third) of Unfair Competition § 40, cmt. c (using trade secret to "solicit[] customers" constitutes "use").

The jury also could find that TCS "used" the comparative analysis even if that document persuaded it *not* to attempt to sell Med Mantra to Kaiser, as TCS appears to suggest.  TCS argues that the comparative analysis could not have been used for marketing because, according to Mr. Menon, it "was never sent anywhere beyond its original recipients, and a second, small group that included Ms. Mukherji and other workers on Kaiser."  Dkt. No. 914 at 24.  But the jury was clearly free to disregard Mr. Menon's testimony as inconclusive given his team's failures to preserve and gather *other* relevant evidence.  *See infra* n. 28; *see also* Dkt. No. 907 at 116:10-19 (Court emphasizing that jurors were free to disbelieve Mr. Menon's testimony on this point). The jury was also entitled to infer that the information contained in the comparative analysis was shared with other TCS employees, either orally or in hard-copy print outs, neither of which would have been captured by Mr. Menon's limited email search.  *See* Dkt. No. 895 at 118:20-119:9; *see also* Dkt No. 815 (Kartha Stip.) ¶¶ 11-12 (testifying that it was "easier to explain information learned from Epic's UserWeb verbally than to send it via email"); *Sokol*, 15 F.3d at 1432.

But even if the jury believed Mr. Menon's testimony, it was free to infer from the evidence that the reason the document was not shared beyond Mr. Reddy, Mr. Guionnet, Ms. Mukherji, and the others, is that the comparative analysis convinced them *not* to market Med Mantra to Kaiser.  *See, e.g.*, Dkt. No. 893 at 71:7-15 (Rishel testifying that the comparative analysis would be valuable to TCS to know "whether [its] system w[ould] stack up well against Epic in the competition" and to learn how to "pick [its] battles")  After all, the expressed purpose of the document was to allow TCS to determine *whether* it could or should attempt to "directly sell" Med Mantra to Kaiser or "make necessary changes and then go to Kaiser."  *See supra* n.19. As the case law makes clear, there is no difference between using a party's trade secrets to

44

decide what to do, and using these secrets to decide what *not* to do.  *See, e.g.*, *Aspen Tech.*, 569 F. App'x at 266-68 (use of trade secrets to "avoid making . . . mistakes" or to determine "where [the defendant] need not waste its time and resources" "constitutes 'use' under the *Restatement*"); *Univ. Computing*, 504 F.2d at 542 (use of stolen trade secret to "serve[] the commercial interests" of the defendant constitutes "use").  Using Epic's trade secrets and confidential information to avoid a failed investment would certainly qualify as a "benefit" to TCS.

       3.       <u>TCS Used Epic's Information to Improve Its Medical Software Products.</u>

Once again, TCS parades out its own evidence, ignoring that the Rule 50 standard requires the Court to consider the evidence in the light most favorable to Epic.  Among the evidence overlooked by TCS is Philippe Guionnet's testimony, based on his own observations and analysis, that he believed to a "***near certitude***" that Epic's confidential information had been used to improve Med Mantra.  Dkt. No. 922-7 (Guionnet Clip Report) at 919:10-922:15; Dkt. No. 901 at 31:15-32:3; Dkt. No. 890 at 33:1-37:11 (testifying he was "astounded" at the changes that had been made to Med Mantra and the steps he took to confirm his concern that Epic information had been used to improve it).  Mr. Guionnet also identified the specific kinds of Epic information used in developing Med Mantra:  workflow, data model, functionalities, architecture and infrastructure.  Dkt. No. 922-7 (Guionnet Clip Report) at 919:10-922:15; Dkt. No. 901 at 31:15-32:3.

In March 2014, Mr. Guionnet attended a Med Mantra "deep dive" meeting in Hyderabad. Dkt. No. 890 at 37:9-38:24.  During that meeting, Mr. Guionnet sat next to a young man who was introduced to him as "the interface" between the Med Mantra team and the Kaiser team.  *Id.* at 42:25-43:12.  That young man had a laptop open, and showed Mr. Guionnet a detailed comparison between Med Mantra and Epic, and in another instance among Med Mantra, Epic,

and Cerner.  *Id.* at 37:18-38:24.   Mr. Guionnet testified that the young man showed him a document with cascading information, like a spreadsheet, with multiple tabs.  *Id.* at 39:7-18. Some tabs had information at a high level, and other tabs had information that was more broken down, and there were also diagrams and workflows.  *Id.*  For example, Mr. Guionnet explained that if one tab had a list of functionalities, the next tab would break one functionality into multiple steps, and then the next tab would break down those steps again.  *Id.* at 41:8-14.   In short, the analysis the young man showed Mr. Guionnet contained "a lot more detail" than the comparative analysis created by Naresh Yallapragada.  *Id.* at 46:9-21.   For example, Mr. Yallapragada's analysis did not contain the detailed breakdown of functionalities or the diagrams or workflow that Mr. Guionnet described.  *Compare* Tr. Ex. 39 *with* Dkt. No. 890 at 39:7-18, 41:8-14.  Mr. Guionnet testified that he observed portions of the analysis relating to laboratory functionality and ambulatory outpatient functionality, and that he believed both of those functionalities had changed in Med Mantra over the course of the prior year.  Dkt. No. 890 at 42:6-22.

As the Court reiterated during Mr. Guionnet's testimony, it is for the *jury* — not TCS — "to judge the credibility of all witnesses, including this witness."  Dkt. No. 901 at 21:6-10. TCS's own view of Mr. Guionnet as a "disgruntled employee" is therefore irrelevant.[25]  Despite its best efforts, TCS was unable to effectively impeach Mr. Guionnet or otherwise undermine his credibility.  *See generally* Dkt. No. 890 at 73-167; *see also* Dkt. No. 901 at 19:12-23 (Court agreeing to play video deposition testimony of Mr. Guionnet despite his availability for live testimony).

---

[25] Nor is it relevant that *Epic's* executives — who have no direct access to TCS's internal documents, data, or employees — lack "personal knowledge" of exactly how *TCS* used the information it stole from Epic to improve its software products.  *See* Dkt. No. 914 at 15-16.  That is precisely why it was incumbent upon TCS to preserve and produce the relevant documentation and data during discovery.  Its failure to do so is what led to the adverse inference instruction.

46

Meanwhile, there were many reasons for jurors to find Mr. Guionnet believable. TCS's attorneys repeatedly emphasized Mr. Guionnet's stature at the company, characterizing him as a "general manager" of TCS, and its executives admitted he received top performance marks in that role.[26] The jury also heard about Mr. Guionnet's senior management roles for companies like Disney, Avis, and KPMG. Dkt. No. 900 (Guionnet) at 125:1-126:3. The jury learned that, once Mr. Guionnet heard rumors about TCS's improper access to Epic, he investigated the issue before raising it up the chain in accordance with the Tata Code of Conduct.[27] With respect to the substance of Mr. Guionnet's claims about Epic, TCS admitted at trial that much of what Mr. Guionnet alleged turned out to be true. Dkt. No. 889 (TCS opening statement) at 62:17-25. Other allegations were also shown to be true, such as Mr. Guionnet's assertion that DV Prasad, a former Med Mantra team member, had been "planted" on the Kaiser team. *See* Dkt. No. 890 (Guionnet) at 21:22-22:21 (explaining that his attempts to remove Prasad from the Kaiser team were denied); Dkt. No. 922-20 (Prasad Clip Report) at 14:22-16:19, 36:7-38:20, 74:5-84:21.

In short, the jury was entitled to accept Mr. Guionnet's eyewitness testimony as direct evidence that TCS used Epic's trade secrets and confidential information to improve Med Mantra. Indeed, viewing the evidence in the light most favorable to Epic — as it is required to do — the Court must assume that this is what happened. *See Emmel*, 95 F.3d at 629-30; *cf. Univ. Computing*, 504 F.2d at 542 (jury can infer use based on "unobjected to hearsay account" of a single witness). Mr. Guionnet's "near certitude" easily satisfies the "preponderance of the evidence" standard on which the jury was correctly instructed. *See* Dkt. No. 858 at 2.

---

[26] Dkt. No. 890 (Guionnet) at 118:3-9, 122:3-6, 123:7-18; Dkt. No. 891 (Muthuswami) at 31:19-32:2; *see also* Dkt. No. 900 (Guionnet) at 130:1-20 (Guionnet describing his role as client executive for Kaiser, including responsibility for 1,000 employees and significance of the account); Dkt. No. 890 (Guionnet) at 69:1-70:4.

[27] Dkt. No. 890 (Guionnet) at 9:16-18:6, 19:23-21:10, 22:22-26:11, 52:25-54:22, 55:22-56:12, 57:22-59:17, 62:8-65:5; Dkt. No. 901 (Guionnet) at 21:25-26:17; Tr. Ex. 50.

47

Mr. Guionnet's testimony, in any event, was not the sole evidence that was favorable to Epic on this point.  Additional circumstantial evidence bolstered Mr. Guionnet's conclusion.  For instance, TCS witnesses admitted that, because of the workaround devised by Kaiser, Epic, and TCS, there would not have been "any reason whatsoever" that TCS employees performing testing for Kaiser would need to access the UserWeb.  Dkt. No. 901 (Sundar) at 71:2-9, 77:24-78:11; Dkt. No. 922-9 (Gupta Clip Report) at 232:24-233:7; Dkt. No. 922-16 (Medikonda Clip Report) at 112:23-113:9, 194:18-195:20, 203:5-204:21; Dkt. No. 809 at 1 (Khader Stip.) ¶¶ 8, 9.  As the Court previously recognized, "a reasonable fact finder might well infer an impermissible purpose" from the fact that TCS employees downloaded thousands of documents from the UserWeb (and accessed an unknown quantity of other confidential and trade secret information) even though the documents were not necessary for their work.  Dkt. No. 538 at 40.  Also, as the Court recognized, Exhibit 423 and testimony from DV Prasad regarding Venugopal Reddy's request for a comparative analysis are also "circumstantial proof of TCS's interest in accessing UserWeb documents for the improper purpose of furthering TCS's own software development." *Id.* at 42; *see also* Dkt. No. 905 at 117:15-19; *supra* n.19.  Finally, as discussed in detail below, the adverse inference instruction allowed the jury to assume that evidence TCS allowed to be destroyed would have shown "improper use."  *Infra* pp. 49-53.

Circumstantial evidence was also presented at trial from which the jury could conclude that TCS used Epic's confidential and trade secret information to improve the lab product it developed for DaVita.  The evidence showed that the DaVita project was an important initiative for TCS:  it was supposed to be a springboard from which to launch TCS into the U.S. market. *Supra* n.16.  The jury heard testimony, however, that the DaVita project fell way behind schedule and was found to be "well below average" by an independent third-party.  Dkt. No. 815

48

at 5 (Kowalski Stip.) ¶¶ 10, 15; Dkt. No. 904 (Jasti) at 85:2-86:22.  Meanwhile, during the same time period that TCS was struggling to develop its laboratory product for DaVita, TCS employees downloaded documents related to Epic's laboratory product known as Beaker, even though Kaiser was not licensing Beaker.  Dkt. No. 889 (Martin) at 157:2-19; *see also* Dkt. No. 900 at 22:2-9 (Martin describing how the Beaker documents would have been "very valuable").  A reasonable jury could infer from this evidence that TCS downloaded Beaker documents to assist or accelerate the development of the DaVita laboratory product.  *See* Dkt. No. 538 at 59.

In sum, contrary to TCS's rote recitations, there was sufficient evidence presented at trial to permit a reasonable jury to conclude that TCS "used" Epic's trade secrets and confidential information to develop or improve its own medical software products.  The jury's verdict in this regard (Dkt. No. 871 at 1) was sound, and there are no grounds for re-weighing the evidence or second-guessing the jury's credibility findings.

4.     <u>The Adverse Inference Instruction Permitted the Jury to "Assume" Epic's Information was Used for an Improper Purpose.</u>

In light of TCS's "*contractual* failures to give notice of unauthorized access to Epic's proprietary website," its failure "to preserve evidence of that breach," its "failures in producing timely records," and its "apparent suppressions of 'the truth,'" the Court permitted "Epic to present evidence of TCS's failures to investigate and preserve data, documents and other discoverable information" and instructed the jury that it was permitted to draw adverse inferences against TCS.  *See* Dkt. No. 709 at 4-5.  Specifically, the Court instructed the jury that, if it found by a preponderance of the evidence that TCS intentionally caused evidence to be destroyed in bad faith, it could "assume that this evidence contained information helpful to Epic and harmful to TCS."  Dkt. No. 858 at 3.  The jury was further instructed that, if it found that TCS's failure to "give prompt notice [to Epic] of improper access to Epic's UserWeb by TCS

49

2437265

employees . . . impeded Epic's ability to identify, preserve and ultimately review evidence," it could "assume this evidence contained information helpful to Epic and harmful to TCS as well." *Id.*

The jury was also provided with a list of non-exclusive examples of reasonable assumptions it could make in light of "the nature of the missing evidence at issue and the evidence in the case as a whole." *Id.* at 3-4. As one example, the jury was instructed that, if it found "by a preponderance of the evidence that TCS conducted its investigations in a way that caused evidence of use of Epic's confidential information to be destroyed intentionally and in bad faith," it could "assume that this evidence would have shown that information was used for improper purposes." *Id.* at 4.[28]

TCS admits that the adverse inference instruction "may have influenced the jury," but nonetheless asks the Court to ignore the impact of the instruction in determining whether jurors

---

[28] Epic presented substantial evidence at trial from which the jury could conclude that TCS conducted its investigations in a way that caused evidence of use of Epic's confidential information to be destroyed intentionally and in bad faith. For example, despite being directed by Kaiser in August 2014 that it had a duty to preserve all "documents or data or electronically stored information" that "may be relevant" to the allegation that its employees had improperly accessed Epic's User Web (Tr. Ex. 713), TCS took no steps to preserve documents and data that were plainly relevant to its employees' UserWeb activity, including web proxy logs, images of computers in the ODC, images of computers used by the Med Mantra team, and archived backup tapes. Dkt. No. 902 (Menon) at 46:21-47:15, 52:19-53:16, 53:18-54:6, 54:18-55:21, 79:9-13, 80:10-24. This resulted in the destruction of an extensive amount of electronic evidence that could have allowed TCS, and later Epic, to determine what actually happened to the documents TCS unlawfully downloaded from Epic's UserWeb. *See* Dkt. No. 903 at 11:13-22 (Epic witness Sam Rubin testimony regarding relevant evidence not preserved by TCS); Dkt. No. 895 at 39:5-44:9 (TCS expert witness Erik Laykin testifying that determining what happened with Epic's data would require review of electronic records that TCS did not review or preserve as part of its investigation). TCS security personnel acknowledged that they typically review web proxy logs and active directory logs in investigations involving the internet, and that doing so would have been helpful in this case in light of inconsistent stories provided by the TCoE employees they interviewed. Dkt. No. 902 (Menon) at 22:25-23:5, 32:15-18, 33:8-13, 33:16-25, 40:11-42:6; Dkt. No. 922-13 (Cmdr. Kumar Clip Report) at 88:23-89:7, 92:7-93:11; *see also* Dkt. No. 903 at 11:13-22 (Rubin testimony regarding relevant evidence not preserved by TCS); Dkt. No. 895 at 39:5-44:9 (Laykin testifying that determining what happened with Epic's data would require review of electronic records that TCS did not review or preserve as part of its investigation). Indeed, TCS chose not to review or preserve the web proxy logs even though both Kaiser and Mr. Menon's subordinate, Paul Amalraj, told TCS they should be preserved. *See* Tr. Exs. 713A, 732; Dkt. No. 902 (Menon) at 47:16-51:1, 57:19-59:13.

were entitled to find that TCS used Epic's trade secrets and confidential information.  Dkt. No. 914 at 67-69; *see also, e.g.*, Dkt. No. 898 at 155:21-156:1 (TCS's counsel asserting that the adverse inference instruction was a "very significant sanction" that may have been "determinative").  TCS's request is improper as a matter of both law and common sense.

An adverse inference instruction serves several purposes, including both prophylactic and punitive.  "The prophylactic and punitive rationales are based on the . . . commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly 'plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk.'"  *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (quoting *Nation-Wide Check Corp. v. Forest Hill Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)).  Accordingly, when coupled with "some (not insubstantial) evidence in support of [a party's] claim," an adverse inference instruction "may push a claim that might not otherwise survive . . . over the line."  *Id.* at 128.[29]

*Aspen Technology* is directly on point.  Following trial, a jury found M3 guilty of trade secret misappropriation and awarded damages to Aspen.  569 F. App'x at 262-63.  M3 filed a

---

[29] *See also, e.g.*, *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001) ("enough circumstantial evidence exists to permit a reasonable trier of fact to conclude that the destroyed documents would show unlawful discrimination"); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996) (affirming district court's holding in ruling on post-trial motions that destruction of evidence permitted a rational jury to infer that the defendant was hiding its negligence); *Tech Sys., Inc. v. Pyles*, No. 12-374, 2013 WL 4033650, at *3 (E.D. Va. Aug. 6, 2013), *aff'd*, 630 F. App'x 184 (4th Cir. 2015) (affirming denial of motion for judgment as a matter of law because jury verdict was supported by the evidence, including adverse inference against defendant); *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 10-228, 2013 WL 443698, at *7 (W.D.N.C. Feb. 5, 2013) (denying motion for judgment as a matter of law on the ground that spoliation, when combined with circumstantial evidence, provided sufficient evidence for the jury to infer misappropriation); *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010) ("the circumstantial evidence of Pitta's illegal access, while not overwhelming, is strong enough to survive summary judgment when paired with the adverse inference a jury could permissibly draw from the spoliation"); *RKI, Inc.*, 177 F. Supp. 2d at 877 (court was entitled to "find misappropriation even without . . . direct evidence" because, *inter alia*, "spoliation of evidence . . . support[ed] a negative inference that defendants destroyed evidence of misappropriation").

motion for judgment as a matter of law, which was denied, and appealed the decision to the Fifth Circuit. *Id.* On appeal, M3 argued "that Aspen never presented any evidence that M3 actually used the confidential information found it its possession," including Aspen's pricing calculators. *Id.* at 265. The Fifth Circuit disagreed, explaining that adverse inference instructions permitted the jury to infer that testimony they did not hear and "deleted . . . documents or information" they did not see "would have been unfavorable to M3." *Id.* at 266. When combined with the "circumstantial evidence of use" offered at trial, these instructions provided jurors "a legally sufficient basis from which to determine that M3" had used Aspen's pricing calculators. *Id.* Likewise, the jury could properly infer that M3 used Aspen's road maps in light of the adverse inference instruction and M3's "calculated attempt to acquire" them. *Id.*

*Kronisch* is also instructive. There, although skeptical of the merits of plaintiff's claim, the Second Circuit held "that a jury should be permitted (but not required) to draw an adverse inference against" one of the defendants based on destruction of documents. 150 F.3d at 126. The Court of Appeals then reversed the district court's grant of summary judgment against the plaintiff, finding that, "when combined with the possibility that a jury would choose to draw such an adverse inference, plaintiff's circumstantial evidence . . . was enough — barely enough, but enough nonetheless — to entitle him to proceed to trial." *Id.*[30]

In short, even if Epic had presented only "borderline" evidence that TCS used the stolen trade secrets and confidential information, the inferences that the jury was entitled to draw pursuant to the adverse inference instruction push Epic's evidence of use "over the line." *Byrnie*,

---

[30] Summary judgment cases, including *Kronisch*, are instructive here, as the Rule 50 analysis "is fundamentally the same standard" employed in determining whether summary judgment is appropriate. *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000); *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 335 (7th Cir. 1994) (court employs "same federal standard" in assessing motions brought under Rules 50 and 56).

243 F.3d at 110; *Kronisch*, 150 F.3d at 128.[31]  Indeed, as discussed above, the Court instructed the jurors — without objection by TCS — that they could assume that TCS "used Epic's information for an improper purpose" if they found bad faith.  *See supra* p. 49.

Were this Court to conclude otherwise, "the purposes of the adverse inference [would be] eviscerated."  *Kronisch*, 150 F.3d at 128.  Under TCS's view, "innocent parties meant to benefit from the adverse inference against offending parties would receive no benefit at all, having been deprived of evidence that may have been crucial to making their case, and yet being held to precisely the same standard of proof" that would otherwise have applied.  *Id.*; *accord Byrnie*, 243 F.3d at 110 (rejecting defendant's argument that the adverse inference "must be limited to giving the greatest weight possible to other existing evidence favorable to plaintiff" because such a rule would merely "reward[] those most thorough in the art of document shredding"); *Aaron v. Kroger Ltd. P'ship I*, No. 10-606, 2012 WL 78392, at *3 (E.D. Va. Jan. 6, 2012) ("allow[ing] Defendants to rebut the [adverse inference] instruction would essentially render futile this Court's prior judgment that Defendant's conduct warranted sanction[s]").  This cannot have been what the Court intended, or what the law envisions, when issuing an adverse inference instruction as a sanction for TCS's spoliation of evidence.  *See* Dkt. No. 709 at 4-5.

---

[31] Notably, this is not a case where the plaintiff failed to offer "at least some suggestion" of how the spoliated evidence "would have impacted its misappropriation claim."  *Compare 3M*, 259 F.3d at 606 n.5. The web proxy logs and other electronic data TCS failed to preserve would have identified at least some of the TCS employees who accessed the UserWeb with Mr. Gajaram's credentials, allowing Epic to obtain discovery from these individuals regarding how they used the information and with whom they shared it.  Without the starting point of the information trail, Epic was left to grope in the dark and take TCS's word for which employees were likely accessing the UserWeb with Mr. Gajaram's password. Likewise, a proper investigation and timely notice to Epic would have allowed Epic to seek information from two key players in the preparation of the comparative analysis, Naresh Yallapragrada and Venugopal Reddy, who subsequently left the company, shielding them from deposition or trial testimony (because of their presence in India, outside the subpoena power of the Court).  *See, e.g.*, Dkt. No. 920 at 7; Dkt. No. 726 at 104:20-105:18, 109:13-14.  Indeed, even TCS's own expert, Erik Laykin, acknowledged that the unpreserved evidence would have been helpful in determining the nature of TCS's access to the UserWeb, the purpose of that access, and how the downloaded information was used by TCS.  Dkt. No. 895 at 43:7-44:9.

> **D.    The Jury's Role Was To Weigh the Competing Evidence, and It Was Entitled to Find it More Likely than Not that TCS Used Epic's Trade Secrets and Confidential Information.**

Notwithstanding the evidence of use discussed above, TCS persists in asking the Court to "treat as gospel" testimony from select employees that they only used the UserWeb for testing purposes.  *See* Dkt. No. 914 at 20; *Lust*, 383 F.3d at 582-83.  But, as explained above, "[t]here is no presumption that witnesses are truthful," *Lust*, 383 F.3d at 583, and it is up to the jury to decide whether to "believe or disbelieve" them.  *McLean*, 868 F. Supp. at 262.  Disbelieving TCS's witnesses' bald assertions that the stolen trade secrets and confidential information were used only for testing purposes was well within the jury's discretion, particularly in the face of evidence that these *very same* witnesses had lied repeatedly and were part of a strategy to "suppress the truth."

As support for its "only for testing" theory, TCS relies primarily on testimony from Ramesh Gajaram and Aswin Anandhan.  *See* Dkt. No. 914 at 20.  As the jury learned during trial, Mr. Gajaram shared his UserWeb log-in and password widely, allowing at least dozens of other TCS employees unfettered access to the trade secrets and confidential information available on Epic's UserWeb. Dkt. No. 891 (Gajaram) at 59:15-60:15, 60:25-61:25; *supra* n.20. At the same time, Mr. Gajaram was the Information Security Coordinator for the entire Offshore Delivery Center, *i.e.*, the very person tasked with ensuring compliance with security protocols, including the prohibition on sharing passwords. Dkt. No. 891 (Gajaram) at 62:2-64:6.  The jury was presented with evidence that Mr. Gajaram lied about sharing his UserWeb credentials on several occasions, including to a Kaiser investigator.  *Id.* at 75:8-76:25.  The jury also observed that Mr. Gajaram changed his signature block before corresponding with Epic about his UserWeb access, in a clear attempt to hide his affiliation with TCS.  Tr. Exs. 122-125; Dkt. No. 891 (Gajaram) 68:19-75:5; Dkt. No. 891 (Muthuswami) at 9:25-11:8.

54

Mr. Anandhan also told several lies related to UserWeb access. For example, when requesting UserWeb access from Epic, Mr. Anandhan claimed that he was in Pasadena, California (the location of a large Kaiser facility), even though he was living in India at the time. Tr. Ex. 305; Dkt. No. 891 (Anandhan) at 106:25-108:24. Mr. Anandhan's request was denied (*id.* at 108:25-109:2), but he later received Mr. Gajaram's credentials. *Id.* at 110:22-25; Dkt. No. 891 (Gajaram) at 60:5-9. After obtaining Mr. Gajaram's password, Mr. Anandhan told a Kaiser employee that he and his team were without UserWeb access, even though they were all using Mr. Gajaram's password at the time. *See* Tr. Ex. 309; Dkt. No. 891 at 110:22-25, 111:16-114:10 (Anandhan testifying his intent was for Kaiser to believe that TCS lacked UserWeb access). Mr. Anandhan also conspired with his boss, Anmol Gupta, to create a UserWeb account for another TCS employee, Deepa Pandurangan, without Ms. Pandurangan's knowledge. Dkt. No. 891 (Anandhan) at 114:11-116:15; *see also* Dkt. No. 809 at 5 (Pandurangan Stip.) ¶¶ 6, 7, 11, 12; Dkt. No. 922-19 (Pandian Clip Report) at 91:12-17, 108:4-110:4. In doing so, Mr. Anandhan made yet another misrepresentation to Epic, claiming to be Ms. Pandurangan when he submitted a registration request on her behalf. Dkt. No. 891 (Anandhan) at 115:9-12.

When Mr. Anandhan was confronted by Kaiser, he lied about accessing UserWeb and denied knowing about Ms. Pandurangan's UserWeb credentials. *Id.* at 120:15-123:16. The jury also heard testimony that Mr. Anandhan was one of the ringleaders of the "suppress the truth" campaign, and directed his subordinates to lie about their access to UserWeb. *Id.* at 117:12-118:18; Dkt. No. 922-19 (Pandian Clip Report) at 107:24-112:11, 132:5-23; Dkt. No. 809 at 5 (Pandurangan Stip.) ¶¶ 11-12.[32]

---

[32] The jury heard testimony that several other testers in the TCoE were also untruthful when questioned about their UserWeb access, providing ample basis to disregard their claims that such access was used solely for testing purposes. *See, e.g.*, Dkt. No. 815 at 3 (Kaspar Stip.) ¶¶ 11-12; Dkt. No. 809 at 5

Far from compelling the jury to accept TCS's "only for testing" story, this evidence merely begs the question: If Mr. Gajaram and Mr. Anandhan (and the others with whom they shared the password) were accessing the UserWeb only for testing purposes, why did they repeatedly lie to obtain and maintain access, and continue to lie once their access was discovered? The jury was entitled to take account of these lies and inconsistencies, and to draw appropriate inferences.[33]

## IV. The Jury's Award of $240 Million for the Value of the Property TCS Obtained was Reasonable and Supported by the Evidence.

"Damages assessed by a jury are largely discretionary with it," *Smith v. Rowe*, 761 F.2d 360, 368 (7th Cir. 1985), as is the "acceptance or rejection of an expert's opinion." *Spesco, Inc. v. Gen. Elec. Co.*, 719 F.2d 233, 240 (7th Cir. 1983) (holding jury "properly accepted [plaintiff's] expert's theory on the proper measure of damages" and, therefore, district court did not err in denying motion for directed verdict); *see also Am. Nat'l Bank & Tr. Co. of Chi. v. Reg'l Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997) (explaining that a "review of the jury's damage award is deferential" because "damage calculations are essentially an exercise in factfinding"). In particular, the "jury alone is vested with the responsibility of resolving" conflicting calculations of "value." *Spesco*, 719 F.2d at 240-41 (holding that damages award that "conform[ed] with [plaintiff's] estimates" of value was "not excessive"). Accordingly, so long as the jury had "a reasonable basis" for its damages calculations, the Court should not interfere with the jury's award. *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1447 (7th Cir. 1992).

---

(Pandurangan Stip.) ¶¶ 6-7, 11-12; Dkt. No. 809 at 7 (Ponnambalan Stip.) ¶¶ 13, 18; Dkt. No. 905 at 5:18-6:12 (Court reading statement regarding material changes in Priscilla Kingston's deposition testimony).

[33] Erik Laykin's opinion that the downloaded documents *could have been* useful for testing also did not compel a conclusion that they *were* used for testing purposes. Notably, Mr. Laykin also admitted that the downloaded documents would also have been "useful" if "somebody wanted to reverse engineer Epic's software." Dkt. No. 895 at 81.

2437265

As the jury was instructed, "[d]etermining damages involves the consideration of many different factors that cannot be measured precisely," and "[m]athematical precision in fixing the exact amount is not required." Dkt. No. 872 at 1-2. Accordingly, if "the fact of TCS's benefit [wa]s clear and certain, but there [wa]s uncertainty as to the exact amount of damages, the trier of fact ha[d] discretion to fix a reasonable amount." *Id.* at 2. The jury was also properly instructed that "where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of a lack of precision." *Id.* As the Court has previously recognized, TCS's failure to adequately preserve and produce evidence severely hampered Epic's ability to prove precisely how TCS used the stolen trade secrets and confidential information and who had access to that information. *See, e.g.*, Dkt. No. 709 at 5; Dkt. No. 896 at 127:25-128:3.

A.     **The Jury Had a Reasonable Basis for the $140 Million It Awarded for the Benefit TCS Obtained From the Information It Took and Used to Prepare the Comparative Analysis.**

Mr. Britven testified that, by stealing the Epic trade secrets and confidential information attributable to the comparative analysis, TCS "experienced an ill-gotten gain in the form of avoided R and D expenses reflecting a benefit conferred of approximately $200 million." Dkt. No. 907 at 106:1-12. The $200 million figure related specifically to the avoided R&D benefit associated with TCS's preparation of the comparative analysis. Using the modified "X analysis" prepared by Mr. Martin, Mr. Britven was able to tether the specific R&D costs associated with the trade secrets and confidential information implicated in the comparative analysis. *See id.* at 11:4.

As Mr. Martin testified, the "X Analysis" identifies the various trade secrets and confidential information contained in the UserWeb documents downloaded by TCS, such as Epic's configuration options, as well as the various Epic modules associated with the information

TCS downloaded.  Dkt. No. 900 at 18:11-24:18; *see* Tr. Exs. 2527-A, 2527-B.[34]  Mr. Martin then provided relative weighting of the various trade secrets and confidential information as they pertain to the overall value of Epic's software.  Tr. Exs. 2527-A, 2527-B; Dkt. No. 900 at 24:19-27:16.  Finally, and importantly here, Mr. Martin identified (by placing a check mark next to the appropriate row) *only* those trade secrets and that confidential information incorporated into the comparative analysis.  Tr. Ex. 2527-B; Dkt. No. 907 at 66:22-69:12.

Mr. Britven then calculated the R&D expenses incurred to develop the information identified by Mr. Martin as having been incorporated into the comparative analysis, resulting in the $200 million figure.  Mr. Britven explained to the jury that his damages opinion was developed by isolating only those R&D expenses (based on Epic's audited financial statements) that were incurred to develop the specific modules at issue in this case.  Dkt. No. 907 (Martin) at 51:3-52:14, Dkt. No. 907 (Britven) at 111:3-16.  The figure was then further reduced, with the help of the X Analysis (Tr. Ex. 2527-B), to isolate only that information incorporated in the comparative analysis (Tr. Ex. 39).  Dkt. No. 907 (Britven) at 112:5-114:17, 140:12-141:5.  Mr. Britven also made clear to the jury, as Mr. Martin had done, that the Data Model/Data Architecture column (weighted at 35% of the total) was removed in calculating the $200 million avoided R&D costs associated with the comparative analysis.  Dkt. No. 907 (Martin) at 70:14-71:10, 78:1-11; Dkt. No. 907 (Britven) at 119:14-23, 140:12-14.  Finally, Mr. Britven explained two additional deductions that he made for coding time and technology decay over time.  Dkt. No. 907 at 113:3-10, 114:15-25, 115:1-116:23.  Accordingly, the jury had a clear basis on which

---

[34] More specifically, as Mr. Martin explained, a category only received an "X" if the documents downloaded by TCS contained a "substantial portion" of the total confidential and trade secret information for that particular category.  Dkt. No. 900 at 18:20-19:23, 20:4-24, 24:15-18.  In other words, "in places where there is no X, that doesn't mean that nothing was taken;" it only means that the stolen information "didn't rise . . . to the level of a substantial portion of the full materials" containing Epic's trade secrets and confidential information for that particular category.  *Id.* at 19:23-20:3. Performing the analysis in this way had the effect of understating the gains TCS obtained as a result of its wrongdoing.

to calculate the R&D costs incurred by Epic in developing the trade secrets and confidential information that were taken by TCS and incorporated into the comparative analysis. The jury was then able to use that figure as a "proxy for the value of what TCS acquired through its improper accessing of UserWeb documents," *i.e.*, TCS's avoided R&D expenses. Dkt. No. 898 at 115; *see* Dkt. No. 907 at 106:1-12, 107:8-19, 108:9-110:1.

TCS cross-examined Mr. Britven as to its concerns with his calculation and argued to the jury that it should disregard Mr. Britven's testimony — and his damages number — in favor of the "zero" amount of damages advocated by its expert. These are the "traditional and appropriate means of attacking" expert evidence. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)); *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 817 (7th Cir. 2012); *Jay Edwards, Inc. v. New England Toyota Distrib., Inc.*, 708 F.2d 814, 821 (1st Cir. 1983). TCS also elicited testimony from its own expert, Mr. Bersin, who offered criticisms of Mr. Britven's methodology.[35] Among other things, Mr. Bersin argued that the trade secrets and confidential information that TCS took from Epic "were entirely or largely developed in the U.S. and the U.S. engineers or software developers are paid at a much higher rate than what would have been paid to the Indian engineers." Dkt. No. 898 at 34:4-35:4. Specifically, Mr. Bersin testified that it is his "understanding . . . that rates are generally 30 to 40 percent less [in India] than [in] the U.S." *Id.* at 60:3-10.

Ultimately, it was the jury's job to weigh the evidence and "fix a reasonable amount." Dkt. No. 872 at 2; *see also Am. Nat'l Bank*, 125 F.3d at 437. This is precisely what the jurors

---

[35] Had TCS wanted the jury to consider an alternative theory of damages, it had every opportunity to put forth such a theory through its own expert. Instead, TCS stuck with a strategy of offering a "zero" damages theory and providing only specific rebuttal to certain parts of Mr. Britven's opinion. As the Court recognized, this was "a dangerous strategy." Dkt. No. 898 at 150.

did.  From all appearances, the jury accepted Mr. Britven's calculation of the value of the stolen trade secrets and confidential information used in the comparative analysis ($200 million), but also accepted Mr. Bersin's testimony that calculating TCS's avoided R&D costs would require a 30-40% reduction to take account of reduced labor rates in India.  Applying a 30% reduction to the $200 million valuation yields $140 million, which is the amount of the jury's award for the stolen Epic information incorporated into the comparative analysis.  Dkt. No. 871 at 1.  While "we do not know for sure whether the jury *actually* made such calculations," it certainly had a "reasonable basis" on which to fashion the $140 million award relating to the comparative analysis.  *See Dresser*, 965 F.2d at 1447.

**B.  The Jury Had a Reasonable Basis for the $100 Million It Awarded for the Benefit TCS Obtained From the Rest of the Information It Took and Used to Formulate a US Entry Strategy and Improve Its Competing Software Products.**

The jury also had considerable qualitative and quantitative evidence from which it could reasonably calculate the benefit to TCS for its use of Epic's information unrelated to the comparative analysis.

As explained above, as one specific example, the jury was entitled to accept Mr. Guionnet's testimony regarding the detailed comparative analysis he witnessed on the young man's computer during the "deep dive" meeting and the dramatic improvements made to Med Mantra during the period of misappropriation which left him "astounded," including improvements to Med Mantra's data model.  *Supra* pp. 45-47.  If the jury believed Mr. Guionnet's testimony that TCS used Epic's trade secrets and confidential information to improve Med Mantra, including its workflow, data model, functionalities, architecture, and

60

infrastructure — as the Court is required to presume in the Rule 50 context — that finding is a reasonable basis for the jury's $100 million damages award.[36]

The data model and architecture were excluded from the comparative analysis calculation of $200 million by Epic's expert, a point that was clearly made to the jury. Dkt. No. 907 (Martin) at 70:14-71:10, 78:1-11; Dkt. No. 907 (Britven) at 119:14-23, 140:12-14. It was thus clear from the evidence that this benefit to TCS would not have been accounted for in the jury's eventual $140 million award for the comparative analysis. *See id.* at 140:16-22 (Britven testifying $200 million calculation excluded any value attributable to data model).

The jury heard considerable testimony about the importance of the data model, including Mr. Martin's testimony that it is a "core component" of Epic's software that would have been very valuable to a competitor. *See* Dkt. No. 889 at 137:1-12; Dkt. No. 900 at 21:3-22:9, 25:8-26:10, 33:22-36:23. Of course, no one knows with certainty how the jury calculated this additional $100 million, but TCS fails to even acknowledge the possibility that the jury assigned value to the data model-related trade secrets and confidential information taken by TCS. In particular, TCS ignores Mr. Martin's testimony regarding the value of information about Epic's data model and Mr. Guionnet's testimony that TCS used Epic's information to improve Med

---

[36] The jury also heard evidence regarding the shift in TCS's market strategy, as outlined in its business planning documents, which took place during the period of misappropriation. This included, for example, TCS's "US Entry Strategy" and its plan to "leverage" the "modular architecture of Med Mantra to create and promote Departmental/Functional Solutions" to market in the United States. *See* Tr. Exs. 159-A, 2565; Dkt. No. 901 (Sundar) at 84:13-86:25. TCS's goal was to "us[e] DaVita as a reference site to promote Lab Management solution to Hospitals and Independent Laboratories," and it has already succeeded in licensing its laboratory product to Quest Diagnostics, another U.S. company. *Supra* pp. 27-28 & n.16. At the same time the DaVita laboratory project was falling behind, TCS downloaded documents about Epic's "Beaker" laboratory product, even though Kaiser did not license that product. *Supra* p. 49. Furthermore, the jury heard that it was during the period of misappropriation that TCS put forth a strategy to increase its market share and become a worldwide leader. *See* Tr. Exs. 159, 159-A, 2565; Dkt. No. 904 (Badipatla) at 16:12-24; Dkt. No. 901 (Muthuswami) at 162:14-163:2.

2437265

Mantra's data model. *E.g.*, Dkt. No. 889 (Martin) at 97:16-98:6, 137:1-12, 155:2-15; Dkt. No. 901 (Guionnet) at 31:15-32:3.

Mr. Martin's "X Analysis" also presented the jury with a framework within which it could arrive at its $100 million figure. As discussed above and at trial, the columns in the X Analysis included relative weightings to indicate the value of each category of information in relation to the total. The categories included in the jury's damages pertaining to the comparative analysis were End User Screens/Workflow (25%), Configuration Options (20%), and Integration (10%), for a total relative weighting of 55% of the overall Epic system. The Data Model/Data Architecture category (35%) was not part of the comparative analysis calculation.

Knowing that the Data Model/Data Architecture column was not part of its $140 million calculation, but recognizing the value of the data model information to TCS, the jury could reasonably assign a value to that information in proportion to the information on which the $140 million award was premised. Following this logic, the jury would note that the Data Model/Data Architecture column had a weighting of 35% and the resulting proportional calculation that a reasonable jury might perform could be as follows:

1. 35% divided by 55% = 64% proportional weighting for the importance of the Data Model/Data Architecture category as compared to the other categories collectively

2. 64% of $140 million = $90 million unjust enrichment for the Data Model/Data Architecture category not included in the comparative analysis damages

The jury could reasonably increase its $90 million calculation to $100 million based on testimony that the data model is critical to every Epic module and is the blueprint of the Epic EHR system. *See* Dkt. No. 889 (Martin) at 137:1-12 (testifying that the data model is a core component of the system), 155:3-15, 157:7-19 (testifying that documents that detail the data model are trade secret and the downloaded documents contained the data model of Beaker and

62

other Epic applications).  Or the jury could have reasonably ascribed the remaining $10 million to the benefits to TCS's consulting business, business planning, and/or US Entry Strategy as a result of its misappropriation.  *See supra* pp. 25-28; Dkt. No. 907 (Britven) at 123:22-124:11, 125:3-22.

Again, of course, we do not have the benefit of knowing exactly what calculation the jury performed to arrive at its $100 million figure.  But the calculation set forth above is simple, logical, and supported by perhaps the most well-known and discussed exhibit at trial, the "X Analysis."  In short, combined with testimony from Mr. Martin, Mr. Britven, Mr. Guionnet, and others, the X analysis provided a "reasonable basis" for the jury's $100 million dollar award. *See Dresser*, 965 F.2d at 1447.

## V.  TCS Is Not Entitled to Judgment as Matter of Law as to Damages for the Remaining Claims on Which Epic Prevailed.

TCS asserts that it is entitled to judgment as matter of law as to damages for Epic's claims of breach of contract, fraudulent misrepresentation, unfair competition, violation of the Computer Fraud and Abuse Act, and deprivation of property, on the ground that Epic failed to show "evidence of use" and, therefore, "actual damages."  Dkt. No. 914 at 22-23.  As explained above, however, Epic *did* present evidence that TCS used its trade secrets and confidential information, and the jury properly relied on that evidence in awarding $240 million in damages to Epic.  TCS's argument also fails for the additional, claim-specific reasons set forth below.

Deprivation of Property.  Epic's deprivation of property claim entitled it to an award of damages equivalent to the "retail or replacement value" of the property taken by TCS, Wis. Stat. § 895.446(3)(a), an award equivalent to the unjust enrichment damages awarded by the jury, which were also premised on the "value" of the trade secrets and confidential information TCS stole.

2437265

Fraudulent Misrepresentation and Unfair Competition.  As explained above, the jury was authorized to award Epic restitution as a remedy for TCS's fraudulent misrepresentations and unfair competition, in the same manner as Epic's claims for unjust enrichment and misappropriation of trade secrets. *Supra* pp. 9-10.

Computer Fraud and Abuse Act.  Having prevailed on its CFAA claim, Epic is entitled to compensatory damages, including the "loss" it incurred to investigate and respond to TCS's unauthorized access.  18 U.S.C. § 1030(g); *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1262-63 (S.D. Fla. 2015); *Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314, 320 (D. Conn. 2008).  Epic was prepared to present evidence of its $9,277 loss during the damages phase. *See* Dkt. No. 226-1 ¶ 14 (Martin Decl.); Dkt. No. 637 at 10; Dkt. No. 654, Ex. 6; Dkt. No. 703 at 26-27.  However, on April 13, 2016, TCS agreed to stipulate to Epic's loss.  Dkt. No. 896 at 89:5-17.  Accordingly, per TCS's request, the Court agreed to remove the portion of the verdict form relating to Epic's loss under the CFAA.  *Id.* ("I will delete that instruction and if the jury does come back with a liability verdict, then the hurdle of loss will have been stipulated to.").  Having stipulated to Epic's $9,277 loss, TCS cannot move for judgment as a matter of law as to damages under the CFAA.

Breach of Contract.  Epic prevailed on all of its claims for breach of contract.  Dkt. No. 538 at 39-47; Dkt. No. 855 at 1.  Accordingly, Epic is entitled to an award of nominal damages for breach, at the very least.  *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990).  TCS's motion for judgment as a matter of law therefore fails as to the breach of contract claim as well.

64

## VI.     The Jury Properly Awarded Epic Punitive Damages.

### A.     Because the Jury Properly Awarded Epic Compensatory Damages, It Was Permitted to Consider an Award of Punitive Damages.

As explained in detail above, the jury properly awarded Epic damages flowing from TCS's unjust enrichment from its wrongful acts.  Regardless of the form that a damages award takes (*i.e.*, whether premised on a "gain" to TCS or a "loss" to Epic), "punitive damages are also available, if otherwise appropriate."  *Pro-Pac*, 721 F.3d at 788.  Wisconsin law permits an award of punitive damages where "compensatory damages" are imposed.  *Id.*  The Restatement defines "compensatory damages" to include "restitution," and "Wisconsin has adopted this definition." *Id.*; *see* Restatement (Second) of Torts § 903, cmt. b (1979) (discussing unjust enrichment damages as "compensatory damages").  In other words, "an award of punitive damages to deter intentional wrongdoing" is not "foreclose[d]" by a party's election to seek restitutionary damages under an unjust enrichment theory.  *Pro-Pac*, 721 F.3d at 788.  Because the jury properly awarded Epic restitutionary damages for its claims of fraud, unfair competition, and misappropriation of trade secrets, it was entitled to "assess punitive damages" against TCS.  *See* Dkt. No. 872 at 5.[37]

### B.     TCS Forfeited Any Challenge to the Jury's Punitive Damages Award on the Basis of Insufficient Evidence.

TCS argues there was "no basis on which to submit to the jury the question of punitive damages."  Dkt. No. 914 at 47-48.  But TCS's challenge comes too late.  TCS never moved for judgment as a matter of law at the close of evidence on the ground that there was insufficient evidence to support an award of punitive damages.  *See* Dkt. Nos. 830, 843.  "That failure kills

---

[37] TCS's argument that punitive damages are unavailable for a common law unjust enrichment claim, *see* Dkt. No. 914 at 47, is irrelevant.  TCS does not dispute that the jury was entitled to award punitive damages for trade secret misappropriation under WUTSA, as well as for TCS's fraud and unfair competition (Dkt. No. 872 at 5), regardless of the damages theory under which Epic proceeded.

[its] argument." *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1286 (7th Cir. 1995). Because TCS failed to make a proper Rule 50(a) motion on the issue at the close of evidence, it has "forfeited" any "argument of insufficient evidence to support the award of punitive damages." *Id.* at 1287; *see also Prod. Specialties Grp., Inc. v. Minsor Sys., Inc.*, 513 F.3d 695, 699 (7th Cir. 2008) (Seventh Circuit "strictly enforce[s]" forfeiture where party fails to "move for judgment as a matter of law at the close of all the evidence"); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 931 (7th Cir. 1999); *Frazier v. Boyle*, 206 F.R.D. 480, 490 (E.D. Wis. 2002); *Midland Mgmt. Corp. v. Comput. Consoles Inc.*, No. 87-971, 1993 WL 69624, at *1 (N.D. Ill. Mar. 1, 1993) (defendant "waived any challenge to the appropriateness of awarding punitive damages" by failing to move for directed verdict on the issue).

### C. By Failing to Raise a Contemporaneous Objection, TCS Forfeited Any Challenge to the Standard Applied by the Jury.

TCS's argument that Epic failed to present sufficient evidence to show that TCS's conduct was "willful and malicious" has been doubly forfeited. Not only did TCS fail to preserve any challenge to the punitive damages award for lack of evidence, but it also failed to preserve a challenge to the jury instructions on the standard the jury should apply.

TCS claims that "Epic failed to put forward sufficient evidence to establish 'willful and malicious' conduct, which is required for punitive damages on its trade secret claim." Dkt. No. 914 at 48. But TCS never asked the Court to include a "willful and malicious" standard in its jury instruction on punitive damages, nor did TCS object to the "malicious or intentional disregard of the plaintiff's rights" standard that the Court read to the jury. *See* Dkt. No. 841 (TCS's proposed revisions to damages instructions); Dkt. No. 896 at 88:8-89:17 (TCS counsel requesting removal of specific language in proposed jury instruction but saying nothing about "willful and malicious" standard); Dkt. No. 872 at 5-6 (punitive damages instruction read to the

66

jury).  Accordingly, TCS's objection amounts to a belated challenge to the instruction provided by the Court.

TCS forfeited its right to object to the standard applied by the jury by failing to object to the language of the instruction before the jury retired to consider its verdict.  *See* Fed. R. Civ. P. 51.  Because the purpose of the rule is to provide the court "the opportunity to correct any error in the instruction" before it goes to the jury, "object[ing] in a post-trial motion[]" is simply "too late."  *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 794-95 (7th Cir. 1989) (emphasizing that an objection "to the inclusion of any instruction at all" is not sufficient; a party must object "to the specific language used"); *Davis v. Consol. Rail Corp.*, 788 F.2d 1260, 1267-68 (7th Cir. 1986).  The Court should reject TCS's attempt to back-door a forfeited jury instruction challenge by characterizing it as a challenge to the sufficiency of the evidence.[38]

### D.    The Jury's Punitive Damages Award Was Supported by the Evidence.

To the extent the Court considers TCS's sufficiency of the evidence argument on the merits, it fails under either the standard in the Court's instruction — to which TCS did not object — or under the standard that TCS now requests.

In evaluating the appropriateness of punitive damages, Wisconsin courts "will not second-guess the jury's findings and independently evaluate the evidence to determine" whether they would have awarded punitive damages.  *Northern Air Servs., Inc. v. Link*, 778 N.W.2d 172, at *6 (Wis. Ct. App. 2009), *aff'd in relevant part*, 804 N.W.2d 458 (Wis. 2011).  Accordingly, where a defendant's argument "boils down to a disagreement over the inferences the jury drew from the evidence submitted at trial," an award of punitive damages must stand.  *Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, 529 F. App'x 784, 793 (7th Cir. 2013).

---

[38] In any event, TCS does not dispute that the jury was properly instructed that, having found in Epic's favor for fraud and unfair competition, it could award punitive damages upon a finding that TCS acted "in an intentional disregard of [Epic's] rights."  Dkt. No. 872 at 5.

67

1.    <u>TCS Acted in an Intentional Disregard of Epic's Rights.</u>

As it was instructed, and TCS concedes, the jury was authorized to award Epic punitive damages if it found "by clear and convincing evidence that TCS acted maliciously toward Epic or in an intentional disregard of its rights."  Dkt. No. 872 at 5; Dkt. No. 914 at 49; *see* Wis. Stat. § 895.043(3).  A defendant intentionally disregards the rights of a plaintiff where he "acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded."  *Strenke v. Hogner*, 694 N.W.2d 296, 304 (Wis. 2005).  These rights are defined broadly and include a plaintiff's "right to safety, health or life, a property right, or some other right."  *Id.*  Accordingly, an award of punitive damages should not be overturned where a "reasonable jury could find" that a defendant "was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded." *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 694 N.W.2d 320, 325 (Wis. 2005).  Notably, under this standard, a plaintiff is *not* required to show "that a defendant intended to cause harm or injury to the plaintiff."  *Id.*  Instead, "it is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer." *Quad/Graphics*, 529 F. App'x at 791.  This standard is easily satisfied here.

TCS's wrongdoing is not limited to the employees who knowingly downloaded thousands of Epic's confidential and trade secret documents without authorization, or the managers who directed these employees to suppress evidence of their wrongdoing.  Rather, TCS executives also knowingly disregarded Epic's legal rights by flouting their obligations to notify Epic of TCS's wrongdoing, to preserve evidence relevant to its wrongdoing, and to conduct an adequate investigation to determine the scope of TCS's wrongdoing.  Moreover, TCS's conscious disregard for Epic's rights, and its continued insistence throughout this litigation that it

has done nothing wrong, evidences a pattern of remorselessness that further supports the jury's award of punitive damages.

The trial record shows that TCS employees, numbering at least in the dozens, shared Ramesh Gajaram's credentials and thereby gained widespread unauthorized access to Epic's UserWeb.  *Supra* n.20.  These employees knew that what they were doing was a violation of corporate security policy.[39]  These employees used their improper access to knowingly engage in unauthorized downloads of more than 6,000 Epic documents, as well as to view and copy-and-paste a substantial quantity of Epic's other confidential information stored on the UserWeb. *Supra* n.21; *see also* Tr. Ex. 714 at 2 (TCS assessment report concluding "no TCS associate was allowed to connect to the EPIC User Web"); Dkt. No. 895 (Laykin) at 44:15-20.  TCS managers also knew what these employees were doing.[40]  And when Mr. Guionnet's allegations spurred an internal investigation of these employees' misconduct, TCS managers were aware of — and approved of — a campaign to "suppress the truth" by hiding evidence of TCS's access to the UserWeb from investigators.  Dkt. No. 922-19 (Pandian Clip Report) at 136:23-137:12.[41]

---

[39] *See, e.g.*, Dkt. No. 815 at 1 (Kartha Stip.) ¶ 14 (testifying his module lead told him to keep UserWeb access a secret because it was against Kaiser's policy); Dkt. No. 891 (Gajaram) at 62:16-64:1 (testifying he was the ISC, charged with ensuring employees did not share passwords); Dkt. No. 922-19 (Pandian Clip Report) at 92:12-22 (testifying he knew that passwords should not be shared); Dkt. No. 901 (Muthuswami) at 134:3-5 (testifying that TCS employees are "constantly reminded not to share passwords or other log-in credentials").

[40] *See, e.g.*, Dkt. No. 809 at 3 (Narisimhan Stip.) ¶ 5 (testifying his supervisors knew that he was provided a UserWeb log-in); Dkt. No. 809 at 7 (Ponnambalan Stip.) ¶¶ 3, 5 (testifying that supervisor Mukesh Kumar knew about her team's access to UserWeb and "he superiors directed her to access Epic's UserWeb"); Dkt. No. 891 at 53:22-54:1, 58:19-60:4 (Gajaram testifying he showed UserWeb to Mukesh Kumar, who knew Gajaram was sharing his password with other TCS employees); Dkt. No. 891 at 106:1-6, 114:17-115:8 (Anandhan testyfing his supervisor, Gupta knew about the UserWeb access and assisted in creating a fraudulent account for TCS employee Pandurangan); Tr. Ex. 163; Tr. Ex. 285 at 8.

[41] Evidence presented at trial also supports the conclusion that TCS executives and managers intentionally disregarded Epic's rights when they knowingly arranged for Naresh Yallapragada to prepare a comparative analysis using Epic's confidential information. *See supra* n. 19. TCS's improper motivations for creating this analysis are clear based on Venugopal Reddy's request to DV Prasad to "prepare a presentation comparing functionality between MedMantra Vs Epic . . . and share it with him

The jury also heard that TCS's most senior executives were notified of their employees' misconduct, but chose to do nothing about it, despite their contractual obligation to take action. TCS agreed under the terms of its Standard Consultant Agreement with Epic to "[n]otify Epic promptly and fully" if it became aware of any unauthorized access to Epic's confidential information.  Tr. Ex. 3 ¶ 3(c)(vi); Dkt. No. 889 (Martin) at 115:1-9; Dkt. No. 901 (Muthuswami) at 134:24-135:24.  TCS executives became aware that TCS employees had improperly accessed the UserWeb in May 2012 and again in August 2014.  Tr. Ex. 163; Tr. Ex. 713 at 5; Tr. Ex. 303 at 6; Dkt. No. 891 (Muthuswami) at 11:11-13:15, 27:10-28:19.  But TCS never notified Epic of its employees' access and, to this day, has never advised Epic fully as to what happened.  Dkt. No. 889 (Martin) at 116:5-22; Dkt. No. 891 (Muthuswami) at 30:19-31:11.  In short, as the Court recognized, TCS exhibited "a rampant disregard of [its] obligations . . . in terms of use of confidential information," and its "senior officials were regularly notified of that and ignored those notifications for more than two years."  Dkt. No. 898 at 165:16-22.

The jury also would have been justified in concluding that TCS took steps that it knew were grossly inadequate to investigate the scope of its wrongdoing.  TCS's internal investigation in August 2014 consisted solely of interviewing a small handful of employees who were directly implicated in accessing the UserWeb and taking these employees at their word despite their

---

such that we can assess Me[d]Mantra and see if we [can] directly sell Me[d]Mantra to Kaiser or make necessary changes and then go to Kaiser."  Tr. Ex. 423; Dkt. No. 922-20 (Prasad Clip Report) at 14:22-25, 15:22-16:1, 16:4-19, 163:3-170:6, 172:21-173:21.  Mr. Prasad declined to prepare the presentation because he "kn[e]w it [wa]s not right" to use "confidential" customer information for such an analysis and "didn't want to get into any trouble."  Dkt. No. 922-20 (Prasad Clip Report) at 174:12-175:8, 175:10-13.  Mukesh Kumar — who arranged for TCoE employees to supply Mr. Yallapragada with Epic's information (*see supra* n. 18) — also testified that if he had known the purpose was to form a comparative analysis he would not have done so.  *See* Dkt. No. 922-14 (M. Kumar Clip Report) at 98:9-14, 98:16-99:9; *see also* Dkt. No. 821 at 3 (Rathina Stip.) ¶ 12 (testifying that the information in the comparative analysis was not publicly available); Dkt. No. 890 (Guionnet) at 46:9-47:10.  This evidence supports the conclusion that the TCS managers who directed the creation of this analysis were well aware that what they were doing was in violation of Epic's rights.

2437265

inconsistent statements and obvious motivation to cover up their wrongdoing.  *See* Tr. Ex. 2078 at 4-5 (TCS asserting its employees engaged in "obfuscation and attempts at deception" throughout the course of pre-suit interviews); Dkt. No. 902 (Menon) at 41:22-42:6.  TCS accepted these employees' denials at face value and chose not to verify their responses against electronic records of their web activity.  *See* Dkt. No. 902 at 32:9-33:13, 42:2-6 (Menon testifying that TCS did not review any electronic records, including web proxy logs, as part of its August 2014 investigation).  The details of TCS's inadequate investigation support the reasonable conclusion that TCS was far more interested in finding evidence to suggest its innocence than in uncovering the true scope of its wrongdoing.  *See also* Tr. Ex. 173 at 1 (TCS representing to Kaiser that the unauthorized access amounted to "individual lapses rather than [an] engagement wide issue"); Tr. Ex. 172 at 1 (proposing that TCS convey to Kaiser that its "investigation will prove to them that this is a single person issue NOT a TCS wide policy problem"); Tr. Ex. 174 at 1 (describing unauthorized access as a "nuisance"); Dkt. No. 922-18 (Mukherji Clip Report) at 36:15-44:8 (testifying that no one told her when she replaced Mr. Guionnet about any issues related to UserWeb access).[42]

---

[42] TCS's highest executives also knew they were obligated to preserve all evidence related to TCS's unauthorized UserWeb access, but instead allowed vast amounts of relevant electronic evidence to be destroyed.  Kaiser directed TCS in August 2014 that it was under a duty to preserve all "documents or data or electronically stored information" that "may be relevant" to the allegation that its employees had improperly accessed Epic's User Web.  Tr. Ex. 713; Dkt. No. 891 (Muthuswami) at 30:19-31:11.  But TCS took no steps to preserve documents and data that were plainly relevant to its employees' UserWeb activity, including web proxy logs, images of computers in the ODC, and archived backup tapes.  Dkt. *Supra* n. 28.  TCS took no steps to preserve this data despite acknowledging that it had preserved web proxy logs in similar investigations, and that both Kaiser and Paul Amalraj indicated that the web proxy logs should be preserved.  *See id.*  This resulted in the destruction of an extensive amount of electronic evidence that could have allowed TCS, and later Epic, to determine what actually happened to the documents TCS unlawfully downloaded from Epic's UserWeb.  *See* Dkt. No. 903 (Rubin) at 11:13-22; Dkt. No. 895 (Laykin) at 39:5-44:9 (testifying that determining what happened with Epic's data would require review of electronic records that TCS did not review or preserve as part of its investigation); Dkt. No. 889 (Martin) at 116:13-22 (testifying about actions Epic could have taken if it had been timely notified).

Finally, the jury's punitive damages award is supported by the fact that TCS has never expressed any remorse for its wrongdoing.  TCS has offered no apology to Epic for its actions. *See* Dkt. No. 898 at 111:23-112:8.  Aside from Mr. Guionnet, no TCS employees have been placed on administrative leave as a result of their misconduct relating to Epic's UserWeb.  Dkt. No. 891 (Muthuswami) at 31:12-16.   And throughout trial proceedings, TCS advanced an argument of "no harm, no foul," insisting that — despite the jury finding in favor of Epic on every claim — it owes Epic nothing for its wrongdoing.  Dkt. No. 898 (Bersin) at 51:13-19; *id.* at 135 (TCS's closing argument criticizing Epic as "outrageous" for suggesting a damages theory in the vein of, "You break it, you bought it").[43]

### 2.    TCS's Conduct Was Willful and Malicious.

The jury's award of punitive damages was appropriate even under TCS's preferred "willful and malicious" standard.  The WUTSA does not define "willful and malicious," and few, if any, decisions have sought to interpret it.[44]  Wisconsin common law provides a definition,

---

[43] TCS's pattern of remorselessness has continued.  Immediately following trial, TCS issued a press release insisting that the jury's verdicts on liability and damages "are unsupported by the evidence presented during the trial."  *See "Epic Systems Wins $940 Mln U.S. Jury Verdict in Tata Trade Secret Case,"* REUTERS NEWS (Apr. 18, 2016 at 11:12am) *available at* http://www.reuters.com/article/tata-epic-verdict-idUSL2N17L0YK; *see also, e.g., "Tata Consultancy Service Fined $940 Million in Trade Secrets Lawsuit, Will Appeal,"* INDIAN-ASIAN NEWS SERVICE (Apr. 18, 2016) *available at* http://www.indiawest.com/news/business/tata-consultancy-services-fined-million-in-trade-secrets-lawsuit-will/article_a377855e-0587-11e6-bb45-83386c51f8c6.html.  TCS has continued to insist it did nothing wrong:  "TCS reiterates that it did not misuse or derive any benefit from the information at issue and never had any intention to do so."  *See "After $940 Million Fine, TCS Receives Another Blow in Trade Secret Case,"* INDIA ABROAD (May 6, 2016) at A24 *available at* http://www.indiaabroad-digital.com/indiaabroad/20160506?pg=37#pg37.

[44] While *Centrifugal Acquisition Corp. v. Moon* cited this provision of WUTSA, it interpreted the meaning of "malicious conduct" in connection with the plaintiff's claim for statutory conspiracy.  849 F. Supp. 2d 814, 838 (E.D. Wis. 2012).  Thus, TCS's proposed standard for malicious conduct — that it "requires inflicting harm for the sake of harm as an end in itself, and not merely as a means to some further end legitimately desired," Dkt. No. 914 at 49 — does not apply here.  Even if it did, *Centrifugal Acquisition* permits an award of punitive damages here, as the court allowed the conspiracy claim to survive summary judgment because there was sufficient evidence "to create the inference that [the defendant] intended to do wrongful harm."  849 F. Supp. 2d at 838.  As explained here, Epic presented sufficient evidence at trial to allow the jury to infer intent to do harm to Epic.

2437265

however:  "[A]cts are malicious when they are the result of hatred, ill will, desire for revenge, or inflicted under circumstances where insult or injury is intended."  *Strenke*, 694 N.W.2d at 302. Intent to cause injury, in turn, may be established by introducing evidence sufficient to allow "a reasonable jury [to] infer [defendant] was aware of a substantially certain risk of harm."  *Milton v. Washburn Cnty.*, 797 N.W.2d 924, 928 (Wis. Ct. App. 2011).

Importantly, "[j]uries often must infer intent," as "[i]ntent by its very nature is rarely susceptible to proof by direct evidence."  *State v. Williams*, 644 N.W.2d 919, 935 (Wis. 2002); *see also Clark v. State*, 214 N.W.2d 450, 451 (Wis. 1974) (same); *Rose v. Clark*, 478 U.S. 570, 581-82 (1986) ("Indeed, in the many cases where there is no direct evidence of intent, [inferring malice from a defendant's conduct] is exactly how intent is established.").  That TCS's witnesses failed to admit that they engaged in misconduct with knowledge that it was substantially likely to cause harm to Epic is therefore not a bar to an award of punitive damages, even under TCS's proposed, heightened standard.  Indeed, TCS has repeatedly emphasized the unwillingness of its employees to admit to misconduct.  *See, e.g.*, Tr. Ex. 2078 at 4-5.

There is more than sufficient evidence in the record to support a finding that TCS created a "substantially certain risk of harm to Epic," but that TCS nonetheless continued to engage in this misconduct.  As discussed in the previous section, TCS employees and managers knowingly violated corporate security policies by engaging in the widespread sharing of Ramesh Gajaram's credentials, and they used these credentials to download more than 6,000 Epic trade secret and confidential documents.  The risk to Epic from this behavior is highlighted by the fact that, according to TCS, some of the confidential and trade secret documents downloaded with Mr. Gajaram's account were obtained by Indian IP addresses *not* affiliated with TCS.  *See* Tr. Ex. 2062 at 18; *see also* Dkt. No. 905 at 54:20-55:21.  The evidence also showed that TCS prepared

73

the comparative analysis using Epic's information with the intent to market Med Mantra to Kaiser, one of Epic's largest customers. *Supra* n. 41. And TCS executives plainly acted with intent when — despite their clear contractual and legal obligations to Epic — they chose not to notify Epic of TCS employees' unauthorized access to UserWeb, failed to preserve evidence of their wrongdoing, and failed to conduct an adequate investigation. *Supra* pp. 69-72.

In short, the jury's punitive damages award was proper even under the "willful and malicious" standard that TCS now espouses.

## VII.   The Punitive Damages Award Should, at Most, Be Reduced to the Statutory Cap – Two Times Compensatory Damages.

After full consideration of the evidence, the jury concluded that a $700 million punitive damages award would "accomplish the purpose of punishing or deterring wrongful conduct," in light of: (1) the grievousness of TCS's acts; (2) the degree of malice involved; (3) the potential damages which might have been done by such acts as well as the actual damage; and (4) the sum of punitive damages that would be sufficient to punish TCS and deter it from the same conduct in the future in light of its wealth. Dkt. No. 872 at 6; Dkt. No. 871. The jury apparently concluded that an award equivalent to approximately one-fifth of TCS's 2015 profits is what it would "take for the TCS executives to finally sit up and take notice and start obeying the code of conduct they talk about." Dkt. No. 898 at 113:7-114:1 (explaining that one-tenth of TCS's 2015 profits "would be about $350 million"); Dkt. No. 870.

TCS requests that the jury's award be reduced, but it (a) almost wholly ignores the twin purposes of punitive damages, *i.e.*, punishment and deterrence; (b) fails to lay out, let alone apply, the full Wisconsin test for excessiveness, and (c) relies on arguments that contradict the jury's liability verdict. Put simply, the jury's punitive damages award is not "so clearly

excessive as to indicate passion and prejudice." *Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 661 N.W.2d 789, 801 (Wis. 2003).

Moreover, any complaints that TCS has as to excessiveness are resolved by Wisconsin's statutory cap limiting punitive damages to two times compensatory damages. *See* Wis. Stat. §§ 134.90(4)(b), 895.043(6). Because this is the very purpose of such statutes, courts have held that a punitive damages award at the statutory limit is presumptively not excessive.[45] Awarding Epic punitive damages in an amount that is double the compensatory damage award — which is $480 million, based on the $240 million compensatory damage award — comports with Wisconsin's statutory cap and is not excessive under either Wisconsin law or the federal Constitution.[46] There is no basis to reduce the jury's award any further.

### A. A Punitive Damages Award of Two Times the Jury's Chosen Compensatory Damage Award Is Not Excessive Under Wisconsin Law.

Awarding Epic double the compensatory damages award comports with Wisconsin law and is not excessive. TCS's argument regarding Epic's level of care is irrelevant, untrue, and unavailing.

---

[45] *See Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) ("we will not normally disturb an award of damages in a Title VII case at or under the statutory cap"); *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1056 (9th Cir. 2014) (en banc) ("rigid application" of the federal excessiveness standard is "less necessary or appropriate" in cases involving statutory punitive damages awards; "the more relevant . . . consideration is the statute itself, through which the legislature has spoken explicitly on the proper scope of punitive damages"); *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 643 (10th Cir. 2016) (same); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) ("a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated"); *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) (same); *Hutelmyer v. Cox*, 514 S.E.2d 554, 562 (N.C. Ct. App. 1999) (fact that award is within statutory limit suggests award is not excessive as a matter of state law).

[46] In addition, Wisconsin's statutory cap is much lower than that applied across the country in other jurisdictions.

1.    The Excessiveness Inquiry Is Integrally Tied to the Twin Purposes of Punitive Damages.

Punitive damages awards serve two purposes: punishment and deterrence.  "Punitive damages are not intended to compensate the plaintiff, but rather are awarded to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct."  *Kimble v. Land Concepts, Inc.*, 845 N.W.2d 395, 398 (Wis. 2014).  With respect to deterrence, punitive damages serve to "remov[e] the profit from illegal activity"; to effect that purpose, the amount of such damages "must be in excess of the profit created by the misconduct so that the defendant recognizes a loss."  *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154, 165 (Wis. 1997).  A punitive damages award is "excessive" only "if it is more than necessary to serve the [twin] purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing."   *Trinity Evangelical*, 661 N.W.2d at 799.   When conducting an excessiveness analysis, the Wisconsin Supreme Court has made clear that "the award of punitive damages in a particular case is within the discretion of the jury, and [the Court is] reluctant to set aside an award merely because it is large or [the Court] would have awarded less."  *Id.* at 798.

a.    **The Punitive Damages Award Is Not So Clearly Excessive As To Indicate Passion and Prejudice.**

The punitive damages award here is not "so clearly excessive as to indicate passion and prejudice."  *Id.* at 801.  "Wisconsin case law calls on courts to apply" the following six-factor test for gauging excessiveness — a test ignored by TCS — which is "substantively identical" to the federal *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003), test:

1.  The grievousness of the acts;

2.  The degree of malicious intent;

76

2437265

3. Whether the award bears a reasonable relationship to the award of compensatory damages;

4. The potential damage that might have been caused by the acts;

5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and

6. The wealth of the wrongdoer.

*Kimble*, 845 N.W.2d at 399-400. "Wisconsin courts are called upon to analyze only those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive." *Id.* at 400. The Wisconsin Supreme Court has made clear that the six factors should be assessed in conjunction with the three constitutional guideposts offered by the Supreme Court: "(1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the harm or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct." *Id.* at 399-400 (citing *BMW of N. Am., Inc v. Gore*, 517 U.S. 559, 574-75 (1996)). Epic and TCS agree that the third guidepost — and, by implication, the fifth factor of the Wisconsin test — is inapposite in this case. Dkt. No. 914 at 60.

Reprehensibility / Grievousness/Malicious Intent. Reprehensibility or, under the Wisconsin test, the grievousness and malicious intent factors, is "the most important indicium of the reasonableness of a punitive damage award." *Jacque*, 563 N.W.2d at 164; *Trinity Evangelical*, 661 N.W. 2d at 801 (construing "grievousness" as equivalent to "reprehensibility"). This factor favors Epic.

TCS's conduct differs little in nature from the conduct the Wisconsin Supreme Court found "clear[ly]" grievous and reprehensible in *Trinity Evangelical*. There, an insurance company knew its policyholder believed that it was covered for a certain category of insurance, but the policyholder was not in fact covered due to a mutual mistake in drafting the policy. 661

77

2437265

N.W.2d at 792.  The insurance company became aware of the mistake but did not alert the policyholder, and then refused to provide the relevant coverage when the policyholder requested it.  *Id.* at 793.  The Wisconsin Supreme Court held that "engag[ing] in prohibited conduct while knowing[ly] or recklessly disregarding the lack of a reasonable basis for denying" an insurance claim that resulted in economic damage to the plaintiff was clearly reprehensible.[47]  *Id.* at 801.  The conduct was made more reprehensible by the failure of the insurance company's Vice President and Director of Operations to investigate the issue after receiving a letter from a district manager informing him that there had been a mistake made with respect to the scope of the coverage.  *Id.* at 793.  Similarly, here, TCS knowingly downloaded files it was not authorized to download — engaging in prohibited conduct — and despite being aware of this conduct, the President of TCS did not investigate or try to halt the conduct.  *Supra* pp. 68-72.

Further evincing malicious intent and reprehensibility is TCS's spoliation of critical evidence.  *See supra* pp. 50-53.  Wisconsin courts consistently deem evidence of spoliation as credible support for punitive damages awards.  *See, e.g.*, *Weiss v. United Fire & Cas. Co.*, 541 N.W.2d 753, 765 (Wis. 1995) (unexplained removal of electrical evidence indicative of a possible electrical fire constitutes "credible evidence to support the jury's award of punitive damages"); *Upthegrove Hardware, Inc. v. Penn. Lumbermans Mut. Ins. Co.*, 431 N.W.2d 689, 695 (Wis. Ct. App. 1988) (defendants' destruction of potentially crucial evidence is among the "sufficient credible evidence" supporting "the jury's award of punitive damages").

TCS's complete lack of remorse further supports a finding that its conduct is particularly reprehensible — and likely to be repeated — meriting a significant punitive damages award to

---

[47]  The court deemed the insurance company's conduct "prohibited" because the law was clear at the time of the conduct that an insurer had a duty to reform an insurance policy upon the discovery of mutual mistake.  *Trinity Evangelical*, 661 N.W.2d at 801.  By not so reforming, the company engaged in prohibited conduct.

serve the deterrence function of the award. *See Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 438 (7th Cir. 1997) ("lack of remorse" suggests problematic conduct "was likely to happen again" and serves as a factor that justifies punitive damages award); *Fahrenberg v. Tengel*, 291 N.W.2d 516, 527 (Wis. 1980) (fact that defendant "showed no remorse for his criminal activity" counsels in favor of punitive damages award); *see also Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1143 (7th Cir. 1987) ("[B]ecause the purpose of punitive damages is deterrence, the jury was entitled to consider evidence of post-verdict recalcitrance in determining the punitive damage award."); *Jacque*, 563 N.W.2d at 164 (explaining that defendants' "arrogant stance" at trial — conceding they "intentionally trespassed" plaintiff's land but still maintaining "we cannot be punished for that trespass because the law protects us" — favors a finding of reprehensibility). The reprehensibility factor — the most important factor — accordingly cuts in favor of Epic.

Reasonable Relationship to Compensatory Damages and the Wealth of the Wrongdoer. Moving to the third and sixth Wisconsin excessiveness factors, a punitive damages award of two times the compensatory damages award bears a reasonable relationship to the latter award, especially in light of TCS's $15.5 billion in annual revenue and $3.5 billion in annual profit. *See* Dkt. No. 870 at 1 (figures based on FY 2015). "Wisconsin law expressly rejects the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of civil or criminal penalties to punitive damages, to calculate the amount of reasonable punitive damages." *Kimble*, 845 N.W.2d at 409. And while "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness[,] they do not establish a range beyond which awards are necessarily excessive." *Adams v. City of Chicago*, 798 F.3d 539, 545 (7th Cir. 2015). In other words, "an exact analogy is not necessary." *Id.* When assessing the ratio, the Supreme Court

79

and Wisconsin courts have made clear that "courts can consider not only the compensatory damages award, but also the harm likely to result from the defendant's conduct" as well as "potential damage that *might* have been caused by a defendant's acts."  *Kimble*, 845 N.W.2d at 409 (emphasis added).[48]

Contrary to TCS's insinuations, Wisconsin courts and the Seventh Circuit have repeatedly deemed to be reasonable ratios of 2:1 or higher, of punitive to compensatory damages, in cases involving only economic damage.  *See, e.g., Trinity Evangelical*, 661 N.W.2d at 803-04 (affirming 7:1 ratio for conduct that resulted in purely economic harm); *Schwigel v. Kohlmann*, 694 N.W.2d 467, 474 (Wis. Ct. App. 2005) (affirming 30:1 ratio in light of defendant's "profoundly egregious conduct"); *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 757 N.W.2d 803, 822 (Wis. 2008) (affirming 2:1 ratio for economic harm resulting to plaintiff from breach of non-compete agreement); *Jacque*, 563 N.W.2d at 156 (upholding award of $100,000 in punitive damages despite only nominal compensatory damages for trespass); *Chapes v. Pro-Pac, Inc.*, 473 B.R. 295, 306-07 (E.D. Wis. 2012) (upholding 8:1 ratio in case where employee breached fiduciary duty by securing a business opportunity for his employer's competitor); *Kimble*, 845 N.W.2d at 411-12 (3:1 ratio in case where defendant breached title insurance policy issued to plaintiffs and exercised bad faith in failing to defend the faulty land title it sold to the plaintiff).  Indeed, in upholding a 3:1 punitive to compensatory damages ratio against an excessiveness claim, the Seventh Circuit observed that "statutes routinely provide for double and treble damage awards to deter and punish."  *AIC Sec. Investigations*, 55 F.3d at 1287.[49]

---

[48] The potential damage that might have been caused by TCS's conduct is described in more detail *infra* pp. 83-84.

[49] Further bolstering the reasonableness of a 2:1 award is the fact that the jury deemed a nearly 3:1 award reasonable.  Dkt. No. 871 at 1-2 (awarding $700 million in punitive damages and $240 million in compensatory damages); Dkt. No. 872 at 6 (instructing jurors to "use sound reason in setting the amount of [punitive] damages," if they decide a punitive damages award is "appropriate"); *see Trinity*

2437265

TCS cites a slew of cases to argue that the *absolute* amount of the punitive damages award here is "out of line" with prior awards in similar cases.  Dkt. No. 914 at 56 & n.14.  But the focus of the excessiveness inquiry is on the *relationship* between the punitive and compensatory damages awards, not the absolute amount of punitive damages considered in isolation.  *See Kimble*, 845 N.W.2d at 407 (relevant inquiry is "[w]hether the [punitive damages] award bears a reasonable relationship to the award of compensatory damages"); *Gore*, 517 U.S. at 575 (second guidepost is "the disparity between the harm or potential harm" suffered by plaintiff and the punitive damages award); *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (second guidepost is "the ratio between the compensatory and punitive damages awards"). When the U.S. Supreme Court discusses the second guidepost analysis, it speaks exclusively in terms of "ratio."  *Gore*, 517 U.S. at 580-81; *State Farm*, 538 U.S. at 424-25; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 507 (2008).  The U.S. Supreme Court's focus on ratio is due, at least in part, to the "long pedigree" of "[t]he principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages."  *Gore*, 517 U.S. at 580.  Awards with reasonable ratios are, therefore, "more likely to comport with due process, while still achieving the State's goals of deterrence and retribution."  *State Farm*, 538 U.S. at 425.

Given the U.S. Supreme Court's exclusive focus on ratio, it is unsurprising that the only authority TCS can muster to justify the relevance of the absolute amount awarded was decided before *Gore* and *State Farm*, and before the Wisconsin Supreme Court introduced its current "excessiveness" test.  *See* Dkt. No. 914 at 55 (citing *DeRance, Inc. v. PaineWebber, Inc.*, 872 F.2d 1312, 1329-30 (7th Cir. 1989)).  Moreover, all of the cases relied on by TCS involve substantially lower compensatory damages than those awarded here, and so, had the juries in

---

*Evangelical*, 661 N.W.2d at 798 (explaining that "the award of punitive damages in a particular case is within the discretion of the jury" and that the court is "reluctant to set aside an award merely because" the court "would have awarded less").

2437265

those cases awarded hundreds of millions in punitive damages, the ratio between punitive and compensatory damages would have been unacceptably high.  *See, e.g.*, *SKF USA Inc. v. BJerkness*, No. 08-4709, 2010 WL 3155981, at *1 (N.D. Ill. Aug 9, 2010) ($41,068.40 in compensatory damages awarded); *Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 939 (7th Cir. 1996) (awarding $252,684.69 in compensatory damages and $505,369.38 in punitive damages); *RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832 (N.D. Ill. 2008) ($13,352,241 in compensatory damages awarded).

Lastly and most importantly, all but one of the cases cited by TCS appear to involve defendants who were substantially less wealthy than TCS, a corporation with annual revenues in excess of $15 billion.  *See* Dkt. No. 870 at 1.  Wisconsin calls on courts (and juries) to account for the wealth of a defendant when setting a punitive damages award.  *See* Wis. Stat. § 895.043(4)(a); *Kimble*, 845 N.W.2d at 400.  Consistent with Wisconsin law, the jury had before it evidence of TCS's immense wealth and this Court instructed the jury to "consider the defendants' wealth in determining what sum of punitive damages will be enough to punish it and deter it and others from the same conduct in the future."  Dkt. No. 872 at 6.  This factor appears to have played a role in the jury's $700 million award.  *See* Dkt. No. 898 at 113:7-114:1 (explaining that one-tenth of TCS's 2015 profits "would be about $350 million").

Wisconsin law directs courts to consider the defendant's wealth for good reason: "Assuming that a wealthy corporation and a corporation of lesser worth engage in the same type of misconduct, common sense dictates that it will take a larger punitive damages award to deter the wealthy corporation from future misconduct."  *E.E.O.C. v. CEC Entm't, Inc.*, No. 98-698, 2000 WL 1339288, at *19 (W.D. Wis. 2000).  Yet, with a single exception, none of the cases relied on by TCS appears to involve a defendant with wealth even close to approaching that of

82

TCS.  *See, e.g.*, *Lucini Italia Co. v. Grappolini*, No. 01-6405, 2003 WL 1989605, at *1 (N.D. Ill. Apr. 28, 2003) (defendants are an individual consultant and small family business); *Eng'g Res. v. CRS Seam*, No. 94-6970, 1997 WL 232778, at *5 (N.D. Ill. May 1, 1997) (defendant's revenue estimate was $3,700,000 and jury could have inferred that defendants had profits "in a range from $823,500 . . . $1,230,250"); *Mangren*, 87 F.3d at 940-41 (defendant is brand new business); *3M*, 259 F.3d at 593 (same); *SKF USA*, 2010 WL 3155981, at *1 (defendants are four individual employees).  The sole case involving a defendant with substantial revenues, *RRK Holding*, involved a compensatory damages award ($13,352,241) significantly lower than the award at issue here, *see* 563 F. Supp. 2d at 838, such that a punitive damage award over $400 million could have raised excessiveness concerns.  *See supra* pp. 75-76.[50]

 Potential damage.  Potential damage to Epic provides an additional factor — ignored by TCS — that supports the punitive damages award at issue.  *See Kimble*, 845 N.W.2d at 400; *Gore*, 517 U.S. at 575 ("disparity between the harm or *potential harm*" is one of the three guideposts for determining whether a punitive damage award is grossly excessive); *Robison v. Lescrenier*, 721 F.2d 1101, 1113 (7th Cir. 1983) (applying Wisconsin law and holding that the

---

[50] TCS also ignores many trade secrets cases with substantial (absolute) punitive damage awards.  For example, in *Mattel Inc. v. MGA Entertainment, Inc.*, 801 F. Supp. 2d 950, 956 (C.D. Cal. 2011), the court awarded the plaintiff $85 million in punitive damages for a willful and malicious trade secrets violation even though the defendant's conduct "d[id] not represent the most reprehensible form of trade secret misappropriation imaginable" and "[t]he need for deterrence [was] absent" because the public nature of the defendant's misconduct would preclude it from engaging in such misconduct again.  Other courts have upheld similarly high punitive damage awards in trade secrets and other economic damage cases. *See, e.g. Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366, 1371-72 (Fed. Cir. 2003) (upholding $50 million punitive damages award with 3.3:1 punitive-to-compensatory ratio); *Dow Chem. Co. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 553 N.E.2d 144, 145, 151 (Ind. Ct. App. 1990) (upholding nearly 3:1 ratio in light of defendant's "phenomenal wealth"); *Time Warner Entm't v. Six Flags Over Georgia*, 563 S.E.2d 178, 180 n.1 (Ga. Ct. App. 2002) (upholding $257 million punitive damages award); *Avery Dennison*, 45 F. App'x at 483, 489; *MacDermid Printing Sols., LLC v. Cortron Corp.*, No. 08-1649, 2015 WL 251527, at *1, 18-20 (D. Conn. Jan. 20, 2015); *Patriot Rail Corp. v. Sierra R.R. Co.*, No. 09-9, 2014 WL 5426446, at *7 (E.D. Cal. Oct. 23, 2014).

"substantial" "potential damage which might have been done" to the plaintiff supported punitive damage award despite only nominal actual damages).

The jury in this case was properly instructed to consider "the potential damage which might have been done" by the defendant's acts in addition to "the actual damage" when determining the amount of punitive damages that should have been awarded.   Dkt. No. 872 at 6. And "[t]he potential damage that might have been caused by" TCS's misconduct in this case is substantial.   *Kimble*, 845 N.W.2d at 400; *see Robison*, 721 F.2d at 1113.   Among other things, TCS's employees could have released Epic's trade secrets and confidential information into the public domain, causing substantial financial harm to Epic.   *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011-12 (1984) (explaining that "the right to exclude others is central to the very definition of [a trade secret]" and "disclosure" will "destroy" the "economic value of that property").   Indeed, the evidence showed that Ramesh Gajaram shared documents downloaded from UserWeb with a friend who did not work for TCS.   *See* Dkt. No. 891 (Gajaram) at 65:18-67:2; Tr. Ex. 118.   Mr. Gajaram admitted that he lost control over Epic's confidential information once it was emailed outside TCS.   *Id.* at 60:21-61:7.   There is no telling how much of Epic's other information was shared outside of the ODC.   *See supra* p. 26; *see also* Dkt. No. 905 at 54:20-55:21.   TCS could also have used Epic's information to improve Med Mantra and to license its own software product to Kaiser in place of Epic's — as it clearly intended to do (*see* Tr. Ex. 423) — with many millions of dollars in resulting harm to Epic.

Accordingly, all five of the relevant Wisconsin factors support a hefty punitive damages award here, rendering appropriate — and far from grossly excessive — an award at two times the level of compensatory damages.

    **b.**  **TCS Mischaracterizes Epic's Level of Care in Protecting Its Trade Secrets and Such Level of Care Is Irrelevant to the Excessiveness Inquiry In Any Event.**

  The only other argument TCS advances for why the punitive damages award is supposedly excessive under Wisconsin law is that "Epic was not as careful as it might have been in guarding" its trade secrets.  Dkt. No. 914 at 54.  This argument is wrong, for three reasons.

  <u>First</u>, it contradicts the jury's verdict.  The jury found TCS liable for misappropriation of trade secrets.  To reach such a verdict, the jurors were required to find, by preponderance of the evidence, that Epic possessed a trade secret and TCS acquired the trade secret.  Dkt. No. 858 at 8.  The jury instructions further defined a "trade secret" as "information" that "is the subject of efforts to maintain its secrecy that are reasonable under the circumstances."  *Id.* at 9.  "[J]uries are presumed to follow the court's instructions."  *CSX Transp.*, 556 U.S. at 841.  Accordingly, by finding TCS liable for misappropriation, the jury necessarily found that Epic undertook reasonable efforts to maintain the secrecy of the relevant information.

  <u>Second</u>, consistent with the jury's verdict, TCS's argument contradicts the record.  TCS relies exclusively on Mr. Laykin's testimony for its assertion that Epic was not sufficiently careful, but it fails to mention the plethora of other testimony showing that Epic undertook reasonable efforts to maintain its secrecy.  Mr. Martin testified in detail about the efforts Epic takes to protect the confidentiality of information related to its software.  Dkt. No. 889 at 101:6-106:5, 112:10-24, 114:5-234:23; *see also* Dkt. No. 900 at 86:1-88:11 (Dvorak testifying Epic is at the "top" of the industry in terms of protecting its confidential information).  Mr. Laykin's testimony was also substantially undermined by Mr. Martin's explanation that most of the screenshots identified by Mr. Laykin as publicly-available "Epic" screenshots were in fact not Epic screenshots at all.  Dkt. No. 895 (Martin) at 162:2-24; *see also id.* at 163:14-172:13 (Martin testifying that Epic *does* "do many of the things that [Mr. Laykin] enumerates as standard

procedures for protecting trade secrets" and that the remaining suggestions would not be reasonable under the circumstances).  The fact that the jury concluded that the stolen information qualified as trade secrets shows that it credited the testimony of Mr. Martin and Mr. Dvorak over that of Mr. Laykin.

Third, consideration of Epic's level of care has no foundation in Wisconsin law.  TCS relies exclusively on *DeRance, Inc. v. PaineWebber*, 872 F.2d 1312 (7th Cir. 1989) for the proposition that Epic's level of care is relevant in assessing punitive damages.  But, although it discussed the plaintiff's level of care in dicta, the Seventh Circuit clarified that it "base[d] the reduction of the punitive damages award entirely upon the conclusion that the award was excessive because it exceeded the amount commensurate with the degree of [the defendant's] wrongdoing." *Id.* at 1330 n.10.  It further explained that "[c]ontributory negligence by [the plaintiff] [was] *not* a factor in our reduction, and we take no position on whether or not it can be used as a factor . . . under Wisconsin law." *Id.* (emphasis added).  Indeed, assessment of the *plaintiff's* conduct finds no place in the six-factor test enunciated by the Wisconsin Supreme Court for assessing the excessiveness of a punitive damages award, *see Kimble*, 845 N.W.2d at 400, a test unmentioned and unaddressed by TCS in its briefing.  It is no surprise, then, that TCS fails to cite a single Wisconsin case to support the view that the plaintiff's level of care serves as a factor in determining whether a punitive damages award is excessive.  And, even if it had, the jury verdict and record show that such a factor would favor Epic, not TCS.

**B.     The Punitive Damages Award Is Not Grossly Excessive Under The Federal Due Process Clause.**

Where, as here, punitive damages are awarded pursuant to statute, a rigorous *Gore* analysis is unnecessary.  *See BNSF*, 816 F.3d at 643; *ASARCO*, 773 F.3d at 1056; *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272 (10th Cir. 2000).  In any event, because

the Wisconsin excessiveness test is "substantively identical" to the federal constitutional excessiveness analysis, *Kimble*, 845 N.W.2d at 400, the analysis above applies to the federal constitutional question too.   The additional arguments in the federal due process section of TCS's brief are unavailing for the reasons set forth below.

>    1.    TCS's Assertions of Foreign Bias Are Unfounded and Contradict the Jury Instructions.

TCS asserts that the jury here "seems to have" been expressing a bias against an out-of-town business in favor of a local business.   Dkt. No. 914 at 59.   This assertion ignores the voir dire process and jury instructions, which served to both filter out jurors with such bias and ensure that the selected jurors did not act on bias even if they had any.   The voir dire questions were designed to filter out jurors with bias for or against TCS.   Among the questions the Court asked were:

> Is there anyone who thinks they might unfairly favor Epic, even slightly, because it is a local company?
>
> Does anyone have a strong opinion, whether positive or negative, about TCS?
>
> Does anyone have a strong opinion, whether positive or negative, about Indian-based companies more generally?
>
> Does anyone have a strong opinion, whether positive or negative, about Epic?
>
> Does anyone believe that a company not based in the United States should have fewer rights in a United States court than an American-based company?

Dkt. No. 856 at 5.[51]   In its opening jury instructions, this Court admonished that "[a]ll parties are equal before the law."   Dkt. No. 857 at 8.   In the closing jury instructions on liability, the Court again reminded the jury that it was "not to consider [TCS's] status as an Indian corporation in

---

[51] Epic also agreed not to make unnecessary references to TCS's status as a foreign company (*see* Dkt. No. 638), and TCS itself regularly referred to its presence in India and the nature of its employees' work offshore.  *See, e.g.*, Dkt. No. 889 at 55:25-56:3 (TCS opening statement describing TCS's Indian origins); Dkt. No. 895 at 7:8-21 (TCS questioning Mr. Menon about the TCS facility in Chennai, India and its offshore development center).

rendering [its] decision.  The parties in this case are entitled to a trial free of any prejudice.  All parties are equal under the law."  Dkt. No.  858 at 5.   In the closing jury instructions on punitive damages, this court further advised the jury that its "[p]unitive damages [award], if any . . . should not reflect bias, prejudice, or sympathy toward either party."  Dkt. No. 872 at 6.  Once again, "[j]uries are presumed to follow the court's instructions."  *CSX Transp.*, 556 U.S. at 841. Indeed, our "jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude the jurors' raw emotions."  *Id.*  TCS does not address the jury instructions, let alone point to any evidence suggesting that the jurors disregarded these instructions.  Such bare assertion does not suffice.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).

2.   <u>The Punitive Damages Award Is Not Grossly Excessive Under The *Gore* Guideposts.</u>

TCS misinterprets and misapplies the *Gore* guideposts for determining whether a particular punitive damages award is grossly excessive in violation of the federal Due Process Clause.   The two relevant *Gore* guideposts are (1) "the degree of reprehensibility of the defendant's conduct" and (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award."  517 U.S. 574-75.

<u>Reprehensibility.</u>   The Supreme Court directs courts to consider five factors when assessing reprehensibility:

(1) whether "the harm caused was physical as opposed to economic;"

(2) whether "the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others;"

(3) whether "the target of the conduct had financial vulnerability;"

(4) whether "the conduct involved repeated actions or was an isolated incident;" and

88

(5) whether "the harm resulted from intentional malice, trickery, or deceit, or
   mere accident."

*State Farm*, 538 U.S. at 419.  In conducting its reprehensibility analysis, TCS misapplies the

first, fourth, and fifth factors.

Starting with the fourth factor, TCS alleges its conduct did not involve "repeated actions"

because such actions must be "committed against other parties," not just the plaintiff.  But the

only authority TCS relies on for this unusual interpretation of "repeated actions" is a Sixth

Circuit case that expressly disavows TCS's interpretation.  *See Chi. Title Ins. Corp. v Magnuson*,

487 F.3d 985, 1000 (6th Cir. 2007) ("when it comes to assessing the amount of damages

awarded," repeated conduct against non-parties should not be considered, "as that would allow a

court to punish behavior outside of its jurisdiction that might be lawful in the second state").  The

Seventh Circuit applies the plain meaning of "repeated actions," finding such repetition when

there have been repeated actions against a single plaintiff, without considering actions against

non-parties.  *See AutoZone*, 707 F.3d at 839 (finding "repeated actions" where employer

disregarded employee-plaintiff's "health concerns . . . on multiple occasions"); *Estate of

Moreland*, 395 F.3d at 757 (finding "repeated actions" where physical assault on plaintiff "was

sustained rather than momentary, and involved a series of wrongful facts, not just a single blow;"

plaintiff "clearly received more than one injury at the defendant's hands" and "prolonged nature

of the assault compounded [plaintiff's] suffering").  The repeated actions factor weighs strongly

in favor of Epic; TCS improperly accessed UserWeb thousands of times, and continued to do so

even after executives at the highest level of the company were aware of the behavior.  *See supra*

pp. 69-70.

With respect to the fifth factor, TCS asserts there is "no evidence" to suggest that harm to

Epic "resulted from malice, trickery, or deceit."  Dkt. No. 914 at 62.  The necessary implication

of this position is that the harm to Epic resulted from "mere accident." *State Farm*, 538 U.S. at 419.  Once again, TCS's assertion contradicts the jury's verdict.  TCS was found liable for trafficking of passwords, which required the jury to find that "TCS acted knowingly with intent to defraud." Dkt. No. 858 at 7.  The jury instructions elaborated that "'defraud' means to cheat or trick or to deprive a person of property or any interest or right by fraud, deceit, or artifice." *Id.*  The jury further found TCS liable of misappropriation of trade secrets; the jurors there found that TCS acquired a trade secret "by using improper means, where 'improper means' includes espionage, theft, bribery, misrepresentation and breach or inducement of a breach of duty to maintain secrecy."  Dkt. No. 858 at 8.  The jury unequivocally found that the harm to Epic did not result from "mere accident" but rather malice, trickery, or deceit, a finding supported by the evidence. *Supra* pp. 69-72.

Finally, with respect to the first factor, while Epic was not harmed physically, the U.S. Supreme Court has made clear that the "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct . . . can warrant a substantial penalty." *Gore*, 517 U.S. at 576.  There is no doubt that TCS acted intentionally through affirmative acts of misconduct.  As stated above, the jury found that TCS "acted knowingly with an intent to defraud." Dkt. No. 858 at 7; *see supra* pp. 69-72 (describing evidence supporting this finding).

Accordingly, three of the five reprehensibility guideposts strongly favor Epic, counseling in favor of a substantial penalty.

Disparity.  The second guidepost requires courts to address "the disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award." *Gore*, 517 U.S. 574-75.  As addressed in detail above, TCS does not account for "potential harm" when addressing disparity. *See supra* pp. 83-84.

90

In addressing disparity, TCS contends that when compensatory damages are "substantial, then a lesser ratio, perhaps only equal to the compensatory damages, can reach the outermost limit of the due process guarantee."   Dkt. No. 914 at 63 (quoting *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2626 (2008)).   But TCS lifts this (equivocal) quote out of context.   In context, the Supreme Court reasoned:

> [B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."   [*Gore*, 517 U.S. at 582] (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine").   The converse is also true, however.   When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.   The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

*State Farm*, 538 U.S. at 425.   The Court made this statement when analyzing the propriety of a 145:1 punitive to compensatory damages ratio.   *Id.* at 426.   The selected dicta does not apply to Epic's award.   Largely because of TCS's spoliation, this *is* a case where "the injury is hard to detect" and a higher ratio "might be necessary."   *Id.* at 425.   Also, unlike in *State Farm*, where the Court held the compensatory damage award afforded the plaintiff "complete compensation," *id.* at 426, in this case, there is a high likelihood of additional potential damage, in no small part because of TCS's spoliation.   As TCS's own expert admitted, TCS's evidence destruction made it impossible to determine precisely *who* accessed Epic's trade secrets and confidential information, *what* they did with it, and with *whom* they shared it.   *Supra* n.31.   The sentence quoted by TCS accordingly does not cover the punitive damages award in this case.

## VIII.   The Court Should Reject TCS's Waiver Argument.

As the jury was instructed, "where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of a lack of precision."   Dkt. No. 872 at 2; *see Bob Willow*

*Motors*, 872 F.2d at 799.  Indeed, "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and would incentivize defendants "to make wrongdoing so effective and complete . . . as to preclude any recovery."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).  The details of TCS's spoliation of evidence and discovery misconduct have been discussed at length in this case, *see, e.g.*, Dkt. No. 531, and will not be repeated here.

Recognizing the difficulties presented by TCS's misconduct, the Court offered Epic — a mere week before trial was scheduled to begin — an opportunity to delay trial to conduct the inspections that TCS had been ordered to make available three months earlier.  Dkt. No. 726 at 150:17-21; Dkt. No. 703 at 12-13.  Rather than delaying trial and incurring further expense, Epic opted to attempt to schedule the inspections for the remaining week before trial.  After the liability phase of trial was completed, the Court offered Epic the option of "go[ing] forward" with its reduced damages calculation and finishing trial as scheduled or, alternatively, delaying the damages phase to conduct additional discovery, with the hope that the jury would agree to return.  Dkt. No. 907 at 11:14-22.  The Court did not indicate that Epic's choice would have any ramifications, such as increasing its burden to show damages with precision.  *See id.*  In fact, the Court confirmed that if Epic elected to go forward and complete trial as scheduled, it would continue to have "the benefit of the doubt . . . because it's hard to prove the absence of things." *Id.* at 11:17-18.

Nonetheless, TCS now asks the Court to hold Epic to a higher burden of proof because it declined the Court's offer to delay trial to conduct further discovery, notwithstanding that the offer was only made *because of* TCS's discovery misconduct.  TCS's request should be rejected out of hand.  Epic cannot be faulted for declining to devote additional time and expense to trying

2437265

to track down the very same evidence it had been seeking — and TCS had been *ordered* to produce — for many months.  By this late stage, critical evidence had already been *destroyed*; no amount of discovery would be able to bring it back.  *See supra* pp. 49-53.  Key witnesses who may have been able to shed additional light on the ways in which TCS used Epic's information, including Naresh Yallapragada and Venugopal Reddy, had already left the company and were unwilling to be deposed.  *See supra* n.31.  And TCS had already been *ordered* by the Court to produce the evidence requested by Epic, and those orders had gone unfulfilled.  *See supra* pp. 49-53.  Epic could not be expected to believe that discovery would suddenly be forthcoming, when Court orders and threats of sanctions had previously been insufficient to compel TCS to comply with its discovery obligations.

TCS should not be permitted to un-wind its many months of discovery misconduct because Epic chose not to halt a trial mid-stream to attempt to find that which TCS had already successfully destroyed, hidden, and refused to produce.

## CONCLUSION

In light of the foregoing, Epic respectfully requests that the Court deny TCS's motion to strike the trial testimony of Stirling Martin and Thomas Britven and TCS's motion for judgment as a matter of law.

2437265

Dated:  June 3, 2016                     _/s/ Rick Richmond_
                                         Rick Richmond
                                         rrichmond@jenner.com
                                         Nick G. Saros
                                         nsaros@jenner.com
                                         Julie A. Shepard
                                         jshepard@jenner.com
                                         Kelly M. Morrison
                                         kmorrison@jenner.com
                                         JENNER & BLOCK LLP
                                         633 West 5th Street, Suite 3600
                                         Los Angeles, CA 90071
                                         Tel:  213-239-5100
                                         Fax:  213-239-5199

                                         Anthony A. Tomaselli
                                         anthony.tomaselli@quarles.com
                                         Kristin G. Noel
                                         kristin.noel@quarles.com
                                         QUARLES & BRADY LLP
                                         33 East Main Street, Suite 900
                                         Madison, WI 53703
                                         Tel.: 608.251.5000
                                         Fax: 608.251.9166

                                         _Attorneys for Plaintiff Epic Systems Corporation_

2437265