## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

                     Plaintiff,

   v.

TATA CONSULTANCY SERVICES
LIMITED and TATA AMERICA
INTERNATIONAL CORPORATION d/b/a
TCA America,

                 Defendants.

OPINION AND ORDER

14-cv-748-wmc

From the outset of this lawsuit, Epic Systems Corporation, a leading provider of medical records software to the U.S. healthcare industry, has asserted a variety of federal and state law claims arising out of defendants repeatedly accessing Epic's web portal without authorization while servicing a mutual client. Epic claims that Tata Consultancy Services Limited and Tata America International Corporation (collectively "TCS"), a much larger, India-based company and its smaller U.S. arm, respectively, used the confidential, propriety information obtained through that portal to help develop their own, competitive software product and for other improper purposes.[1] After this court granted partial summary judgment on liability as to certain of Epic's claims and on elements of other claims, the remainder proceeded to a jury trial. (3/2/16 Op. & Order (dkt. #538).) Following a 10-day trial, the jury returned a liability verdict in favor of plaintiff on all remaining claims (dkt. #855), and awarded compensatory damages of $240,000,000 and punitive damages of $700,000,000. (Dkt. #871.) The court also entered injunctive relief,

---

[1] A detailed explanation of the underlying facts can be found in the court's summary of facts in its summary judgment decision (dkt. #538), which were largely confirmed at trial.

permitting ongoing monitoring of TCS to assure no further use of Epic's stolen information.  (Dkt. #888; Am. Injunction (dkt. #959).)

There remain several, post-trial motions still pending before the court, the most significant being:  (1) defendants' motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) as to the jury's liability and damages verdicts (dkt. ##830, 843, 913); (2) plaintiff's motion for attorneys' fees and costs (dkt. #916); and (3) defendants' motion for clarification of the court's injunction order (dkt. #962).  For the reasons that follow, the court will deny defendants' Rule 50(a) motion as to liability, and will deny in part and grant in part defendants' motion as to damages, reducing the jury's compensatory damage award to $140 million and the punitive damages award to the statutory cap of $280 million, but otherwise leaving the jury verdict intact.  The court will further deny plaintiff's motion for attorneys' fees and costs, finding that the adverse inference instruction to the jury when coupled with the jury's sizeable punitive damages award is a sufficient sanction for TCS's discovery abuses.  Finally, with respect to defendants' motion for clarification, the court will grant that motion and respond to the defendants' specific questions below.

OPINION

I.  **Rule 50(a) Motions**

Under Federal Rule of Civil Procedure 50(a), a court may "enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"

*Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (quoting Fed. R. Civ. P. 50(a)). In considering a Rule 50 motion, however, the court is to "construe the facts strictly in favor of the party that prevailed at trial," including drawing "[a]ll reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May v. Chrysler Group, LLC*, 692 F.3d 734, 742 (7th Cir. 2012) (internal citations and quotation marks omitted). In particular, the court is not to make credibility determinations or weigh the evidence; it need only determine whether "more than 'a mere scintilla of evidence' supports the verdict." *Id.* (quoting *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)). Said another way, the court's "job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *May*, 692 F.3d at 742. Set against this high bar, defendants' motion largely falls short.

## A. Liability[2]

### i. Misappropriation of Trade Secrets Claim

Defendants contend that plaintiff failed to prove by a preponderance of the evidence "(1) that TCS 'used' the Alleged Trade Secrets and (2) that the Alleged Trade Secrets" satisfy the definition in the Wisconsin Uniform Trade Secrets Act. (Defs.' Mot. (dkt. #843) 2.) Defendants' first contention is the least persuasive since plaintiff had no

---

[2] Defendants actually filed two, essentially duplicative motions for judgment as a matter of law on liability. (Dkt. ##830, 843.) The latter one contains additional citations to the trial record. The court has reviewed both, but relies on the second for purposes of addressing defendants' arguments.

obligation to demonstrate use or disclosure *if* the trade secrets were acquired using "improper means." (*See* Closing Instructions at 8-9; *see also* 3/2/16 Op. & Order (dkt. #538) 57-58.) On the question of "improper means," plaintiff put forth ample evidence for a reasonable jury to find that TCS acquired trade secrets through misrepresentation, as well as through multiple breaches of its duty to maintain the secrecy of confidential information provided for the sole purpose of servicing a mutual client. Moreover, even if plaintiff were required to show actual misuse to prove its claim, the court again finds more than sufficient evidence from which a reasonable jury could find improper use for reasons explained in the court's opinion and order on summary judgment and in multiple orders on TCS's motions *in limine*. (*See* 3/2/16 Op. & Order (dkt. #538) 40-42, 58-59; 3/23/16 Op. & Order (dkt. #703) 20.) Indeed, in light of the jury's entitlement to reach an adverse inference, as it was free to do after TCS's repeated, egregious failures to maintain and allow timely access to relevant discovery materials (3/23/216 Op. & Order (dkt. #709)), the court is hard-pressed to understand defendants' argument to the contrary. Finally, and again contrary to defendants' suggestions, TCS's evidence that *some* of the wrongfully obtained, confidential documents were used for a "legitimate purpose" does *not* preclude a reasonable jury from finding that the documents were also used for an impermissible purpose. (Defs.' Br. (dkt. #843) 4 (describing TCS's expert's testimony about legitimate use of documents in servicing a mutual client).)

Defendants' second basis for seeking a directed verdict on plaintiff's claim for misappropriation of trade secrets is premised on its claimed failure to take reasonable steps to maintain those secrets. (Defs.' Br. (dkt. #843) 7-10.) While the court agrees with

defendants that they have put forth sufficient evidence from which a reasonable jury *could* have found that Epic failed to undertake reasonable efforts to maintain the secrecy of 30-some documents at issue, the evidence was certainly not so legally insufficient as to remove the issue from the jury's consideration. On the contrary, a reasonable jury could well have credited testimony by Epic employees about its efforts to protect the confidentiality of information related to software, both as to specific steps and general commitment to maintaining secrecy. (Trial Tr. (dkt. #889) 101-16 (Stirling Martin's testimony about efforts to maintain confidentiality); *see also* Trial Tr. (dkt. #900) 86-88 (Carl Dvorak testifying Epic is at the "top" of the industry in terms of protecting its confidential information).)

### ii. Unfair Competition and Unjust Enrichment Claims

TCS also moves for directed verdict on Epic's unfair competition and unjust enrichment claims on much the same basis, arguing that Epic failed to demonstrate "use of something belonging to Epic . . . to benefit TCS at Epic's expense." (Defs.' Opening Br. (dkt. #832) 10.) The court rejects this motion for the same reasons as well: there is more than sufficient evidence to support the jury's finding that Epic met its burden to prove liability on these claims, especially when considered in light of an adverse inference.

### iii. Injury to Business

Defendants next seek judgment as a matter of law on plaintiff's claim of injury to business in violation of Wis. Stat. § 134.01. As the jury instructions explained, this claim requires plaintiff to demonstrate that the two defendants "acted together to injure

maliciously another person's reputation, trade, business, or profession." (Closing Instructions at 11.) However, after defendants submitted its Rule 50(a) motion, plaintiff withdrew this claim, thus mooting this isse.

### iv. Deprivation of Property

TCS further moves for judgment on Epic's claims for deprivation of property/ civil theft claim in violation of Wis. Stat. §§ 895.446 & 943.20, arguing that the property at issue in this case does not constitute "moveable property" under § 943.20. The court previously considered this argument, rejected it and sees no basis to revisit that ruling. (*See* 4/1/16 Op. & Order (dkt. #776) 7-9.)

### v. Fraudulent Misrepresentation

TCS also seeks a directed verdict on plaintiff's fraudulent misrepresentation claim, asserting that Epic neither demonstrated that TCS intended to induce Epic's reliance, nor that Epic's reliance was reasonable. Again, as explained in the court's summary judgment order, Epic's claim is premised on TCS employees misrepresenting that they were "Ramesh Gajaram" and then using his credentials to access Epic's UserWeb without authorization. (3/2/16 Op. & Order (dkt. #538) 54-56.) Epic put forth ample evidence for a reasonable jury to find that TCS and its employees *intended* to induce Epic to rely on that misrepresentation and that Epic's reliance was reasonable. In its brief, TCS contends that Epic failed to put forth any evidence that it intended to "induce Epic to do something that would cause it economic harm." (Defs.' Opening Br. (dkt. #843) 17.) However, that is not the test. The test is whether Epic relied on that misrepresentation and whether its

reliance was reasonable.  TCS offers no basis for challenging the jury's determination as to either prong of that test.

### vi. Breach of Contract and Breach of Duty of Good Faith and Fair Dealing

TCS moves for a directed verdict on these claims on the basis that the evidence foreclosed a finding of improper use.  The court rejects this argument for the same reason as explained above with respect to TCS's motion on Epic's misappropriation of trade secrets claim.

### vii. Trafficking of Passwords (CFAA Claim)

Finally, TCS moves for judgment on its trafficking of passwords, arguing Epic failed to put forth evidence from which a reasonable jury could conclude that TCS "acted knowingly with intent to defraud."  (Defs.' Mot. (dkt. #83) 16 (quoting Closing Instructions at 7).)  Because the court continues to find sufficient evidence to support a jury's verdict that TCS employees were specifically motivated to improperly use other's passwords for an improper purpose (*i.e.*, that TCS accessed UserWeb documents for a purpose other than to enable TCS employees to do their jobs for their mutual customer Kaiser), the court rejects this basis for its motion as well.

### B. Damages

In addition to filing a motion for judgment as a matter of law with respect to liability, defendants move as to the jury's damages award, lobbing several challenges to the

award of both compensatory damages and punitive damages.[3]  The court addresses each

category below.

###    i.    Compensatory Damages

*First*, TCS contends that the court should not have allowed plaintiff to proceed on

a damages claim based on the alleged value of the comparative analysis to TCS, because

that theory was untimely and prejudiced TCS.  After the court found plaintiff's expert's

estimate of the value of its stolen confidential and trade secret information was

insufficiently tied to evidence of TCS's actual use of that information to proceed before

the jury.  (4/14/16 Op. & Order (dkt. #860).)  The court allowed Epic to make a proffer

on damages during the time the jury deliberated on liability.  Specifically, Epic narrowed

its damages theory to TCS's use of confidential information detailed in Exhibit 39 by doing

a comparative analysis of Epic's products against competing products being developed by

TCS.  (Trial Tr. (dkt. #907) 4-5.)

As explained during that hearing, the court found this revised methodology

"ratchet[ed Epic's damages] back to something that more approximates what was actually

received and apparently used by your client both in the comparative model but also what

[became] ongoing discussions by marketing people within [TCS] as a result."  (*Id.* at 9.)

In addition, this alternative measure more closely followed evidence of TCS's actual use of

---

[3] In addition to filing the Rule 50(a) motion, defendants filed a motion with respect to expert testimony, seeking an order from the court barring plaintiffs' damages case from going to the jury. The court effectively denied that motion in allowing plaintiff to present its damages case to the jury.  Regardless, the court reviewed the motion during the course of trial and, for reasons explained in its decision on the Rule 50(a) motion, will also deny that motion.

Epic's propriety information to compete for sales of software to companies for whom TCS was already providing other services. On this basis, therefore, the court permitted Epic to pursue damages based on TCS's use of trade secrets and other confidential information in creating the comparative analysis, and the jury awarded $140,000,000 for that benefit. (Damages Verdict (dkt. #871).)

TCS's assertion that this theory was untimely is belied by TCS's contemporaneous statements during the hearing on the revised damages theory. (*See* Trial Tr. (dkt. #907) 8-9 ("I really don't feel like I'm hearing anything new here."); *id.* at 10 ("[T]here's really nothing new here apart from . . . it's more targeted to [what] Mr. Martin thinks he saw download[ed].").) The court agreed then, and it still does: the revised theory actually *narrowed* Epic's damages claim by anchoring it to proof of actual use of confidential and trade secret information as detailed in the comparative analysis. As such, it was not a new theory, and any claim of prejudice based on this narrowed damage claim being offered untimely is without merit.

For its part, Epic sufficiently describes the evidentiary basis for the $140 million award in its opposition to the Rule 50(a) motion. (Pl.'s Opp'n (dkt. #926) 72-75.) Indeed, this award is fairly straightforward to understand: (a) TCS plainly took and used this information to understand and compare Epic's product to compete effectively with it; (b) the cost of developing this information was roughly $200 million, but crediting lower costs for IT work in India would still cost $130 to $140 million; (c) during this same time, TCS was actively working to create software to compete with Epic's in the United States and other parts of the world; and (d) a high-ranking official (Phillipe Guionnet) assigned to this

task within TCS was frozen out of the effort after raising concerns that TCS's rapid advances in its software could only be explained by appropriating Epic's software advances.

Despite the court's misgiving as to a similar anchor for other claimed uses, the verdict form also allowed the jury to award damages for TCS's use of "other confidential information," for which the jury awarded $100,000,000. (Damages Verdict (dkt. #871).) The court included this subpart over TCS's objection, because there was some evidence that other confidential information was disseminated "out beyond the specific people who discussed the comparative analysis." (Trial Tr. (dkt. #907) 94.) As the court explained during the trial, the purpose of separating out subpart (b) of the compensatory damages award was to give the court some flexibility if it determined that any additional claim of damages were too speculative to uphold. (Trial Tr. (dkt. #898) 87-88.)

Accordingly, the court anticipated TCS would challenge this $100 million award under subpart (b) based on a lack of evidence of use. Instead, TCS chose to swing for the fences (or as Epic's opposition aptly put it, to employ "an 'all-or-nothing' gambit" (dkt. #926 at 16), by challenging evidence that TCS even used Epic's trade secrets or other confidential information to create the comparative analysis (*see* Defs.' Br. (dkt. #914) 33-36), information the jury found ultimately conferred a $140 million benefit, and for reasons that are not entirely clear, chose *not* to make a discrete challenge to the jury's additional $100 million award.

Even though TCS's own Rule 50(a) submission offers little reason to upset either portion of the jury's compensatory damage award, the court would be remiss not to follow up on its own concerns. Epic obviously understood this, since its opposition to TCS's

motion offers a convoluted attempt to tie the jury's $100 million award largely premised on Guionnet's testimony that he saw astonishing improvements to a customer's data model on a young TCS worker's computer screen after accessing Epic's trade secrets. (Pl.'s Opp'n (dkt. #926) 75-78.) Even crediting this testimony and other more amorphous evidence of use of Epic's confidential information in marketing decisions, it already bolsters the jury's sizable award for the benefit received from information at least shown to have been used by TCS. In contrast, the additional $100 million award for benefits obtained from "the rest of the information" that TCS took and used to improve its competing software is tied to no evidence of specific use at all.

That is why, in closing arguments at trial, Epic itself argued the monetary benefit to TCS was $200 million "conferred on TCS when it acquired Epic's trade secrets and confidential information and embedded them in that comparative analysis." (Trial Tr. (dkt. #898) 128.) At no point in closing did Epic's counsel assert that an entire separate value of another $100 million was conferred by virtue of TCS's unspecified use of "other information." Only in its creative argument in support of that award does Epic offer a logic tree working backward from the jury's $140 million dollar award to justify a further compensatory award abased on amorphous benefits for the 65% portions of the comparative analysis its expert did not value in arriving at an opinion of $200 million for "the Data/Model Data Architecture" column. (Pl.'s Opp'n (dkt. #926) 76-78.)

Even if this *did* explain the jury's thinking, the same problem would remain: it depended on an off-the-cuff, relative assignment of value *to Epic* for the columns in the comparative analysis, not to TCS. Combined with evidence that TCS ultimately chose not

to go forward with the competing software product under development, and is enjoined from using any of the stolen information in new products, a further award of $100 million strikes the court as both excessive and without sufficient mooring in the facts of record.

*Second*, TCS argues that the court should not have allowed plaintiff to proceed on a narrowed damages theory for the same reasons that the court rejected Epic's initial damages theory -- it was not sufficiently related to TCS's use of Epic's trade secrets and other confidential information. As acknowledged during the hearing on Epic's revised damages theory, the court shared that concern. Still, unlike the original, broader damages claim, which was untethered from a showing of use, the revised, narrower claim tied the value of Epic's conditional information, including trade secrets, to a showing of TCS's use of that information in the creation of a comparative analysis (or at least the jury could reasonably find, especially in light of the adverse inference instruction).

As detailed for the jury in closing and in its opposition brief, Epic presented evidence from which a reasonable jury could infer that its trade secrets and confidential information were used to: (1) inform TCS's U.S. entry strategy, including developing a laboratory module for its principal U.S. health care customer, DaVita, and as importantly, discerning dead ends and what *not* to do; (2) prepare a comparative analysis to insure that TCS's product would be attractive to customers; and (3) improve its Med Mantra product. (Pl.'s Opp'n (dkt. #926) 40-64.)[4] Contrary to TCS's position, there is no basis for requiring

---

[4] Epic devotes much of the opposition brief to argue that it need not have shown use in order to be injured and entitled to damages under an unjust enrichment damages theory. (Pl.'s Opp'n (dkt. #926) 26-29.) The court need not reach this argument given that Epic was not prejudiced by any error in instructing the jury that it should "only award damages for the development costs saved by misappropriation of Epic's trade secrets or confidential information if the trade secrets or

Epic to show that TCS was ultimately successful in its use of Epic's confidential information and trade secrets (*i.e.*, that such use was profitable).  *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) ("Enrichment from benefits wrongfully obtained is not discounted to reflect some lesser value actually realized in advancing the purposes of the defendant."); *Cosgrove v. Bartolotta*, 150 F.3d 729, 734 (7th Cir. 1998) (applying Wisconsin law and holding that, where the defendant obtains a benefit from the plaintiff that "is not rendered gratuitously, as by an officious intermeddler, or donatively, as by an altruist or friend or relative," then the plaintiff "is  entitled to demand the restitution of the market value of the benefit").  Moreover, in light of the adverse inference, the jury could reasonably conclude that Epic's trade secrets and other confidential information were used, providing a separate basis for awarding damages.[5]

*Third*, defendants argue that there was no evidence to support the jury's finding that Epic's trade secrets were used to create the comparative analysis.  As an initial matter, the court barred defendants from arguing that the analysis was generated from publicly-available information, having failed to disclose this evidence in its intial Rule 26 disclosures *and* during any point in discovery, despite specific requests to do so.  (3/23/16 Op. & Order

---

confidential information were in fact *actually* used by TCS."  (Damages Jury Instructions (dkt. #873).)  Indeed, Epic's proof to the jury at trial, and as argued in closing, fell into these very same categories of use, resulting in savings made by avoiding Epic's missteps and improvement made by following the path Epic has already blazed.  Regardless, for the reasons explained in its prior opinion and order, Epic was required to tie its damages theory to use.  (4/14/16 Op. & Order (dkt. #960) 11-13.)

[5] As the court noted during one of the hearings on damages at a break in the trial, "there's an awful lot of smoke and the jury is entitled to look for some fire if they can infer it, particularly with respect to . . . the comparison and the fact that there were discussions within the company for that comparison."  (*See* Trial Tr. (dkt. #898) 7).)

(dkt. #703) 7-8 (granting in part plaintiff's motion *in limine* to exclude defendants from arguing that "the comparative analysis was created from publicly-available sources absent evidence to support this assertion previously disclosed in response to plaintiff's interrogatories").) Moreover, the jury was instructed on the definition of trade secrets and, as described above, Martin's testimony provided an adequate basis for them to find use of trade secrets in creating the analysis. Finally, because plaintiff advanced claims based on both misappropriation of trade secrets and of other confidential information, the jury's award was not dependent on a finding that trade secrets specifically were used in creating the comparative analysis.

*Fourth*, TCS argues that the testimony of plaintiff's expert, Mr. Britven, was based on an incorrect assumption that TCS used Epic's trade secrets and other confidential information. (Defs.' Br. (dkt. #914) 37.) The court previously addressed this argument, faulting TCS, at least in part, for its failure to preserve certain evidence and produce other evidence timely, which resulted in Britven being asked to assume use. (4/14/16 Op. & Order (dkt. #860) 6.) Regardless, an expert may premise his or her opinions on factual assumptions, which the proponent of that opinion must then prove through the testimony of other witnesses or documentary evidence. Here, the jury was instructed that they could only award damages if TCS actually used Epic's trade secrets and/or other confidential information, and plaintiff put forth sufficient evidence to permit a reasonable jury to make that finding as detailed above, especially in light of the adverse inference instruction.

### ii.  Punitive Damages

Defendants also seek an order vacating or at least reducing plaintiff's punitive damages award.  As an initial matter, TCS argues that there is no evidence that its conduct was "willful and malicious" to justify a punitive damages award on the misappropriation of trade secrets claim.  (Defs.' Br. (dkt. #914) 55 (citing Wis. Stat. § 134.90(4)(b) ("If a violation of sub. (2) is willful and malicious, the court may award punitive damages in an amount not exceeding twice any award under par. (a).")).)  This initial argument is meritless, if not frivolous.  Even putting aside the issue of whether defendants forfeited the argument by failing to raise it before the verdict question was submitted to the jury (Pl.'s Opp'n (dkt. #926) 80), defendants never objected to the jury instruction allowing for an award of punitive damages based on a finding that "TCS acted maliciously toward Epic or in an intentional disregard of its rights."  (Damages Instr. (dkt. #872) 5; *see also* Pl.'s Opp'n (dkt. #926) 81-82 (describing defendants' failure to object).)  This failure to object at trial is hardly surprising since, contrary to TCS's characterization now, Epic's request for punitive damages was *not* limited to the misappropriation of its trade secrets claim under § 134.90.  Epic also sought punitive damages based on its common law claims for fraudulent misrepresentation and unfair competition.  (Damages Instr. (dkt. #872) 5.)  As TCS itself acknowledged in post-trial briefing, the "malicious or intentional disregard" standard *is* the appropriate one for an award of punitive damages on these common law claims.  (Defs.' Br. (dkt. #914) 56-57.)  Accordingly, there was no timely objection *and* no underlying error in giving that instruction.

As for TCS's contention that there is no evidence supporting the jury's finding that it acted with an *intentional* disregard of Epic's rights, the jury was instructed that to prove "an intentional disregard of the rights," plaintiff must prove by clear and convincing evidence that the defendant acted "with the purpose to disregard the plaintiff's rights" or was "aware that the acts [were] substantially certain to result in the plaintiff's rights being disregarded." (Damages Instr. (dkt. #872) 5.) As detailed in Epic's opposition brief, there was more than sufficient evidence from which a reasonable jury could reach that conclusion on the trial record. (Pl.'s Opp'n (dkt. #926) 83-87.) Specifically, Epic presented evidence that a variety of TCS employees intentionally shared restricted credentials with dozens of unauthorized co-employees, *and* they then gained widespread, unauthorized access to Epic's UserWeb. Moreover, the evidence also supported a finding that many of those employees knew they were both acting in violation of corporate security requirements *and* without any even arguable, legitimate purpose of supporting Epic's software shared customers. Finally, the evidence reflected that TCS employees downloaded more than 6,000 Epic documents, in addition to viewing and copying and pasting information from documents, for reasons at times unrelated to customer support.

Even if this were not enough, the jury further heard evidence that when Epic raised concerns about this conduct, TCS executives and managers engaged in a campaign to "suppress the truth" from investigators. (Pl.'s Opp'n (dkt. #926) 84.) The evidence also supported a finding that TCS failed to notify Epic of its unauthorized access and that, in its internal investigation, TCS took its employees' denials at face value without conducting an adequate investigation or preserving evidence for Epic to verify its findings. All of this

16

forms a sufficient basis from which the jury could reasonably conclude that TCS intentionally gained access to, misused and then suppressed evidence of misuse of Epic's trade secrets and confidential information. At minimum, the jury had ample basis to find clear and convincing evidence that TCS was sufficiently aware a group of its employees were blatantly disregarding Epic's right to restrict access and use if its trade secrets and confidential information, and TCS chose to take no steps to stop it.

Finally, defendants challenge the amount of the jury's punitive damages award. On this, plaintiff agrees that the award of punitive damages must be capped at no more than two times the amount of compensatory damages as a result of a relatively recent change in Wisconsin law. (Defs.' Br. (dkt. #914) 59 (citing Wis. Stat. § 134.09(4)(b) and § 893.043(6)); Pl.'s Opp'n (dkt. #926) 90 (acknowledging cap under Wisconsin law and seeking award of punitive damages of $480 million).) Having denied defendants' request to vacate the jury's $140 million compensatory award, the question is whether an award of punitive damages capped at $280 million is so excessive as to violate defendants' due process rights.

"A punitive damages award 'is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing.'" *Kimble v. Land Concepts, Inc.*, 2014 WI 21, ¶ 45, 353 Wis. 2d 377, 845 N.W.2d 395 (quoting *Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 50, 261 Wis. 2d 333, 661 N.W.2d 789). In determining whether a punitive damages award is excessive, Wisconsin courts are to consider: (1) the grievousness of the acts; (2) the degree of

malicious intent; (3) whether the award bears a reasonable relationship to the award of compensatory damages; (4) the potential damages that might have been caused by the acts; (5) the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and (6) the wealth of the wrongdoer. *Id.* at ¶ 47. This six-factor test is considered "substantively identical" to the guideposts described by the United States Supreme Court, which consider: "(1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the harm or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct." *Id.* at ¶ 46 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).[6]

In terms of the factors concerning the reprehensibility, grievousness and malicious intent on the part of TCS, the Supreme Court described in *BMW* certain factors that may be relevant to determining the reprehensibility of a party's actions, including whether "the conduct involved repeated actions or was an isolated incident" and whether "the harm resulted from intentional malice, trickery or deceit, or mere accident." 517 U.S. at 576-77. Here, plaintiff presented evidence of TCS employees' widespread, knowing and unauthorized access and downloading of Epic's confidential information, with TCS supervisors at least aware of this misconduct and choosing to turn a blind eye to it, if not actively encouraging it, as well as TCS's failure to investigate timely or adequately the unauthorized access and resulting spoliation of evidence.

---

[6] There appears no dispute that the third guidepost and fifth factor -- concerning the relationship to any civil or criminal penalty -- are not applicable to this case.

In response, TCS principally argues that Epic was not as careful as it should have been in protecting its trade secrets and confidential materials. While perhaps in theory this argument might weigh against a significant punitive damages award, the jury was free to, and almost certainly did, reject it by explicitly finding for Epic on its trade secret misappropriation claim, which necessarily required a finding that Epic took steps to maintain the secrecy of its trade secrets. Moreover, evidence of any failure on the part of Epic to protect its confidential information does not undercut the significant evidence of TCS gaining widespread unauthorized access of Epic's UserWeb, much less than using that information to compete.

Courts are also directed to consider whether there is a reasonable relationship between the punitive damages award and compensatory damages. "Wisconsin law expressly rejects the use of a fixed multiplier . . . to calculate the amount of reasonable punitive damages." *Kimble*, 2014 WI 21, ¶ 55. Still, the Wisconsin Supreme Court in *Kimble* pointed to United States Supreme Court cases that "in practice, [found] few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at ¶ 65 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)). Indeed, the Supreme Court found that "[e]ven a punitive damages award of just four times compensatory damages can come 'close to the line' of violating due process." *Id.* (quoting *BMW*, 517 U.S. at 581).

In light of Wisconsin's statutory cap, however, the ratio of punitive damages to compensatory damages is 2:1. As detailed in plaintiff's opposition, courts have routinely approved of punitive damages awards under Wisconsin law of 2:1 or higher. (Pl.'s Opp'n

(dkt. #926) 95 (citing *Kimble*, 2014 WI 21, ¶ 71 (vacating punitive damages award as excessive and reducing it to one consistent with 3:1 ratio); *Trinity Evangelical*, 2003 WI 46, ¶ 65 (affirming punitive damages award with 7:1 ratio); *Schwigel v. Kohlmann*, 2005 WI App 44, ¶ 21, 280 Wis. 2d 193, 694 N.W.2d 467 (affirming award with 30:1 ration for "profoundly egregious conduct"); *Chapes v. Pro-Pac, Inc.*, 473 B.R. 295, 307 (E.D. Wis. 2012) (upholding jury award of punitive damages with 8:1 ratio in case where employee breached fiduciary duty).)  With the reduction to the statutory cap to 2:1, therefore, the relationship between compensatory damages and punitive damages here falls well within the range of reasonable punitive awards.  If anything, TCS's suppression of evidence that might have justified a higher compensatory award, argues for a larger multiple here.

Having lost that argument (or at least failing to convince this court that an award of less than a 2:1 ratio is necessary), TCS spends much of its brief describing cases in which the punitive damages award was significantly less than the $480 million.  (Defs.' Br. (dkt. #914) 62-64, 70-73.)  As Epic correctly points out, however, the factors described by the Wisconsin Supreme Court and the United States Supreme Court focus on a relative comparison between compensatory and punitive damage awards, not on the absolute amount of either award.  Moreover, the punitive damage awards cited by TCS consist for the most part of cases in which the compensatory damages award is *significantly* lower than the $240 million here, or even the $140 million after reduction by this court.  As such, a significantly larger punitive award was to be expected by a reasonable jury.

Of course, these distinctions are broad theoretical considerations and, therefore, they fail to account for the factual differences in each case.  For example, courts are directed

to consider the wealth of the defendant. Here, TCS has annual revenues in excess of $15 billion. Most, if not all of the defendants in the cases cited by TCS, had significantly lower revenues and net worth. *See* Wis. Stat. § 895.043(4)(a) (considering wealth of a defendant in setting punitive damages award). Consistent with this law, the jury was instructed to "consider the defendants' wealth in determining what sum of punitive damages will be enough to punish it and deter it and others from the same conduct in the future." (Damages Instr. (dkt. #872) 6.) While the jury appears to have placed significant weight on this factor, the court sees no error in them doing so.[7]

Similarly, in reviewing a punitive damages award, courts are directed to consider the potential damage to Epic. Epic presented evidence that one of TCS's employees forwarded Epic's confidential documents to someone who did not even work for TCS. This evidence, coupled with the uncertainty as to the possible, broader disbursement of Epic documents to a wider group of TCS employees or independent software freelancers, further supports a finding that the punitive damages award addressed potential damage to Epic. (Damages Instr. (dkt. #872) 6 (instructing the jury to consider "the potential damage which could have been done").) After reviewing the factors, therefore the court finds that a punitive

---

[7] Relatedly, defendants also contend that the jury, "egged on by Epic's counsel's closing argument, seems to have used evidence of TCS's earnings to express their bias against a business that is not only based out-of-town, but out-of-country, and in favor of a prominent local business." (Defs.' Br. (dkt. #914) 66.) The court was sensitive to defendants' position as out-of-town -- indeed, out-of-country -- litigants, and it attempted to address any bias during *voir dire* and in barring any emphasis on defendants' citizenship during argument. While defendants may speculate that bias influenced the jury's award, there is no credible basis to support it.

damages award of $280 million is not excessive in violation of TCS's due process rights under either state and federal law.[8]

## II. Attorneys' Fees and Costs

In a prior opinion and order, the court denied plaintiff's request for entry of default judgment as a sanction for defendants' repeated, egregious discovery abuses, but: (1) allowed "Epic to present evidence of TCS's failures to investigate and preserve data, documents and other discoverable information to the extent the jury finds this conduct was intentional and undertaken in bad faith"; and (2) agreed to provide the jury with an instruction permitting it to draw reasonable adverse inferences with regard to likely content of the missing information. (3/23/16 Op. & Order (dkt. #709) 4-5; Closing Liability Instr. (dkt. #858) 2-5.) In addition, the court reserved until after trial whether further monetary sanctions were appropriate. While the jury was deliberating on damages, the court invited Epic to submit its attorney's fees documentation, including invoices, if the court opted to award attorney's fees as a sanction. (Trial Tr. (dkt. #898) 153-56.) During that exchange with the parties, and consistent with earlier rulings, the court agreed to take into consideration: (1) any mitigating steps taken by TCS (for example, its subsequent cooperation with the court-sanctioned Stroz investigation); (2) the fact that TCS had already been sanctioned by the adverse inference instruction; and (3) whether a further sanction is warranted in light of the jury's verdict on damages. (*Id.* at 155-56.)

---

[8] Defendants sought leave to file a reply brief to respond to arguments raised in Epic's opposition brief. (Dkt. #934.) Although defendants did not presume to file a proposed brief with their motion, the areas identified by defendants are ones for which the court does not need further clarification. Accordingly, the court will deny defendants' motion to file a reply brief.

While TCS's failure to preserve evidence and respond timely to discovery requests in this case was inexcusable, the most serious prejudice done to Epic was hindering its ability to prove specific damages. This prejudice was largely rectified by giving Epic the benefit of an adverse inference instruction, and allowing Epic to proceed on a damages theory that was only narrowed during the course of the trial. Indeed, by virtue of the jury's sizeable award of both compensatory and punitive damages, Epic may have done as well (or better) than it would have had TCS complied with its obligation to preserve and respond timely to discovery. Accordingly, the court finds these prior sanctions sufficient under Rule 37 to both hold TCS accountable for its discovery lapses and to deter similar misconduct in the future, whether by TCS specifically or by other entities more generally, and will deny plaintiff's request for an award of attorney's fees as a further sanction.[9]

## III. Clarification of Injunction

Finally, after the court appointed a monitor and issued an amended permanent injunction, TCS filed a motion for clarification, raising specific questions. The court will address each in turn. *First*, TCS seeks clarification at to the court-appointed monitor Samuel Rubin's communications with Epic. Epic may direct Rubin's activities, consistent

---

[9] As an aside, in its submission, plaintiff also asserts that an award would be appropriate under Wisconsin's civil theft statute, Wis. Stat. § 895.446(3)(b), which provides for an award of "[a]ll costs of investigation and litigation," and under Wisconsin Uniform Trade Secrets Act, Wis. Stat. §134.90(4)(c), which authorizes an award of attorney's fees to a prevailing party where the defendant's misappropriation was "willful and deliberate." (Pl.'s Br. (dkt. #917).) Epic failed to develop the underlying factual basis for either statutory provision, however. As defendants point out in opposition, Wisconsin courts have limited § 895.446(3)(b) to an award of costs, *not* including attorney's fees. *See Kremers-Urban Co v. Am. Employers Ins. Co.*, 119 Wis. 2d 722, 746, 351 N.W.2d 156 (1984). As for the WUTSA, the jury was not asked to make a specific finding of "willful and deliberate" misappropriation of trade secrets, and the court is disinclined to intuit one after the fact. In short, the alternative bases for an award of fees under Wisconsin statutes was developed too little and raised too late to prevail.

with those outlined in the permanent injunction. If there is a concern as to whether Rubin's activities extend beyond those contemplated in the injunction, TCS was and remains welcome to raise any concerns with the court, just as Epic may preemptively seek guidance. As for what Rubin may tell Epic, the court understands TCS's concern with his charge in paragraph 5 of the Amended Permanent Injunction, which reads as follows:

> Except by leave of court, the monitor shall not disclose the substance or outcome of its ongoing investigation, except for (1) the procedures or tasks undertaken; and (2) any evidence of violations of the permanent injunction.

(11/2/16 Op. & Order (dkt. #959) 9.) Accordingly, the court will modify that paragraph slightly going forward as follows:

> Except by leave of court, the monitor shall not disclose the substance or outcome of its ongoing investigation except for: (1) the procedures or tasks undertaken; and (2) specific evidence of a violation of the permanent injunction. To the extent the monitor may have only general evidence, he should disclose that evidence to the court, at which time the court will determine whether the monitor may disclose the evidence to Epic.

*Second*, TCS seeks clarification on the starting date and notification obligations for the four-year terms of the injunction. TCS maintains that the start date should be April 27, 2016, the date the original, permanent injunction was entered. The court agrees. As for repetition in paragraphs in the amended permanent injunction requiring TCS to provide written notice to all employees of the injunction, and requiring TCS to provide a report describing the manner and form with which it has complied (11/2/16 Op. & Order (dkt. #959) 9), the issuance of the amended permanent injunction did *not* trigger another notice requirement and report.

# ORDER

IT IS ORDERED that:

1) Defendants Tata Consultancy Services Limited and Tata America International Corporation's motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) as to the jury's finding of liability (dkt. ##830, 843) are DENIED.

2) Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) as to the jury's finding of damages and to strike the damages phase of testimony of Thomas Britven and Stirling Martin (dkt. #913) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to a reduction of the compensatory damage award by $100 million and as to defendants' request to reduce the punitive damages award to the Wisconsin statutory cap of $280 million. In all other respects, the motion is DENIED.

3) Plaintiff Epic Systems Corporation's motion for attorney fees and costs (dkt. #916) is DENIED.

4) Plaintiff's motion to strike or, in the alternative, for leave to file a short reply (dkt. #932) is DENIED AS MOOT.

5) Defendants' motion for leave to file a reply brief in further support of Rule 50(a) motion as to damages (dkt. #934) is DENIED.

6) Plaintiff's motion to amend/correct order on motion to seal (dkt. #953) is GRANTED. The court's August 17, 2016, order is amended to reflect plaintiff's changes at dkt. #943 at p.3.

7) Plaintiff's motion for appointment of a monitor (dkt. #954) is DENIED AS MOOT.

8) Defendants' motion for clarification (dkt. #962) is GRANTED.

9) Plaintiff's motion for hearing (dkt. #968) is DENIED AS MOOT.

Entered this 29th day of September, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge