IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

                      Plaintiff,

  v.

TATA CONSULTANCY SERVICES
LIMITED and TATA AMERICA
INTERNATIONAL CORPORATION d/b/a
TCA America,

                      Defendants.

OPINION AND ORDER

14-cv-748-wmc

To date, this court has extensively addressed plaintiff Epic Systems Corporation's claims against defendants Tata Consultancy Services Limited ("TCS") and Tata America International Corporation ("TAIC"), including a jury trial on those claims. Over a year after plaintiff filed its complaint, however, defendants filed counterclaims for federal and state antitrust violations, tortious interference and misappropriation of trade secrets. The court severed those counterclaims and stayed all proceedings pending a decision on plaintiff's motion to dismiss. (Pl.'s Mot. (dkt. #326); 3/2/16 Op. & Order (dkt. #538) 65.) For the reasons that follow, the court will grant that motion in its entirety.

ALLEGATIONS OF FACT[1]

**A. The EHR Market and Epic's Role in It**

TCS alleges that Epic is the dominant supplier of Electronic Health Records ("EHR"), claiming to serve 54% of patients in the United States. Epic has over 300

---

[1] For purposes of this motion, the court will accept the factual allegations in defendants' counterclaims and other pleadings, including all permissible inferences in favor of defendants unless precluded by adverse factual findings by the jury or law of the case.

customers, including large clients such as Kaiser Permanente, Mayo Clinic, and Partners Healthcare. In May 2015, most heath care providers in the United States were using Epic's system (approximately 185,000 providers).

The EHR market is concentrated. In March 2015, ten EHR vendors accounted for 90% of the United States hospital market. Epic was among the top three, which together have a market share of nearly 60%

TCS also contends that there are significant barriers to entry and switching in the EHR market. Specifically, once physicians or hospitals purchase an EHR system and load patient date, a significant expense and effort is required to switch to another software provider. TCS further alleges that Epic has developed a "closed platform that discourages interoperability and encourages customers to use only Epic's systems." (Countercl. (dkt. #295) ¶ 58.) TCS further alleges that Epic falsely claims that the lack of interoperability is endemic to the industry, rather than specific to Epic's software. (*Id.* at ¶¶ 64-68.)

### B. TCS's Healthcare Software

In 2006, TCS partnered with Apollo Hospitals, India's first corporate hospital, to develop a consistent, unified information management system for all of Apollo hospitals. First marketed in 2009, this system is named Med Mantra. Recently, TCS India has been developing a spin-off of Med Mantra called TCS-HIS. TCS-HIS is a more generic derivative of Med Mantra, with Apollo-specific functionality removed, making it more appealing to a broader range of Indian healthcare entities. TCS, however, alleges that

2

"Med Mantra and TCS-HIS are not suitable for deployment in the United States EHR Market because of the very different nature of the U.S. healthcare system." (*Id.* at ¶ 86.)

Still, TCS "has explored customizing certain modules of Med Mantra to meet the specific requirements of clients in the U.S." (*Id.* at ¶ 92.) Specifically, TCS created a laboratory management software system for a U.S. client, DaVita. (*Id.* at ¶¶ 93-97.) "Although TCS does not actively market the DaVita product in the U.S., TCS would, of course, be willing to work with a U.S. customer to design and build a similar solution." (*Id.* at ¶ 98; *see also id.* at ¶ 82 ("TCS has also developed custom-built software solutions based on its clients' specifications.").) From this, TCS alleges that "Epic and TCS are each creating products for the U.S. healthcare marketplace, and those products are potential alternatives for each other, [making] TCS and Epic are competitors." (*Id.* at ¶ 100.)

**C. Epic and TCS's Relationship with Kaiser**

On or about February 3, 2003, Kaiser Permanente entered into an agreement wherein Epic licenses computer software to Kaiser. This agreement was and is an important contract for Epic, as Kaiser Permanente is the largest managed healthcare organization in the United States. In furtherance of their agreement, Epic provided Kaiser access to the its "UserWeb," as well as the internet portal that Epic maintains to provide training, software-related documents and data, and other materials to its customers and their consultants. The Epic-Kaiser agreement also include provisions allowing third-party access to the UserWeb under certain conditions by, for example, consultants to Kaiser.

TCS is also a service provider to Kaiser, including software. In 2011, Kaiser sought to expand TCS's role in testing required as part of Kaiser's implementation and ongoing maintenance of the its software. TCS's role was set forth in a scope of work statement that expressly contemplated TCS testing Kaiser's EHR Epic software. The end date of that work was April 30, 2014.

In or about May 2011, Kaiser and TCS executives traveled to Wisconsin to give a presentation to Epic on TCS's abilities. "Immediately after the May 2011 presentation by TCS, Epic's top-level executives decided to block TCS from effectively providing [testing] services to Kaiser, which Epic knew to be a very important engagement for TCS in the healthcare space." (*Id.* at ¶ 128.) At some point, Epic executives also became aware that TCS was a provider of an EHR product in India.

As a result, Epic determined it did not want to share any information with TCS, and Epic developed specific protocols to limit the information it would provide to its customers' off-shore consultants. TCS further contends that these protocols were "developed directly as a result of Kaiser's request that Epic work with TCS and allow TCS access to necessary information." (*Id.* at ¶ 131.) Indeed, even though TCS was a "minor competitive threat," TCS alleges that "Epic resolved to prevent competition from TCS in the EHR market by any means possible." (*Id.* at ¶ 132.)

"Epic's policy of refusing to allow off-shore consultants to access its purportedly confidential materials, while couched in terms of protecting Epic's intellectual property, is actually the means by which Epic excludes . . . those consultants it fears are (or might become) its competitors in the EHR Market." (*Id.* at ¶ 136.) In particular, TCS alleges

4

that Epic denied access to information needed to conduct testing services "because [Epic] wanted to disrupt TCS's relationship with Kaiser and eliminate TCS as a potential competitive threat." (*Id.* at ¶ 140.)

In September and October 2011, Kaiser Permante continued to push for increased access for TCS, indicating that "the issue around TCS not having access to Epic documentation and training for our testing and Clarity work have become critical in terms of KP employee satisfaction and productivity." (*Id.* at ¶ 145.) In responding, Epic indicated that it wanted to discuss with Kaiser "plans to bring operations back onshore" and "plans [to] switch to another organization without competing product lines." (*Id.* at ¶ 148.) At the same time, TCS's Suresh Muthusami continued to make multiple overtures to meet with Epic to assuage their concerns. This situation continued into the following year, with Kaiser continuing to push for TCS's access, stating that TCS is "willing to sign anything, but Epic is not returning their calls." (*Id.* at ¶ 157.) Epic implied that Kaiser was "on thin ice" if it insisted on working with TCS. (*Id.* at ¶ 159.) In 2012, Kaiser nevertheless entered into an amended master service agreement with TCS, which continued its engagement generally through an end date of April 30, 2017. The amended agreement contemplated that the bulk of TCS's testing work would occur off-site in India.

In 2014, however, "Kaiser succumbed to Epic's demand that it enter into an agreement to terminate TCS's services" testing its Epic EHR software. (*Id.* at ¶ 161.) Kaiser then essentially allowed Epic to choose TCS's successor, with Epic selecting Accenture on August 6, 2014. "Epic approved of this choice because Accenture is not

based in India and is not perceived as a company likely to enter the EHR market." (*Id.* at ¶ 164.) Since the termination of TCS's specific testing assignment, Kaiser has also terminated, declined to renew or refused to expand other TCS services it was providing or could have provided. TCS alleges that the loss of the Kaiser testing contract was significant. "Not only were these engagements lucrative, but TCS was in the process of expanding the relationship within Kaiser that could serve it in the future and allow it to market TCS's other products and services, potentially including healthcare-related software to Kaiser." (*Id.* at ¶ 166.)

**D. Allegations of Spying**

On February 6, 2015, Epic's CEO, Judith Faulkner sent an email to Epic team members in which she wrote that they were "trying to find people who can 'stop in' at the Apollo hospitals" and examine the Med Mantra software. (*Id.* at ¶ 170.) To that end, an Epic employee compiled a list of 19 individuals of Indian national origin from which Faulkner and her staff could determine "who would do the sleuthing." (*Id.* at ¶ 171.) "Upon information and belief, TCS alleges Epic employees traveled to India and gained competitive information about Med Mantra and other TCS systems under false pretenses, as directed by Ms. Faulkner." (*Id.* at ¶ 179.) In fact, a jury found at trial that Epic's fears were well-founded, as TCS had stolen and misused confidential, proprietary information from Epic in an effort to understand its features and to develop competing HER software.

6

### E. Procedural Posture

Defendants filed their counterclaims on December 11, 2015, 14 months after this case was filed, and less than four months from the trial date, while the parties were briefing summary judgment and in the midst of significant discovery disputes regarding efforts by Epic to understand the scope of TCS's theft. Plaintiff promptly moved to dismiss or immediately sever and stay all counterclaim proceedings. The court granted that motion and stayed all proceedings on TCS's counterclaims until issuing its decision on Epic's motion to dismiss. (3/2/16 Op. & Order (dkt. #538) 65.)

After the court granted summary judgment to Epic on claims for breach of contract, failure to maintain the confidentiality of Epic information and documents, the first element of the Computer Fraud and Abuse Act, 19 U.S.C. § 1030(g), and the Wisconsin Computer Crimes Act, Wis. Stat § 943.70(2)(a), based on unauthorized access and sharing of password information, the rest of Epic's claims proceeded to a jury trial. (3/2/16 Op. & Order (dkt. #538).) The jury returned a verdict in favor of plaintiff on all claims, including claims for breach of contract, misappropriation of trade secrets and unjust enrichment, among other claims, based on TCS's unlawful access of Epic's UserWeb and unauthorized use of trade secrets, as well as other confidential information. (Dkt. #855.)

Defendants assert eight counterclaims, which roughly fall into three categories: (1) antitrust claims for unlawful monopolization and attempted monopolization, under Sections I and II of the Sherman Act and two corresponding Wisconsin antitrust claims(counts 1-5); (2) intentional interference with contract and intentional interference

with prospective economic advantage under California common law (counts 6-7); and (3) misappropriation of trade secrets in violation of Wis. Stat. § 134.90 (count 8). Plaintiff seeks dismissal of all eight causes of action.

OPINION

## I. Antitrust Claims

Epic raises several challenges to TCS's antitrust claims. The court need not address all of them, because Epic's argument that TCS fails to allege standing as a competitor is persuasive and a sufficient basis to dismiss counterclaims 1-5.[2] "Antitrust standing is limited in several ways . . . normally only customers or competitors have standing." *Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042, 1046 (7th Cir. 2000). Here, except for a one-off product for a client, DaVita, TCS has not entered the United States market as an EHR software developer. To establish standing, TCS must allege "that it intended to enter *and* was prepared to do so within a reasonable time." *Grip-Pak, Inc. v. Ill. Tool Works, Inc.*, 694 F.2d 466, 475 (7th Cir. 1982) (emphasis added), *disapproved of on other grounds*, *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 65 (1993); *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 545 F. Supp. 765, 775 (N.D. Ill. 1982) ("[A] potential competitor who has reached an advanced stage of preparedness to enter a particular market and who has taken substantial steps directed toward that end may have

---

[2] TCS's Wisconsin antitrust claims rise and fall with TCS's federal claims. "Wis. Stat. § 133.01 was intended as a reenactment of the first two sections of the federal Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1 and 2." *Eichenseer v. Madison-Dane Cty. Tavern League, Inc.*, 2008 WI 38, ¶ 74 n.23, 308 Wis. 2d 684, 748 N.W.2d 154. While Wisconsin's standing requirements are less strict in certain respects, namely, allowing indirect purchasers to assert state antitrust claims, that difference is not material to the claims at issue here. Even if they were, TCS's antitrust counterclaims also suffer from fatal deficiencies on the merits as set forth above.

suffered an injury to its business or property" within the antitrust context.); *see generally* 2 Julian O. von Kalinowski, *Antitrust Laws & Trade Regulation: Desk Edition* § 10.02[2][b] at 10-8 to 10-9 (2d ed. 2016) ("With respect to potential market participants, where the business is deemed far enough along in the planning stages and has the intent to, and is prepared to, commence operations, it has generally been found able to sustain injury to 'business' under the Clayton Act." (citing cases)).

In its pleading, TCS simply alleges that it "would, of course, be willing to work with a U.S. customer to design and build a similar solution" (Countercl. (dkt. #295) ¶ 98), not that it affirmatively intends to enter the market or has taken "substantial steps" to do so. Moreover, any such allegation would be contrary to the position TCS took in defending against Epic's claims. Indeed, in closing argument on damages during the trial on Epic's claims, TCS's counsel represented that the reference to a U.S.-entry strategy from a September 2012 document "never materialized. Neither the partnership with Epic nor any kind of large-scale entry into the U.S. market ever really got beyond this think piece stage." (Trial Tr. (dkt. #898) 139.) TCS further presented evidence and argued to the jury at trial that it was attempting to market healthcare management systems software *not* EHR software, therefore undermining any contention that it intended to compete with Epic or anyone else in the United States' market for EHR software. (Trial Tr. (dkt. #898) 143-44.)

Although defendants failure to allege a sufficient factual basis for antitrust standing -- and that TCS's representations in defending against Epic's claims would estop them from doing so -- is enough to grant plaintiff's motion to dismiss counterclaim

counts 1-5,[3] the antitrust allegations also do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, TCS does not even arguably allege facts supporting a claim Epic enjoys monopoly power, could plausibly attempt to achieve monopoly power or conspired with *anyone* to obtain monopoly power in the EHR market in violation of § 2 of the Sherman Act or its Wisconsin counterpart, Wis. Stat. § 133.03(2). *At most*, TCS alleges that Epic has market power, as one of the top three HER vendors accounting "for nearly 60%" of the U.S. "hospital market" and one of ten "account[ing] for 90%" of that market. (Countercl. (dkt. #295) ¶ 52.) Ignoring the upstream market power of the largest hospital groups for purposes of Epic's motion to dismiss, there is absolutely no facts suggesting that Epic's place in this ill-defined submarket for EHR software in the U.S. On the contrary, the overwhelming evidence at trial is that Epic grew organically and quite consciously from a small software design provider to a few hospitals into a vertically structured, closed software provider to an exclusive clientele comprised of hospital groups and other large, integrated health care providers.

---

[3] Of course, reliance on TCS's representations to the jury to bolster TCS's lack of standing is potentially something of a two-edge sword for Epic in light of the jury nevertheless finding that TCS benefitted from unauthorized access to the features and architecture surrounding Epic's EHR software in the sum of $140 million dollars. However, that award was supported by the leg up TCS obtained in savings from not going down dead ends in the further development of its own EHR software that competes with Epic's in other countries, as well as savings in market research and strategy should TCS ever seriously turn itself to the U.S. market for this software. (9/29/17 Op. & Order (dkt. #976) 8-14.) Moreover, as noted above, TCS *affirmatively* pleads in its counterclaims that its current products "are not suitable for deployment in the United States EHR Market." (Countercl. (dkt. #295) ¶ 86.) As Epic points out, this allegation, as well as others in TCS's counterclaims, not only effectively pleads itself out of a claim to antitrust *standing*, but also antitrust *injury*. (Pl.'s Br. (dkt. #327) 13-14.)

Similarly, because there is *no* allegation of any horizontal agreements between Epic and its competitors, nor competing, downstream health providers, its vertical customer agreements could only be held unlawful "if an assessment of market effects, known as a rule-of-reason analysis, reveals that [Epic] unreasonably restrain[s] trade." *United States v. Apple, Inc.*, 791 F.3d 290, 313-14 (2nd Cir. 2015). More specifically, TCS would need to prove: (1) Epic's alleged anti-competitive conduct "is likely to keep at least one significant competitor . . . from doing business"; and (2) "the probable (not certain) effect of the exclusion will be to raise prices above . . . the competitive level, or otherwise injure competition." *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). While alleging an injury to itself, TCS fails to make any specific allegation of injury to another, significant competitor, much less to competition generally. Nor could it do so plausibly given the size of other competitors and those of many of its downstream customers, to say nothing of software behemoths far larger than even TCS, who certainly have the resources to enter the EHR market were supra-competitive profits to be had (e.g., Microsoft, Google and Apple). Even TCS's dubious claim to be a *possible* competitor fails for the reasons already explained above. Moreover, Epic's decision to operate its software in a closed system would appear without more to meets any reasonable application of the rule-of-reason test, beginning with the obviously pro-competitive benefits of maintaining the confidentiality and security of healthcare records. In short, TCS's Section 1 and Wis. Stat. § 133.03(1) claims are no more plausible than its monopoly claims, at least on the face of its pleading.

## II. Tortious Interference Claims

In count six, defendants allege that TCS and Kaiser were parties to valid, binding and enforceable service contracts, including the statement of work, and that Epic interfered with those contracts by failing to provide access to information needed to perform the work. In count seven, TCS also alleges that Epic interfered with TCS's prospective economic relationship with Kaiser in the form of additional work. Both claims are asserted under California common law.

Epic seeks dismissal of both claims on the basis that its actions were justified or privileged. *See Sade Shoe Co. v. Oschin & Snyder*, 162 Cal. App. 3d 1174, 1180, 209 Cal. Rptr. 124, 127 (Ct. App. 1984) (dismissal based on justification defense appropriate if it appears on the face of the complaint); *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005) (affirming dismissal of claim when "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense"). Under California law, "One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor [¶] (a) does not employ improper means, and [¶] (b) acts to protect his interest from being prejudiced by the relation." *Id.* at 1181, 209 Cal. Rptr. at 127 (citing Restatement of Torts, § 769); *see also Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1205 (N.D. Cal. 2004) (same) (citing Restatement (Second) of Torts § 773).

Here, TCS alleges affirmatively in its counterclaims that Epic had its own contractual relationship with Kaiser. (Countercl. (dkt. #295) ¶¶ 101-11.) As such, Epic obviously had a financial interest in its business with Kaiser. Moreover, at summary

judgment, this court concluded that: (1) *TCS* breached its contract with Epic; *and* (2) *TCS* violated computer crime statutes. At trial, the jury further found that TCS breached other terms in its contract with EPIC prohibiting unauthorized use of its confidential information, misappropriated its trade secrets, was unjustly enriched, and engaged in fraudulent misrepresentation and unfair completion, among other violations of law. (Jury Liability Verdict (dkt. #855).) Based on these liability findings, TCS cannot allege in good faith that Epic's actions were divorced from its own justified and privileged interests in protecting its business relationship with Kaiser, as well as its trade secrets and other confidential information.

Even in its counterclaims, TCS affirmatively alleges that Epic had a standing policy of limiting access to its confidential information by consultants performing work off-shore, including in India, and that Epic communicated to Kaiser its concerns about granting TCS access to the UserWeb (a concern that we now know was well-founded). (*Id.* at ¶¶ 134-34, 148-49.) While alleging that Epic's interference was improper, TCS stops short of alleging -- and indeed cannot now allege in light of overwhelming evidence that Epic was not acting covertly to protect its intellectual property, but rather was upfront about its concerns with TCS's access to the UserWeb -- that Epic neither used *improper means* to remove TCS from the Kaiser project, nor had an *improper motive* in limiting any prospective, additional injury.

Epic argues persuasively in its brief in support of its motion to dismiss that the facts alleged here are similar to those at issue in *State Farm Mut. Auto Ins. Co. v. Wier*, No. A101791, 2004 WL 2988429 (Cal. Ct. App. Dec. 27, 2004). In that case, the court

similarly found interference with a contract justified or privileged. In that case, the plaintiff, an insurance company, asserted a claim of trade secret misappropriation against two of its former agents, and the agents counterclaimed for intentional inference with contract. *Id.* at *1. After the agents took the insurance company's customer list to a rival insurance company, the plaintiff sent its competitor a cease and desist letter; unsurprisingly this caused that competitor to terminate its contract with the two agents. *Id.* at *2, *15. The court rejected the intentional interference counterclaim, because "as a matter of law, a party is justified in interfering with a contract . . . [by] (1) informing the third party of a prior, valid, and inconsistent contractual commitment owed by the plaintiff to the interfering party and (2) threatening enforcement of that prior, valid contractual right." *Id.* at *16; *see also Planet Goalie, Inc. v. MonkeySports, Inc.*, No. CV 11-07263 RZ, 2013 WL 1729512, at *5 (C.D. Cal. Apr. 22, 2013) ("Even if [plaintiff] has stated a contractual interference tort, [defendants'] conduct was justified because it was seeking in good faith to protect its own business interests and relationship with [third party] by appropriate means despite the potential detriment to [plaintiff].").

So, too, here. Indeed, the evidence presented by the parties during the trial on Epic's claim, and the jury's finding of liability in Epic's favor, forecloses TCS's intentional interference with contract claim as a matter of law. Accordingly, the court will also dismiss counts 6 and 7.

## III. Misappropriation of Trade Secrets Claim

Finally, TCS alleges a claim for misappropriation of trade secrets based on Epic's purported attempt to view TCS's Med Mantra software, as well as TCS's allegation

14

"[u]pon information and belief," that Epic actually "gained competitive information about Med Mantra and other TCS systems." (Countercl. (dkt. #295) ¶ 179.) Epic seeks dismissal of this claim based on TCS's allegations that Epic employees, posing as patients, would simply have access to publicly-viewable material, more specifically, "the user interface and operating procedures of TCS's Med Mantra." (Pl.'s Opening Br. (dkt. #327) 22 (citing Countercl. (dkt. #295) ¶ 241).) Said otherwise, trade secret misappropriation cannot occur by use of publicly-accessible information. *Mobile Med. Int'l Corp. v. United* States, 95 Fed. Cl. 706, 734 (2010) ("Obtaining alleged trade secrets from . . . public displays are acceptable means of acquiring the information."); Uniform Trade Secrets Act § 1 cmt. ("Proper means include . . . Observation of the item in public use or on public display."); Wis. Stat. § 134.90 cmt. (same).

TCS's alternative argument that any public displays would constitute HIPAA violations is equally meritless for at least two reasons. First, it is not clear whether India has the same privacy protections as those available in the United States. Second, TCS is alleging that Epic was seeking Indian employees or other affiliated individuals to visit the Apollo hospital to view their own health records, and therefore any privacy considerations are irrelevant. Regardless, TCS's own allegations and the Epic emails cited in those allegations both undermine any trade secret claim based on public viewing of Med Mantra's user interface. Finding that TCS's allegations of trade secret misappropriation similarly fail as a matter of law, therefore, the court will grant Epic's motion to dismiss this final claim as well.

ORDER

IT IS ORDERED that plaintiff Epic Systems Corporation's motion to dismiss counterclaims (dkt. #326) is GRANTED. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 29th day of September, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge